1    **GIBSON, DUNN & CRUTCHER LLP**
     SCOTT A. EDELMAN, SBN 116927
2    sedelman@gibsondunn.com
     CATHERINE A. CONWAY, SBN 98366
3    cconway@gibsondunn.com
     JESSE A. CRIPPS, SBN 222285
4    jcripps@gibsondunn.com
     333 South Grand Avenue
5    Los Angeles, CA 90071-3197
     Telephone: 213.229.7000
6    Facsimile: 213.229.7520

7    **GIBSON, DUNN & CRUTCHER LLP**
     MICHAEL LI-MING WONG, SBN 194130
8    mwong@gibsondunn.com
     RACHEL S. BRASS, SBN 219301
9    rbrass@gibsondunn.com
     555 Mission Street, Suite 3000
10   San Francisco, CA 94105-0921
     Telephone: 415.393.8200
11   Facsimile: 415.393.8306

**SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, PC**
JAMES H. HANSON (admitted *pro hac vice*)
jhanson@scopelitis.com
10 West Market Street, Suite 1500
Indianapolis, IN 46204
Telephone: 317.492.9205
Facsimile: 317.687.2414

Attorney for Defendant
WAL-MART STORES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES RIDGEWAY, JAIME FAMOSO, JOSHUA HAROLD, RICHARD BYERS, DAN THATCHER, NINO PAGTAMA, WILLIE FRANKLIN, TIM OPITZ, FARRIS DAY, KARL MERHOFF, and MICHAEL KROHN, <br><br>             Plaintiffs, <br><br>     v. <br><br> WAL-MART STORES, INC., a Delaware corporation d/b/a WAL-MART TRANSPORTATION LLC, and Does One through and including Doe Fifty, <br><br>             Defendants. <br><br> [Previously captioned as *Bryan et al. v. Wal-Mart Stores, Inc.*] | CASE NO. 3:08-cv-05221-SI <br><br> **DEFENDANT WAL-MART STORES, INC.'S MOTION TO DECERTIFY CLASS** <br><br> [Fed. R. Civ. P. 23] <br><br> Date:     August 12, 2016 <br> Time:     9 a.m. <br> Place:    Courtroom 1, 17th Floor <br> Before:   Hon. Susan Illston |

### NOTICE OF MOTION AND MOTION

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on August 12, 2016 at 9 a.m. in the United States District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, California, Courtroom 1 before the Honorable Susan Illston, Defendant Wal-Mart Stores, Inc. will and hereby does move pursuant to Federal Rule of Civil Procedure 23 for an order decertifying the class certified on September 10, 2014.

Decertification is appropriate because discovery has proven that the work of over-the-road ("OTR") driving with Wal-Mart is so varied that that no driver, including the named plaintiffs, can be said to be representative of other Wal-Mart drivers.  This fatal dissimilarity means that commonality and predominance are lacking and there is no manageable way to try the minimum wage and derivative penalty and UCL claims asserted here on a classwide basis.  That variation will require hundreds of mini-trials so as to preserve Wal-Mart's right to present evidence in support of its individualized defenses, and there is no meaningful way to conduct such proceedings consistent with Wal-Mart's due process rights.  This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Jesse A. Cripps filed concurrently with this Motion, the Rule 1006 Compendium filed concurrently with this Motion, the papers on file in this case, any oral argument that may be heard by the Court, and any other matters that the Court deems appropriate.

Dated: July 8, 2016

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/          *Scott A. Edelman*
                Scott A. Edelman

Attorney for Defendant
WAL-MART STORES, INC.

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF CONTENTS

2
Page

3
NOTICE OF MOTION AND MOTION ................................................................................. i

4
I.      INTRODUCTION .................................................................................................... 1

5
II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND...................................... 2

6
        A.      The Class Certification Order ...................................................................... 2

7
        B.      Classwide Discovery Confirms The Gap Between Plaintiffs' Theory and
8               Reality ....................................................................................................... 3

9
        C.      Dr. Phillips's Report and Other Supporting Reports .................................... 9

10
        D.      The Summary Judgment Orders................................................................ 10

11
III.    LEGAL STANDARD ............................................................................................. 11

        IV.     ARGUMENT ....................................................................................................... 11
12

13
        A.      Class Members' Varying Experiences Show The Class Lacks Commonality .......... 13

14
        B.      Plaintiffs Have Not Delivered On Their Promise Of A Classwide Method Of
                Trying This Case To Judgment ................................................................... 15

15
                1.      Plaintiffs Failed To Produce A Reliable Class-Based Damages Model ......... 15

16
                2.      Adjudicating Plaintiffs' Claims Without A Classwide Damages Model
17                      Cannot Be Done Under Rule 23(b)(3) ............................................... 18

18
                3.      A Class Action Is Not Superior Given Plaintiffs' Damages Claims............... 25

19
V.      CONCLUSION .................................................................................................... 25

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**Cases**

3

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................................25

4

5

*Barnes v. Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998) ............................................................................11

6

7

*Blake v. Arnett*,
    663 F.2d 906 (9th Cir. 1981) ...........................................................................11

8

*Burnell v. Swift Transp. Co. of Arizona LLC*,
    2016 WL 2621616 (C.D. Cal. May 4, 2016) ....................................... passim

9

10

*Campbell v. Vitran Express Inc.*,
    2016 WL 873009 (C.D. Cal. Mar. 2, 2016) ....................................................13

11

12

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ............................................................................23

13

14

*Chao v. Pac. Stucco, Inc.*,
    2006 WL 2432862 (D. Nev. Aug. 21, 2006) ...................................................18

15

*Cole v. CRST, Inc.*,
    2012 WL 4479237 (C.D. Cal. Sept. 27, 2012) ................................................19

16

17

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .........................................................15, 16, 18, 22

18

19

*Curtis v. Extra Space Storage, Inc.*,
    2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) .................................................16

20

*Duran v. U.S. Bank Nat'l Ass'n*,
    59 Cal. 4th 1 (2014) ...................................................................................12, 19

21

22

*E. Tx. Motor Freight Sys. Inc. v. Rodriguez*,
    431 U.S. 395 (1977) .........................................................................................17

23

24

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...........................................................................10

25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) .........................................................................................19

26

27

*Espenscheid v. DirectSat USA LLC*,
    705 F.3d 770 (7th Cir. 2013) ...........................................................................14

28

Gibson, Dunn &
Crutcher LLP

*Hervey v. City of Little Rock*,
787 F.2d 1223 (8th Cir. 1986)..................................................................................2, 11

*In re Hotel Tel. Charges*,
500 F.2d 86 (9th Cir. 1974).................................................................................23

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001).................................................................................19

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) ...................................................22

*Leyva v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013).................................................................................16

*Lindsey v. Normet*,
405 U.S. 56 (1972) ...................................................................................................19

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012).................................................................................14

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008).................................................................................23

*Peake v. Chevron Shipping Co.*,
2004 WL 1781008 (N.D. Cal. Aug. 10, 2004) ...................................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .............................................................................16

*Reinhardt v. Gemini Motor Transp.*,
869 F. Supp. 2d 1158 (E.D. Cal. 2012)..............................................................19

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009).................................................................................11

*Sullivan v. Oracle Corp.*,
51 Cal. 4th 1191 (2011) ........................................................................................20

*In re Taco Bell Wage & Hour Actions*,
2016 WL 2755938 (E.D. Cal. Apr. 8, 2016).......................................................22

*Tidewater Marine W., Inc. v. Bradshaw*,
14 Cal. 4th 557 (1996) ..................................................................................20, 21

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ................................................................................. passim

*Unger v. Amedisys, Inc.*,
401 F.3d 316 (5th Cir. 2005).................................................................................10

Gibson, Dunn &
Crutcher LLP

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009)..................................................................................15

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009)....................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................................................... passim

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (9th Cir. 2013)...............................................................................14, 20

*Weinberg v. Whatcomb Cty.*,
  241 F.3d 746 (9th Cir. 2001)....................................................................................16

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
  2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) ..........................................................15

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009)...............................................................................12, 14

*Windham v. Am. Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977).......................................................................................19

**Statutes**

28 U.S.C. § 2072(b) ...........................................................................................................16

**Rules**

Fed. R. Civ. P. 23 .....................................................................................2, 11, 16, 25

**Regulations**

49 C.F.R. § 395.1 ...................................................................................................8, 23, 24

49 C.F.R. § 395.8 ......................................................................................................22, 23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In 2014, the Court certified the minimum wage and derivative penalty claims of a class of Wal-Mart drivers on the premise that their claims presented common questions of law that were not outweighed by individualized questions of liability (injury) or damages.  In so doing, the Court accepted Plaintiffs' representations that the Court could manageably try the individualized questions on a classwide basis.  *See* Class Cert. Order [ECF 158] at 14.  The Court acknowledged, however, that further discovery might reveal an unmanageable level of variation within and among class members' experiences and invited Wal-Mart to file a decertification motion should that become the case.  *See id.* at 14 ("[I]f it later becomes clear that there are major variations in the time class-members spent completing tasks like paperwork or fueling, defendant may move to decertify the class.").

Discovery has shown that the Court's concern was prescient.  In addition to the fact that three of the remaining 11 named plaintiffs have either refused to appear for deposition or in fact have opted out of the class, individual driver experiences, according to the drivers' sworn testimony, put the lie to Plaintiffs' theory of classwide liability.  Since the certification order, 55 drivers, including seven named plaintiffs, have testified about their actual work through surveys administered by Plaintiffs and depositions taken by Wal-Mart, and the only consistent feature of that testimony is the degree of day-to-day variation it describes:  Named plaintiff Karl Merhoff admitted that "every dispatch" and "every day" "was different." Ex. 44, Merhoff Dep. 69:12-25.[1]  Named plaintiff Farris Day echoed that, testifying that "routes were different" "week to week" and "day to day."  Ex. 21, Day Dep. 23:4-6.  Mark Alumbaugh similarly said there was "no such thing as a usual trip or a usual workday, particularly for someone running wild"—doing different and unpredictable runs each day.  Ex. 3, Alumbaugh Dep. 50:12-15.  Michael Andrews testified that the idea of a "trip" didn't capture his work because a given week could have seven or 22 trips.  Ex. 4, Andrews Dep. 52:16-25.

As this Court predicted then, discovery has revealed "major variations," and not only "in the time completing tasks like paperwork or fueling."  Class Cert. Order [ECF 158] at 14; *see also* Rule

---

[1]  All exhibits are attached to the concurrently filed Declaration of Jesse A. Cripps.  The Rule 1006 Exhibits are attached to the concurrently filed Compendium of Rule 1006 Exhibits.

Gibson, Dunn & Crutcher LLP

1006 Ex. A; 6/10/16 Tr. 4:9-15 (Plaintiffs admit that their evidence "doesn't adequately establish the duration" of activities performed at distribution centers). Compounding these problems are the named plaintiffs' acknowledgments that their trips were not representative of those taken by other drivers. *See*, *e.g.*, Ex. 48 , Opitz Dep. 339:2-21 (named plaintiff noting that drivers who did "set run[s]" or "lived closed to the DC" could "get home" but his case "was different" because he "lived a hundred miles away"); Ex. 16, Byers Dep. 184:11-14 (testifying he had "no way of" knowing whether or not [his] experiences were similar to other drivers" and that he "never compared" his to theirs). That dissimilarity within the class and between the named plaintiffs and the class is fatal to class-based resolution of this litigation. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016); *see also Burnell v. Swift Transp. Co. of Arizona LLC*, 2016 WL 2621616 (C.D. Cal. May 4, 2016) (declining to certify truck driver class asserting minimum wage claims based on excessive variation across driver experiences). Plaintiffs must establish classwide *liability* through admissible common proof without preventing Wal-Mart from "litigat[ing] its … defenses to individual claims." *Hervey v. City of Little Rock*, 787 F.2d 1223, 1230 (8th Cir. 1986) (decertifying class where "class proof was completely inadequate"); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). Mere theories are not enough. Because they cannot meet their burden, the Court should decertify the class.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Class Certification Order

In September 2014, the Court certified a class to litigate the following common questions: "whether Wal-Mart's piece-rate pay plan violates California's minimum wage laws by failing to pay drivers minimum wage for all hours worked; whether Wal-Mart's drivers are entitled to payment of at least minimum wage for all hours worked; and whether Wal-Mart requires drivers to perform services during Department of Transportation (DOT)-mandated layovers, for which drivers are paid less than California's minimum wage." Class Cert. Order [ECF 158] at 7-8. The Court concluded that any individualized inquires would not "negate [P]laintiffs' assertion that there is a general default policy, defined in the driver reference and pay manuals, against paying drivers for certain tasks." *Id.* at 9. The Court also concluded that Rule 23(b)(3)'s predominance requirement was satisfied because "there was a pay policy in place that applied to all California drivers" and the lawfulness of that poli-

cy "predominat[ed] over individual questions of whether certain drivers received additional discretionary pay after requesting such payments for certain tasks, or whether some drivers completed tasks like paperwork during wait-time or attended to personal phone calls during layovers." *Id*. at 14.  The Court dismissed Wal-Mart's manageability arguments, concluding that the various problems of proof Wal-Mart identified "pertain to the calculation of each individual's damages," and Plaintiffs had provided a "method of calculating damages." *Id*. at 19-20.  Accordingly, the Court certified the class as to the minimum wage claims and penalty claims.  In doing so, however, the Court invited Wal-Mart to move to decertify the class "if it later becomes clear that there are major variations in the time class-members spent completing tasks like paperwork or fueling." *Id*.  That turned out to be correct: even Plaintiffs' own evidence (their faulty "survey") reveals "major variations in the time [drivers] spent on the tasks that Plaintiffs say were not compensated." Ex. 81, Walker Report ¶ 85.

> **B.**    **Classwide Discovery Confirms The Gap Between Plaintiffs' Theory and Reality**

Plaintiffs maintained that they would "prove [c]lass-wide damages through common proof, employing Wal-Mart's own standardized records and databases …; the [d]eposition testimony of Wal-Mart's F.R.C.P. § 30(b)(6) witnesses; representative testimony by Class Members and Plaintiffs; and Plaintiffs' expert witnesses." Class Cert. Mtn. [ECF 113-1] at 28-29.  They contended that the tasks were "highly repetitive, performed by [d]rivers on a daily basis and subject to uniform regulation, policies and procedures." *Id*.  Thus, they expected only "minor variation" in the amount of time [d]rivers take to complete the tasks" and believed that "quantifying the time spent by [d]rivers performing the tasks presents an ideal opportunity to employ representative testimony." *Id*.

In January 2016, the Court approved discovery of absent class members:  (1) Plaintiffs' survey of forty randomly selected class members;[2] (2) depositions by Wal-Mart of those forty plus an additional ten class members (the "driver deposition testimony"); (3) depositions of nine Wal-Mart managers, and (4) depositions by Wal-Mart of each named plaintiff (the "Plaintiff testimony").[3]  That

---

[2]   This survey followed a 2014 survey, redacted versions of which were produced to Wal-Mart and filed with this Court.  *See* ECF 131-9, 139-10.

[3]   Plaintiff Nino Pagtama opted out of the case not long after the class was certified.  *See* Ex. 77 (opt-out form).  Plaintiff Michael Krohn refused to have his deposition taken.  And Plaintiff Farris Day twice did not appear for his deposition for personal reasons.

discovery revealed that Plaintiffs' promise of classwide evidence was an empty one for several reasons relevant to both liability and damages:

*First*, the driver deposition testimony made clear that, to the extent a driver performed the tasks at issue—weighing, DOT inspections, California Highway Patrol (CHP) inspections, paperwork, fueling, washing, waiting, and rest breaks—they did so for unequal and widely variable durations. Rule 1006 Ex. A; *see also* Walker Report ¶¶ 46-48, 53 (describing the variance in the number of trips, layovers, and miles per trip across the different distribution centers). A look at some of the tasks about which Plaintiffs complain demonstrates the gap between their representation of "minor variation" across "highly repetitive" tasks performed "on a daily basis" and actual driver practices:

- *Paperwork:* At certification, Plaintiffs claimed that drivers "must complete mandatory paperwork throughout the work day." Class Cert. Mtn. [ECF 113-1] at 8. While they have since modified this claim to encompass only time spent reviewing paperwork with designated Wal-Mart "driver coordinators," each driver's sworn testimony demonstrates that the length of a meeting varies depending on the time of day, counter lines, trip complexity, coordinator efficiency and chattiness, route length, or whether the bills were ready on time. Walker Report ¶ 51 (low-mileage drivers reported spending more than twice as long meeting with coordinators than high-mileage drivers); Ex. 52, Ridgeway Dep. 222:2-24 (named plaintiff could not provide an estimate of time spent with driver coordinator); Byers Dep. 96:21-97:17 (named plaintiff said "it's hard to pinpoint"); Ex. 63, Benavidez Dep. 72:13-24; Ex. 15, Byer Dep. 66:19-25; Alumbaugh Dep. 54:16-55:19. In addition, the frequency of this paperwork exercise varies dramatically and drivers found it hard to estimate. *See, e.g.*, Ex. 28, Goodman Dep. 78:8-19 (talked to coordinator five to seven times a week but admitted it was "hard to give an estimate"); Ex. 50, Putnam Dep. 60:17-61:1 ("I'm guesstimating" and "don't really recall").

- *Weighing*: Contrary to Plaintiffs' assertion that "[d]rivers must take the[ir] vehicles to a weigh scale" (Class Cert. Mtn. [ECF 113-1] at 8), drivers did not in fact routinely weigh their load at a scale outside a Wal-Mart distribution center or make adjustments to a load. A given driver might go weeks without weighing, or might weigh several times in one week, depending on the route driven and the load hauled. *E.g.*, Alumbaugh Dep. 64:2-6; Benavidez Dep. 62:8-25 (frequency depended "on [whether] you're at a vendor"); Ex. 67, Johnston Dep. 28:15-25 (could not estimate how often he had to stop to weigh his vehicle). Weighing time also varied depending on the type of scale used, counter or scale lines, and the time of day. A minor change—such as adjusting a truck axle to meet weight requirements—took less time than an intensive change—such as returning to a vendor to unload freight. *Compare, e.g.*, Ex. 66, Harris Dep. 99:25-100:7 (5 minutes to "move the axles back") *with* Ex. 37, D. Lopez Dep. 96:15-99:25 (vendor might have to "unload the whole trailer"); *see also* Walker Report Appx. 7E (showing variety in frequency/duration for weighing); Putnam Dep. 52:11-56:2 (providing only a "guesstimation" and adding "It would vary. I have no idea.")

- *DOT, CHP, and pre- and post-trip inspections:* Inspection lengths could vary based on inspector completeness, or external factors like a long line. *E.g.*, Harris Dep. 81:6-82:6 (describing three levels of DOT inspections and how they differed in length). And, while drivers

generally testified to performing at least one pre-trip and post-trip inspection per day, each did so with varying care and speed. *Compare, e.g.*, Ex. 77, Steele Survey (5 minutes for a post-trip) *and* Ex. 68, Lauryе Survey (5 minutes for a pre-trip) *with* Ex. 76, Trevino Survey (30 minutes for a post-trip) *and* Ex. 62, Batham Survey (up to 30 minutes for a pre-trip); Putnam Dep. 40:24-41:2 ("Everything's different every time"). Contrary to Plaintiffs' repetition thesis (Class Cert. Mtn. [ECF 113-1] at 28-29), drivers described DOT inspections as "random," the most extreme term of variability; a driver might go the entire year without inspection; another driver might be inspected three or four times within a few months. *See, e.g.*, Ex. 25, Fox Dep. 36:13-20; Ex. 53, Rivero Dep. 76:8-13 ("you have no way of knowing when they're going to pull you in"). CHP inspections similarly happened randomly and unpredictably depending on the route and the patrol officers on duty. *E.g.*, Ex. 41, McFall Dep. 48:17-24; Ex. 49, Powers Dep. 26:4-25. Moreover, differences in trip length (*see* Walker Report ¶¶ 39, 40, Figs. 1 & 2) created schisms within the class: "[h]igh-mileage drivers reported that CHP/DOT roadside/weigh inspections occurred nearly 5 times as frequently as low-mileage drivers reported." *Id.* ¶ 52. And some had no inspections during the class period for which they were not paid. Opitz Dep. 349:11-16 (named plaintiff did not recall any DOT inspection he was not paid for); Alumbaugh Dep. 48:19-25 (left his survey "blank" in response to DOT inspections); Johnston Dep. 28:15-25 ("I can't calculate because it's random").

- ***Fueling***: As this Court anticipated when it invited this decertification motion (Class Cert. Order [ECF 158] at 14), fueling time estimates ranged from 5 to 60 minutes depended on the time of day, fueling lines, and the amount of gas in the tank (*See, e.g.*, Benavidez Dep. 69:2-18; Ex. 27, Garcia Dep. 102:18-24; Steele Survey (5 minutes for fueling); Ex. 73, Rivero Survey (60 minutes for fueling); Alumbaugh Dep. 49:2-9 ("I put zero [on my survey] because it varies"). Drivers testified that the frequency of fueling also varied day to day and week to week depending on route and schedule. *See, e.g.*, Fox Dep. 42:14-23 ("wouldn't refuel after every [trip] necessarily and "each one would be different"); Byer Dep. 25:11-15 (routes changed "every six months" with "realignment"); *see also* Walker Report ¶ 167 & Figs. 30, 31 (Gasboy data show a wide variation in the frequency at which trucks were refueled and number of gallons per refueling).

- ***Washing***: As with other tasks, the time spent washing was not consistent among drivers but was tied to the relative dirtiness of the truck, lines at the wash bay, and wash bay efficiency. *See, e.g.*, Benavidez Dep. 58:19-59:4 (dirtiness); Fox Dep. 37:24-38:12 (road conditions and weather); Ex. 47, Nevarez Dep. 97:5-16 (long lines plus type of truck wash); Ex. 43, McLaughlin Dep. 32:4-20 ("It just varied"; "Depended on if the truck got dirty"); *see also* Walker Report Appx. 7C (showing range of washings per week). The frequency of washing also varied dramatically, depending on a driver's personal practices, based in part on that driver's route, the weather, and the time of year. *See, e.g.*, Ex. 55, Ryan Dep. 71:11-23 (lines, weather); Rivero Dep. 83:5-12 (would wash "every time [he'd] hit a DC" but frequency would "depend" on his route); Ex. 45, Montoya Dep. 90:25-91:16 (frequency depended on route and how often he returned to his DC); Johnston Dep. 66:7-10 ("Q. So do you have an estimate then as to how many times you usually have your truck washed in every ten usual trips? A. No.").

- ***Waiting:*** There is no uniform or classwide waiting experience either. The total time, like everything else, varied widely depending on the speed of a vendor's employees, store's employees, or Wal-Mart dispatchers, the type of load being delivered, the average length of a driver's trip, and whether the driver elected to seek another load, or perform a task like moving trailers, rather than continuing to wait. *See, e.g.*, Walker Report ¶ 51 (low-mileage drivers report-

ed waiting for loading and unloading nearly twice as often as high-mileage drivers); Ex. 5, Auker Dep. 103:6-19 (wait times ranged from 30-60 minutes "depend[ing] on who is unloading, and how fast they want to work"); Benavidez Dep. 97:4-15 (wait times varied between 20 minutes and 2 hours "depending on the people at the back of the store" and "where you're at"); Byers Dep. 88:1-90:4, 93:13-23 (named plaintiff admitted he was paid for wait time and could not estimate how often he was not paid for it); Ridgeway Dep. 238:11-13 (named plaintiff, same); Opitz Dep. 201:21-24, 202:1-8 (named plaintiff did not remember whether he was "ever paid for wait time for less than 45 minutes"). The number of instances a driver waited less than 45 minutes fluctuated based on the route, the destination, and the driver's schedule. *See, e.g.*, Ex. 31, Hartley Dep. 63:13-21 (frequency of waiting depended on "so many scenarios" which could be "endless"); Johnston Dep. 36:20-22 (waiting "varies from week to week and trip to trip").

- *Rest Breaks:* The time spent on rest breaks would vary from just a minute or two to over 20 minutes depending on the driver's personal needs that day. *See, e.g.*, Auker Dep. 106:14-24 (length would "depend[] on how I feel"); Ex. 42, McKee Dep. 52:13-22 (length changed based on where he was and it was "up to [him]" how long they would be). And the frequency of rest breaks was similarly individualized and keyed to a driver's "feeling," "the road," or the "time of day." *See, e.g.*, Ex. 56, Steele Dep. 103:6-23; Benavidez Dep. 97:16-99:23; Garcia Dep. 132:10-14 (number "would depend on where you're going to"); Opitz Dep. 78:10-18 (named plaintiff never took rest breaks); Day Dep. 97:3-5 (named plaintiff, same). It might also depend on the length of the driver's route—"high mileage drivers reported pulling over for unpaid rest breaks over four and a half times as often as low-mileage drivers." Walker Report ¶ 51. Further, rest breaks might be taken at the same time as hourly wages were being paid. *See, e.g.*, Ex. 7, Barker Dep. 32:4-20; Ex. 35, LaCas Dep. 37:2-13. Other examples of variation are included at Rule 1006 Ex. A.

In sum, there are major variations in the time spent on the tasks identified by Plaintiffs and no uniform or similar experience during the class period for a single driver, much less the entire class.

*Second*, discovery confirmed that individual driver practices and preferences drove questions of duration and frequency, and Plaintiffs offer no method of adducing the actual practices of each driver. That contradicts Plaintiffs' contentions that drivers performed tasks at regular frequencies and times and that there was only "minor variation" across class members. Class Cert. Mtn. [ECF 113-1] at 30. Just as no two routes were the same for most drivers, no two drivers had the same experience performing any of the tasks at issue:

- Some drivers spent more time weighing every load out of an abundance of caution (*see, e.g.*, Montoya Dep. 93:1-21 (would check air gauge and weight "for every load")); others weighed about half (Goodman Dep. 59:7-14), and others rarely did so (Ex. 70, McLaughlin Survey, stating he never weighed his truck at an outside scale).

- Some drivers chose to begin their workday late at night to avoid traffic and spent zero minutes with a coordinator (*see, e.g.*, Powers Dep. 101:10-102:2); others spent more time chatting with them (McKee Dep. 34:11-35:8).

Gibson, Dunn &
Crutcher LLP

- Some drivers spent a long time fueling because they filled up only when necessary; others did a quick top off after every stop, and others would fuel only when the line was short. *See, e.g.*, Ryan Dep. 66:17:67:13 (chose to fuel at the middle and end of the week); Ex. 46, Nettles Dep. 40:25-41:7 (fuel tank level at refueling varied); Ex. 54, Robinson Dep. 43:16-21 (typically would fuel "every time [he] got the DC").

- Some drivers took pride in their trucks and spent a long time washing them; others did the bare minimum. *Compare* Ex. 59, Trevino Dep. 41:16-19 (did not wash truck) *and* Auker Dep. 67:5-14 ("I mean I'm not a truck-washer. Some people are real fanatical about it. I'm not.") *with* Ex. 65, Craft Dep. 71:2-8 ("liked to have a clean truck") *and* Harris Dep. 86:9-24 ("liked driving a shiny truck" and regularly polished the chrome on the truck).

- Some drivers would choose to log their waiting time off duty; others would do other paid tasks while waiting, like moving trailers (*See, e.g.*, Garcia Dep. 125:16-126:8 (would sometimes log off duty while waiting).

The differences between and among individual driver decisions are particularly stark with respect to time management practices. For example, one driver took meal breaks while waiting less than 45 minutes at a vendor and another took them at his home domicile (which meant payment on an hourly basis for that time ("hourly pay")). *See, e.g.*, Ex. 23, Evans Dep. 59:17-60:13 (took shower or meal break while waiting at a home domicile); Garcia Dep. 125:9-15 (took meal break while waiting at vendor). Other drivers performed tasks including weighing, pre-trip inspections, fueling, or washing, while waiting at a vendor, store, or domicile for more than 45 minutes. *See, e.g.*, McKee Dep. 66:20-67:3 (washing while waiting); Johnston Dep. 44:22-45:3 (multitasking during waiting); Ex. 36, Laurye Dep. 93:7-15 (same); Byer Dep. 77:1-4 (multitasking at home domicile); Auker Dep. 46:24-47:5 (same). Some drivers fueled their trucks as part of their pre-trip inspection. *See, e.g.*, Garcia Dep. 95:5-18, 96:12-20. Others cleaned the truck, took a rest break, or met with a driver coordinator during the truck's fueling. *See, e.g.*, Harris Dep. 103:11-104:3; Hartley Dep. 59:4-18; McFall Dep. 75:12-76:12; Garcia Dep. 92:18-24. These practices cannot be reconciled with Plaintiffs' claim at certification that "in every instance, the unpaid wages [associated with wait time] can be calculated by reference to Wal-Mart's pay records and the regular rate / minimum wage rate of pay multiplied by the amount of uncompensated wait time." Class Cert. Mtn. [ECF 113-1] at 30.

***Third***, driver testimony underscores the disparity between Plaintiffs' claims at class certification and the actual evidence with respect to DOT-mandated 10-hour breaks. Plaintiffs previously claimed that because Wal-Mart paid drivers a stipend for layovers, it had initiated a "*quid pro quo* which compensates the driver for doing something [i.e., staying in the tractor cab] that he or she is

1    not otherwise obligated to do" and argued that any layovers taken elsewhere required management

2    pre-approval.  Class Cert. Reply [ECF 145] at 8.  But the individual drivers' testimony does not sup-

3    port this theory, and instead demonstrates that driver choice dictates how off duty time is spent.  Any

4    alleged belief by the named plaintiffs that they were required to remain with their trucks during a 10-

5    hour DOT break is irreconcilable with the very DOT regulations governing layover time.  *See* 49

6    C.F.R. § 395.1(g) (requiring, prior to driving, at least ten hours of off-duty time, regardless of wheth-

7    er that time is spent outside of the tractor, in the sleeper berth, or some combination of the two).  Ac-

8    cordingly, drivers regularly took DOT breaks at hotels, motels, or friends' houses.  *See*, *e.g.*,

9    Alumbaugh Dep. 19:24-20:8; Ex. 57, Temple Dep. 26:7-11, 114:13-24.  Some asked permission prior

10   to doing so (*see*, *e.g.*, D. Lopez Dep. 124:14-125:1); others did not (*see*, *e.g.*, Ryan Dep. 19:10-20:4).

11   Some agreed there were no restrictions at all on where they could go during their 10-hour DOT break

12   (*see*, *e.g.*, Auker Dep. 60:19-61:5); while others felt that they were required to remain in their sleeper

13   berths for at least 8 hours (*see*, *e.g.*, Ex. 2, Allen Dep. 35:8-24; Benavidez Dep. 85:4-8).  And many

14   testified that it was entirely their choice whether to remain in the truck.  *See*, *e.g.*, Garcia Dep.

15   111:11-112:6; Putnam Dep. 67:17-20; *see also* 49 C.F.R. § 395.1(g) (providing drivers with choices

16   about where and how to spend off-duty time).  This testimony was far from anecdotal:  "no class

17   members have said that they had wanted to spend time away from their trucks but that Wal-Mart re-

18   fused to allow them to do so."  Walker Report ¶ 139.  One thing is clear:  throughout discovery, no-

19   body has identified any mechanism to determine which class member falls into these different camps

20   on any given day, much less throughout the entire class period.

21        ***Fourth,*** drivers confirmed that their routes often took them out of California for long stretches

22   of time for some or all of the class period.  *See*, *e.g.*, Ex. 51, Rand Dep. 81:3-8 (50 to 60% of time out

23   of state); McKee Dep. 9:13-22, 14:19-23 (50% of time in Nevada); Harris Dep. 22:9-20 (more than

24   100 trips per year out of state); Ex. 12, Brittan Dep. 22:2-13 (3-5 trips to Nevada per month); Byer

25   Dep. 25:23-26:2 (90% of trips to Oregon).  The amount of time drivers spent outside of California

26   varied over the class period, however, with some drivers testifying to spending far more time out of

27   state at the beginning than at the end.  *See*, *e.g.*, Rand Dep.  80:19-81:8 ("50 to 60" percent of time

28   outside California between 2004 and 2008); Rivero Dep. 30:17-31:11 (started out in 2004 with "three

quarters" of his week out of state but stared "slowing down" after 2006); Ex. 8, Batham Dep. 28:14-23 (spent approximately 50% of week outside California in 2004 and approximately 30% outside in 2013); Powers Dep. 14:1-16 (spent about 50% of week outside California in 2004 and "less" now). If drivers were not performing compensable work "primarily" in California, Wal-Mart is not liable for any payment and they consequently have no claim for damages.

Taken together, the promise of evidence showing highly repetitive uniform work is for naught. Actual driver experience shows day-to-day and week-to-week variety that precludes class-based litigation of the claims asserted in this case.

### C.    Dr. Phillips's Report and Other Supporting Reports

Plaintiffs have retained Dr. G. Michael Phillips, a statistician and economist and members of his firm, Phillips, Fractor & Co., in an attempt to harmonize the significant differences between their representations at class certification and the highly individualized experiences that drivers actually described in their sworn testimony. Dr. Phillips and his team, however, do not confront the differences among drivers; they simply pretend such differences do not exist.

Dr. Phillips et al. were asked to "estimate how much time private fleet drivers for Walmart spent performing various activities and then, under various assumptions, to estimate the dollar equivalent values for such time and corresponding simple interest charges." Ex. 79, Phillips Report at 2. The activities included "layovers, pre- and post-trip inspections, rest breaks, time spent fueling, wait time, and other activities such as breaks, weighing, washing, CHP/DOT inspections, and driver coordinator meetings." *Id*. at 3-4. Dr. Phillips used "corporate records" and the "average and median response" given by deponents on their surveys and in their testimony to generate a range of estimated times and frequencies for each of the activities listed. *Id*. at 4. Dr. Phillips provided some calculations for layovers, pre-trip inspections, post-trip inspections, rest breaks, and fueling, but provided only a generalized estimate for the remaining categories. *Id*. at 7-19. Included within his report were two shorter reports by Edward Garcia (estimating penalties) and Sean Chasworth (describing Plain-

tiffs' sampling methodology).  All in all, Dr. Phillips estimated classwide damages, including penal-ties, to be between $198 and $248 million, or between $118,000 and $195,000 per class member.[4]

Wal-Mart's rebuttal expert, Dr. Jonathan Walker, identified numerous flaws in Plaintiffs' sur-vey methodology and subsequent report:[5]  In brief, "Dr. Phillips does not provide any reliable evi-dence that any particular class member was underpaid by any amount at all on any particular paycheck, including his or her final paycheck" (*id*. ¶ 29), and had no "statistical basis to rule out that class damages are 1/2, 1/10 or even 1/100 of what he estimates.  On an individual basis, his analysis does not establish that any particular class members suffered any damages at all." *Id*. ¶ 25.

### D.    The Summary Judgment Orders

The Court has granted partial summary judgment to Plaintiffs as to their minimum wage claims on the theory that "certain required tasks are specifically designated as unpaid activities," and that "activities that are not separately compensated (and are explicitly listed and recognized as unpaid activities) may not properly be built in or subsumed into the activity pay component of Wal-Mart's pay policies."  2015 MSJ Order [ECF 211] at 11.  The Court also concluded that Wal-Mart "specified and controlled" the "physical location of the layover."  *Id*. at 14.  The Court granted partial summary judgment on Plaintiffs' UCL claims on a law-of-the-case theory.  2016 MSJ Order [ECF 286] at 4.[6]

These orders do not establish that Plaintiffs can prove liability or damages on a classwide ba-sis, however, because they do not address the question whether drivers received other forms of pay

---

[4]  Plaintiffs also offer Mr. V. Paul Herbert, who was asked to provide an opinion concerning "the average amount of time necessary for Wal-Mart's truck drivers to complete required pre-trip, en-route, and post-trip inspections" as well as the "amount of time it will take to fuel and wash the truck at the end of the shift."  Ex. 80, Herbert Report at 1.  Mr. Herbert's opinions were based on a Wal-Mart truck inspection video, certain DOT regulations, and his own years of experience as a driver (albeit not for Wal-Mart).  He admitted in his deposition that he did nothing to determine the *actual* experience of drivers. Ex. 32, Herbert Dep. 46:14-47:16.  Plaintiffs will presumably ask this Court to ignore drivers' testimony about their actual experiences and replace it with Mr. Herbert's theoretical opinions.  This Court should decline that invitation.

[5]  These flaws, including the failure to address double-counting and a range of cognitive biases, will be detailed in a *Daubert* motion to be filed after the depositions of Dr. Phillips, Mr. Garcia, and Mr. Chasworth.  "Expert" testimony relevant to whether a class should be or remain certified must satisfy the admissibility requirements of the Federal Rules of Evidence.  *Dukes*, 564 U.S. at 353-55; *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011); *Unger v. Amedisys, Inc*., 401 F.3d 316, 323 n.6 (5th Cir. 2005).

[6]  Wal-Mart maintains that these rulings were wrongly decided and that its pay plans throughout the class period fully compensate drivers for all time worked.

for the allegedly uncompensated tasks.  Nor do they touch on the issue of injury or damages at all, or address Plaintiffs' theory that Wal-Mart "requires drivers to perform services during DOT mandated layovers."  Class Cert. Order [ECF 158] at 7-8, 18-19.  As discussed below, there is no evidence that could "sustain[] a reasonable jury finding" as to either issue.  *Tyson*, 136 S. Ct. at 1046.

## III.   LEGAL STANDARD

A class may only be certified "if the trial court is satisfied, after a rigorous analysis," that the class proponent has satisfied all of the "prerequisites of Rule 23(a)" and one of the alternative requirements of Rule 23(b).  *Dukes*, 564 U.S. at 350-51; *Blake v. Arnett*, 663 F.2d 906, 912 (9th Cir. 1981).  In addition, a court has a continuing duty to ensure that all requirements of Rule 23 are satisfied even after certification.  Fed. R. Civ. P. 23(c)(1); *Hervey*, 787 F.2d at 1230; *see also* Class Cert. Order [ECF 158] at 14 (acknowledging that decertification may be required).  When it appears certain in the litigation that the requirements of Rule 23 are not met, decertification is appropriate.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998).

## IV.   ARGUMENT

In 2014, this Court concluded that a class action trial could manageably resolve this lawsuit without violating Wal-Mart's rights.  While the Court certified the class, however, the Court invited Wal-Mart to file a motion for decertification "if it later becomes clear that there are major variations in the time class-members spent completing tasks like paperwork or fueling."  Class Cert. Order [ECF 158] at 14.  That has now become clear.

The reason is simple:  Relying on Plaintiffs' promises, the Court opined in certifying the class that "from Wal-Mart's pay records, [Plaintiffs' experts] will be able to extract the number of miles driven, the number of times a task was performed, the number of layovers, waiting, and unscheduled time" and that "a survey of class members could provide common evidence regarding the time required to perform the undocumented tasks."  *Id.* at 19-20.  But the sworn testimony of just 5% of the 850-member class—the great majority of which were supposedly selected at "random" by Plaintiffs—demonstrates the impossibility of reliably determining any of these metrics, other than through guesswork and admitted speculation.  And the absence of evidence means that for any given class

member, much less all of them, there is no lawful way to determine liability or damages in this case. The U.S. Supreme Court, the Ninth Circuit, and the California Supreme Court have foreclosed any approach that would ignore the "major variations" in driver experience. *See Dukes*, 564 U.S. at 353-55 (refusing to credit expert testimony that failed to capture whether a general policy affected any members of the class, and if so, how many); *Wells Fargo*, 571 F.3d at 956 (determining liability would depend on "the experience of individual [drivers]" including "how they spend their time"); *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 27 (2014) (where the "primary considerations are how and where the employee actually spends his or her workday" there is an "obvious potential to generate individual issues"). Where, as there, there is no manageable way to determine *if* a driver performed a task, *how long* a task was performed, *how often* it was performed, *where* it was performed (i.e., inside or outside California), or *whether* a task was performed concurrently with another paid or unpaid task (leading to either a lack of injury or impermissible double-counting), the case cannot and should not proceed as a class action under binding precedents.

A recent district-court decision, *Burnell v. Swift Transportation Co. of Arizona*, is particularly instructive. In *Burnell*, a case on all fours with this one, plaintiffs suing on behalf of a putative class of thousands of OTR truck drivers alleged that Swift did not pay for all hours worked. The court denied plaintiffs' class certification motion because while it was "undisputed that Swift compensated drivers based on an estimate of miles driven, and not by the hour," and "did not pay drivers additional compensation for certain non-driving duties," the evidence "show[ed] that there was wide variation as to if, when, and for how long any particular driver performed any of these allegedly uncompensated tasks (e.g., waiting, conducting pre- and post-trip vehicle inspections, filling out and submitting paperwork, refueling, and communicating with dispatchers)." 2016 WL 2621616, at *3. As an example, the court contrasted the named plaintiff, who took 20-60 minutes to perform a pre-trip inspection, with other drivers who said they did the inspections in 10 minutes or less. *Id.* Others said inspection times "'fluctuate[] a lot' based on a number of factors." *Id.* The court thus concluded that plaintiffs had not shown that "the putative class was denied a minimum wage in a manner appropriate for class-wide resolution," and declared that "an individualized inquiry [would be] required, not only to determine the amount of damages, but to determine whether Swift is liable for not paying mini-

1    mum wage." *Id*.  For those reasons (and others), based on the additional classwide evidence, the

2    Court should similarly decertify this class.

3         **A.    Class Members' Varying Experiences Show The Class Lacks Commonality**

4         The evidence developed in discovery, including the depositions of an additional 48 drivers

5    confirm that there are not "*in fact … common questions of law or fact*" governing resolution of Plain-

6    tiffs' claims.  *Dukes*, 564 U.S. at 350; *Burnell*, 2016 WL 2621616, at *3.  In particular, there is no

7    "common answer[]" to the question whether Wal-Mart actually underpaid each class member; there

8    are only individual answers reflecting each driver's varied experience.  *See Dukes*, 564 U.S. at 350;

9    *Tyson*, 136 S. Ct. at 1045 ("a common question is one where 'the same evidence will suffice for each

10   member to make a prima facie showing'" (citation omitted)).

11        In its class certification order, this Court found that the class-action procedure could generate

12   common answers to the following questions: "whether Wal-Mart's piece-rate pay plan violates Cali-

13   fornia's minimum wage laws, whether Wal-Mart's drivers are entitled to payment of at least mini-

14   mum wage for all hours worked, and whether drivers are entitled to damages for these claims."  Class

15   Cert. Order [ECF 158] at 9.  Just as in *Burnell*, however, there is no proof of any policy identically

16   *applied* to all drivers' conduct in the same way.  2016 WL 2621616, at *3.  Rather, as sworn driver

17   testimony lays bare, drivers' experiences differed starkly and dramatically.  Plaintiffs cannot sweep

18   these profound differences under the rug and simply pretend that the Company's Pay Manuals—

19   themselves repeatedly described as "guidelines" (Ex. 6, Aurit Dep. 53:7-54:8)—provide common an-

20   swers, applicable to all drivers, simply because they are written documents that set the same starting

21   point for what is otherwise individualized treatment.  *See Vinole v. Countrywide Home Loans, Inc.*,

22   571 F.3d 935, 946 (9th Cir. 2009) ("a district court abuses its discretion in relying on an internal uni-

23   form … policy to the near exclusion of other factors," including evidence of actual experience); *see*

24   *also Campbell v. Vitran Express Inc*., 2016 WL 873009, at *3 (C.D. Cal. Mar. 2, 2016) ("a court can-

25   not simply view an allegedly deficient policy in isolation when other evidence in the record presents

26   a genuine dispute as to how employees actually spent their time").

27        This is true because only an actual *pay practice*, as opposed to a policy, can be a possible

28   cause of any actual cognizable harm to the class.  As in *Burnell*, while it is "undisputed that [Wal-

Mart] did not pay drivers additional compensation for certain non-driving duties," the "evidence submitted … shows that there was wide variation as to if, when, and for how long any particular driver performed any of these allegedly uncompensated tasks." 2016 WL 2621616, at *3. In particular, beyond the significant evidence of variation across drivers, tasks, years, and distribution centers, the evidence shows that pay practices differed in a way obscured by the labels Plaintiffs use to group activities. *See*, *e.g.*, WM 2016 MSJ Opp. [ECF 268] at 11-21; Class Cert. Opp. [ECF 130] at 15-23. Some drivers organized their day so as to perform certain tasks while they were receiving hourly pay; others received discretionary pay; and still others were paid through activity codes depending on the circumstances under which the driver performed a given task. *See* pp. 6, 7, *supra*. Where individual drivers were, in fact, paid for tasks—no matter how those tasks are otherwise labeled—liability for claims for unpaid wages can only be assessed by examining the individual circumstances surrounding the performance of the task. *See Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (holding that consideration of policy language "in isolation" improperly disregards the existence of "other potential individual issues" that could make certification impossible); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) ("Whether such a policy is in place or not, courts must still ask" what "actually" occurred). It is that necessary examination of individual experiences that destroys commonality and forecloses class certification (separate and apart from the lack of predominance and manageability discussed below).

Continued class-based adjudication is also improper because discovery has confirmed that the class contains members who were not injured and accordingly lack Article III standing. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("no class may be certified that contains members lacking Article III standing") (quotations omitted); *Espenscheid v. DirectSat USA LLC*, 705 F.3d 770, 776 (7th Cir. 2013) (no duty to certify class where there are a large number of class members "each harmed to a different extent (and many not harmed at all)" and class counsel has proposed no "feasible litigation plan"). In particular, certain drivers testified that they did not perform some tasks, while others testified they performed those tasks but were paid for them. *See* Rule 1006 Ex. A. And certain absent class members have affirmatively confirmed they lack standing to pursue specific claims. *Id.* Article III precludes the windfall damages (more than $118,000 per driver) that Plaintiffs

seek where, as here, there are class members who suffered no injury but, under Plaintiffs' proposal, stand to be compensated.  As Plaintiffs have offered no "administratively feasible" way to identify such drivers, continued class litigation is improper.  *See In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 2014 WL 6888549, at *16 (C.D. Cal. Sept. 3, 2014); *Tyson*, 136 S. Ct. at 1053 (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.").

The problem here is simple—Plaintiffs cannot offer a common answer to the key question in this case:  where some class members did not perform some of the tasks at issue, others were admittedly paid for those tasks and performed those during paid time, others have simply forgotten or refused to testify about their experiences, and all have described dramatically different experiences about the duration and frequency of tasks, how can a factfinder determine whether any given class member was paid less than the minimum wage for that task—or for that matter, whether they were paid minimum wage for any given hour of work*?  See, e.g.*, *Dukes*, 564 U.S. at 350.  And how does it do so consistent with due process?  Because neither is possible, the Court should decertify the class.

### B.     Plaintiffs Have Not Delivered On Their Promise Of A Classwide Method Of Trying This Case To Judgment

Rule 23's mandate is relatively straightforward:  A district court must address how the "claims, issues, and defenses" can be tried to a collective judgment.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013) (courts must assess whether liability "is capable of proof at trial through evidence that [is] common to the class rather than individual to its members"); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (vacating certification where the defendant intended to "proffer individualized and varying evidence to defend against claims of individual class members" and court could not feasibly manage that evidence).  Here, classwide discovery has shown that the parties cannot try this case through predominantly class-wide proof.  *Dukes*, 564 U.S. at 350, 358.

### 1.     Plaintiffs Failed To Produce A Reliable Class-Based Damages Model

Plaintiffs' representations to the Court at class certification regarding their ability to prove classwide damages have proved to be misleading:  They submitted the declarations of William Roberts and Sean Chasworth, who proposed calculating damages using "representative testimony by

Plaintiffs and a select number of Class Members"; a "random sample" of Wal-Mart's records if not available in electronic format; and an unspecified "survey of potential class members."  Jones Decl. [ECF 113-3] ¶ 27; Roberts & Chasworth Decl. [ECF 113-30] ¶¶ 16, 18.  The Court rejected Wal-Mart's *Daubert* objection to this testimony, because it was "premature."  Class Cert. Order [ECF 158] at 20.  Plaintiffs also promised that, if the Court certified the class, they would obtain electronic data to prove their claims without the need for individualized evidence.  Class Cert. Mtn. [ECF 113-1] at 29.  Plaintiffs' promises however, proved false.

What Plaintiffs have actually proffered is Dr. Phillips's damages study, which is tied to no actual injury and is concededly premised largely on guesswork and rough approximations.  *See* Phillips Report at 18 (admitting it "may be impossible to provide a precise, accurate, statistical estimate of damages without using a variety of non-Wal-Mart information").  Even accepting as correct the Ninth Circuit's ruling in *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) that individualized damages issues do not preclude class certification in *all* cases, they preclude certification here.

A party cannot offer a deeply flawed damages study and then punt the question to the jury:  an assertion that "*any* method of measurement is acceptable so long as it can be applied class wide, no matter how arbitrary the measurements" would "reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Comcast*, 133 S. Ct. at 1433; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification"); *Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (rejecting class certification "[b]ecause plaintiff fail[ed] to demonstrate a reliable method to compute damages classwide").  *Contrast Leyva*, 716 F.3d at 514 (affirming certification where damages could be calculated "feasibly" and "accurately" on a classwide basis).  Here Plaintiffs' problem is two-fold.

*First*, Dr. Phillips has not even attempted to offer a reliable calculation of damages for *any* of the named plaintiffs.  Were the named plaintiffs seeking individual relief instead of classwide relief, the Court would summarily enter judgment.  *See Weinberg v. Whatcomb Cty.*, 241 F.3d 746, 751 (9th Cir. 2001) ("summary judgment is appropriate where [the non-moving party] [has] no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages").  That fatal flaw does not suddenly disappear because this is a class action.  *See*

*Dukes* 564 U.S. at 367 ("[T]he Rules Enabling Act [28 U.S.C. § 2072(b)] forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'").  If Plaintiffs (or Dr. Phillips and his team) cannot feasibly estimate damages for a single named plaintiff, they cannot accurately and reliably estimate damages for 850 drivers as Dr. Phillips purports to do.  *Id.* at 348-49 (class action as "an exception to the usual rule that litigation is conducted by and on behalf of the named parties only" and class representatives "must … possess the same interest and suffer the same injury as the class members") (internal quotations omitted)); *E. Tx. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (class should not have been certified where named plaintiffs "could have suffered no injury" and were "simply not eligible to represent a class of persons who did allegedly suffer injury").

*Second*, as to the remainder of the class, Plaintiffs simply ignore—instead of confronting— key differences among individual drivers' experience, including basic concerns such as the widespread variation in the amount of time required to complete those tasks and the disparate frequency at which tasks were performed.  Plaintiffs ignore these differences, offering instead Dr. Phillips's report, which relies on averages, guestimates, and assumptions that are flatly contradicted by the evidence of drivers' actual experiences.  Dr. Phillips's approach is to aggregate damages, employing a methodology that bears no resemblance to the actual experiences of any one driver or named plaintiff, much less those of an entire class of drivers.

Take pre-trips, for example:  Dr. Phillips simply assumed drivers spent 8 to 15 minutes on their pre-trips (Phillips Report at 11) but some drivers testified that they would spend 5 minutes on a pre-trip (Ex. 74, Steele Survey, Ex. 61, Allen Survey, Ex. 5, Auker Survey); others regularly spent 20 to 30 minutes (Ex. 67, Johnston Survey, Ex. 72, Nevarez Survey).  These examples are not isolated. *See* Rule 1006 Ex. A; Cripps Decl. ¶¶ 64-76.

Dr. Phillips sweeps aside those differences and instead offers averages based on unsupported—and sometimes directly contradicted—assumptions about how drivers spent their time.  The law requires a method of proving damages that synthesizes the evidence regarding the class, not one that completely and blithely ignores the evidence.  Dr. Phillips's averages do not and cannot capture the scope of any "harm" (or injury) drivers suffered, or any damages that may be owed.  In particular, Dr.

1  Phillips does not analyze whether Wal-Mart in fact paid any given driver at least the minimum wage

2  during the time that they performed the allegedly uncompensated tasks.

3        Compounding that problem is the reality that an average time or frequency does not equate

4  with an average driver experience—because there was no average driver experience.  Walker Report

5  ¶ 41 ("[t]he fact that an average can be calculated does not mean that most trips are 'average' or that

6  the average is particularly informative about what typically occurs"); *Dukes*, 564 U.S. at 354 (ex-

7  pert's concession that he could "not calculate whether 0.5 percent of 95 percent of the employment

8  decisions at Wal-Mart" were motivated by bias was fatal to plaintiffs' statistical showing).  This is

9  therefore not a case like *Tyson* in which every class member in one of two departments changed his

10  or her clothes before and after every shift but may have taken plus or minus 10 minutes to do so.  *See*,

11  *e.g.*, *Tyson*, 136 S. Ct. at 1047.  The more than 50 drivers who have now testified have established

12  that experience with each of these tasks was different for each driver and from one driver to the next.

13  That makes it impossible for any single driver or group of drivers to provide admissible evidence

14  bearing on whether, how long or how often any other driver performed a task.  *Id.* at 1048-49 ("Rep-

15  resentative evidence that is statistically inadequate or based on implausible assumptions could not

16  lead to a fair or accurate estimate of the uncompensated hours an employee has worked."); *Chao v.*

17  *Pac. Stucco, Inc.*, 2006 WL 2432862, at *3 (D. Nev. Aug. 21, 2006) ("A determination of whether

18  the representative testimony adequately represents the class depends on the nature of the work in-

19  volved, the working conditions and relationships, and the detail and credibility of the testimony");

20  Rule 1006 Ex. B.[7]  Without a model showing that damages are "capable of measurement on a class-

21  wide basis,"  "[q]uestions of individual … calculations will inevitably overwhelm questions common

22  to the class."  *Comcast*, 133 S. Ct. at 1433.  That is what has happened here.

23       **2.**     **Adjudicating Plaintiffs' Claims Without A Classwide Damages Model**
              **Cannot Be Done Under Rule 23(b)(3)**

24        Individual evidence overwhelms the common questions here, as illustrated by considering

25  what the named plaintiffs must show to establish Wal-Mart is liable to them, to say nothing about the

---

27    [7]  Moreover, at least 5 of the 50 drivers served with a subpoena did not even show up, three ap-
peared but opted out, 50 were not served prior to deposition, and eight were deceased or had
28  health issues, thus further skewing the sample of drivers.  Cripps Decl. ¶ 2.

Gibson, Dunn &
Crutcher LLP

class. *Tyson*, 136 S. Ct. at 1043. This is a minimum wage case, so the questions are (1) whether Wal-Mart failed to pay minimum wage for each hour that the driver worked, and (2) if so, how much time Wal-Mart paid to that driver across the class period (adding hours, days, etc.). *See Cole v. CRST, Inc.*, 2012 WL 4479237, at *8 (C.D. Cal. Sept. 27, 2012) (drivers must show they were not paid minimum wage "for all work completed"); *Reinhardt v. Gemini Motor Transp.*, 869 F. Supp. 2d 1158, 1168 (E.D. Cal. 2012) ("compliance with the minimum wage law is determined by analyzing the compensation for each hour worked"); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action") (quotations omitted). Neither can be answered on a classwide basis.

To answer that first question, one that indisputably goes to liability and not merely damages, the trier of fact must examine whether Wal-Mart paid a driver for the time during which he or she performed a given task (if not hourly, as Plaintiffs seek, in other ways), including whether the driver performed the task concurrently with any other task. To answer the second question, one must determine how often the driver performed the task and if so, for how long, to arrive at an aggregate estimate of unpaid time. *Burnell*, 2016 WL 2621616, at *3. Accurately answering either question would require individualized testimony and hundreds of mini-trials. *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 194 (3d Cir. 2001) (mini-trials "would present severe manageability problems for the court"); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) ("separate mini-trials of an overwhelming large number of individual claims" made case "unmanageable as a class action"). That is because the differences in frequency and duration of tasks, as well as questions of double-counting, mean no subset of drivers (including the named plaintiffs) is representative of any other drivers. Walker Report ¶ 25 ("[T]here is no statistical basis to infer that the selected deponents are representative of the class, and it is implausible that they actually are."); *Duran*, 59 Cal. 4th at 38 ("[I]nferences from the part to the whole are justified *only* when the sample is representative").

Because there are no records (because there was no duty to have kept them), to preserve its due process right to "present every available defense" (*Lindsey v. Normet*, 405 U.S. 56, 66 (1972)), Wal-Mart would have to elicit testimony from every member of the 850-plus member class, not just

the 61 drivers whose depositions were taken.  While this defense may be "cumbersome," it is abso-lutely necessary.  *Duran*, 59 Cal. 4th at 35 (court could not "abridge … presentation of a[] … defense simply because that defense was cumbersome to litigate in a class action").  If each driver's testimo-ny took even half as long as the class member depositions in this case (say 2 hours), it would take 175 days to get through that testimony.  Even if that were realistic, it would be "difficult if not impossi-ble" to shoehorn the "maybes" "depends" and "varies" testimony, along with the blind guesses and admitted memory lapses, into a workable model of damages across the class.  *Wang*, 737 F.3d at 545.

Plaintiffs cannot urge the Court simply to ignore double-counting.  *See*, *e.g.*, *Peake v. Chev-ron Shipping Co.*, 2004 WL 1781008, at *3 (N.D. Cal. Aug. 10, 2004) (stating the "'undeniable proposition' that a plaintiff is 'not entitled to a double recovery'").  Further, there is no dispute that drivers received hourly pay (and thus suffered no injury) while they also performed tasks Plaintiffs claim were unpaid.  *See* Rule 1006 Ex. C.  Others received hourly "downtime" pay for time spent making weight adjustments (McFall Dep. 70:17-20), a DOT inspection (Steele Dep. 48:21-49:12), or doing a pre-trip inspection in which an error was discovered (Powers Dep. 20:18-21).  Plaintiffs offer no reliable to way to determine who did so, or when.  Walker Report ¶ 55.  Plaintiffs' survey does not correct for this defect, either:  While the survey instructed respondents to provide "the usual amount of time that you were performing ONLY that activity and not also performing another task" (Trevino Survey at 2), "[e]very one of the randomly selected class members who filled out a survey and gave deposition testimony … testified to having engaged in activities concurrently."  Walker Report ¶ 57; *see also* Rule 1006 Ex. C.  Dr. Phillips's report ignores this, and Plaintiffs have proposed no other method to ensure that drivers do not earn double pay for the same task.

The question of a given task's duration is equally individualized, because answering requires knowing *where* a driver worked.  No class member is entitled to payment for work performed "prin-cipally" outside California.  *See Tidewater Marine W., Inc. v. Bradshaw*, 14 Cal. 4th 557, 578 (1996) (drivers must work "principally" in California to be entitled to wages under the Labor Code); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1199 (2011) (examining whether drivers were "California resi-dents" and left the state "temporarily … during the course of [a] normal workday").  There is no meaningful or manageable way to make this determination on a classwide basis.

In its class certification order, the Court dismissed Wal-Mart's extraterritoriality argument on the ground that "plaintiffs are residents of California and worked out of distribution centers located in California" and thus "presumptively enjoy the protections of IWC regulations." Class Cert. Order [ECF 158] at 12. But minimum wage laws do not depend on where a person works or is headquartered; they focus on where a driver "principally" performs work. *Bradshaw*, 14 Cal. 4th at 578. Moreover, the evidence now confirms that drivers did not track how often they performed tasks in California, and it is not feasible to determine this information using Wal-Mart's records. This is not a *de minimis* concern; more than 10 drivers testified that for at least some of the class period, they spent their time "principally" outside of California, were domiciled outside California, or spent a majority of their time outside California. *See* pp. 8-9, *supra*; Rule 1006 Ex. A. There is simply no feasible way—without individual driver hearings—to determine which drivers performed what work in California, subject to the requirements of the California Labor Code, and how often they did so in Nevada, Arizona or Utah (for example). Even that would prove difficult, as some drivers testified they were unable to give any estimate of how long they spent inside the state over the entire class period.

Surveys regarding the "usual" driver trip are not the solution. Although Plaintiffs' attorneys drafted their damages survey using that phrase, the actual driver testimony referred to above confirms there is no such thing as a "usual" trip, rendering the survey results unreliable to the point of uselessness. *See*, *e.g.*, Barker Dep. 52:15-53:2, 53:17-20 ("great variety" in trips and that his answers on Plaintiffs' survey were "rough justice"); Ex. 60, Vasquez Dep. 66:8-10 ("each trip [was] different from every other trip"). Indeed, nearly every driver asked about the survey explained that it is fundamentally flawed because it was based on the "implausible assumption[]" that there was a "usual trip" or "10 usual trips." *Tyson*, 136 S. Ct. at 1048. Additional critiques of the survey offered by less than 5% of the class confirm the absurdity of the "usual trip" assumption. *See* Rule 1006 Ex. A.

While some drivers wrote a single number for time or frequency on their surveys, and while Dr. Phillips and his team relied on those numbers, the same drivers testified that their "how often" estimate could not be reduced to a single number. *Id*. Jim Batham, for example, agreed that it was "impossible to give an estimate of the frequency" of weighing his truck because it "just varies so much. One week you might haul nothing but [heavy] pet food back and forth. You might go a

month and not haul another pet food." Batham Dep. 76:17-77:7.  Bernard Johnston said that because

he ran "wild," he would have a "mixture of drop and hooks, live loads, live unloads" and that he

"could not put an exact number on it because of its wildness." Johnston Dep. 48:11-49:7.  Others ex-

pressed unease with the average trip concept, writing "depends," "random," or "varies" in response to

questions on their surveys (Ex. 63, Benavidez Survey, Johnston Survey, Ex. 75, Temple Survey,

Ex. 65, Craft Survey, Ex. 69, McCulley Survey, Ex. 71, Nettles Survey); others did not recall the an-

swers (Benavidez Survey, Trevino Survey, Nevarez Survey); others provided an estimate, but subse-

quently explained that it was really a guess.  *Compare* Allen Survey (one live load per 10 trips) *with*

Allen Dep. 73:19-22 (admitting he was "guessing" for frequency of live loads); Ex. 64, Brown Sur-

vey (one outside weighing per 10 trips) *with* Ex. 14, Brown Dep. 42:18-23 ("guessing once or twice,

once a month" for weighing).  At best, this is inadmissible speculation—"it depends" cannot serve as

proof of liability or damages for 850 drivers.  *Comcast*, 133 S. Ct. at 1433 (damages methodology

must be based on "a just and reasonable inference" not "speculat[ion]"); *In re Taco Bell Wage &*

*Hour Actions*, 2016 WL 2755938, at *9 (E.D. Cal. Apr. 8, 2016) (rejecting use of data in class action

that was "speculation and not a standard which this Court could assess damages for an amount cer-

tain"); *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *10 (N.D. Cal. June 13, 2014) (declining

to certify consumer class that could not reliably remember whether they purchased a given product).[8]

Compounding these problems are the named plaintiffs' acknowledgment that their trips were

not representative of other drivers'.  *See* p. 2, *supra*.  Given class member testimony, that is unre-

markable.  For example, while John Rivero and Todd Brown agreed that waiting time to load the

truck varied, their estimates differed by orders of magnitude.  *Compare* Rivero Survey (3-4 hours;

180-240 minutes) *with* Brown Survey (10 to 30 minutes).  Neither driver's experience is representa-

tive of the other's.  Using either as "average" would overcompensate one, undercompensate the other,

---

[8]  Wal-Mart did not require drivers to keep records of these activities beyond recording their duty
status as "on duty," "on duty driving," "off duty" or in "sleeper berth" as required by the DOT
regulations.  49 C.F.R. § 395.8(b)(1)-(4).  There is no state or federal law requiring Wal-Mart to
track how often drivers fueled, washed, waited, etc., and no driver reported doing so on his own
initiative, either.  Dr. Walker confirmed that he was not aware of any "reliable business records or
other data … showing how much time any class member (let alone all class members) spent on
the specific activities that Plaintiffs say they were not compensated for."  Walker Report ¶ 15.

Gibson, Dunn &
Crutcher LLP

and deprive Wal-Mart of the ability to determine whether it had already paid for that time. *See Dukes*, 564 U.S. at 367 ("a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its … defenses to individual claims"); *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) (rejecting aggregate damages model that calculated only "average" injury in violation of due process and the Rules Enabling Act); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (defendants have "a due process right to raise individual challenges and defense to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008) (emphasizing "serious due process concerns" when "the right of defendants to challenge the allegations of individual plaintiffs is lost").

Nor would trying Plaintiffs' DOT break claim be any more manageable. This Court previously held that the DOT breaks were compensable based on language in the 2008 Pay Manual stating that "[t]he intent is to pay Drivers for layovers taken in the tractor cab" and that "the physical location of the layover—inside the tractor cab and not at the driver's residence—was specified and controlled by Wal-Mart." 2015 MSJ Order [ECF 211] at 13-14.[9] Dr. Phillips, for Plaintiffs' part, estimated damages for these claims between $41-$48 million plus interest. Phillips Report at 8. The problem, however, is that his assumption that each layover was compensable in its entirety is ***contrary to the deposition of each and every single survey respondent***. *See* Walker Report ¶ 58 & Appx. 4 (collecting and citing testimony). If some class members genuinely but erroneously believed they were required to stay in the truck for at least part of the layover (*e.g.*, Allen Dep. 35:8-10), many others, including the named plaintiffs, disagreed and testified that no one "specif[ied] or control[led] the physical location of [the] layover[]," that they were not required "to take layovers in a designated place" (Nettles Dep. 86:23-25, 87:1-3), and that Wal-Mart would "allow you to take a layover, basically, *any place you wanted*…." Alumbaugh Dep. 19:24-25 (emphasis added); Opitz Dep. 339:2-21 (named plaintiff noting that drivers who did "set run[s]" or "lived closed to the DC" could "get

---

[9]   Wal-Mart respectfully submits that this ruling cannot be reconciled with the controlling DOT regulations, which vest *drivers* with broad discretion over how to spend their DOT breaks. *See* 49 C.F.R. § 395.1(g) (setting forth options). Time spent resting in the sleeper berth is off-duty time in which the driver is relieved of duty and responsibility for the equipment and the load. Otherwise it would be "on-duty" time. *See* 49 U.S.C. § 395.8(h)(1), (2) (defining "off-duty" time and "sleeper berth" time). That time is not compensable despite Wal-Mart's $42 stipend.

home" but his case "was different" because he "lived a hundred miles away"); Ridgeway Dep. 193:15-194:2 (named plaintiff lived only 5 miles from distribution center yet he chose to stay in the cab of the truck); *see also* Rule 1006 Exs. A, B.  In total, at least 63% of class members "felt that they had the discretion to spend their layovers away from their trucks without needing Wal-Mart's approval to do so" or else gave testimony "that is consistent with them also disbelieving that Wal-Mart restricted them from taking layovers whenever they chose."  Walker Report ¶ 58.  Plaintiffs admitted as much where they said a DOT break was only compensable "[i]f a Wal-Mart [d]river spent the DOT-mandated layover with his or her truck," implicitly conceding that layovers not spent in the truck, or portions of layovers not spent in the truck, were not compensable.  Class Cert. Reply [ECF 145] at 9.  Thus, even if Wal-Mart controlled a driver's decisions regarding how to comply with the DOT mandates (it does not), the myriad ways individual drivers actually complied did so means that even the existence of control does not answer the question whether any driver is entitled to recover damages or the scope of that recovery.  Thus, a flat determination that all drivers are entitled to layover pay cannot be reconciled even with Plaintiffs' theory; instead, individualized inquiries are necessary for determining whether drivers who chose where to layover and whether to leave their trucks for some or all of the layover have a claim for damages.

Similarly, there is no classwide way to determine whether a driver spent no time, less than two hours, or more than eight hours in the sleeper berth if he or she elected to spend the DOT break in the truck as section 395.1(g) of the DOT regulations provides.  *See*, *e.g.*, Opitz Dep. 272:17-22 (named plaintiff had "no estimate" as to "the amount of time that [he] spent with and around the truck versus away and apart from the truck"); Walker Report ¶ 19 (no "reliable information spanning the entire class period" showing "how much time class members spent at their trucks").  For example, if a driver stayed in the truck two hours or less and earned $42, he or she was paid more than minimum wage for that time, and no liability could accrue.  But no method to identify such drivers is provided. Nor is there classwide evidence across the entire class period regarding the number of layovers each driver took per trip, which is "directly relevant to the aggregate amount of extra pay, if any, that Wal-Mart would owe a class member for layover time."  *Id.* ¶ 49.  These issues make it impossible to de-

1   termine the amount of compensation, if any, owed for layovers without individualized testimony

2   from each and every one of the 850-plus drivers. *Burnell*, 2016 WL 2621616, at *3.

3          In sum, without a classwide model, this case will devolve into countless mini-trials on liabil-

4   ity issues, such as whether a driver suffered injury or performed compensable work in California, as

5   well as damage issues, such as the frequency and duration of tasks, double-counting, past payment,

6   and how time was spent during DOT breaks, along with the attendant uncertainty class members have

7   testified to as to all of the above. Such a trial—for 850 drivers over twelve years—is not manageable

8   as a class action in a manner that preserves Wal-Mart's due process rights.

9                    **3.     A Class Action Is Not Superior Given Plaintiffs' Damages Claims**

10         Dr. Phillips estimates the value of the DOT break claim alone exceeds $55,000 for each class

11   member, and estimates that the value of all claims, including penalties, exceeds $118,000 per class

12   member. Phillips Report at 9, 20, 22. If these sums are to be believed, class treatment does not fur-

13   ther the "policy at the very core of the class action mechanism" namely, "to overcome the problem

14   that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting

15   his or her rights." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quotations omitted).

16   Permitting the class to remain certified would take claims that any injured class member would have

17   sufficient incentive to bring on an individual basis and unnecessarily force them into an unmanagea-

18   ble classwide proceeding. The Court's conclusion that Rule 23(b)(3)'s superiority requirement was

19   satisfied here is therefore no longer appropriate, and the Court should decertify the class.

20   **V.     CONCLUSION**

21         This Court relied on Plaintiffs' representations at class certification that this case could be

22   manageably tried to judgment on a classwide basis. Because it is now clear those promises were

23   baseless, Wal-Mart respectfully asks the Court to decertify the classes as to all claims.

24   Dated: July 8, 2016                        Respectfully submitted,

25                                              GIBSON, DUNN & CRUTCHER LLP

26                                              By: /s/          *Scott A. Edelman*
                                                            Scott A. Edelman
27

28                                              Attorney for Defendant
                                                WAL-MART STORES, INC.