**Volume 12**

**Pages 2348 - 2542**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

```
DONALD C. BRYAN, ET AL.,        )
                                )
          Plaintiffs,           )
                                )
  VS.                           )    NO. CV 08-05221-SI
                                )
WAL-MART STORES, INC.,          )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Wednesday, November 16, 2016

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

             LAW OFFICES OF WAGNER, JONES, KOPFMAN &
             ARTENIAN, LLP
             1111 East Herndon - Suite 317
             Fresno, CA  93720
      BY:  **LAWRENCE M. ARTENIAN, ESQUIRE**
           **NICHOLAS WAGNER, ESQUIRE**
           **DANIEL KOPFMAN, ESQUIRE**
           **ANDREW B. JONES, ESQUIRE**
           **ANGELA MARTINEZ, ESQUIRE**

             MARLIN & SALTZMAN, LLP
             29229 Canwood Street - Suite 208
             Agoura Hills, CA  91301
      BY:  **STANLEY D. SALTZMAN, ESQUIRE**

(Appearances continued on the next page)

Reported By:         Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                   Official Reporter

APPEARANCES CONTINUED:


For Plaintiffs:
                         THE RDM LEGAL BROUP
                         7979 Ivanhoe Avenue - Suite 400
                         a Jolla, CA  92037
                   BY:   **RUSSEL MYRICK, ESQUIRE**



For Defendant:
                         GIBSON, DUNN & CRUTCHER LLP
                         555 Mission Street
                         San Francisco, CA  94105
                   BY:   **MICHAEL LI-MING WONG, ESQUIRE**
                         **RACHAEL S. BRASS, ESQUIRE**
                         **JOSEPH A. GORMAN, ESQUIRE**


                         GIBSON, DUNN & CRUTCHER LLP
                         2029 Century Park East
                         Los Angeles, CA  90067
                   BY:   **SCOTT A. EDELMAN, ESQUIRE**


                         GIBSON, DUNN & CRUTCHER LLP
                         333 South Grand Avenue
                         Los Angeles, CA  90071
                   BY:   **CATHERINE A. CONWAY, ESQUIRE**
                         **JESSE CRIPPS, ESQUIRE**


                         GARVIN, LIGHT, HANSON & FEARY
                         10 West Market Street - Suite 1500
                         Indianapolis, IN  462j04
                   BY:   **ADAM SMEDSTAD, ESQUIRE**


                         WAL-MART LEGAL
                         702 Southwest 8th Street, M.S. # 0215
                         Bentonville, AR  72716
                   BY:   **JENNIFER B. BECHET, ESQUIRE**

# I N D E X

|                                                | PAGE | VOL. |
|------------------------------------------------|------|------|
| Defense Rests                                  | 2464 | 12   |
| Plaintiffs' Rests                              | 2538 | 12   |
|                                                |      |      |
| **PLAINTIFFS' WITNESSES**                      | **PAGE** | **VOL.** |
|                                                |      |      |
| **EASTERLING, JAMES**                          |      |      |
| (SWORN)                                        | 2465 | 12   |
| Rebuttal Examination by Mr. Myrick             | 2466 | 12   |
| Rebuttal Examination by Ms. Conway             | 2482 | 12   |
| Rebuttal Examination by Mr. Myrick             | 2489 | 12   |
| Rebuttal Examination by Ms. Conway             | 2491 | 12   |
|                                                |      |      |
| **ALLRED, PAMELA**                             |      |      |
| (SWORN)                                        | 2498 | 12   |
| Rebuttal Examination by Ms. Martinez           | 2499 | 12   |
| Rebuttal Examination by Ms. Conway             | 2508 | 12   |
|                                                |      |      |
| **PARRISH, EDMOND**                            |      |      |
| (SWORN)                                        | 2510 | 12   |
| Rebuttal Examination by Mr. Wagner             | 2510 | 12   |
| Rebuttal Examination by Mr. Edelman            | 2512 | 12   |
| Rebuttal Examination by Mr. Wagner             | 2526 | 12   |
| Rebuttal Examination by Mr. Edelman            | 2528 | 12   |
| Rebuttal Examination by Mr. Wagner             | 2533 | 12   |
| Rebuttal Examination by Mr. Edelman            | 2536 | 12   |
|                                                |      |      |
| **DEFENDANT'S WITNESSES**                      | **PAGE** | **VOL.** |
|                                                |      |      |
| **WALKER, JONATHAN**                           |      |      |
| (SWORN)                                        | 2357 | 12   |
| Cross-Examination resumed by Mr. Saltzman      | 2357 | 12   |
| Redirect Examination by Mr. Edelman            | 2373 | 12   |
| Recross-Examination by Mr. Saltzman            | 2393 | 12   |
| Further Redirect Examination by Mr. Edelman    | 2401 | 12   |
|                                                |      |      |
| **MARTIN, GARY**                               |      |      |
| (SWORN)                                        | 2402 | 12   |
| Direct Examination by Ms. Conway               | 2403 | 12   |
| Cross-Examination by Mr. Wagner                | 2439 | 12   |
|                                                |      |      |
|                                                |      |      |
| **HARRIS, IVAN**                               |      |      |
| By Deposition                                  | 2447 | 12   |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 639 | | 2487 | 12 |
| 663 | | 2521 | 12 |
| 689 | | 2435 | 12 |

<u>**Wednesday - November 16, 2016**</u>                              **8:39 a.m.**

1

2                          **P R O C E E D I N G S**

3                              ---000---

4         (Proceedings were heard out of presence of the jury:)

5         **THE CLERK:**  Come to order.

6         **THE COURT:**  Good morning.  You may all be seated.

7    So you wanted to talk?

8         **MR. EDELMAN:**  Yes, Your Honor.

9         **THE COURT:**  Is it about this paper you filed?

10        **MR. EDELMAN:**  Yes, Your Honor.

11        **THE COURT:**  What is your response?  What is the

12   plaintiffs' response to the paper?

13        **MR. MYRICK:**  Your Honor, these rebuttal witnesses are

14   going to be called specifically to rebut testimony and evidence

15   raised by the defendant's witnesses, specifically with regard

16   to the activity codes paying for all these activities and

17   policy on layover, the application of the policy, strictly

18   those two issues.

19        **THE COURT:**  All right.  Well, I'm inclined to allow

20   it.

21        **MR. EDELMAN:**  You are --

22        **THE COURT:**  Inclined to allow it.  Your motion is

23   denied.

24        **MR. EDELMAN:**  Your Honor, I have two concerns.

25        One, I know you've already thought about and rejected --

PROCEEDINGS

1          THE COURT:  Well, I did read your paper which you

2   filed.

3          MR. EDELMAN:  Okay.  And I would also call the Court's

4   attention to our prior brief where we raised this issue when

5   they were talking about recalling our prior five witnesses, but

6   I -- because it's the same topic.  In other words, these issues

7   have been in the case throughout.

8          THE COURT:  They have, but they've been certainly more

9   clearly limbed now than they were before.  So I think it's

10  certainly fair that they call rebuttal witnesses on these

11  points.

12         MR. EDELMAN:  All right.  Well, Your Honor --

13         THE COURT:  Now, I don't know how much time anybody

14  has.  That's a different point.

15         MR. EDELMAN:  That's the second part of my concern,

16  which is --

17         THE COURT:  Well, that's my concern; that's not your

18  concern.

19         MR. EDELMAN:  Well, let me tell you why it's my

20  concern.

21      The reason it's my concern is because if they're going to

22  call six witnesses -- and, you know, we believe that they're on

23  topics that have already been addressed, but you've ruled on

24  that -- but if they are going to call six witnesses now, even

25  people who were on their witness list earlier, even people that

**PROCEEDINGS**

```
 1   they told us that they were going to call during their case and
 2   then they changed their mind and they've decided to wait and
 3   call them later, that puts us in a difficult situation because
 4   we don't have time to cross-examine --
 5        THE COURT:  They don't have time to examine six
 6   witnesses.
 7        MR. EDELMAN:  Well, but, I mean, you know, I can't put
 8   myself in the position -- what it means is that I'm not going
 9   to be able to read the deposition testimony that we had planned
10   to read because I can't --
11        THE COURT:  Well, then let me tell you the quiet rule
12   which exists in any courtroom -- well, at least in my
13   courtroom, which imposes time limits.  My quiet rule is this,
14   because lawyers do sometimes run out of time.
15        You've got five minutes to cross-examine if you've run out
16   of time and somebody else puts on a witness.  It's not much,
17   but it's probably more than they have to examine.
18        So for either of you, if you run out of time, you've got
19   five minutes to cross-examine some witness the other person
20   puts on.
21        Is that clear?
22        MR. EDELMAN:  Okay.  Thank you, Your Honor.
23        MR. MYRICK:  Thank you, Your Honor.
24        THE COURT:  Are we ready?  Do we have all the jurors?
25        THE CLERK:  I don't think so.
```

**PROCEEDINGS**

1          **THE COURT:**  Incidentally, the five-minute rule is if

2     the other guy puts somebody up on his own time, you've got five

3     minutes.  It does not mean you've got five extra minutes to

4     call all the witnesses you would like to call on rebuttal if

5     you've run out of time.

6          Is that clear?

7          **MR. MYRICK:**  I understand, Your Honor.

8          **THE COURT:**  Evidently we are missing one juror, so

9     we'll have to wait.

10          **MR. SALTZMAN:**  Your Honor, thank you for your

11     graciousness yesterday in giving me your copy of this page, but

12     I will give it back to you so you have a full set.  Thank you.

13          **THE COURT:**  Let's talk about instructions since we

14     have some time.

15          I did consider, for one brief shining moment, ordering

16     that you produce a joint set.  It would be the third time I

17     have ordered it.  It would be the third time that I was

18     disappointed, so I'm not going to do that again.

19          I think what we're going to do is make an effort to put

20     together a set.  I will try to get that to you tonight sometime

21     so that when you come -- assuming we end today, that when you

22     come tomorrow, you'll have at least something to start on and

23     then we can talk about it.

24          We could -- I would suggest that we start like at 1:30

25     tomorrow.  Does that work for people?

**PROCEEDINGS**

1          **MR. WAGNER:**  Rather than the morning?

2          **THE COURT:**  Would you prefer the morning?

3          **MR. WAGNER:**  Right.  Yes.

4          **MR. ARTENIAN:**  Midmorning.

5          **MR. SALTZMAN:**  Maybe 10:30.

6          **THE COURT:**  Okay.  10:30.  That would be fine.

7          **MR. WAGNER:**  How many hours do you think, Judge, it's

8    going to take?

9          **MR. SALTZMAN:**  Five minutes of rebuttal time.

10         **THE COURT:**  We will be done by noon.

11         **MR. WAGNER:**  So about an hour and a half for jury

12   instructions and verdict form?

13         **THE COURT:**  Golly, I haven't looked at that yet.

14         **MR. WAGNER:**  Okay.

15         **THE COURT:**  Why do you ask?

16         **MR. WAGNER:**  Well, just trying -- for timing for

17   tomorrow.

18         **THE COURT:**  Are you from out --

19         **MR. WAGNER:**  Yes.

20         **THE COURT:**  So you need an airplane?

21         **MR. WAGNER:**  Yes.

22         **THE COURT:**  Oh, okay.  Well, I would think you'd be --

23   what you should do at noon when we finish up here, you should

24   all go to lunch together, drink some nice Napa wine, and settle

25   the case.

**WALKER - CROSS / SALTZMAN**

1       But assuming you don't do that, I would imagine that by

2   midafternoon or late afternoon, you'd be ready to go home.

3           **MR. WAGNER:**  Tomorrow?

4           **THE COURT:**  Yes.

5           **MR. SALTZMAN:**  Thank you, Your Honor.

6           **MR. EDELMAN:**  So we will start at 10:30 tomorrow?

7           **THE COURT:**  Yes.

8       (Proceedings were heard in the presence of the jury:)

9           **THE COURT:**  All right.  Mr. Saltzman -- oh, you better

10   swear the witness again today.

11                       **JONATHAN WALKER**,

12   called as a witness for the Defendant, having been duly sworn,

13   testified as follows:

14           **THE COURT:**  Mr. Saltzman.

15           **MR. SALTZMAN:**  Thank you, Your Honor.  I will try and

16   be brief this morning.

17               **CROSS-EXAMINATION**    **(resumed)**

18   BY MR. SALTZMAN:

19   **Q.**   Dr. Walker, nice to see you again.

20   **A.**   Good morning.

21   **Q.**   I put up on the board a blowup we've been using throughout

22   the trial.  It has pretty close -- it has summaries or

23   pretty -- summary language of the activity codes that Wal-Mart

24   has issued.

25       Do you recognize -- do you see that board?

WALKER - CROSS / SALTZMAN

1   **A.**   I do.

2   **Q.**   Is it close enough for you?  I see --

3   **A.**   I see --

4   **Q.**   -- you straining a little bit.

5   **A.**   -- most of it.

6   **Q.**   Let me see if I can move it a little bit closer.

7          **THE COURT:**  Well, you know, somebody could put it up

8   on the screen.

9          **MR. EDELMAN:**  We can put it up on the screen.  Would

10  that help?

11         **MR. SALTZMAN:**  That would be fine.

12         **MR. EDELMAN:**  Kim, could you do that, please?  Is that

13  69 -- 619.  There we go.  Thank you very much.

14  **BY MR. SALTZMAN:**

15  **Q.**   It's on the screen in front of you to your left.

16  **A.**   Okay.

17  **Q.**   Do you recognize that as the various activities codes that

18  Wal-Mart has published?

19  **A.**   I think so, yes.

20  **Q.**   And in your review of the documents and getting ready to

21  testify in this case, you reviewed the -- am I correct you

22  reviewed the three manuals, the 2001, 2006, and 2008?

23  **A.**   Yes.

24  **Q.**   Okay.  And it's your belief, if I'm correct, that the pay

25  codes are actually not very well defined in the pay manuals; is

WALKER - CROSS / SALTZMAN

1    that right?

2    **A.**   They're not completely defined, that's right.

3    **Q.**   I think actually you said "not very well defined" when you

4    were deposed.

5        Do you recall that?

6    **A.**   I may have.

7    **Q.**   Okay.  Do you know who drafted these activity codes?  As

8    between Wal-Mart and the drivers in the class, do you know who

9    drafted these activity codes?

10   **A.**   Wal-Mart employees.

11   **Q.**   Wal-Mart -- not the drivers, though.  Wal-Mart corporate;

12   right?

13   **A.**   Yes.

14   **Q.**   Okay.  Did you read the testimony -- you said you read a

15   lot of testimony for the trial.

16       Did you read Ms. Ann Wilson Dyer's testimony?

17   **A.**   I did.

18   **Q.**   Did you see where she testified that in 2006, before

19   issuing the 2006 manuals, the company set about trying to

20   clarify its pay manuals and pay codes specifically?  Did you

21   see that?

22   **A.**   I don't recall exactly what she said.  I know there was a

23   revision.

24   **Q.**   I'm sorry.  You know there was what?

25   **A.**   I know they revised it, and I would assume that it's to

**WALKER - CROSS / SALTZMAN**

1  make it clearer.

2  **Q.**   Okay.  So Wal-Mart, in 2006, had the opportunity -- in

3  fact, took upon itself to try and make them more clear;

4  correct?

5  **A.**   In some respects, yes.

6  **Q.**   And what's up on the board in front of you is the result

7  of -- because these were -- this was 2006 and 2008 on the board

8  included -- that's what they came up with after doing their

9  clarification; correct?

10  **A.**   I don't know.  Maybe.  I mean, I don't remember exactly

11  where -- which manual each language -- all the language comes

12  from.  But --

13  **Q.**   Okay.

14  **A.**   -- I don't deny it; I just don't know.  I don't dispute

15  it.

16  **Q.**   Okay.  But whatever it is, you believe that they were not

17  very well defined.

18  **A.**   They were not completely defined, no, that's right.

19  **Q.**   Let me move that.  I have left up on the board -- we can

20  close that one down.  Thank you.

21      I've left up on the board a chart that counsel put in

22  yesterday when you were being examined.

23      One of the issues that you were concerned about in the

24  questionnaires was people being affected by unconscious

25  influences; correct?

**WALKER - CROSS / SALTZMAN**

1    **A.**    Yes.

2    **Q.**    And I took notes while you were talking yesterday, and one

3    of the unconscious influences you were concerned about was

4    social desirability.

5         Do you remember that?

6    **A.**    Yes.

7    **Q.**    The example you gave was, for example, washing the truck

8    somewhat of a -- is a courtesy to a driver who is coming after

9    you, and, therefore, it's -- how does that create some kind of

10   unconscious influence?

11   **A.**    That may be perceived as something that people are

12   supposed to do, that the people answering the question may

13   perceive that it's better if you're somebody that regularly

14   washes your truck and takes care of the other guy.

15   **Q.**    You're aware that the Wal-Mart manual requires the drivers

16   to wash the tractor every week?

17   **A.**    I know that there's language saying, "Wash your tractor

18   once a week," yes.

19   **Q.**    Okay.  So in this case, whether it's courteous or not to

20   do that, in fact, it's required by Wal-Mart; right?

21          **MR. EDELMAN:**   Objection.  Misstates evidence.

22          **THE WITNESS:**   I read testimony that said no.  I know

23   that the -- the manual says, "Wash your truck once a week," but

24   I also read the trial testimony where people who were managers

25   said no.

1          So I don't know.  I'm not an expert on those sorts of

2      things.

3      BY MR. SALTZMAN:

4      Q.   Right.  The managers.

5          Okay.  What about the pre-trip?  You said that pre-trips

6      and post-trips, which are safety issues, would be socially

7      desirable because it's, what, polite to take care of safety

8      issues?

9      A.   That -- again, that it's something that's -- that may be

10     perceived as something that it's good to do because it's more

11     safe.

12     Q.   And, again, kind of the same question.  I think we've

13     covered it, but this -- something that's nice to do, socially

14     desirable, it's required by law and by the Department of

15     Transport and it's required by Wal-Mart, correct, pre-trips and

16     post-trips?

17     A.   Yes.  It's my understanding that those are required, but

18     my testimony had to do with whether people will remember that

19     they did it -- the frequency at which they remember doing it,

20     not whether it's required or not.

21     Q.   Okay.  In terms of the social bias or the social

22     desirability that might trigger an unconscious influence, I

23     think you also talked about former employees perhaps being more

24     inclined to, what, testify to longer durations.

25          Is that what you were saying yesterday?

**WALKER - CROSS / SALTZMAN**

1    **A.**   No, I didn't say that.  I said that the former employ --

2    that the group was not statistically representative, and that

3    when you looked at what people said, former employees tended to

4    say that things took longer and that they occurred more

5    frequently and that Dr. Phillips' sample was overly weighted

6    towards those employees.  So that was a separate issue.  It

7    wasn't a social desirability bias.

8    **Q.**   I don't like to dwell on those that have passed from this

9    earth, but you did talk about six people who were deceased;

10   right?

11   **A.**   I think you asked me about the deceased people, yes, and I

12   said that that also is potentially a source for statistical

13   bias.

14   **Q.**   The people who were deceased, those were former employees;

15   right?

16   **A.**   Yes.

17   **Q.**   So by having -- just kind of moving forward with this, by

18   having six of the people removed from the pool who were

19   deceased, those would be -- that would result in removing

20   people that you believe would be more likely to testify in

21   favor of the plaintiffs; is that right?

22   **A.**   I wasn't talking about the deceased being -- likely to

23   testify in favor of the plaintiffs.  I said that that would

24   affect the statistical representativeness of the sample.

25   **Q.**   But those six people, by your other testimony, would be

1    apparently more -- some kind of unconscious influence to favor

2    the plaintiffs, so, therefore, removing six people who were

3    deceased would remove six people from potentially being in the

4    pool who would be favorable towards the plaintiff, under your

5    theory?

6    **A.**   I didn't say that the people who were former employees

7    were more like -- were being subjected to unconscious biases

8    which caused them to testify or to fill out the questionnaire.

9    You said that.

10        What I had said was that they tended to answer the

11   questions differently, for whatever reason.  The two potential

12   explanations are:  One, their experiences tended to be

13   different, which suggests that they shouldn't have been -- you

14   shouldn't have looked at former employees and current employees

15   and mish-mashed them together; or, secondly, they just had

16   different recollections and that their recollections were

17   biased.

18   **Q.**   Okay.

19   **A.**   But, you know, I wasn't talking about -- you're conflating

20   two different things from the board when you're talking about

21   the statistical representativeness and the unconscious biases.

22   **Q.**   Okay.  With regard to current employees, have you reviewed

23   any studies or any California cases, case law out of the

24   California Supreme Court, for example, talking about the

25   likelihood of current employees testifying -- or not wanting to

1    testify, first of all, against their current employers and

2    feeling intimidated or inhibited when testifying against a

3    current employer?  Have you reviewed any Supreme Court law

4    about that?

5              MR. EDELMAN:  Objection, Your Honor.

6              THE COURT:  So the question is has he reviewed Supreme

7    Court law?

8              MR. SALTZMAN:  I'll make it more -- that's the

9    question, but I'll try and lay a better foundation to where I'm

10   going.

11   BY MR. SALTZMAN:

12   Q.   You review surveys and articles about what happens in

13   litigation to understand surveying and proportional testimony.

14   You read about that in the literature; correct?

15   A.   I -- do I -- no, I don't look at court cases to understand

16   surveys.  I -- maybe you could repeat your question.

17   Q.   Okay.  In general, you read literature in the field;

18   right?

19   A.   Yes.

20   Q.   Okay.  And as an expert in this field, which is employment

21   litigation, have you taken it upon yourself to actually stay

22   current with the law regarding these issues, at least to know

23   what it talks about?  Not to be an expert in that, but to

24   understand the law.

25             MR. EDELMAN:  Objection.

1        **THE COURT:**  Sustained.

2   **BY MR. SALTZMAN:**

3   **Q.**    Have you -- in your reading and literature you look at to

4   try and be familiar with being able to testify on these issues,

5   do you -- do you ever read cases of the law that governs these

6   issues?

7        **MR. EDELMAN:**  Same objection.

8        **THE COURT:**  Well, that's yes or no.  You may answer,

9   sir.

10        **THE WITNESS:**  Yes.

11   **BY MR. SALTZMAN:**

12   **Q.**    So you do read some cases?

13   **A.**    Yes.

14   **Q.**    Okay.  So my question is with regard to the specific issue

15   of unconscious influences, have you read any California or

16   Supreme Court cases dealing with the unconscious influence or

17   effect on testimony on current employees of any cases that deal

18   with that issue and that talk -- that talk about current

19   employees feeling inhibited or intimidated?

20        **MR. EDELMAN:**  Objection, Your Honor.

21        **THE COURT:**  Overruled.

22      You can answer.  That's yes or no.

23        **THE WITNESS:**  I'm sorry.  Could you just repeat it?

24   I'm sorry.  Reread it or --

25        **MR. SALTZMAN:**  Kind of long-winded.  I'll try and make

WALKER - CROSS / SALTZMAN

1    it shorter.

2    BY MR. SALTZMAN:

3    Q.   And this is -- again, as the Court said, this is a yes or

4    no question.

5        So have you read -- in trying to stay current -- and

6    you've said you read some case law -- have you read any cases

7    from the California Supreme Court that talk about the impact of

8    a current employee being asked to testify in a case that is

9    against his or her employer -- current employer?

10           MR. EDELMAN:   Same objection, Your Honor.

11           THE COURT:   Overruled.

12       You may answer, sir.

13           THE WITNESS:   I don't recall -- I thought there was

14   something about unconscious bias in there.   I certainly don't

15   recall any court cases, reading any of the talk about

16   unconscious bias.   I just don't recall it.

17   BY MR. SALTZMAN:

18   Q.   Okay.   So more spec -- a little broader, then.

19       In your -- in your reading and staying current in the

20   area, have you read any cases, in the legal cases you have

21   read, that talk about current employees feeling intimidated or

22   inhibited in testifying against their current employer?

23           MR. EDELMAN:   Objection, Your Honor.

24           THE COURT:   You may answer.   That's yes or no.

25           THE WITNESS:   I don't recall that.   It may have been

**WALKER - CROSS / SALTZMAN**

1   in cases that I've read, but I don't recall it.

2            **MR. SALTZMAN:**  Okay.

3   **BY MR. SALTZMAN:**

4   **Q.**   I assume you're being paid for your time here and --

5   **A.**   Yes, I am.

6   **Q.**   -- and for your time in preparing to come here?

7   **A.**   Yes, I am.

8   **Q.**   And in doing all the studies you did, preparing to issue

9   your reports that were done several months ago?

10  **A.**   Yes.

11  **Q.**   Okay.  Can you tell us approximately how much your firm

12  has been paid for its services in this case?

13  **A.**   I don't know the number.  It's -- the total bill is at

14  least $500,000, but I don't know the number.

15  **Q.**   $500,000?

16  **A.**   Yes.

17  **Q.**   Okay.  And does that include any work you've done in the

18  last month or so as you've gotten ready to come to court?  Are

19  those bills current, or is that in addition to whatever was

20  billed earlier?

21  **A.**   That was just a guess.  I don't -- I don't know what the

22  total cost has been --

23  **Q.**   Well, none of us --

24  **A.**   -- for any period of time.

25          I know that through today, I'm sure it's $500,000, but I

**WALKER - CROSS / SALTZMAN**

1    don't know beyond that.

2    **Q.**   So I don't want you to guess, but you're confident that's

3    a fair estimate?

4    **A.**   I'm confident that we've billed at least -- Economists

5    Incorporated has billed at least $500,000 for the work it's

6    done in this case.

7    **Q.**   You testified yesterday about what drivers had said at

8    depositions regarding spending a portion of time away from

9    their trucks during layovers.

10        Do you remember that?

11   **A.**   Yes.

12   **Q.**   In the percentages that you gave to the jury, did you --

13   were you including anyone who testified that even once they had

14   done that?  You weren't attempting to -- for example, you

15   weren't attempting to quantify how often that happened; it

16   simply had to have happened once for them to fall into your

17   categories?

18   **A.**   Yes.

19   **Q.**   Okay.  So for all of the percentages you gave, if someone

20   had spent one time away, that was included in your 60 or 70 or

21   80 percent numbers you gave the jury?

22   **A.**   Well, one of the numbers had to do with whether they

23   perceived that they -- that they could if they wanted to

24   without permission, and that's not how many times.

25        The -- there were counts -- the other counts, as I

**WALKER - CROSS / SALTZMAN**

1  recall -- I don't have them right in front of me; I could look

2  at them -- but, yeah, it was just, "Did you ever do this?"

3  **Q.**  So one time -- one time, it put them in that group?

4  **A.**  Yes.

5  **Q.**  And, also, did you attempt to figure out whether any of

6  the drivers in that group were what are called set run drivers?

7      Do you know what a set run driver is?

8  **A.**  I do know what a set run driver is.

9  **Q.**  Did you attempt to see whether any of those drivers were

10  in the group you were looking at?

11  **A.**  I'm sure that they were.

12  **Q.**  Okay.  And you understand that set run drivers don't have

13  a sleeper berth in their tractor; right?

14  **A.**  Yes.  I understand that they always take their layovers at

15  hotels and motels.

16  **Q.**  Okay.  So they were included in those numbers, as well?

17  **A.**  Yes.

18  **Q.**  And included in that number would have been, then, anyone

19  who took a layover outside their tractor if, for example, they

20  had an emergency situation that might have triggered discretion

21  pay or something else, but as long as the layover was outside

22  the -- outside the tractor, even once for an emergency -- and

23  we had drivers talk about that -- they were included in that

24  number, as well; right?

25  **A.**  I don't recall that being the case for any of those 39.  I

**WALKER - CROSS / SALTZMAN**

1    don't recall that that was what I was pointing to, but, you

2    know, you have that in my -- in my report.  It identifies the

3    passage that I was relying upon.  I don't think any of those

4    passages concerned that example, but it's possible.

5    **Q.**   Okay.  And then you talked about, at the end of your

6    depo -- your -- at the end of your direct testimony from

7    Mr. Edelman, the last issue was criticism of Mr. Garcia, Ed

8    Garcia, and his penalty calculation because, as you said, it

9    assumed that each payroll period a driver had unpaid time;

10   correct?

11   **A.**   Yes.

12   **Q.**   Okay.  Now, we're not going to resolve, you and I, whether

13   or not time was unpaid.  That's not our job between you and I.

14        Would you agree with me, however, that if the plaintiffs

15   are correct and, for example, pre-trip and post-trip has not

16   been paid separately under the pay codes and let's assume it

17   amounts to unpaid time, for our discussion purposes, would you

18   agree that if that amounts to unpaid time, that would have

19   happened in every pay period that a driver drove; correct?

20   **A.**   Probably.

21   **Q.**   And -- because they have to do that every day; right?

22   **A.**   Well, you have to -- probably.  But, again, I just tie it

23   back to pay periods.  But probably it would -- it would be

24   true.

25   **Q.**   And the same thing for rest breaks?  They would probably

**WALKER - CROSS / SALTZMAN**

1    have had rest breaks somewhere in every two-week pay period;

2    correct?

3    **A.**   I don't know that that's the case.  I mean, the testimony

4    was that some people never took -- never took unpaid rest

5    breaks.  Some people --

6    **Q.**   Unpaid rest breaks, yes.  Let's stop you there, because

7    we're not going to resolve that.  I apologize.

8         Okay.  So -- but overall, then, if the plaintiffs are

9    correct in their theories, then, in fact, it's very likely that

10   every payroll period would have had at least an unpaid

11   violation and, therefore, would fall within the category

12   covered by that statute, 1197.1; right?

13   **A.**   No.  If they're correct in that one theory that everybody

14   did a post-trip and that no post-trips and no -- and pre-trips

15   and that those were uncompensated, then it seems probably to be

16   the case.

17             **MR. SALTZMAN:**  Okay.  I have nothing further,

18   Your Honor.  Thank you.

19             **THE COURT:**  Thank you.

20   **BY MR. SALTZMAN:**

21   **Q.**   Oh, one last question.

22        You said you billed around $500,000.  Has that been paid?

23   **A.**   I said that -- that -- that I'm sure that we billed --

24   that the total bill has been $500,000, and the bills were

25   current the last time I looked.

WALKER - REDIRECT / EDELMAN

1    **Q.**    So most of it would have been paid by now?

2    **A.**    Yes.

3            **MR. SALTZMAN:**   Okay.   Thank you.   No further

4    questions.

5            **THE COURT:**   Mr. Edelman.

6            **MR. EDELMAN:**   Thank you, Your Honor.

7                      <u>**REDIRECT EXAMINATION**</u>

8    **BY MR. EDELMAN:**

9    **Q.**    Dr. Walker, good morning.

10   **A.**    Good morning.

11           **MR. EDELMAN:**   Ladies and gentleman, good morning.

12   **BY MR. EDELMAN:**

13   **Q.**    Just with respect to this issue of payment, you read

14   Dr. Phillips' report and his deposition; right?

15   **A.**    Yes, I did.

16   **Q.**    And do you recall his testimony in this courtroom that he

17   had a large team of people who worked for him?

18   **A.**    Yes.

19   **Q.**    Do you remember him also disclosing in his report and/or

20   deposition that he and his team were being paid for their time?

21   **A.**    Yes.

22   **Q.**    And that they had put in hundreds and hundreds of hours?

23   **A.**    Yes, I did.

24   **Q.**    Is it common for economists who are retained in litigation

25   like this, whether it's Dr. Phillips or whether it's your firm,

**WALKER - REDIRECT / EDELMAN**

1  to be paid --

2  **A.**    Yes.

3  **Q.**    -- for their time?

4  **A.**    Yes, it is.

5  **Q.**    You were also asked a question by Mr. Saltzman about

6  claims run drivers.

7  **A.**    Yes.

8  **Q.**    And those are the guys who generally don't have a sleeper

9  berth --

10  **A.**    Yes.

11  **Q.**    -- right, and stay in hotels instead?

12  **A.**    Yes.

13  **Q.**    And you've read the testimony that when they stay in the

14  hotel, they still get the $42 layover pay?

15  **A.**    Yes.

16  **Q.**    In the model that Mr. -- that Dr. Phillips prepared of all

17  of the layover data where he put together that sheet of paper

18  that we saw, did his model account for or take out those claims

19  run drivers?

20  **A.**    No.  He's including loss estimates for all of those

21  drivers who regularly stay in hotels rather than sleeping in

22  their trucks.

23  **Q.**    So he did not separate out even the claims drivers who are

24  staying in hotels because they don't have sleeper berths and

25  are still getting the $42 in layover pay?

**WALKER - REDIRECT / EDELMAN**

1    **A.**    That's correct.

2    **Q.**    A couple other things.  I'm going to try to be quick here

3    today because of what we need to do in the limited time we

4    have.

5         But yesterday, Mr. Saltzman asked you about -- some

6    questions about one of the points you made on your board about

7    memory -- about frequency and duration being unreliable.

8         And in particular, he sort of questioned you whether it's

9    reasonable for you to be suggesting in some fashion that --

10   that this jury cannot rely on the testimony of drivers who have

11   come forward in this case and testified as to things that they

12   did over the course of 20 years or more.

13        Do you remember that line of questioning?

14   **A.**    Yes.

15   **Q.**    And so he asked you, "Can't we rely on jurors" -- I'm

16   sorry -- "on drivers who come in and say, 'I spent, you know,

17   however much time day in and day out for however many years

18   doing a pre-trip or a post-trip'."

19        Do you remember that line of questioning?

20   **A.**    I do.

21   **Q.**    So simple question for you.  Did Dr. Phillips, in his

22   analysis, rely on either -- on any of the plaintiffs' testimony

23   or any of the drivers who came forward in this case as to how

24   long it took them to do a pre-trip or a post-trip over the 20

25   or however many years that they did that?

**WALKER - REDIRECT / EDELMAN**

1  **A.**   No.  For those everyday activities, he relied on just an

2  assumption of 15 minutes for everybody.

3  **Q.**   So he used -- he did not rely on the testimony they gave;

4  he just used his assumptions?

5  **A.**   Yes.

6  **Q.**   And on things like waiting time, there's been some

7  testimony in this case from some of the plaintiffs about how

8  long they think they waited over the course of ten years.

9        You've read that?

10  **A.**   Yes.

11  **Q.**   And then some of the testimony from drivers that the --

12  that the plaintiffs' counsel have brought in to testify about

13  how long they waited over the years; correct?

14  **A.**   Yes.

15  **Q.**   Did Dr. Phillips rely on that testimony in his analysis?

16  **A.**   No.  He just assumed that everybody waited 45 minutes per

17  week, regardless of the testimony that they had given or the

18  answers on the questionnaires.

19  **Q.**   And what he said was that was an assumption that he was

20  asked to make by plaintiffs' counsel for purposes of his

21  analysis; correct?

22        **MR. SALTZMAN:**  Objection, Your Honor.  It misstates

23  the testimony.

24        **THE COURT:**  Well, I was going to say it's leading,

25  which it is.  So why don't you just ask a question and we'll

1    get his response.

2              MR. EDELMAN:  Fair enough.

3    BY MR. EDELMAN:

4    Q.   From your review of Dr. Phillips' testimony, was he asked

5    to make any kind of an assumption about waiting time?

6    A.   Yes.

7    Q.   What was he asked to make?

8    A.   He assumed -- said he was asked to assume that every

9    driver had 45 minutes of wait time -- uncompensated wait time

10   per week, regardless of what they'd said in their

11   questionnaires or testimony or at depositions.

12   Q.   All right.  Another question.  Mr. Saltzman was talking to

13   you yesterday about the questionnaire and the deposition

14   process that these 39 drivers went through.

15   A.   Yes.

16   Q.   40, but one of them you said only worked at Wal-Mart for a

17   day or two, so that person didn't have anything to say; right?

18   A.   Yes.

19   Q.   And you recall the line of questioning about your comments

20   about the fact that they had had to subpoena their own clients,

21   and you had some questions about that.

22   A.   Yes.

23   Q.   Okay.  And I'm just trying to set the stage.

24        And Mr. Saltzman said, "But isn't that appropriate or

25   necessary to ensure the integrity of the process so that it not

1    be tainted by communications between the lawyers and the people

2    who were going to fill out the questionnaires and be deposed?"

3        Do you remember that line of questioning?

4    **A.**   I do.

5    **Q.**   All right.  So when the drivers who did these surveys, the

6    39 of them, filled them out, that was before they spoke with

7    counsel; correct?

8    **A.**   Yes.  So far as I know, yes.

9    **Q.**   There was -- you had testified previously that there was

10   another survey that had gone out earlier and you commented

11   about your concerns about that.  I'm not going to get back into

12   that, but let me rephrase my question.

13       At least for purposes of the deposition, the way it was

14   supposed to work was the drivers were supposed to come in, fill

15   out the questionnaire before they talked to counsel.

16   **A.**   That's right.

17   **Q.**   Okay.  After they filled out the questionnaire, and before

18   they went into their depositions, how did the process work?

19   **A.**   They all met with counsel.  They all met privately with

20   plaintiffs' counsel, and it was only then that they gave the

21   deposition testimony that Dr. Phillips relied upon.

22   **Q.**   So they had private attorney-client communications with

23   their lawyers before they went into their depositions?

24   **A.**   Yes, that's right.

25   **Q.**   Do you have any concerns about whether those types of

1    private communications might taint the integrity of the

2    deposition process on which Dr. Phillips relied?

3    **A.**   Yes.  I mean, this is the exact sort of unconscious bias

4    that we were talking about or potentially conscious bias that

5    we were talking about before.

6        So the decision not to contact potential deponent

7    survey-takers before coming in -- well, one, it's already been

8    tainted because they all got a letter, but to the extent that

9    it preserves anything, it preserves the integrity of the

10   questionnaire.

11       But Dr. Phillips didn't rely just on the questionnaire, he

12   relied primarily on the deposition.  The deposition occurred

13   immediately after a private conference and meeting with

14   plaintiffs' counsel, and so it introduces the potential for

15   bias that can't be measured.

16   **Q.**   All right.  And my last line of questioning relates to

17   some of the questions you were asked yesterday about some of

18   the hard data that Dr. Phillips had.

19   **A.**   Yes.

20   **Q.**   And do you remember that at some point during the

21   questioning, Mr. Saltzman said to you, "Didn't the fact that

22   Dr. Phillips relied on some hard data render your concerns that

23   you had spent the morning testifying about irrelevant?"

24   **A.**   Yes.

25   **Q.**   And you said, "No."

**WALKER - REDIRECT / EDELMAN**

1    **A.**   Yes, that's right, I said, "No."

2    **Q.**   I want to try to clear up what hard data he had, how he

3    used it, and what hard data he did not have.

4         So let's first talk about the hard data relating to the

5    Department of Transportation --

6    **A.**   Yes.

7    **Q.**   -- the DOT breaks.

8    **A.**   Yes.

9    **Q.**   What was the time period for which there was hard data

10   available?

11   **A.**   I think it was 2013 through 2015, and then there was a

12   question even about whether he had complete data for 2014.  So

13   it's 2 or 3 years out of the 11.

14   **Q.**   Out of the 11.

15        What did Dr. Phillips do for the remaining time in the

16   class period?

17   **A.**   He extrapolated backwards based upon assumptions, rather

18   than on hard data.

19   **Q.**   Let's talk about Gasboy.

20        The Gasboy data is the data that Wal-Mart had that showed

21   the frequency of fueling of trucks.

22   **A.**   Yes.

23   **Q.**   It doesn't show how much time was spent fueling, it just

24   shows how often a particular truck or driver identification

25   number is associated with a fueling event; correct?

1    **A.**   Actually, it just shows the truck.  It doesn't establish

2    that the driver filled the truck.

3          But, yes, it's -- it doesn't have frequencies.

4    **Q.**   Okay.  And, first, for what period of time was the Gasboy

5    data available?

6    **A.**   If I can correct, I said it doesn't have frequencies.  It

7    doesn't have the length of time.  It does have frequencies.

8          And it's only available for a few years, I think, again,

9    2013 to 2015, 2 or 3 years out of the 11.

10   **Q.**   And is it -- is it your understanding that prior to that,

11   Wal-Mart had not contracted with Gasboy?

12   **A.**   That's right.  This is a private company that developed

13   these data, and it's my understanding Wal-Mart didn't contract

14   with them before.

15   **Q.**   Okay.  Now, what did Dr. Phillips do with the Gasboy data?

16   **A.**   Well, he -- again, he extrapolated backwards in time based

17   on assumptions that were just assumptions without any basis in

18   fact.

19         And, also, he again had to rely on his hybrid data in his

20   extrapolations to estimate how long it took to fill the tank

21   when it was filled.

22   **Q.**   Because the Gasboy data doesn't show that?

23   **A.**   Correct.

24   **Q.**   And so what were -- even with the hard data that

25   Dr. Phillips had for the Gasboy data -- that is, the data that

**WALKER - REDIRECT / EDELMAN**

1    showed how often a truck or a driver ID number is associated

2    with fueling -- do you consider what he did to be reliable?

3    **A.**    No --

4    **Q.**    Why not?

5    **A.**    -- it's not reliable.

6         Because he's still relying on the hybrid data for the

7    length of time that it took.  It's not enough to know how

8    frequently the trucks were filled.  You need to know how long

9    it took to fill them.

10        And then also he was extrapolating backwards in time under

11   the assumption that the circumstances regarding refueling would

12   mean that you refuel it just as often in the earlier years as

13   you did in the later years.  And when I looked at the Gasboy

14   data, I saw an upward trend in the frequency at which the tanks

15   were being refueled, which would call into question the

16   reliability of that assumption.

17        So even where he relied partially on the Gasboy data, he

18   was still relying upon the hybrid data for times, which is

19   subject to all of those problems on the board, and he was

20   extrapolating backwards in time for most of the class period

21   and close -- most of the class members.

22   **Q.**    You said when you looked at the data, you saw an increase

23   in the frequency with which trucks were being refueled?

24   **A.**    Yes, that's right.

25   **Q.**    Meaning that in prior years, it -- the trucks might have

1    been fueled less frequently?

2    A.    That's right.

3    Q.    And are you aware that at some point during the class

4    period, the size of the tanks on the trucks changed from 150

5    gallons on either side to 100 gallons on either side?

6    A.    Yes.

7    Q.    And so there was less fuel on a truck in subsequent years?

8    A.    Yes.

9    Q.    Might that be an explanation for why there was --

10          MR. SALTZMAN:   Objection --

11   BY MR. EDELMAN:

12   Q.    -- an increase in fueling later, as opposed to earlier, in

13   the trend that you saw?

14          THE COURT:   Stop.

15      What's your --

16          MR. SALTZMAN:   Objection.   Leading, Your Honor.   Calls

17   for speculation.

18          THE COURT:   It is leading.

19          MR. EDELMAN:   All right.   I'll ask it differently.

20          MR. SALTZMAN:   Well, it still -- go ahead.

21   BY MR. EDELMAN:

22   Q.    Did Dr. Phillips, in his analysis of frequency of fueling,

23   account for this upward trend in frequency of fueling that you

24   saw in the data?

25   A.    No.

WALKER - REDIRECT / EDELMAN

1          **MR. SALTZMAN:**  Objection, Your Honor.  Leading and

2   calls for speculation.

3          **THE COURT:**  Overruled.  The answer may stand.

4          **THE WITNESS:**  No.  He ignored it.

5   BY MR. EDELMAN:

6   **Q.**   Did he, in his work, make any mention, either in the

7   report or in the testimony, about changes in the size of the

8   tanks on the trucks?

9   **A.**   No.

10  **Q.**   Let's talk briefly about this minute -- per-minute

11  calculator that Dr. Phillips came up with.

12         **MR. EDELMAN:**  And, Tracy, if I could ask for your

13  assistance, please, just for the ELMO.  Thank you.

14         **THE CLERK:**  You want the ELMO?  Okay.

15         **MR. EDELMAN:**  Perfect.

16  BY MR. EDELMAN:

17  **Q.**   So this per-minute calculator that Dr. Phillips has

18  provided --

19  **A.**   Yes.

20  **Q.**   -- and that Mr. Saltzman asked you about yesterday --

21  **A.**   Yes.

22  **Q.**   -- is this -- in your view, does -- is this an accurate

23  way for the jury -- is this an accurate tool for the jury to

24  use in considering loss or damages in this case?

25  **A.**   No.

**WALKER - REDIRECT / EDELMAN**

1  **Q.**  Why not?

2  **A.**  Because you need to know the frequency and the length of

3  time spent on these activities.  In order to assess loss, you

4  need to know how many minutes were uncompensated.

5      And all this goes to is if you knew how many minutes were

6  uncompensated on average, then on average, this could translate

7  that into a class-wide figure.

8      But unless you know, even on average, how many minutes

9  were spent on these activities, this calculator is useless.

10  And if you're trying to figure out individual people's

11  uncompensated time, even knowing the on-average figure doesn't

12  help you, because we know that on an individual basis, there's

13  all sorts of variety.

14      So unless you know for each of the 840 class members how

15  much time they spent on these allegedly uncompensated

16  activities, you can't calculate their loss.

17      And if you do know on an individual basis, this number has

18  absolutely nothing to do with them because this is an

19  aggregation of a whole bunch of people, rather than any -- than

20  any individual.

21  **Q.**  So does -- does use of this calculator that Dr. Phillips

22  has attempted to provide implicate all of the problems that are

23  on Defendant's Exhibit 687 and to which you testified

24  yesterday?

25  **A.**  It doesn't respond to any of them.

**WALKER - REDIRECT / EDELMAN**

1    **Q.**   All right.  And will any of the evidence that has

2    presented -- that has been presented in this trial allow the

3    jury to make a reasonable and reliable estimate of the amount

4    of time that the 800 or so plaintiffs who have not testified

5    and whom we know nothing about in fact spent on the activities

6    in this case?

7    **A.**   No.

8         **MR. EDELMAN:**  All right.  I want to -- if we could

9    pull up -- well, I think a better way for me to do it is just

10   to stay with the ELMO.  I'm going to pull up Slide 13 from

11   yesterday.

12   **BY MR. EDELMAN:**

13   **Q.**   This is one of your slides where you showed for end-of-day

14   meetings -- you showed a very broad -- what would you call

15   that?  Range or margin of error or --

16   **A.**   Either one is fine.

17   **Q.**   All right.

18        -- for -- this is for -- for one particular driver?

19   **A.**   Yes.

20   **Q.**   All right.  And then -- and so that range was between $810

21   and over $118,000; right?

22   **A.**   Right.

23   **Q.**   And then Mr. Saltzman put up his -- their chart or list

24   for end of day and he said, "But, look, all we're asking for is

25   3,875,116 for the time period of '05 through '15 and then a

**WALKER - REDIRECT / EDELMAN**

1   $438,000 figure for 2004 through -- period through 2004 and

2   2005 and asked you isn't that a conservative, reasonable

3   estimate?

4   **A.**   Yes.

5   **Q.**   And that's my question to you.  Is what they did, in light

6   of your concerns in Slide 13, a reasonable and accurate

7   estimate?

8   **A.**   No, it is not reasonable and accurate.

9   **Q.**   Is it conservative?

10  **A.**   It's not reasonable, accurate, or conservative.

11  **Q.**   Why not?

12  **A.**   This has to do with the variability by person, and what

13  this is showing is that people will tend to be grossly overpaid

14  or overcompensated or grossly undercompensated by Dr. Phillips'

15  method.

16       And the people that are overcompensated, when you look at

17  the whole, are, you know, offset by people that are

18  undercompensated.  So when you look at the whole, because it is

19  an average, if you assume all -- away all of the things on the

20  board, if you assume that the questionnaire is accurate and

21  people's memories are accurate and Dr. Phillips' crew

22  transcribed the depositions appropriately, if you assume all

23  those things are correct, then the dispersion we were talking

24  about suggests that individual damages are going to be grossly

25  inaccurate.  And the $4 million doesn't change that.

WALKER - REDIRECT / EDELMAN

1      The -- at the individual level, some people would be

2    getting large awards when perhaps they didn't suffer any loss

3    at all; some people would be getting very tiny awards when

4    perhaps they were the ones that actually had some uncompensated

5    time.  So that's what this was all about, and that's why it's

6    not reliable, even at the individual level.

7      The other reason that it's not reliable or conservative is

8    that we know that those other points on the board still exist.

9    So the 4 million number is based upon the people's

10   recollections about how frequently things occurred and how long

11   they lasted.  And to the extent we were able to test that, it

12   was inflated by, you know, I think close to 60 percent in terms

13   of the frequency at which things happened, close to 60 percent

14   in terms of how long they happened.  And taken together, that

15   could have an impact of over 150 percent.  So that's not

16   conservative at all.

17     And then we also saw that Dr. Phillips' interpretations of

18   what people said was highly subjective, and in some cases, it

19   was clearly incorrect and in a way that would tend to inflate

20   the damages numbers or the loss numbers that he calculated.

21     And, finally, we know that Dr. Phillips' sample of 39 or

22   40 people is overly comprised of folks who were former Wal-Mart

23   employees, who tended to answer that things occurred more

24   frequently and took longer than the nonemployee -- than the

25   noncurrent employees do, so that the sample group's stated

1   experiences would overstate the amount that the rest of the

2   class would tend to say.

3       So for all of the reasons we talked about yesterday, it's

4   not a conservative estimate at all, nor is it reliable on

5   either the individual level or the aggregate level.

6   **Q.**   All right.  Just a few questions and then I'm going to be

7   done.

8       I want to get back to this question of hard data --

9   **A.**   Yes.

10  **Q.**   -- and make sure we all have a clear understanding, before

11  you leave, of what Dr. Phillips purported to rely on hard data

12  for and what he didn't.

13      So here is the question.  Did Dr. Phillips rely on hard

14  data for the amounts of time any of the class members spent on

15  the following tasks:

16      Rest breaks?

17  **A.**   No.

18  **Q.**   What did he do?

19  **A.**   For rest breaks, he relied on the -- an assumption that

20  everybody had 20 minutes of unpaid rest every shift.  It was

21  just an arbitrary assumption.  It was not based on any hard

22  data.

23  **Q.**   Pre-trip and post-trip inspections.  Did he rely on hard

24  data?

25  **A.**   Certainly not for the amount of time it took.  He just

**WALKER - REDIRECT / EDELMAN**

1  relied on an assumption that it was 15 minutes for everybody

2  every time for each of those tasks.

3  **Q.**   Fueling at Wal-Mart.  Did he rely on any hard data as to

4  how much time the drivers spent fueling?

5  **A.**   The amount of time per event was not based on any hard

6  data.

7  **Q.**   The Gasboy data only showed the frequency, not the amount

8  of time; right?

9  **A.**   Correct.  And it didn't cover all the people for all the

10  time.

11  **Q.**   Right.  It was only for a limited period of time?

12  **A.**   Yes.

13  **Q.**   Fueling away from the distribution center?

14  **A.**   Didn't rely on hard data at all.

15  **Q.**   Washing?

16  **A.**   Did not rely on hard data at all.

17  **Q.**   Did he rely on any hard data as to whether drivers washed?

18  **A.**   No.

19  **Q.**   Did he rely on any hard data as to how often they washed?

20  **A.**   No.

21  **Q.**   Did he rely on any hard data as to how long the washing

22  took?

23  **A.**   No.

24  **Q.**   Weighing.  Did he rely on any hard data as to how long

25  weighing took?

**WALKER - REDIRECT / EDELMAN**

1    **A.**    No, he did not.

2    **Q.**    Driver coordinator, whether you call them conversations

3    over the counter or if you want to call them meetings, as the

4    plaintiffs do.  Did he rely on any hard data as to how long it

5    takes for those to happen?

6    **A.**    Nope.

7    **Q.**    Did he rely on any hard data as to wait time?

8    **A.**    No, he did not.

9    **Q.**    Did he rely on any hard data as to, on layovers, how much

10   time class members actually spent in their truck?

11   **A.**    No, he did not.

12   **Q.**    Is there any reliable way, any reliable evidence, on which

13   the jury could determine loss associated -- alleged loss

14   associated with the following tasks:

15        Rest breaks?

16   **A.**    No.

17   **Q.**    Pre-trip and post-trip inspections?

18   **A.**    No.

19   **Q.**    Fueling at Wal-Mart?

20   **A.**    No.

21   **Q.**    Fueling away from the DC?

22   **A.**    No.

23   **Q.**    Washing?

24   **A.**    No.

25   **Q.**    Weighing?

**WALKER - REDIRECT / EDELMAN**

1   **A.**   No.

2   **Q.**   Driver coordinators?

3   **A.**   No.

4   **Q.**   DOT or CHP inspections?

5   **A.**   No.

6   **Q.**   Wait time?

7   **A.**   No.

8   **Q.**   Or time -- time spent in the sleeper berth on a layover?

9   **A.**   No.

10  **Q.**   Is there any reason to believe, Dr. Phillips, that the

11  named plaintiffs who testified at trial are representative of

12  the 800-plus class members whom we know nothing about?

13  **A.**   Well, you called me Dr. Phillips, but the answer is still

14  no.

15  **Q.**   He is on my mind.  Let me rephrase.

16       Is there any reason, Dr. Walker, for us -- for the jury to

17  believe that the named plaintiffs who testified at trial are

18  representative of the 800-plus class members whom we know

19  nothing about?

20  **A.**   They are not representative in any statistical sense, no.

21  **Q.**   And briefly, because we have in mind your prior testimony,

22  why not?

23  **A.**   Because they were not selected in a random way.  People do

24  not become named plaintiffs by some random process, nor do

25  either side's lawyers tend to choose witnesses by a random

1    process.

2    **Q.**   And is there any reason to believe that the drivers who

3    testified at trial -- some of them were not named plaintiffs,

4    but including the named plaintiffs -- are representative of the

5    800-plus drivers whom we know nothing about?

6    **A.**   Not in any statistically-reliable sense, no.

7              **MR. EDELMAN:**  Thank you.

8              **THE WITNESS:**  You're welcome.

9              **THE COURT:**  Anything further, Mr. Saltzman?

10             **MR. SALTZMAN:**  Yes, Your Honor.  Thank you.

11                        <u>RECROSS-EXAMINATION</u>

12   BY MR. SALTZMAN:

13   **Q.**   Have you ever testified in a class action before?

14   **A.**   Yes, I have.

15   **Q.**   Did you just say that the named plaintiffs are not proper

16   because they were not randomly selected?

17   **A.**   I did not say that, no.  I said that they are not

18   statistically representative of the class, so that one cannot

19   draw reliable conclusions about the class from their

20   circumstances, given that there is a wide variety of

21   experiences across people and over time.

22   **Q.**   Let me read to you from the transcript, sir:

23        "And briefly, because we have in mind your prior

24   testimony, why not?"  And this is as to the plaintiffs, the

25   representatives.

**WALKER - RECROSS / SALTZMAN**

1    Answer, "Because they were not selected in a random way."

2    Do you believe that representatives -- that the plaintiffs

3  in a class action have to be selected in a random way?

4  **A.**  If -- if the question is in order for them to be a

5  statistically-representative group whose experiences will yield

6  reliable information about the class that you can extrapolate

7  to the class, under circumstances where people vary, where some

8  people engage in tasks really frequently and some people engage

9  in tasks not at all, some people take a long time, some people

10  don't -- in circumstances such as that, where you're trying to

11  extrapolate from this group of named plaintiffs to the class,

12  yes.

13    If the issue is is this group statistically representative

14  of the class, yes, they have to be chosen in some random way in

15  order for that to be true.

16  **Q.**  Okay.  So let me ask you, how many class actions have you

17  been involved in as a witness?

18  **A.**  I don't know.  I can't answer that without looking at my

19  CV and going through the classes.

20  **Q.**  Over 20?

21  **A.**  No.  You mean as -- have I testified as a -- as a witness

22  in a --

23  **Q.**  Or been a consultant.

24  **A.**  There have been cases where I consult with people and

25  don't -- don't testify, and I don't keep track.  So I don't

1   know what the numbers are.

2   **Q.**   Isn't it correct, sir, that in most class actions, as

3   compared to this one, where there is nine representatives --

4   isn't it correct, sir, that in most class actions, there is

5   maybe one or two named plaintiffs who step forward, especially

6   in employment litigation, to actually make class action claims

7   against their employers?

8   **A.**   I don't know whether that's true or not.

9   **Q.**   You don't.

10      Well, let's assume that this case had one representative

11  plaintiff instead of nine.

12  **A.**   Yes.

13  **Q.**   Can you tell me, sir, and tell the jury, how one

14  representative plaintiff, who has the right to file a proposed

15  class action, could ever be randomly selected to handle -- to

16  step forward as a class?  How could one person ever be randomly

17  selected?

18  **A.**   I don't -- I don't actually know how it is that -- that

19  plaintiffs' counsel find class reps.  I don't know --

20  **Q.**   How about how class reps find plaintiffs' counsel, sir?

21  **A.**   I don't know that it happens that way either.  I don't

22  know whether it's a random process when it's the case that

23  plaintiffs' counsel chooses a rep.  I just don't know.  But I

24  don't know --

25  **Q.**   Are you saying, sir, that plaintiffs' counsel go out

**WALKER - RECROSS / SALTZMAN**

1    and -- go out and choose the case or aggrieved employees go

2    looking for and find an employer -- a counsel to represent

3    them?

4            **MR. EDELMAN:**  Excuse me, Your Honor.  This is

5    inappropriate.

6            **THE COURT:**  Well, it's argumentive.  It's not going to

7    shed much light.

8            **MR. SALTZMAN:**  I'll move on.

9            **THE COURT:**  I'll let him answer because I bet the

10   answer is, "I don't know."

11           **MR. SALTZMAN:**  I would probably anticipate that, so

12   I'll move on.  Thank you.

13           **THE COURT:**  All right.

14   **BY MR. SALTZMAN:**

15   **Q.**   So just to close out this issue, when you said earlier

16   that you -- they were not proper because they had not been

17   randomly selected to be class representatives, you don't stand

18   by that statement any longer, do you?

19   **A.**   Well, I never said that.  What I said --

20   **Q.**   Well, actually, you did say that, sir.  I just read it

21   back to you.

22           **MR. EDELMAN:**  Objection, Your Honor.  Misstates his

23   prior testimony.

24           **THE COURT:**  Sustained.

25

**WALKER - RECROSS / SALTZMAN**

1  BY MR. SALTZMAN:

2  **Q.**   Did you -- did you read the trial testimony of the driver

3  witnesses who came in here to testify to this jury before you

4  came into this courtroom yesterday?

5  **A.**   Many of them, yes.

6  **Q.**   Okay.  So the jury had the benefit or has had the benefit

7  not only of the summaries and the estimates derived from the

8  depositions and from other data, but also of the live testimony

9  of many drivers; correct?

10  **A.**   Yes.

11  **Q.**   And is it appropriate for the jury, in your mind, to take

12  into account the testimony of the live witnesses who came into

13  this courtroom to testify as to the facts of this case?

14  **A.**   Appropriate?  I assume so.  Accurate?  It depends on what

15  they're using it for.

16  **Q.**   Okay.  And to the extent that witnesses came in -- excuse

17  me -- and some of them testified that it took 15 minutes for a

18  pre-trip or a post-trip, some may have testified to 10 minutes,

19  there would be variances because, in fact, people have exact --

20  don't have exactly the same experiences; correct?

21  **A.**   There -- there are variances for a number of reasons, one

22  of which is their experiences vary from person to person, yes.

23  **Q.**   And all of that, whether it was from the 40 depositions or

24  from the live testimony in front of this jury, all of that

25  together is something the jury should consider in determining

**WALKER - RECROSS / SALTZMAN**

1    what the appropriate amount of time, how to work with or accept

2    testimony, and how to determine how much time they believe

3    tasks took -- wouldn't you agree that that is the jury's

4    function?

5    **A.**   I think this is way out of my realm.  I think that, you

6    know, the Court will give instructions on what they should do.

7    It's not --

8    **Q.**   Okay.

9    **A.**   -- for me to tell them to do that.

10   **Q.**   Now, the per-minute calculation that you criticized,

11   assuming that the jury, instead of accepting 15 minutes for a

12   pre-trip inspection, if they thought it was 16 minutes or 14

13   minutes, Dr. Phillips has provided them with a tool by which

14   they could then determine their own number, rather than

15   anything that either side has suggested; correct?

16   **A.**   Sure.  The jury could come up with some number randomly

17   and apply this one minute, but --

18   **Q.**   Randomly?

19   **A.**   -- the point -- yes, randomly.  I thought that was what

20   you were saying, if the --

21   **Q.**   No.  The jury --

22   **A.**   -- if the jury, without any information, comes to some 14-

23   or 16-minute number.

24       And I've seen the testimony.  There's no basis for such a

25   number.  But if the jury randomly comes up with a number, they

1    can multiply it by his calculator.

2        But the point was there's no basis to come up with such a

3    number.  That's why the calculator is useless.

4    **Q.**   And part of why you thought it wasn't useful was because

5    it didn't tell the jury how much time each and every driver

6    spent doing those tasks, right, individually; right?

7    **A.**   That's one of many reasons that the calculator is useless.

8    **Q.**   So coming back to your class action experience, is it your

9    belief that when you told the jury that, that each and every

10   driver has to be individually calculated in order to come to a

11   global number in a class action?

12   **A.**   You're missing -- you're mixing up general cases, talk --

13   discussions about sort of general circumstances, all class

14   actions, and you're conflating that with the circumstances

15   here.

16       The circumstances here --

17   **Q.**   No.  Let --

18   **A.**   -- involve people who were widely different in terms of

19   the frequency at which they engage in the tasks, the amount of

20   time that it takes, and in the -- and the amount at issue is

21   very large.  You know, a hundred thousand dollars or so per

22   person is the allegation.

23       And in circumstances such as that, yes, I think that the

24   accurate thing to do is to go through these things one by one

25   to make sure that it's right.

**WALKER - RECROSS / SALTZMAN**

1    But is that the case with all class actions?  No.  There

2    are lots of class actions that are different, where you're

3    talking about rote activities where everyone is doing the same

4    thing over and over and over again, and in which case any one

5    individual would be somewhat representative of everybody else.

6    But that's not the case --

7    **Q.**   So your --

8    **A.**   That's not the case that we have here.

9    **Q.**   So your instruction or your preference would be that we

10   bring in 800 drivers to testify individually in order to have

11   this class action, which is brought forth by representative

12   plaintiffs, properly presented to this jury?  You think that

13   they need to hear from all 800 people?  That's your bottom

14   line?

15   **A.**   I'm saying that in order to be accurate, given the wide

16   disparate circumstances that we see here, there is a need for

17   individualized evidence --

18   **Q.**   Okay.

19   **A.**   -- and that if it's not there, given the wide disparate

20   variety of activities and experiences, the individual damages

21   are going to be grossly inaccurate, and for all those other

22   reasons, they are going to be grossly inaccurate whether you do

23   it on an individualized basis or not.

24   **MR. SALTZMAN:**  Okay.  I have no further questions,

25   Your Honor.

WALKER - FURTHER REDIRECT / EDELMAN

1          **THE COURT:**  Thank you.

2      Anything further?

3          **MR. EDELMAN:**  A couple really quick questions,

4   Your Honor.

5                  **FURTHER REDIRECT EXAMINATION**

6   BY MR. EDELMAN:

7   **Q.**  Dr. Walker, the -- you're aware that there are cases that

8   are class actions and there are cases that are not class

9   actions?

10  **A.**  Yes.

11  **Q.**  Are you purporting to testify in this case that every case

12  that is styled as a class action requires every class

13  representative to come in and testify?

14  **A.**  No.

15  **Q.**  Are you saying that in this particular case, for this jury

16  to get an accurate or better assessment of damages, that would

17  be necessary?

18  **A.**  Yes.

19  **Q.**  So you're saying this case is different from other

20  possible class actions where the data is different?

21  **A.**  Yes.

22  **Q.**  Okay.  Now, do you have any information in this case as to

23  whether the plaintiffs' lawyers selected the class

24  representatives, as opposed to the class representatives coming

25  to the plaintiffs' lawyers?

WALKER - FURTHER REDIRECT / EDELMAN

1    **A.**    I don't.

2    **Q.**    You don't know how it happened in this case?

3    **A.**    I don't know how it happened in this case.

4          **MR. EDELMAN:**  No further questions, Your Honor.

5          **THE COURT:**  Thank you.

6          **MR. SALTZMAN:**  No further questions, Your Honor.

7          **THE COURT:**  Thank you.

8       May the witness be excused?  Yes?

9          **MR. SALTZMAN:**  Yes on the plaintiffs' side.

10         **MR. EDELMAN:**  Yes, Your Honor.

11         **THE COURT:**  Thank you very much, sir.  You're excused.

12         **THE WITNESS:**  Thank you.

13         **THE COURT:**  Okay.  The defendants may call their next

14   witness.

15         **MS. CONWAY:**  Gary Martin, Your Honor.

16         **THE CLERK:**  I'm going to take your picture.

17         **THE WITNESS:**  Okay.

18         **THE CLERK:**  Thank you.

19       Raise your right hand.

20                        **<u>GARY MARTIN</u>**,

21   called as a witness for the Defendant, having been duly sworn,

22   testified as follows:

23         **THE CLERK:**  Pull that microphone or scoot in closer.

24       State your full name for the record.

25         **THE WITNESS:**  Gary Lewis Martin.

MARTIN - DIRECT / CONWAY

1                    <u>**DIRECT EXAMINATION**</u>

2    **BY MS. CONWAY:**

3    **Q.**   Mr. Martin, can you spell your name for the record?

4    **A.**   G-A-R-Y, L-E-W-I-S, M-A-R-T-I-N.

5    **Q.**   Good morning, Mr. Martin.  I'm Cathy Conway, and I

6    represent Wal-Mart.

7              **MS. CONWAY:**  Good morning, ladies and gentleman of the

8    jury.

9    **Q.**   Mr. Martin, are you currently employed?

10   **A.**   Yes, I am.

11   **Q.**   Who is your employer?

12   **A.**   Wal-Mart Transportation -- or Stores.

13   **Q.**   What is your job title?

14   **A.**   I'm a truck driver.

15   **Q.**   Okay.  And how long have you been a truck driver for

16   Wal-Mart?

17   **A.**   I'm two months into my 26th year.

18   **Q.**   Prior to joining Wal-Mart, how many years of trucking

19   experience did you have?

20   **A.**   Just a little over 20.

21   **Q.**   What distribution center do you work out of?

22   **A.**   They call it 6821, which is located in Porterville,

23   California.

24   **Q.**   And can you tell me what your typical work schedule is?

25   **A.**   I go to work on Sunday and I get one of their trucks, and

**MARTIN - DIRECT / CONWAY**

1    I drive all around the United -- or not -- I drive around the

2    western part of the United States delivering Wal-Mart freight.

3        I don't do the exact same thing every day; I just -- a

4    little bit different every day.

5    **Q.**   And can you make sure you speak up so you can -- the jury

6    can hear you?

7    **A.**   Oh, sorry.

8    **Q.**   How much money do you make a year?

9    **A.**   I think I'm on target right now to make right about

10   $106,000.

11   **Q.**   And how did you come to work for Wal-Mart?

12   **A.**   I think it was about 1987, the guy that lived across the

13   street from me, he's a truck driver, him and his dad -- and

14   he's -- originally -- his mom is originally from the

15   Bentonville -- not Bentonville, but the Arkansas area.

16       And he went back there when he was unemployed to go visit

17   with some cousins and members on his mom's side of the family

18   that he'd never seen and wound up getting a job driving for

19   Wal-Mart.

20       When he came back for Christmas, he tried to talk me into

21   moving to Arkansas to get the world's best truck driving job.

22   And at that time, I was going to move to Arkansas for a job,

23   but he kept coming every year, and I think he went to work

24   there in '84.

25       And sometime around 1989, he told me, he said, "You don't

**MARTIN - DIRECT / CONWAY**

1   have to move to Arkansas.  Wal-Mart is coming to California."

2   And he kind of kept me informed, got me an application, so I

3   was able to apply for the job when they first showed up out

4   here and eventually go to work for them.

5           THE COURT:  Ms. Conway, I'm having a real hard time --

6           MS. CONWAY:  Okay.

7           THE COURT:  -- hearing him.

8           MS. CONWAY:  Let -- may I approach the witness and --

9           THE COURT:  Sure.

10          MS. CONWAY:  -- move the microphone?  Thank you, Your

11  Honor.

12      You have a low, gravelly voice, and we're all trying to

13  catch --

14          THE WITNESS:  Yes, I do.  Okay.  Is that better?

15          MS. CONWAY:  Is that better?  That's better, Your

16  Honor?

17          THE WITNESS:  Okay.  Thank you.

18          THE COURT:  Speak real slowly, and then we'll get

19  every word.

20          THE WITNESS:  Okay.

21          THE COURT:  Thank you.

22  BY MS. CONWAY:

23  Q.   Did you do anything to check Wal-Mart out before joining

24  them?

25  A.   I had never really seen one until they built the store in

**MARTIN - DIRECT / CONWAY**

1    Bakersfield where I live, and I didn't really know anything

2    about the store or the company, their transportation part.  I

3    just listened to my buddy Kenton what he told me, and it

4    just -- the more he talked about it, the better it sounded.

5         And at the time, Kmart used to have their own private

6    fleet of trucks, and that was considered a very good job.  So

7    the only way I could relate to it was Wal-Mart was like Kmart

8    with chrome on it.  If you don't know, truckers love chrome.

9    It's like motorcycles.  So it just made everybody understand

10   what we were talking about, that Wal-Mart transportation was

11   probably a pretty good gig.

12   **Q.**   So you thought Wal-Mart was like Kmart with chrome?

13   **A.**   Yes, ma'am.  Someplace I wanted to go to work for.

14   **Q.**   Okay.  And so what year did you join Wal-Mart?

15   **A.**   1991.

16   **Q.**   How did you learn about this lawsuit?

17   **A.**   I got a letter from a law firm out of Fresno, I believe it

18   was.

19   **Q.**   Did you read the letter?

20   **A.**   Yes, I read the letter.

21   **Q.**   What did you do with the letter when you got it?

22   **A.**   I threw it in the -- threw it in the trash.

23   **Q.**   Did you --

24   **A.**   That was the first letter.

25   **Q.**   How many letters did you get?

**MARTIN - DIRECT / CONWAY**

1    **A.**   I'm not sure if it was two or three, but at one point I

2    got a letter with an option clause and a -- like a postcard

3    that said I could sign this and opt out of the lawsuit.

4          And so I immediately filled it out and mailed it back to

5    them.

6    **Q.**   And after you -- before signing that option to opt out and

7    mailing it, did you get any contact from anyone at Wal-Mart in

8    reference to that letter?

9    **A.**   Absolutely nobody.

10   **Q.**   Why did you decide to opt out of the lawsuit?

11   **A.**   I don't feel that I was owed any money.  When I cash my

12   check every two weeks, what I perform, the duties that I've

13   done, the miles that I drove, I felt that I was adequately

14   compensated for everything that I did, so when I cashed that

15   check on Friday, I felt we were pretty much even.

16         Wal-Mart has never cheated me out of anything or I felt

17   that they owed me anything, and to accept the money in this --

18   this particular matter, I just didn't think I wanted any part

19   of it.

20   **Q.**   Has Wal-Mart put any pressure on you to testify today?

21   **A.**   None whatsoever.

22   **Q.**   Are you afraid for your job?

23   **A.**   No.

24   **Q.**   Why are you testifying on behalf of Wal-Mart today?

25   **A.**   I like the place I work.  They've taken pretty good care

**MARTIN - DIRECT / CONWAY**

1  of me.  They actually -- they obviously pay me pretty decent

2  for what I do, and I just -- I kind of felt like it was a

3  personal assault on me.  I've said to my wife, "I almost feel

4  like my house is being burglarized and someone is trying to

5  break in and take something that doesn't belong to them."

6  That's just how I feel.

7       And so I've kind of felt like I wanted to step up and do

8  something I could do to try to help that be resolved.

9  Q.   Did you feel obligated to testify?

10 A.   I don't know if you'd call it obligated.  I just felt

11 something within my own being that I just wanted to do what I

12 could do to help, and if I was asked to testify, obviously,

13 that's what I'm doing.

14 Q.   In addition to driving, have you ever had any other roles

15 at Wal-Mart?

16 A.   I've been a driver mentor over the years where they --

17 after they go through orientation, all the classes, they learn

18 about insurance and all of that, then a senior driver takes

19 them out for a week to get them used to the paperwork, how our

20 computers in the truck work, and just kind of get them up to

21 speed with the Wal-Mart.  And so I've done that for quite a few

22 years.  I've probably mentored at least a dozen drivers or

23 more, maybe 15.

24      I've -- also was involved when they first put the

25 computers in the trucks.  I was the Qualcomm -- that's what we

**MARTIN - DIRECT / CONWAY**

1    use, a Qualcomm.  I don't know if you ever heard about those,

2    but it's an onboard computer system.  I helped in the

3    installation and the training of all the drivers on how this

4    piece of equipment worked.  And I actually spent almost 14

5    months working in the office without even driving a truck.

6    **Q.**   And in reverse order, in reference to the Qualcomm

7    computer system, did that make your job as driver easier?

8    **A.**   Yeah.  When they -- when they put the computer in the

9    truck, that way you have -- it's a satellite communication

10   system where you don't have to get out of the truck and use the

11   telephone.  When they want to relay information to you, they

12   can send it to you over this computer in the truck.

13   **Q.**   And when they send information over the computer in the

14   truck, do you have to read it?

15   **A.**   They've disabled it where it can't be read while you're

16   driving, for safety purposes, but it's got a button you can

17   push and the Sirius lady, Jill, she reads it to you.

18   **Q.**   Okay.  So Jill tells you any --

19   **A.**   Yeah.  Whatever the message they send you, then she can

20   read it to you.

21   **Q.**   Okay.  And you listen?

22   **A.**   Yeah.  The same thing -- we have a GPS in there, too, so

23   if you don't know where -- they send you to a place you've

24   never been to, you can put the information in the GPS and then

25   they read you a direction, "Take left turn, right turn."  You

**MARTIN - DIRECT / CONWAY**

1    know how that works.

2    **Q.**   So the computer is there to make your driving life easier?

3    **A.**   Yes.   It's just another tool that we have at our

4    availability to lighten the load, sort of.

5    **Q.**   And you assisted in the implementation of that; is that

6    correct?

7    **A.**   Yes.

8    **Q.**   Now, talking about your mentoring time, what kind of

9    mentoring did you do around pay issues at Wal-Mart?

10   **A.**   Well, that always comes up, because everybody wants to

11   know how much they're going to get paid.   That's always a big

12   issue.

13       So the way I used to do it, I just -- I wouldn't tell much

14   about that for three days, kind of, you know, load it up as a

15   surprise.   So I would go with them Monday, then Tuesday, and I

16   would wait until Wednesday, then I would get a calculator and

17   I'd let them know how much they made for each day, and they

18   would usually have a pretty good surprised look on their face

19   that they made that much money for what they -- "I just did

20   this little bit and I got that much?"   And I said, "Yeah.

21   That's how it works.   We get paid pretty good for what we do."

22   **Q.**   And did you describe the activity codes at Wal-Mart and

23   how they impacted the driver?

24   **A.**   Well, that's part of the mentoring system, to let them

25   know how the codes are used, when to use them, how to fill out

1   their trip sheet.  Yeah.  That's all part of the mentoring --

2   you let them know what each code is, what it pays, and so

3   forth.

4   **Q.**   Let's take a few minutes and look at some of these

5   activity codes.

6   **A.**   Okay.

7   **Q.**   Have you seen the codes shown in Defendant's Exhibit 619

8   before?

9   **A.**   Yes.

10         **MS. CONWAY:**  Can we put it up on the board so he can

11   see it?

12   **Q.**   You can see it right there.

13   **A.**   Oh, there it is.

14   **Q.**   Are these the current activity codes that you deal with as

15   a driver?

16   **A.**   Yes, they are.

17   **Q.**   And when you're talking to your mentees about the activity

18   codes, do you describe what is involved in reference to an

19   arrive and a drop?

20   **A.**   Yes.

21   **Q.**   And do you discuss how the activity code kicks in in

22   reference to a hook and a depart?

23   **A.**   The best you can.  Some -- that's the other part.  You

24   know, you don't know what I'm talking about.  It's confusing to

25   understand what you're listening to.  But, you know, you try to

**MARTIN - DIRECT / CONWAY**

1   do your best so they understand what -- what -- how the whole

2   thing works.

3        It's actually not as difficult as you might think it is,

4   but we do the best we can to try to explain it out.

5   **Q.**   Are these terms that Wal-Mart uses in reference to these

6   activity codes?

7   **A.**   Probably the only term that's basic in the trucking

8   industry is "drop" and "hook."  That's pretty much a word

9   that's used throughout the industry.

10       Some of the other stuff is just -- we call it "Wal talk."

11  It's our own little language for Wal-Mart.

12       But the "drop" and "hook" and some of this other stuff,

13  "live load" and all that, that's all regular truck jargon.

14  **Q.**   So some of these activity codes are what you call "Wal

15  talk," Wal-Mart talk; is that correct?

16  **A.**   Yes.

17  **Q.**   And part of a mentor is you're explaining what these mean

18  and how to use them?

19  **A.**   Yes, I am.

20  **Q.**   Prior to these activity codes -- I've heard the term

21  "backhaul."  Have you ever heard that term?

22  **A.**   Yes, I have.

23  **Q.**   And was backhaul an old activity code that they used?

24  **A.**   That was -- yes.  That was -- you know, back when I first

25  started, it was called -- everything was just a backhaul.

**MARTIN - DIRECT / CONWAY**

1       And what a backhaul is is I pick up a load of general

2   merchandise, freight at our warehouse, and I deliver it to a

3   store, and then I leave there and go to a vendor and pick up a

4   load to take it back.

5       So that's where that term "backhaul" -- so whenever I haul

6   something back to the distribution center from -- it could be a

7   load of TVs from Sony or dog food or --

8   **Q.**   Whatever --

9   **A.**   -- Pepsi.

10  **Q.**   Do you know when the activity codes shown in Exhibit 619

11  came into effect, approximately?

12  **A.**   These here?

13  **Q.**   Yeah, those.

14  **A.**   I'm not -- I'm not sure of the years.  2000-something.  I

15  don't know if it was 2005 or --

16  **Q.**   Is it --

17  **A.**   -- '6, '4.  Yeah.

18  **Q.**   So whenever they came in, did it simplify the activity

19  codes that the drivers had to use?

20  **A.**   I believe it did, yes.  Because like they say, a hook is a

21  hook and a drop is a drop.  And that was -- it just makes it

22  easier, you know.  So you hook up your trailer, you know what

23  you're doing.

24  **Q.**   Okay.  And you know you're getting a certain amount of pay

25  for --

**MARTIN - DIRECT / CONWAY**

1    **A.**    That's correct.

2    **Q.**    -- the activities around that; is that correct?

3         And in describing the activity codes and how they worked

4    to these mentees that you had, were any of them inexperienced

5    drivers driving for the first time?

6    **A.**    No.  No.  They're -- pretty much Wal-Mart picks veteran.

7    We might -- I think the minimum is three years experience, and

8    most of the time -- I'm trying to think of the guy with the

9    least experience I've seen.  He's been there maybe six years or

10   seven.  So . . .

11   **Q.**   And in your experience, do Wal-Mart drivers tend to stick

12   around for a long time once they're trained?

13             **MR. WAGNER:**  Objection.  Relevance and lacks

14   foundation.

15             **THE COURT:**  Well, you can ask him about the drivers he

16   knows.  I don't think --

17   **BY MS. CONWAY:**

18   **Q.**   And the drivers you know, have they been around Wal-Mart

19   for a long time?

20   **A.**   Most of them stay until they retire or passed away.

21   **Q.**   Okay.  When you're training these new mentees, do you talk

22   about waiting 45 minutes for loads?

23   **A.**    Well, that's part of what you explain to them, the --

24   the -- that waiting part is actually -- you're already paid for

25   that, because you're paid to arrive, you're either paid to hook

**MARTIN - DIRECT / CONWAY**

1    or you're paid a live load, and that covers 45 minutes.

2        If you're only there 30 minutes, you still get the same

3    money, and if you're in L.A., they throw another 6 bucks on

4    there.  They call it regional pay, and that's supposed to help

5    absorb some of the traffic problems that we have.

6        So you get the arrive, you get the load, and you get the

7    6 bucks.  And if you're there for 40 minutes, that's what you

8    get; if you're there for 30 minutes, that's what you get; if

9    you're there for an hour, after the 45 minutes, they put you on

10   unscheduled time.  You start getting paid by the hour for every

11   minute after that 45 minutes.

12       So you're -- you're getting paid for actually the whole

13   time you're there.

14   **Q.**   Have you ever received unscheduled time?

15   **A.**   Yes, I have.

16   **Q.**   And unscheduled time, according to the chart, is $14 an

17   hour; is that correct?

18   **A.**   That's the pay, yes.

19   **Q.**   Have you ever talked about how the activity codes work

20   with Farris Day?

21   **A.**   Yeah.  I've known Farris Day for probably six, seven years

22   before I went to work at Wal-Mart.  We drove tanker trucks in

23   Bakersfield for two different companies, so we had -- we

24   interlooped together quite a bit.

25   **Q.**   And have you explained to him how the 45 minutes --

**MARTIN - DIRECT / CONWAY**

1  **A.**   Yeah.  He was --

2  **Q.**   -- of waiting was covered by activity codes?

3  **A.**   He was like a lot of drivers.  They assumed that they

4  weren't getting paid for those 45 minutes.  He used to get

5  upset about it.  He said, "Oh, I can't believe that Wal-Mart

6  make me wait 45 minutes and not pay me."

7       And I tried to explain to him, I said, "You got this, you

8  got that, and then you get more money after that," and it

9  seemed like he understood.  Then it wouldn't be a month later

10  he'd be in the break room complaining, "I was at this backhaul

11  for two hours.  I don't know why I got to wait 45 minutes for

12  nothing."

13       And at some point, I just decided he didn't -- either he

14  didn't want to understand it or he just -- it didn't register.

15  I don't know.

16  **Q.**   What types --

17  **A.**   Not just him, other people, too.

18  **Q.**   Okay.  And what types of routes have you driven at

19  Wal-Mart?

20  **A.**   Up into Oregon, Washington, Idaho, Utah, Colorado, Texas,

21  Arizona.

22  **Q.**   We've heard of ADP.  What is your ADP?

23  **A.**   What is mine?

24  **Q.**   Yes.

25  **A.**   Mine right now is about $390 a day.

**MARTIN - DIRECT / CONWAY**

1  **Q.**  And how many hours a week do you tend to work?

2  **A.**  It's -- it varies between 55 and 63.

3  **Q.**  And do you determine how many hours you work?

4  **A.**  Yes.

5  **Q.**  How do you maximize your pay?

6  **A.**  I call it time management.  You try to be like, you know,

7  doing two things at the same time that give you some type of

8  pay.

9      So you're a live backhaul, and while you're getting paid

10  to load that live backhaul and you're going to be there for an

11  hour, hour and a half, that's a good time to go ahead and take

12  your lunch break, and then you get paid for your lunch break at

13  the same time.  So you're getting paid two different types of

14  activity at the same time.

15     So that's -- that's why I try to mentor.  I try to show

16  these guys a way that they can kill two birds with one stone

17  and kind of increase their ability to make a little bit better

18  paycheck.

19  **Q.**  So just as you described the lunch, how do you go about --

20  do you -- strike that.

21     Do you ever take ten-minute rest breaks?

22  **A.**  Yes.

23  **Q.**  And how do you go about taking your ten-minute rest

24  breaks?

25  **A.**  Usually, when I do those, I just -- I'll be at a store and

1    I just -- I'll put the trailer in the dock, grab the other

2    trailer, and then just park the truck, and then I'll go over to

3    McDonald's just to get a Coke, go in the store and go to the

4    bathroom.

5        Just -- I got a back problem sometimes, so I just feel

6    like walking around for ten minutes just to kind of get the

7    kink out of it and maybe 15 minutes to go back in the truck and

8    then leave.

9    Q.   At the time that you're taking your ten-minute rest break,

10   are you receiving any activity code?

11   A.   Well, I'm at the store, so I've already got the -- I got

12   the arrive, I got the hook, and if I'm in L.A., I got the $6

13   regional pay.  So, yeah, if I do that all in conjunction, I

14   would guess, yeah.

15   Q.   So when you take a rest break, you take it when you are

16   doing the activity of arrive?

17   A.   Yes.  Yes.

18   Q.   And you take -- you also take rest breaks when you're

19   doing the activity of a hook and a drop?

20   A.   Well, after I get done with the hook and the drop, then I

21   go take my ten-minute break at the -- yeah, before I leave.

22   Q.   Do you also take rest breaks when you're doing the live

23   load?

24   A.   A lot of times on the live load I'll take my lunch breaks.

25   Q.   Okay.  Because it's a longer time?

**MARTIN - DIRECT / CONWAY**

1    **A.**   Correct.  It's usually -- most live loads take right at an

2    hour or better, so you're going to be able to get your

3    30-minute plus lunch break in in a live load.

4    **Q.**   And if most live loads take an hour, you're also getting

5    15 minutes of unscheduled time?

6    **A.**   That is correct.

7    **Q.**   And you get that time until your wheels are rolling again;

8    is that correct?

9              **MR. WAGNER:**  Objection.  Leading.

10             **THE COURT:**  Sustained.

11   **BY MS. CONWAY:**

12   **Q.**   When does the unscheduled time stop?

13   **A.**   The unscheduled time stops when you depart, when you leave

14   the facility.

15   **Q.**   At the beginning of your week, which code is the first

16   code that you receive when you leave the distribution center?

17   **A.**   It would be the hook.

18   **Q.**   And to do a hook, do you have to do an inspection?

19   **A.**   Yes.

20   **Q.**   How long does it take for you to do an inspection?

21   **A.**   A couple of minutes.

22   **Q.**   A couple of minutes?

23   **A.**   Uh-huh.

24   **Q.**   And what do you do to do an inspection?

25   **A.**   You hook the truck up, obviously, and you put the -- put

**MARTIN - DIRECT / CONWAY**

1    all the lights on, four-way flashers.  You hook the air lines

2    up.  You charge the trailer with air.  You put the light cord

3    in so you've got electricity to the trailer.

4              **THE COURT:**  Slow down.

5              **THE WITNESS:**  You hook the air lines up so it charges

6    the trailer with air, hook the electric line up to give it

7    lights, and then you get your tire bumper and you walk around

8    and make sure all the tires got air in it.

9         You make sure the fifth wheel is connected.  That's where

10   the trailer hooks up.  You make sure the door is closed, there

11   is a seal on it, put a lock on it.

12        And you walk up the other side, you look up and down the

13   trailer, make sure there's no holes in it, just looking for

14   damage.  And you might look on the truck and make sure you're

15   not leaking any motor oil, and you're about ready to go.

16   **BY MS. CONWAY:**

17   **Q.**   And that entirely takes you a few minutes; is that

18   correct?

19   **A.**   Yes.  A couple minutes.

20   **Q.**   And do you actually check -- touch the lug nuts on the

21   truck when you're doing that inspection?

22   **A.**   No.  When you're -- when I'm looking at -- when I'm doing

23   my pre-trip walking around, you're looking at the whole wheel

24   and you don't actually have to touch the lug nuts.  You're

25   looking for, like, oil seepage.  If maybe there is a wheel seal

**MARTIN - DIRECT / CONWAY**

1  out, it will show oil.

2       And if there's a lug nut loose, the dust from the brakes

3  actually find a way to seep through that lug nut, and so you

4  can actually -- you can actually see it.  It looks like a

5  little vein coming out from the lug nuts.  That's what you're

6  really looking for.

7       You don't -- these lug nuts are put on with an impact

8  wrench, so unless it's completely a hundred percent loose,

9  grabbing them and touching them ain't going to tell you

10 nothing.

11      So that's what you're looking for.  You're looking for

12 that little seepage, and that would give you a sign that that's

13 loose.  The only time I'd actually grab a lug nut would be if

14 they'd taken a tire completely off and put it back on as a

15 flat.  Then you might say, "Well, make sure he got them all,"

16 or if they took all the tires off and did a brake job and then

17 they put the tires back on, you might check.

18      But other than that, checking the lug nuts is -- just

19 doesn't have to happen.

20 Q.   So in your 45 years of experience, other than those two

21 examples you gave, you do not touch the lug nuts when you do an

22 inspection; is that --

23 A.   I never have.  I have never had one come off, either,

24 so . . .

25 Q.   Okay.  And back to the rest breaks, we talked about your

**MARTIN - DIRECT / CONWAY**

1   taking ten minutes during certain activities.

2         How do you log that time?

3   **A.**   Just stay on duty.

4   **Q.**   And is that a Wal-Mart requirement, that you log it on

5   duty?

6   **A.**   No, it's not.  I think it's either/or.  I think the log

7   gives you the -- you can either log it off duty or on duty.  I

8   think you have the choice there for DOT.

9   **Q.**   And when you're taking those ten-minute breaks, are those

10  uninterrupted breaks?

11  **A.**   Yes.  I'm usually -- like I said, I'm off walking off

12  someplace by myself, go get a soda pop or something like that.

13  So . . .

14  **Q.**   When you're doing that first hook and depart of the week,

15  do you talk to the driver coordinator?

16  **A.**   Yeah, for -- just enough to get my paperwork.

17  **Q.**   And how much time do you talk with the driver coordinator

18  to get your paperwork?

19  **A.**   Just -- they all know each other, so you walk up and they

20  know who I am.  They just reach over and get the paperwork, and

21  then their job is to tell you where you're going, what time you

22  have to be there, and what trailer you're pulling.

23        And they sign that and they hand you the paperwork, and

24  that's it.

25  **Q.**   Do you have to get that paperwork in order to do a hook

**MARTIN - DIRECT / CONWAY**

1    and a drop?

2    **A.**   You have to have the paperwork in hand, usually, before

3    you go out and do that so you know what trailer to hook up to.

4    **Q.**   And how much time does it take you to get that paperwork?

5    **A.**   A minute, unless you're socializing.  You can stand there

6    all day, but . . .

7    **Q.**   But that's your choice?

8    **A.**   That's your choice, yes.

9    **Q.**   At the end of the trip, do you also talk to -- with the

10   driver coordinator?

11   **A.**   You can, but when you end your trip, all you got to do is

12   bring your paperwork and put it in the basket on her desk.  You

13   don't have to say nothin', you just [indicating].

14       The only time you have to talk to her or him is if you're

15   going back out on another load, so you turn in that paperwork

16   and then you ask her for your next -- your next assignment.

17   **Q.**   Let's talk about your layovers for a few minutes.

18       Do you lay over on your trips when you're driving --

19   **A.**   Yeah.  When you run out of hours, you're -- the law says

20   we can work 14 hours a day, drive 11, and after that we have to

21   take a 10-hour break.  That's mandated by the federal

22   government.  So when you get to that point, you have to shut

23   the truck down and take ten hours off.

24   **Q.**   And what do you usually do on your layovers?

25   **A.**   I don't know if it's doctor's order or his advice.  I go

**MARTIN - DIRECT / CONWAY**

1    walking.  I park the truck, do my post-trip.  Then I go off

2    duty for my -- start my ten-hour break.

3        And I put my earphones on, call a family member --

4    usually, it's my wife -- and I'll walk for about a half an hour

5    while I'm talking on the phone to my wife.

6    **Q.**    How long have you been doing the walking?

7    **A.**    Probably about five years now.

8    **Q.**    And you mentioned you talk to your wife.

9        How long have you been married?

10   **A.**    It will be 45 years in May.

11   **Q.**    Do you have any children?

12   **A.**    Four.

13   **Q.**    How many grandchildren?

14   **A.**    Sixteen.

15   **Q.**    Before taking a layover, do you ask anyone for permission

16   to take that layover?

17   **A.**    No.

18   **Q.**    Have you ever laid over at home?

19   **A.**    A couple of times.

20   **Q.**    Did you ask someone for permission prior to laying over at

21   home?

22   **A.**    You don't ask for permission, but you let them know where

23   you're at.

24   **Q.**    Why would you let them know where you're at?

25   **A.**    Well, when I first started, that's what was explained,

**MARTIN - DIRECT / CONWAY**

1  that if you're going to leave the truck, they just want to know

2  where the truck is at in case something happens to it.

3      And you can have an electrical fire and the truck catches

4  on fire -- most of the store managers know when there's a

5  Wal-Mart truck parked in the parking lot, there's a driver in

6  there sleeping.

7      And so it's just like, you know, if something happened to

8  that truck, you know, you have the fire department out there

9  trying to rescue somebody out of the truck and there's nobody

10  in it.  So it's just a good idea to just let them know, "I'm

11  going home and my truck -- this is where my truck is at," so if

12  anything was to happen to it, they're aware that there's nobody

13  there, but they know where the truck is.

14      So you're not -- you're not asking for permission.  You're

15  just, you know, staying in touch with your -- with your people

16  about, you know, what you're doing and where your equipment's

17  at.

18  **Q.**  Has Wal-Mart ever asked you to be a security guard in

19  reference to the truck?

20  **A.**  Excuse me?

21  **Q.**  Has Wal-Mart ever asked you to be a security guard in

22  reference to the truck?

23  **A.**  No.  I -- no.

24  **Q.**  Do you do any Wal-Mart work during your layovers?

25  **A.**  Not -- none whatsoever.

**MARTIN - DIRECT / CONWAY**

1    **Q.**   Do you do any work during your layovers?

2    **A.**   No.  If you call talking work -- no.  There is no work

3    done at all.

4    **Q.**   And does Wal-Mart tell you how much time you have to spend

5    in the sleeper berth?

6    **A.**   No.  You just -- you have to have a combination of off

7    duty and sleeper berth that equals 10 hours, and then --

8    **Q.**   And that's totally up to you?

9    **A.**   Correct.

10   **Q.**   Have you ever stayed in a hotel on a layover?

11   **A.**   Yes, I have.

12   **Q.**   In what circumstances?

13   **A.**   Well, whenever you're mentoring, of course, there's two

14   people in the truck, so you have to go get a motel.

15       And both of us -- when I'm mentoring, the person I'm

16   training, he gets the 42 bucks or she gets the 42 bucks and

17   Wal-Mart pays for the motel.  While I'm mentoring, I get ADP,

18   so that would include all the money I make for the day.

19   **Q.**   And have you ever slept in a hotel when you were not

20   mentoring?

21   **A.**   Yes, I have.

22   **Q.**   And can you tell the jury the circumstances and how you

23   were paid.

24   **A.**   Well, there's several reasons why, but the one that

25   happened to me was I'm a nonsmoker and the -- my truck was

**MARTIN - DIRECT / CONWAY**

1   broke down.  They assigned me to a smoking truck and they said

2   I could wait for another truck, but I said, "I'll be all right.

3   I'll spray some, you know, Fabreze or whatever."

4       And it was okay until I went to go to sleep, and then the

5   odor of that cigarette truck was giving me a headache, so I

6   just went and got a motel room, and they give me my 42 bucks

7   and they paid for the motel room for three nights.

8   **Q.**   Are there any limitations on what you can carry in your

9   truck?

10  **A.**   As far as what?

11  **Q.**   Can you carry alcohol in your truck?

12  **A.**   Oh, no.

13  **Q.**   In the cab?

14  **A.**   No.  No alcohol in the truck is allowed.

15  **Q.**   Are you allowed to drink alcohol on a layover?

16  **A.**   Well, if I want to drink alcohol on my ten-hour layover,

17  that's entirely up to me.  There's a federal laws that fall

18  into place about how much time you have to take off after

19  you've had a drink, but there's nothing that says I can't.  I

20  just have to fall into that -- I think it's a minimum of eight

21  hours after the last drink before you can move again.

22      So . . .

23  **Q.**   And so you comply with that --

24  **A.**   Oh, yeah.  I can go -- I could go to a restaurant and have

25  a beer or something with my dinner if I chose to.

**MARTIN - DIRECT / CONWAY**

1   **Q.**   Are you allowed to have pets in your truck?

2   **A.**   No.

3   **Q.**   And do you have any feeling as to why that -- why that

4   would be?

5   **A.**   Well, I've got my own personal feelings.  I think, you

6   know, animals create their own odors, so the truck is a small,

7   confined area and you keep a truck in there for five or six

8   days -- or a dog or a cat or whatever, it's going to -- it's

9   going to start smelling like a doghouse.  It's going to shed

10  fur, so they're going to create allergies for somebody else

11  that might have to drive the truck.

12       And then my biggest concern is, you know, dogs have to go

13  to the bathroom just like people, so where do you take your

14  dog?  I mean, you know, you're not at your house, you're at

15  somebody else's property and you're -- you know, not everybody

16  carries rubber gloves with them, so that creates a whole other

17  mess, too.

18  **Q.**   Okay.  You don't think it's an inconvenience that you

19  can't have a pet in your tractor; is that correct?

20  **A.**   No.

21  **Q.**   Let's talk about for a few minutes washing your tractor.

22       The first 20 years of your employment at Wal-Mart, did you

23  ever wash your tractor-trailer?

24  **A.**   I never did.

25  **Q.**   Did you ever get disciplined for not washing your

**MARTIN - DIRECT / CONWAY**

1   tractor-trailer?

2   **A.**   Never once.

3   **Q.**   Did any -- did you have anyone tell you you had to wash

4   your tractor?

5   **A.**   No.

6   **Q.**   And is it your habit now to wash your tractor?

7   **A.**   In the last five years, I just now started washing my

8   truck.  So . . .

9   **Q.**   And what made you change?

10  **A.**   The trucks that Wal-Mart bought when I first -- they were

11  just work trucks.  They're just -- they're not like dolled up

12  or customized, so I just didn't feel like I just wanted -- I

13  kept the inside clean.  The outside didn't matter.  I said,

14  "It's your truck, you wash it."

15      And then they started buying these more classic-looking

16  trucks.  They got polished wheels from the factory and all that

17  and it's -- they're real nice-looking trucks, what I was used

18  to driving before I came to Wal-Mart.

19      And so I said, "You know what, I'm going to go out and get

20  me some chrome, put some stuff on it, and I'm going to take a

21  little bit more care of this truck."  So it's my decision.

22  **Q.**   And have you observed whether there is other drivers that

23  don't wash their truck?

24  **A.**   Oh, there's a lot of them that don't.  There's probably

25  more that don't than do.

**MARTIN - DIRECT / CONWAY**

1   **Q.**   Okay.  And we've been hearing a lot of testimony about
2   trucks.
3        I mean, there's a tractor portion of a truck and a trailer
4   portion; is that correct?
5   **A.**   Correct.
6   **Q.**   And so when I talk about washing your truck, is it just
7   the tractor portion?
8   **A.**   Yes, just the tractor.  I don't wash the trailer.
9   **Q.**   Okay.  And in your observations of what other drivers do,
10  do most other drivers only wash the tractor portion?
11  **A.**   Yes.
12            **MR. WAGNER:**  Objection.
13            **THE WITNESS:**  On rare occasion, you might see someone
14  pull through --
15            **THE COURT:**  Wait.  Wait.
16            **MS. CONWAY:**  Okay.  Sorry.
17            **THE COURT:**  You got to stop while I hear the
18  objection.
19            **THE WITNESS:**  Oh.
20            **MR. WAGNER:**  Objection.  Relevance and lacks
21  foundation and leading -- not relevance.  Leading and lacks
22  foundation.
23            **THE COURT:**  It's leading, so I will sustain.
24  **BY MS. CONWAY:**
25  **Q.**   Okay.  Have you had the opportunity to observe other

**MARTIN - DIRECT / CONWAY**

1   drivers washing their trucks while you're washing your truck?

2   **A.**    Yes.

3   **Q.**    And in your observations, do the majority of drivers just

4   wash their tractors?

5   **A.**    Yes.

6   **Q.**    In your 45 years of experience with Wal-Mart, you've never

7   washed your trailer; is that correct?

8   **A.**    I have never washed a trailer ever.

9   **Q.**    How long does it take for you to wash the tractor?

10  **A.**    The -- they bought a -- it's like a -- what they call --

11  like a car wash.  You just drive it in.  It's got brushes and

12  all that just like a car wash.  You drive in and there is a

13  red/yellow/green light, so when you get up to the spot so the

14  computer knows what to do, it has a red light.  Set the brakes,

15  get out, push a button, get back in the truck.  It takes seven

16  minutes and it brushes it, sprays it, and you're done.

17  **Q.**    What -- when do -- excuse me.  When do you wash your

18  tractor?

19  **A.**    I usually try to wash it at the beginning of the week in

20  between coming back into the yard and going back out.

21  **Q.**    During the time that you're --

22  **A.**    Yeah.

23  **Q.**    -- doing a hook and a depart?

24  **A.**    Correct.

25  **Q.**    And how often do you now wash your tractor?

**MARTIN - DIRECT / CONWAY**

1   **A.**   I try to wash it once a week, but it could be -- you know,

2   it just depends on the weather, if you felt the truck was

3   dirty.

4       If I come into the yard and there is two or three trucks

5   waiting in line, then I just won't do it until the next day,

6   and then sometimes there is not the next day, until the next

7   week.  But I'd say that probably three times a month is about

8   what I'm at right now.

9   **Q.**   Do you always wash your tractor when you're getting

10  another activity code?

11  **A.**   Yes.

12  **Q.**   And we've heard some testimony in this case about tomato

13  season.

14      Do you know what tomato season is?

15  **A.**   I have lived it.

16  **Q.**   And what -- when did you live tomato season?

17  **A.**   Back in the '70s, it was probably one of the filthiest

18  things that went on.  The guys that would haul bulk tomatoes,

19  there's a -- the tomatoes would bounce and they start creating

20  a juice in their own -- their own liquid, and they leaked.

21      And then sometimes the driver would actually pull the

22  drains and drain the liquid out, because they got to the tomato

23  cannery, they have to drain the tubs before they unload the

24  tomatoes so they're trying to save time.

25      So they were spreading tomato juice up and down all the

**MARTIN - DIRECT / CONWAY**

1  highways all over, and when you drive on that same highway, it

2  was like -- it's almost like the first rain.  I don't know if

3  you understand, the first rain, how you get that black kind of

4  soot on your -- on your vehicle.

5       So the tomato juice would mix up with the road oil and it

6  had like just this nasty coating all over your truck and it was

7  just -- and it would draw flies.  You would park your truck,

8  you'd have a million flies around it.  And it created a big

9  mess with everybody.

10 **Q.**  And at some time -- point, did that stop -- that tomato

11 season problem stop?

12 **A.**  You don't have that problem no more.

13 **Q.**  Okay.  When --

14 **A.**  I don't -- I --

15 **Q.**  You mentioned --

16 **A.**  I'm trying to think.  It probably quit back in the '90s.

17 **Q.**  You believe that stopped in the '90s?

18 **A.**  Yeah.  I think the Highway Patrol started writing them up

19 for drop -- because you can have clear water leak out of your

20 truck and that's it, and this is not clear water.  So I think

21 they started citing them for hazardous and the problem just

22 kind of just disappeared.

23 **Q.**  Have you ever heard the term "truck check"?

24 **A.**  No, I haven't.

25 **Q.**  Has anyone at Wal-Mart ever disturbed you in the middle of

**MARTIN - DIRECT / CONWAY**

1    your ten-hour layover?

2    **A.**    No.

3                **MS. CONWAY:**  Just a minute, please.

4           (Defense counsel confer off the record)

5                **MS. CONWAY:**  For identification, I would like to show

6    Mr. Martin Defendant's Exhibit 689.

7           Can I approach the witness, Your Honor?

8    **BY MS. CONWAY:**

9    **Q.**    Do you recognize this document?

10   **A.**    It's got my writing all over it.

11   **Q.**    Is this a trip sheet you filled out?

12   **A.**    Yes.  It's what we call a manual trip sheet.

13   **Q.**    Okay.  And is -- it's your handwriting on it?

14   **A.**    Yes, it is.

15   **Q.**    And does this demonstrate a trip that you had when you

16   were working at Wal-Mart as a private driver?

17   **A.**    Correct.  This was from April of last year.

18   **Q.**    Okay.

19               **MS. CONWAY:**  Your Honor, we would move to enter into

20   evidence and publish Exhibit 689.

21               **THE COURT:**  Any objection?

22               **MR. WAGNER:**  Hearsay.  Yes.  Hearsay.

23               **THE COURT:**  Do you want to lay a business record

24   foundation?

25               **MS. CONWAY:**  Sure.

**MARTIN - DIRECT / CONWAY**

1   **Q.**   Are you required to fill out trip sheets as part of your

2   job?

3   **A.**   Yes.  Every trip we're on has a trip sheet attached to it.

4   **Q.**   And you mentioned that this is your trip sheet.

5       Did you --

6   **A.**   Yes, it is.

7   **Q.**   Did you fill it out accurately?

8   **A.**   Yes --

9   **Q.**   And --

10  **A.**   -- I did it.

11  **Q.**   And is this part of the paperwork you turned in?

12  **A.**   Correct.

13  **Q.**   And in looking at this trip sheet, does it look like a

14  accurate portrayal of the trip that you took in April of this

15  year?

16  **A.**   Yes, it does.

17            **MS. CONWAY:**  I would again move, Your Honor.

18            **MR. WAGNER:**  That's fine.

19            **THE COURT:**  It will be received.  Thank you.

20        (Trial Exhibit 689 received in evidence).

21  **BY MS. CONWAY:**

22  **Q.**   For the record, this trip sheet was referred to in the

23  opening statements in this case, and in looking at this trip

24  sheet, does this accurately reflect the various activity codes

25  that you received on this April trip?

1  **A.**   Yeah.  That's the codes I was using.  That's the ones I

2  put down.

3  **Q.**   And does it also accurately reflect the times that you

4  left the various locations?

5  **A.**   Yes, it does.

6       **MS. CONWAY:**  No further questions.  Thank you,

7  Mr. Martin.

8       **THE COURT:**  Thank you.

9    I think we'll take our morning recess at this time,

10  Mr. Wagner.  Is that okay?

11       **MR. WAGNER:**  Thank you.

12       **THE COURT:**  All right.  Ladies and gentleman, we'll

13  take a morning recess at this time.  If you would be ready to

14  come back, please, at 20 minutes until 11:00.

15    In the meantime, please don't speak with each other or

16  anyone else or make up your minds.  We are near the end of the

17  case, but you have not heard all the evidence yet.

18    (Proceedings were heard out of presence of the jury:)

19       **MR. EDELMAN:**  Your Honor, one quick issue to raise.

20       **THE COURT:**  All right.

21       **MR. EDELMAN:**  I don't think that Mr. Saltzman did this

22  on purpose because I don't think he was involved in the case at

23  the time -- neither was I -- but there was a line of

24  questioning by him of Dr. Walker about the suggestion that --

25  well, he was suggesting to the witness that it was the

**PROCEEDINGS**

1   plaintiffs who went to counsel, rather than vice versa, and

2   back and forth on that.

3       And --

4           **THE COURT:**  And the bottom line was the witness had no

5   idea either way about anything.

6           **MR. EDELMAN:**  Well, the --

7           **THE COURT:**  And you objected to the question and I

8   sustained the objection.

9       What is your point?

10          **MR. EDELMAN:**  Well, he asked several questions which

11  suggested that the plaintiffs contacted the plaintiffs' counsel

12  and, in fact, the opposite happened in this case, because --

13          **THE COURT:**  Well, I do not believe that that is a

14  relevant fact.  There certainly is no evidence in this record

15  so far about it, and if you propose to put that in, then I will

16  take arguments from counsel about whether that's a relevant

17  matter.

18          **MR. EDELMAN:**  Well, I didn't want to put it, in and

19  that's why I stopped.  I was --

20          **THE COURT:**  I don't know why he asked those questions,

21  frankly, but he got no responses to them.

22          **MR. SALTZMAN:**  Right.

23          **THE COURT:**  So . . .

24          **MR. SALTZMAN:**  I think it's over and done.

25          **MR. EDELMAN:**  Well, okay.  I just -- you know, I

PROCEEDINGS

1   purposely did not go further because I did not want to talk

2   about any orders that the Court made, because that's clearly

3   been the instruction to us.  So I stopped.

4       But what happened in this case, as you may recall, is that

5   you ordered them to -- you ordered Wal-Mart to give them a list

6   of all the class members, because they had lost their

7   plaintiffs, who had died or retired or whatever, and they then

8   took the list and they went out and they selected the

9   plaintiffs.  It was the opposite of a random process and it was

10  the opposite of the -- anybody approaching them.  They went and

11  picked the group.

12      THE COURT:  Yeah, but your witness' random discussion

13  was only about how -- regardless of how they're chosen, if

14  they're not chosen randomly, then you can't use them

15  statistically to make -- and he said that several times at some

16  length, actually, and he didn't know anything about what

17  Mr. Saltzman was asking him.

18      MR. EDELMAN:  Well, I know he didn't.

19      MR. SALTZMAN:  But on the random issue, no matter

20  which way it came down, it's still the same answer.  It's not

21  ran -- random is not an issue.  So he didn't know anything

22  about that.

23      THE COURT:  In any event, if you're requesting to, I

24  don't know, reopen and put in evidence about that, I will not

25  grant that request.

**MARTIN - CROSS / WAGNER**

1          **MR. EDELMAN:**  Okay.  And -- okay.

2          **MR. SALTZMAN:**  Thank you, Your Honor.

3            (Recess taken at 10:28 a.m.)

4         (Proceedings resumed at 10:48 a.m.)

5    (Proceedings were heard out of presence of the jury:)

6          **THE COURT:**  Are you ready?

7          **MR. WAGNER:**  Yes, Your Honor.

8          **THE COURT:**  All right.

9    (Proceedings were heard in the presence of the jury:)

10          **THE COURT:**  All right.  Mr. Wagner, you may proceed.

11    And you are still under oath from this morning, sir.

12          **MR. WAGNER:**  Good morning, Your Honor.

13    Good morning, ladies and gentleman.

14               **<u>CROSS-EXAMINATION</u>**

15 **BY MR. WAGNER:**

16 **Q.**   Okay.  Mr. Martin, hi.

17 **A.**   How you doing?

18 **Q.**   I'm Butch Wagner.  I'm one of the attorneys for the -- for

19 the class members, your fellow truck drivers.  Okay?

20    I -- you made some statements here that you thought you

21 were well paid; right?

22 **A.**   Correct.

23 **Q.**   Okay.  How familiar are you with California wage laws as

24 they would apply to a person like you?

25          **MS. CONWAY:**  Objection, Your Honor.  Calls for a legal

1    conclusion.

2            THE COURT:  Calls for a yes or a no -- or, actually,

3    it doesn't call for a yes or a no, it's a gradation.  So

4    perhaps you could change it to a yes or a no.

5    BY MR. WAGNER:

6    Q.   Do you consider yourself to be fairly familiar with the

7    California wage laws as they apply to a driver -- a truck

8    driver like yourself?

9    A.   Not really.

10   Q.   Okay.  Well, are you aware that you're entitled to a paid

11   ten-minute rest break every four hours under the law?

12           MS. CONWAY:  Objection, Your Honor.  Calls for a legal

13   conclusion.

14           THE COURT:  Sustained.

15   BY MR. WAGNER:

16   Q.   Well, did anyone ever tell you that you were entitled to a

17   ten-minute paid rest break every four hours you work?

18   A.   Yes --

19           MS. CONWAY:  Same objection, Your Honor.

20           THE COURT:  Well, no, it's not a legal conclusion.

21       You may answer.

22           THE WITNESS:  Am I aware of the fact that I have a

23   right to one of those?  Is that what you're asking me?

24   BY MR. WAGNER:

25   Q.   No.  Has anyone ever told you that you have a right to

**MARTIN - CROSS / WAGNER**

1  take a ten-minute off-duty rest break every four hours and get

2  paid for it?

3  **A.**   Yes, I've heard that law.  I -- yes, I have heard about

4  that --

5  **Q.**   Okay.

6  **A.**   -- yes.

7  **Q.**   All right.  Did anyone at Wal-Mart ever tell you that?

8  **A.**   That, I don't remember.

9  **Q.**   All right.  Now, you drive --

10       **MR. WAGNER:**  Can we -- Tracy, can we get Mr. ELMO

11  going?  Thank you.

12  **BY MR. WAGNER:**

13  **Q.**   You drive all over the state; correct?

14  **A.**   That's correct.

15  **Q.**   Okay.  Where do you -- where is your distribution center?

16  Did you say Porterville?

17  **A.**   Yes, Porterville, California.

18  **Q.**   That's right here; right?  And in --

19  **A.**   Yes, just north of Bakersfield, south of Fresno.

20  **Q.**   Right.  So -- and you drive all over the state; correct?

21  **A.**   Yes.

22  **Q.**   So when you're on the road here, let's say, somewhere on

23  Highway 5 or 99 and you think you need a -- you feel like you

24  need a rest break for whatever reason, use the restroom, get

25  some coffee, stretch your legs, and you take your rest break,

1  you're not taking that rest break in conjunction with any other

2  paid activity, are you?

3  **A.**   I myself personally normally don't take my breaks in those

4  type of situations.  I usually try to take my breaks at a place

5  where there's a restaurant or a store, usually, like I said, in

6  conjunction with something else I'm doing --

7  **Q.**   But when you --

8  **A.**   -- with my job.

9  **Q.**   But when you do take it on the road --

10  **A.**   Uh-huh (affirmative).

11  **Q.**   -- and you're not at a distribution center, you -- you're

12  not taking that in connection with any other activity, are you?

13         **MS. CONWAY:**  Lacks foundation, Your Honor.

14  Argumentive.

15         **THE COURT:**  Overruled.

16     You can answer.

17         **THE WITNESS:**  What I said earlier and what I'm saying

18  right now is when I take my breaks, it's usually when I'm at a

19  store doing some type of activity.  I don't usually ever

20  stop -- unless I've got the runs, I don't stop on I-5 in the

21  middle of nowhere to take any break.

22  **BY MR. WAGNER:**

23  **Q.**   But sometimes you do; right?

24  **A.**   No.

25  **Q.**   Okay.

**MARTIN - CROSS / WAGNER**

1    **A.**    I said unless I have the runs.  Unless I'm sick, I

2    normally do not plan my day to stop in the middle of nowhere.

3    That would only be a rare occasion for me, would be if I had

4    some type of medical situation where I needed to get off the

5    road for a few minutes.

6    **Q.**    But are you aware that other drivers do that --

7    **A.**    Oh, absolutely.  There is people that stop in places they

8    probably shouldn't, but, yes, they do.

9    **Q.**    Okay.  Now, you mentioned earlier that you -- when you run

10   out of time, either because you've worked 14 hours that day or

11   driven 11, you have to stop and take your layover; right?

12   **A.**    That's correct.

13   **Q.**    And you take your layover all over the state; correct?

14   **A.**    Yes.

15   **Q.**    All right.  So when you run out of time, you say you stop

16   the truck and you -- that's when your ten-hour layover period

17   starts; right?

18   **A.**    Well, after you do your post-trip and finish your

19   paperwork up.

20   **Q.**    So when you stop the truck, you're not getting paid for

21   mileage anymore then; right?

22   **A.**    That would be correct.

23   **Q.**    And then you do your layover period -- then you do --

24   excuse me -- you do your post-trip inspection somewhere at some

25   truck stop; right?

**MARTIN - CROSS / WAGNER**

1  **A.**   Or, yeah, wherever you're parked at.

2  **Q.**   Okay.  And you're not getting paid for that post-trip

3  inspection --

4  **A.**   Well, I was getting paid -- it's --

5  **Q.**   What?

6  **A.**   You -- you -- you haven't quit working.  You've drove into

7  that point.  So that would be part of your driving --

8  **Q.**   Well, when you're --

9  **A.**   -- because you --

10 **Q.**   -- doing your post-trip inspection, you can't be driving.

11 **A.**   No, you can't be driving, but you're -- you're -- you

12 finish driving at that point, you spend a couple minutes doing

13 a post-trip, and then you're done.

14 **Q.**   And so --

15 **A.**   It's not -- it's not a big, long, drawn-out process.

16 **Q.**   But however long it takes, you're not getting paid for

17 that; right?

18 **A.**   It just depends on your termination.  Again, I got paid to

19 drive to that point, so I incorporated it with the driving.

20 **Q.**   Okay.  But once you're -- but you can't possibly be

21 getting -- be getting mileage pay when you're doing a post-trip

22 inspection; right?

23 **A.**   No.

24 **Q.**   Okay.  Same way with the pre-trip inspection when you get

25 up in the morning?

**MARTIN - CROSS / WAGNER**

1   **A.**   Well, yeah.  You spend a few minutes checking the truck

2   before you take off and drive.

3   **Q.**   And you're not getting paid for that, either, are you?

4   **A.**   It's incorporated with the driving.  You can't drive

5   because the law says you can't drive until you check the truck,

6   so it's kind of like a catch-all thing.

7   **Q.**   Right.  No, I understand that that's required, but you get

8   paid for the driving under Wal-Mart's piece rate plan.

9   **A.**   Uh-huh.

10  **Q.**   Okay.  But you're not getting paid for the time you spend

11  before driving doing the pre-trip inspection; correct?

12  **A.**   I guess not.

13  **Q.**   Okay.  Now, you mentioned before that -- I mean, I guess

14  you're usually -- you almost always take your layover in the

15  cab; right?

16  **A.**   That's correct.

17  **Q.**   And you said a couple times you took it at home; right?

18  **A.**   Yeah.  I don't go home very often to my actual house.  I

19  usually stay in the truck.

20  **Q.**   Are you familiar with Wal-Mart's written pay manuals and

21  reference manuals, the driver reference manuals?

22  **A.**   I -- I've probably read every one they give me, but I

23  don't have it memorized.

24  **Q.**   Are you familiar and aware that the policy requires the

25  drivers to get prior authorization before taking a layover at

1    home?

2    **A.**   I've read it, but that's not the way it's enforced.  It's

3    acted -- it's like I said in my prior testimony, you're not

4    asking permission to go home, you're letting them know where

5    their equipment is at because you're not going to be there in

6    case something happens to it.  That's the whole purpose of

7    calling.  It's not for permission.

8    **Q.**   Well, you're familiar with the policy that requires you to

9    get permission to take your layover --

10   **A.**   I -- like I said, I have read it in the book, but that's

11   not how it is enforced at the company level.  I mean, what they

12   wrote and what they do obviously don't go hand in hand, because

13   I've never had to ask permission.  Nobody that I know of has

14   asked permission to go home.  They just tell them that's where

15   they're going.

16   **Q.**   And that's per --

17   **A.**   And it's --

18   **Q.**   And that's personal to yourself; right?  What you're

19   testifying to now, that's personal to yourself?

20   **A.**   Well, I talk to other drivers.  They would tell you the

21   same things, but that would be hearsay.  But . . .

22   **Q.**   Okay.  Have you -- have you ever received a pay bulletin

23   or a newsletter from Wal-Mart stating that the policy regarding

24   layovers and getting permission to take the layover somewhere

25   other than the truck has been changed?

**HARRIS - DIRECT**

1    **A.**   No.

2    **Q.**   Okay.

3           **MR. WAGNER:**  Mr. Martin, I don't have anything

4    further.  Thank you -- thank you for your time.

5           **THE COURT:**  Anything further, Ms. Conway?

6           **MS. CONWAY:**  Nothing, Your Honor.

7           **THE COURT:**  May the witness be excused?

8           **MS. CONWAY:**  He can.

9           **THE COURT:**  Thank you very much, sir.  You're excused.

10          **THE WITNESS:**  Thank you.

11          **MS. CONWAY:**  We would call -- we would read the

12   deposition transcript portions of Ivan Harris, Your Honor.

13                        **IVAN HARRIS,**

14   called as a witness for the Defendant, having been duly sworn,

15   was examined and testified through **DEPOSITION TESTIMONY** as

16   follows:

17          **MS. CONWAY:**  Transcript pages -- line -- page 5, lines

18   4 to 5.  Ivan Harris, having been first duly sworn, testifies

19   as follows:

20       "**Q.**  Good morning, Mr. Harris.

21       "**A.**  Good morning.

22       "**Q.**  All right.  When did you start working for Wal-Mart?

23       "**A.**  June of 2006.

24          **MS. CONWAY:**  I'm sorry, lines 2 through 9 for the

25   Court's attention.

HARRIS - DIRECT

```
 1        "Q.  What was your job when you were hired?

 2        "A.  I was hired as a truck driver.

 3        "Q.  Have you been a truck driver for Wal-Mart since June

 4        2006?

 5        "A.  Yes."

 6            MS. CONWAY:  Page 15, lines 3 to 8:

 7        "Q.  Why did you want to drive for Wal-Mart?

 8        "A.  It was real close to home and I've always heard one

 9        of the best jobs in trucking.  I had already applied two

10        times prior to that.  Only like seven miles up the street

11        from my house, and the third application somebody actually

12        looked at it."

13            MS. CONWAY:  Lines 18 through 25:

14        "Q.  Have you found it to be true that it's the best

15        company to drive for?

16        "A.  Oh, yeah.  Yeah.  To me, yeah.

17        "Q.  Why do you think so?

18        "A.  I mean, I get along with everybody and they treat you

19        good and I haven't had any problems.

20        "Q.  Are you happy with your compensation?

21        "A.  Yeah."

22            MS. CONWAY:  Page 16, lines 21 through 25:

23        "Q.  You're making more now as a driver than you had at

24        other --

25        "A.  Oh, yes, yes."
```

HARRIS - DIRECT

1      MR. WAGNER:  Objection.  Relevance.  Move to strike.

2      THE COURT:  Overruled.

3      MS. CONWAY:  (Reading):

4  "A.  Oh, yes, yes.

5  "Q.  Do you think Wal-Mart pays better than other driving

6      companies' jobs?"

7      MR. WAGNER:  Objection.  Relevance.

8      THE COURT:  Sustained.

9      MR. WAGNER:  Your Honor, before the answer is shown to

10 the jury, I think we need --

11     MS. CONWAY:  It wasn't shown.  It wasn't shown,

12 Your Honor, only the question.  The answer was on the next

13 page.

14     THE COURT:  Okay.  So that's good for that, but he

15 makes a good point that if you are showing the whole page

16 before he has an opportunity to object, it's there.

17     MS. CONWAY:  I could do it this way, Your Honor.  I

18 could say the lines, he can make his objection, and then we can

19 read it.  How about that?

20     MR. WAGNER:  And then put it on?  That's fine.

21     THE COURT:  And after that, put it on.

22     MR. WAGNER:  Okay.

23     MS. CONWAY:  Next, page 19, lines 18 through 25

24 through page 20, lines 1 through 4.

25     MR. WAGNER:  19 what?

1    **MS. CONWAY:**  Lines 18 through 25.

2    **MR. WAGNER:**  Okay.  No objection.

3    **MS. CONWAY:**  Okay.  Kim, it can be put on the board.

4    **THE COURT:**  Sure.

5    **MS. CONWAY:**  (Reading):

6  "Q.  Do you have pride in being a Wal-Mart driver?

7  "A.  Oh, yeah.

8  "Q.  Why is that?

9  "A.  I like it.  It's different.  It's not like an

10   over-the-road company, you know.  I don't know.  It's --

11   they're more family oriented, put it that way.  If you

12   have to get home, they get you home, and, you know, they

13   take care of you.  They have barbecues.

14  "Q.  They care about you?

15  "A.  Yeah.

16  "Q.  They want to take care of you as a driver?

17  "A.  Yeah."

18    **MS. CONWAY:**  Page 36, lines 4 through 25, and page 37,

19   lines 1 through 20.

20    **MR. WAGNER:**  No objection.

21    **THE COURT:**  Thank you.

22    **MS. CONWAY:**  (Reading):

23  "Q.  Do you get paid for your layovers?

24  "A.  Yes, I do.

25  "Q.  How much do you get paid?

HARRIS - DIRECT

 1    "A.   Each layover is $42.

 2    "Q.   What do you do during your layover?

 3    "A.   Must have at least eight hours of sleep and I go eat

 4    dinner usually, watch a movie.

 5    "Q.   Where do you watch the movie?

 6    "A.   In my truck.

 7    "Q.   Have you ever gone to the movies?

 8    "A.   I think I have maybe once.

 9    "Q.   While working for Wal-Mart?

10    "A.   On layover, yeah, probably have.

11    "Q.   Go for walks?

12    "A.   Yeah.

13    "Q.   So when you would go to eat, what do you do with the

14    truck?

15    "A.   I lock it up.

16    "Q.   You make it secure?

17    "A.   Secure it.

18    "Q.   And then you leave it?

19    "A.   Uh-huh.

20    "Q.   What about if you go for a walk?  You secure it and

21    leave?

22    "A.   Uh-huh.

23    "Q.   Has anyone at Wal-Mart told you you have to stay with

24    the truck during your layover?

25    "A.   No.

**HARRIS - DIRECT**

1    **"Q.** Have you ever taken a layover in a hotel?

2    **"A.** Yes.

3    **"Q.** Are you reimbursed for that?

4    **"A.** Depends on the situation.

5    **"Q.** When do you get reimbursed?

6    **"A.** If you're -- say, for instance, if your truck breaks

7    down and they tow it, they will put you in a hotel and pay

8    for it.  Or I think I had had one where I stayed at a

9    casino and I parked my truck right out the window and I

10   called and said, 'I'm not sleeping in it.'  I told them --

11   I didn't push layover.  They said, 'You could have.  We

12   would have paid you for it because you're still laying

13   over.'  I told them it was all right.  That's about it."

14        **MS. CONWAY:**  Page 38, lines 12 through 24.

15        **MR. WAGNER:**  All right.

16        **MS. CONWAY:**  Okay.  Thank you.

17   **"Q.** What about if next week you're out for a layover and

18   you decide you just don't want to stay in the sleeper

19   berth?  Can you get a hotel?

20   **"A.** Yes.

21   **"Q.** And pay for it yourself?

22   **"A.** Uh-huh.

23   **"Q.** Do you have to ask permission?

24   **"A.** No.  I just have to tell them where the truck is at

25   if I'm not sleeping.  They make sure I'm parked in a

HARRIS - DIRECT

1          secure location.

2          "Q.  You make sure you're parked securely and then you can

3          do whatever you want?

4          "A.  As far as layover time.  I have to sleep."

5               MS. CONWAY:  Page 39, lines 2 to 3 and lines 6 through

6     19.

7               THE COURT:  Any objection?

8               MR. WAGNER:  No.

9               THE COURT:  All right.

10               MS. CONWAY:  (Reading):

11          "Q.  How many hours sleep do you need?

12          "A.  I personally need only about six or seven.

13          "Q.  Do you work during your layover?

14          "A.  No.

15          "Q.  Do you -- how many hours do you have to be on

16          layover?

17          "A.  Ten.

18          "Q.  Do you know where the rule comes from?

19          "A.  That's the DOT regulation.

20          "Q.  The U.S. Department of Transportation?

21          "A.  Yes.

22          "Q.  How many hours a day can you be driving?

23          "A.  You can drive 11 hours per day.

24          "Q.  Where did that rule come from?

25          "A.  Same regulation, Department of Transportation

1    regulations."

2         MS. CONWAY:  Page 65, lines 13 through 25.

3         MR. WAGNER:  Did you say 65?

4         MS. CONWAY:  I did.

5         THE COURT:  Well, it's a little hard because --

6         MS. CONWAY:  It refers to Exhibit A, which was one of

7    the questionnaires, Your Honor.

8         THE COURT:  Okay.  All right.  Any objection?

9         MR. WAGNER:  No.

10        THE COURT:  But you better -- they will be referring

11   to a questionnaire.

12        MS. CONWAY:  That was filled out by this particular

13   driver.

14        "Q.  I'd like to actually start with the comments on page

15        7 at the end.  It says, 'Please record any comments or

16        clarifications of your answers here.'  Can you read what

17        you wrote, please.

18        "A.  'Each trip is different and location and situation

19        change.'

20        "Q.  What do you mean by that?

21        "A.  Each trip is different.  I mean, it depends where

22        you're going, the time of day, where it's at, you know,

23        situations behind the store.

24        "Q.  Did that make it hard to answer some of these

25        questions?

1    "A.  Yes."

2         MS. CONWAY:  Page 73, lines 23 to 24 -- 25, I'm sorry,

3    going on to page 74, lines 1 through 20.

4         THE COURT:  Any objection?

5         MR. WAGNER:  No objection.

6         THE COURT:  You may.

7         MS. CONWAY:  (Reading):

8    "Q.  Do you think you were being paid for all of your

9    work?

10   "A.  Yes and no.

11   "Q.  Okay.

12   "A.  I have to say it that way because some -- some people

13   believe everything that you do is pay.  I'm the type of

14   person that some things are just part of your job.  So

15   say, for instance, I have to get a live load.  I've picked

16   this trailer up from the store.  It's supposed to be swept

17   out, so I'm supposed to check it.  Then I go to a vendor

18   for a live load.  The vendor says the trailer hasn't been

19   swept out.  The driver will get the okay to drive back to

20   a location to get a clean trailer instead of sweeping it

21   out himself to go back to the vendor.  I don't -- I'm the

22   type of person I would sweep it out at the vendor and get

23   what I'm supposed to do.

24   "Q.  You're getting paid for the live load time, though;

25   right?

HARRIS - DIRECT

1        "A.   Yes.  But you can also write down unscheduled time

2        and get paid for it."

3          (Loud noise interrupts the proceedings.)

4             THE COURT:  Can you find out what that was?

5             MR. WAGNER:  Something fell, as opposed to explosion.

6             THE COURT:  I think so.

7             MS. CONWAY:  Going on to more mundane issues.

8             MR. EDELMAN:  Your Honor had warned me not to engage

9   in theatrics, and I promise you I didn't do that.

10            MS. CONWAY:  Page 114, lines 11 through 22 -- I'm

11  sorry.  I didn't finish.

12       "Q.   You are getting paid for the live load time, though;

13       right?

14       "A.   Yes.  But you can also write down unscheduled time

15       and get paid for it.  Some drivers would rather go get the

16       miles, the extra activity pay, and hope to go back."

17            MS. CONWAY:  114, lines 11 through 22.

18            THE COURT:  Any objection?

19            MR. WAGNER:  No.

20            MS. CONWAY:  (Reading):

21       "Q.   Are there some weeks where you don't have to wait for

22       a load at all?

23       "A.   Yes.

24       "Q.   Are there some weeks where you have to wait for more

25       than one load?

1      "A.  Yes.

2      "Q.  Is it possible to estimate how many weeks are no wait

3      versus --

4      "A.  You know, it's hard to estimate because I might only

5      have one live load the whole week, might have none for a

6      few weeks.  Usually it's hard to estimate.

7      "Q.  No further questions, Mr. Harris.  Thank you."

8          THE COURT:  Mr. Wagner, are there other --

9          MR. WAGNER:  Well, yes.  We're going to do some read

10     from here.  Is Mr. Edelman going to --

11         THE COURT:  He still stays the witness.

12         MS. MARTINEZ:  Do you need the complete transcript,

13     Mr. Edelman -- I mean, Mr. Harris?

14         MR. EDELMAN:  I think I just have excerpts, so I

15     probably do.

16         MS. MARTINEZ:  Okay.  You have it?

17         MR. EDELMAN:  No, no, I think I need it.

18         MS. MARTINEZ:  Okay.

19         THE COURT:  Where are you going to read?  You need to

20     tell me, because I don't know.

21         MS. MARTINEZ:  I will start on page 18, lines 4 to 11.

22     "Q.  What do you understand -- how do you understand they

23     come up with what they pay you?

24     "A.  Oh, they give us a driver's handbook, for one, and it

25     shows how much you get for drop and hook pay or whatever.

HARRIS - DIRECT

1      It is listed on a Green Bar.  The handbook doesn't change

2      every year.  The Green Bar will give you the amounts you

3      get for each type of activities and your per mile."

4           MS. MARTINEZ:  Page 18, lines 15 to 18.

5           THE COURT:  All right.

6           MS. MARTINEZ:  (Reading):

7      "Q.  What about waiting pay?

8      "A.  Detention pay, yeah.  That's -- I don't know for sure

9      if it's on there, but I know we get it after 45 minutes."

10          MS. MARTINEZ:  Page 37, lines 21 to 24.

11          THE COURT:  All right.

12          MS. MARTINEZ:  (Reading):

13     "Q.  So the times that you have a breakdown and they put

14     you up in the hotel and reimburse it, do you still get the

15     $42?

16     "A.  No."

17          MS. CONWAY:  Your Honor, for completeness, I think 37,

18     lines 21 through --

19          THE COURT:  I agree.  I agree.  I think you need to

20     read the next -- lines 1 through 7 on the next page.  It

21     explains the answer.

22          MS. MARTINEZ:  Sure.

23          MS. CONWAY:  Thank you.

24          MS. MARTINEZ:  (Reading):

25     "Q.  What about if -- sorry --

HARRIS - DIRECT

1    "A.  You know, I really don't know the answer to that.  I

2        broke down once where they towed the truck to the store,

3        dropped the trailer, towed the tractor to the dealer, and

4        put me in a hotel, and I used the Wal-Mart credit card to

5        pay for it.  They paid me ADP per hour for the time that I

6        was not with my truck.  So I don't know."

7            MS. MARTINEZ:  Page 45, lines 5 through 8.

8            MS. CONWAY:  Your Honor, it's outside the scope.

9            THE COURT:  Overruled.

10           MS. MARTINEZ:  (Reading):

11   "Q.  Do you get a hook there?

12   "A.  Yes, I paid for the hook at Porterville.

13   "Q.  What does the hook involve?

14   "A.  Connecting to the trailer you're going to pull."

15           MS. MARTINEZ:  Page 46, lines 1 to -- wait.  46, lines

16   3 through 6.

17           THE COURT:  All right.

18           MS. MARTINEZ:  (Reading):

19   "Q.  And all the work that you were just describing, the

20       checking the trailer and proceeding to the outbound gate,

21       that is all part of a hook?

22   "A.  Right."

23           MS. MARTINEZ:  And then 15 to 21 on the same page.

24           THE COURT:  All right.

25           MS. MARTINEZ:  (Reading):

HARRIS - DIRECT

1    "Q.  Okay.  And you got an activity pay for -- well, you
2    would get an activity pay for the arrive and the activity
3    pay for the hook?
4    "A.  Right.  Correct."
5         MS. MARTINEZ:  Page 53, lines 19 to 24.
6         THE COURT:  I'm sorry?  53?
7         MS. MARTINEZ:  Yes, Your Honor, page 53, lines 19 to
8    24:
9    "Q.  So your go home day, you leave the truck in Apple
10   Valley.  Do you wash it before you leave to go home?
11   "A.  Every other week.
12   "Q.  What about fueling it?
13   "A.  I fuel it."
14        MS. MARTINEZ:  Page 113, lines 11 to 21.
15        MS. CONWAY:  Your Honor, I believe it's beyond the
16   scope and wasn't previously designated.
17        THE COURT:  Overruled.  You may read it.
18        MS. MARTINEZ:  (Reading):
19   "Q.  Not meal breaks, your rest breaks.  Do you take rest
20   breaks?
21   "A.  Yeah.
22   "Q.  What do you do?
23   "A.  When I'm out on the road, normally I will pull up to
24   the truck stop, go to the bathroom, grab a soda.
25   "Q.  Do you log off duty for that?

1     "A.  No.  That's on duty.  We're allowed, I think, ten --

2     two ten-minute breaks in a five-hour period.

3     "Q.  Are you paid for those?

4     "A.  No."

5          MS. MARTINEZ:  Page 123.  Page 123, lines 21, to page

6     124, line 7.

7          MS. CONWAY:  Your Honor, there was an objection within

8     that and I would renew that objection.

9          THE COURT:  The leading objection?

10         MS. CONWAY:  Yes.

11         THE COURT:  Overruled.  You may read it.

12         MS. MARTINEZ:  (Reading):

13    "Q.  Have you ever requested to stay anywhere other than

14    the cab on a layover?

15    "A.  Yes.

16    "Q.  How many times have you done that?

17    "A.  Five or six, maybe --

18    "Q.  Okay.

19    "A.  -- in the past year.

20    "Q.  Do you recall if you were paid the $42 if you did not

21    sleep in the cab?

22    "A.  Yes.  I recall that I know I wasn't paid."

23         MS. MARTINEZ:  Page 24 [sic], lines 22 to page 125,

24    line 7.

25         THE COURT:  You mean page 124?

1          MS. MARTINEZ:  124, Your Honor, yes.

2          THE COURT:  All right.

3          MS. MARTINEZ:  (Reading):

4     "Q.  What were the circumstances that led you to needing

5     to be outside the cab those five to six times?

6     "A.  My fiancee lives in Vegas and I would call -- well,

7     they have a rule that if you're not going to be in the

8     truck, call them, tell them where the truck is parked, and

9     they will approve it or disapprove it.  I always went to

10    the same store if I was in the area.  I would call, say,

11    'My truck is parked at such and such store, I'm not going

12    to be in it.'  And they have security, roaming security.

13    They will say, 'Okay,' and I call a cab and go."

14         MS. MARTINEZ:  Same page, 125, starting at line 10 to

15    page 126 --

16         THE COURT:  125 what?

17         MS. MARTINEZ:  I'm sorry, Your Honor.  Page 125,

18    starting at line 10 --

19         THE COURT:  Okay.  Sorry.  All right.  Starting at

20    line 10 to where?

21         MS. MARTINEZ:  To page 126, ending on line 5.

22         MS. CONWAY:  Your Honor, they previously did not

23    designate that in the exchange of designations, and I don't

24    think it's complete without -- if read, without lines 9 through

25    15.

1      **THE COURT:**  Okay.  Well, I'll tell you to read all the

2  way down to line 15.

3      **MS. MARTINEZ:**  Okay.

4      **"Q.**  Did they ever say that you couldn't go to your

5  fiancee's when you wanted to?

6      **"A.**  No.  I never specified where I was going.  They never

7  asked.  I just said, 'My truck is here.  I won't be

8  sleeping in it tonight,' and they would say yes or no.

9      **"Q.**  Did they ever say no?

10     **"A.**  No -- on one occasion.  They gave me curfew store and

11  I had hours to run, and I got there after the curfew and I

12  couldn't deliver.  And I said, 'Well, I can stay the

13  night.  Can I go down to such and such store and park?'

14  It was only three miles down the road.  The coordinator

15  was trying to get me to go someplace else which was

16  further away, and I convinced him closer store.

17     **"Q.**  So it worked out?

18     **"A.**  Yeah.

19     **"Q.**  So they didn't -- so they didn't -- they initially

20  said you couldn't go where you wanted to, but then you

21  convinced them that -- convinced them, then you could?

22     **"A.**  Right, because of the distance.

23     **"Q.**  That was a conversation with a driver coordinator?

24     **"A.**  Right.

25     **"Q.**  Was that -- go ahead.

HARRIS - DIRECT

1      "A.   I told him I would not be putting down layover on my

2      paperwork.   Each time I write 'no layover' so there

3      wouldn't be no mistake that I got paid.

4      "Q.  You didn't want to get paid?

5      "A.  No, I didn't."

6            MS. MARTINEZ:  No further reads, Your Honor.

7            THE COURT:  Thank you.  The witness may be excused.

8            MR. EDELMAN:  Thank you, Your Honor.

9            THE COURT:  Defendants may call their next witness.

10            MS. CONWAY:  Your Honor, we don't have any further

11     witnesses.

12            THE COURT:  Does that mean you rest?

13            MS. CONWAY:  Yes.

14            THE COURT:  Okay.

15            MR. WONG:  Subject to confirming that our exhibits

16     have been received into evidence, we respectfully rest our

17     case.

18                       (Defense rests.)

19            THE COURT:  Do the plaintiffs have any rebuttal?

20            MR. WAGNER:  Yes, we do, Your Honor.  For our first

21     rebuttal witness, we call Mr. Ed Parrish, who is a HR resource

22     manager for Wal-Mart.  He was sitting here a minute ago.

23            MS. CONWAY:  Your Honor, Mr. Parrish was not on their

24     witness list for today.  We exchanged witness lists.  He wasn't

25     on it.

HARRIS - DIRECT

1        MR. WAGNER:  He was on theirs for today to testify

2   this morning.

3        MS. CONWAY:  He -- Your Honor, should we have a

4   sidebar?

5        THE COURT:  Do you have anybody besides that?

6        MR. WAGNER:  Yes.  Yes.

7        THE COURT:  I suggest we go ahead with that and then

8   we can discuss this at the lunch break.

9        MR. WAGNER:  Okay.

10       MS. CONWAY:  Thank you.

11       MR. MYRICK:  Your Honor, at this time, plaintiffs

12  would like to call Mr. Michael Easterling.

13       THE COURT:  First she will take your picture, then she

14  will give you the oath, and then he will ask you some

15  questions.

16       THE WITNESS:  Thank you.

17       THE CLERK:  Raise your right hand, please.

18                    **JAMES EASTERLING**,

19  called as a witness for the Plaintiffs, having been duly sworn,

20  testified as follows:

21       THE CLERK:  Please state your full name for the

22  record.

23       THE WITNESS:  James Michael Easterling.

24       THE CLERK:  James -- what was the last name?

25       THE WITNESS:  Easterling, E-A-S-T-E-R-L-I-N-G.

1          **<u>REBUTTAL EXAMINATION</u>**

2          **<u>DIRECT EXAMINATION</u>**

3    **BY MR. MYRICK:**

4    **Q.**   Good afternoon, Mr. Easterling.

5    **A.**   Good afternoon.

6    **Q.**   Are you currently a driver for Wal-Mart?

7    **A.**   Yes, I am.

8    **Q.**   How long have you been a driver for Wal-Mart?

9    **A.**   March 10, 1997 was my hire date.

10   **Q.**   And, Mr. Easterling, we've heard a lot of testimony about

11   arrive and drop and hook and depart from Wal-Mart drivers.

12         Did you perform a hook and depart from a store location?

13   **A.**   Yes.

14   **Q.**   And did you then follow a route that was designated by

15   Wal-Mart to a DC at any time?

16   **A.**   Yes.

17   **Q.**   And you said you performed a hook and depart at a store;

18   correct?

19   **A.**   Correct.  Yes.

20   **Q.**   And you performed an arrive and drop when you reached your

21   destination at a DC?

22   **A.**   Yes.

23   **Q.**   How long could a hook take?

24   **A.**   Anywhere between 15 and 45 minutes.

25   **Q.**   And you were paid 8.50, to your knowledge?

EASTERLING - DIRECT / MYRICK

1  **A.**   Yes.

2  **Q.**   And, likewise, how long could an arrive and drop take?

3  **A.**   Total of 15 to 45 minutes again.

4  **Q.**   And were you paid 9.25 for an arrive and drop?

5  **A.**   Yes.

6  **Q.**   How many miles could you drive in a day?

7  **A.**   500 to 525.

8  **Q.**   Was it possible for you to have to take a layover from

9  this route?

10 **A.**   Yes.

11 **Q.**   And would you be taking your layover at a truck stop on

12 occasion?

13 **A.**   Yes.

14 **Q.**   And when you arrived at the truck stop, did you perform a

15 pre-trip -- I'm sorry, a post-trip inspection when you arrived?

16 **A.**   Yes.

17 **Q.**   And did you perform a pre-trip inspection in the morning?

18 **A.**   Yes, I did.

19 **Q.**   How much time did it typically take you to perform a

20 pre-trip inspection?

21 **A.**   Typically, the minimum amount of time would be 15 minutes.

22 **Q.**   When was the last time you performed a pre-trip

23 inspection?

24 **A.**   Day before yesterday.

25 **Q.**   You said the day before yesterday?

EASTERLING - DIRECT / MYRICK

1    **A.**    Yes.

2    **Q.**    Is it hard for you to estimate those times?

3    **A.**    No, not at all.  I've been doing this since 1965, so I

4    pretty much know exactly what I'm looking for and how to

5    perform them.

6    **Q.**    Do you perform a pre-trip inspection every day at work?

7    **A.**    Every day.

8    **Q.**    Do you perform multiple pre-trip inspections?

9    **A.**    Yes, we do.

10   **Q.**    Do you feel like you're exaggerating when you say it takes

11   you 15 minutes?

12           **MS. CONWAY:**  Objection.  Leading, Your Honor.

13           **THE COURT:**  Overruled.

14       You may answer, sir.

15           **THE WITNESS:**  Say it one more time, sir.

16   **BY MR. MYRICK:**

17   **Q.**    Are you exaggerating -- do you feel like you are

18   exaggerating when you say it took you 15 minutes?

19   **A.**    No, not at all.  Sometimes it can take more, depending on

20   the equipment that we have.  We do have some older equipment

21   that we have to pay special attention to.  We have newer

22   equipment that you can basically just see real easily what's

23   going on with them.  It's a technical thing.

24       We have different braking systems, different airing

25   systems, different lighting systems.  So from using them every

1    day, we know what we're looking at there.  Older equipment is

2    going to take you a longer time.

3    **Q.**   Just so we're clear, your testimony is that you performed

4    a pre-trip inspection multiple times in a week since 1965?

5    **A.**   Yes, even while I was in the military.  In the military,

6    we were required to do this also.  This is a safety thing, not

7    only for myself, but for the public.  If something seriously

8    happens going down the road, I am the one that is responsible

9    for it.

10   **Q.**   And, similarly, how long --

11          **THE COURT:**  You can pull the mic towards you.

12          **THE WITNESS:**  Thank you, ma'am.

13   **BY MR. MYRICK:**

14   **Q.**   How long does it take you to perform a post-trip

15   inspection?

16   **A.**   Post-trip inspections usually are a little bit different

17   than the pre-trip inspections, because they are usually done at

18   night because of the -- my times the way I do.  But timing on

19   that is usually about 15 minutes minimum.

20   **Q.**   Do you sometimes have to fuel at the truck stop that you

21   stop at?

22   **A.**   Yes, we do.

23   **Q.**   Can you provide for the jury your best estimate of how

24   long it takes you to fuel?

25   **A.**   Half hour to 45 minutes.

EASTERLING - DIRECT / MYRICK

1    **Q.**   Do you sometimes have to weigh?

2    **A.**   Yes, we do.

3    **Q.**   And how long can it take you to weigh the tractor and

4    trailer?

5    **A.**   Fifteen minutes to a half hour, sometimes 45 minutes,

6    depending on how long of a line that we have to wait in to get

7    to the scale and then how long of a line we have to wait in

8    inside to pay for the scale ticket and receive our certified

9    scale weight.

10   **Q.**   And then, finally, are you on occasion inspected by the

11   Department of Transportation?

12   **A.**   Yes, we are.  There's a sticker that they put in our lower

13   window, and that sticker has a color.  And when we go through

14   the scales, it will see that color and they'll know how long

15   it's been since we have had an inspection.  They like to do

16   them once a quarter.  So four times a year, basically, we're

17   being pulled in to do that.

18   **Q.**   What's your best estimate of how long a DOT lasts?

19   **A.**   Usually about 30 minutes.

20   **Q.**   I'm not very good at math, but this looks like a total

21   time 2 hours and 30 minutes.

22       Has anyone from Wal-Mart ever told you that this $8.50 or

23   this $9.25 covers any of the time that you've spent on this

24   layover?

25           **MS. CONWAY:**  Objection, leading and compound.

1        **THE COURT:**  Overruled.

2     You can answer.

3        **THE WITNESS:**  No, they haven't.

4  BY MR. MYRICK:

5  **Q.**   And to be clear, this layover took place 500 miles from

6  where you received a hook; is that accurate?

7  **A.**   Yes.

8  **Q.**   And how far away did the layover take place from where you

9  received the arrive?

10  **A.**   500 miles.  It could be -- it just depends on where our

11  destination is, how far away from where we're at.

12  **Q.**   Did you receive any activity pay for this?

13  **A.**   No, none at all.

14  **Q.**   Is it possible that you performed multiple layovers?

15  **A.**   Yes.  Yes, it is.

16  **Q.**   What's your understanding of Wal-Mart's policy with regard

17  to layovers?

18  **A.**   Layovers are -- you need to stay in your truck.  You're

19  allowed to get out and, of course, use the restroom or go get a

20  bite to eat, but then you need to be back in your truck.

21  They're basically -- they want somebody there to watch their

22  equipment and to watch the product that we're hauling.

23     There are special occasions that you can call and get

24  permission like to stop at your -- through your hometown, but

25  they're very specific as -- if you're hauling like a load of

1   computers or a load of TVs or something like that, they're
2   going to say, "No, you're going to have to go somewhere else
3   and stay," and then you have to stay with that truck.
4   **Q.**   How much money are you paid for a layover?
5   **A.**   $42.
6   **Q.**   What's your understanding of how Wal-Mart determines that
7   they were going to pay you $42 for the ten hours of sleeping in
8   the cab?
9   **A.**   When they first started this, it was based upon --
10           **MS. CONWAY:**   Your Honor, lacks foundation --
11           **THE WITNESS:**   -- minimum wage --
12           **MS. CONWAY:**   -- and also the witness is being
13   nonresponsive.
14           **THE COURT:**   We don't know what his response was
15   because you cut him off in the middle of it.
16           **MR. MYRICK:**   I can reask the question if you like,
17   Your Honor.
18           **THE COURT:**   Why don't you.  Her foundational question
19   is actually, I think, a really good question.  So you better
20   lay a foundation if you're going to ask him the question again.
21   **BY MR. MYRICK:**
22   **Q.**   How much are you paid for a layover?
23   **A.**   $42.
24   **Q.**   Do you know where the $42 comes from?
25   **A.**   Yes.

1    **Q.**    Okay.  And what is your understanding of how --

2            **THE COURT:**  How does he know that?

3    **BY MR. MYRICK:**

4    **Q.**    How do you know that?

5    **A.**    From working with Wal-Mart for years.  We have meetings

6    that are called grassroots meetings, where the drivers are all

7    gathered up at certain times.  These are questions that are

8    asked by the drivers, including myself, is, "Where do you come

9    up with $42?  How in the world is that relevant to anything we

10   do?"  And --

11           **MS. CONWAY:**  Your Honor, this is hearsay.

12           **THE COURT:**  Overruled.

13           **THE WITNESS:**  It is not.

14           **THE COURT:**  Look, I get to say --

15           **THE WITNESS:**  I'm sorry, ma'am.

16           **THE COURT:**  -- whether it is or isn't.

17           **THE WITNESS:**  That just kind of --

18           **THE COURT:**  That's my job here.

19           **THE WITNESS:**  -- took me by surprise.

20           **THE COURT:**  So -- but I'm overruling your objection,

21   just like you said.

22           **MS. CONWAY:**  Thank you, Your Honor.  I appreciate

23   that.

24           **THE WITNESS:**  Thank you, ma'am.

25

**EASTERLING - DIRECT / MYRICK**

1   **BY MR. MYRICK:**

2   **Q.**   You can continue.

3   **A.**   Anyway, we have these grassroots meetings where we are

4   allowed to ask questions and we talk about, with management,

5   what we do on a daily basis.

6          And that has been brought up time and time again, is to --

7   where this $42 came from.  The answer is that when it was first

8   established, it was based on minimum wage.  Now, as minimum

9   wage has changed and our hours of service also has changed, the

10  $42 never has changed.

11  **Q.**   Is it your understanding that Wal-Mart receives a benefit

12  by requiring you to sleep in the truck on these layovers?

13          **MS. CONWAY:**   Objection.  Leading.  Lacks foundation.

14          **THE COURT:**   Also, I think it's a very confusing

15  question.  I will sustain her objections.

16  **BY MR. MYRICK:**

17  **Q.**   Why does Wal-Mart require you to sleep in the truck on

18  layovers?

19          **MS. CONWAY:**   Same objection, Your Honor.

20          **THE COURT:**   There will be a foundation problem with

21  this if you are saying why does Wal-Mart do it.  So you better

22  lay a foundation.

23  **BY MR. MYRICK:**

24  **Q.**   Does Wal-Mart require you to sleep in the truck on

25  layover?

**EASTERLING - DIRECT / MYRICK**

1    **A.**    Yes, they do.

2    **Q.**    Why?

3              **MS. CONWAY:**  Same objection, Your Honor.

4              **THE COURT:**  How would he know?

5              **MR. MYRICK:**  I'm asking his understanding, Your Honor.

6              **THE COURT:**  He has to have a foundation for the

7    understanding to make it relevant.

8              **MR. MYRICK:**  Okay.

9    **BY MR. MYRICK:**

10   **Q.**    Do you understand why Wal-Mart requires you to sleep in

11   the truck on layover?

12   **A.**    Yes, I do.

13   **Q.**    How do you understand that?

14   **A.**    Again, from the beginning of my first day at Wal-Mart when

15   we come into orientation, they explain to us about the layover

16   procedures and why you need to stay in that truck.  And we are

17   told flat out that the reason is -- is that you are there to

18   guard the property and the commodity that we have in the

19   trailer there.  That is the purpose for us to stay there.

20   **Q.**    Have you ever experienced a break-in on layover?

21   **A.**    Yes, I have.

22   **Q.**    And can you describe your experience of a break-in on a

23   layover.

24   **A.**    I was parked at a Wal-Mart store in Sacramento and some

25   people came up behind my trailer and took bolt cutters and they

EASTERLING - DIRECT / MYRICK

1   cut the padlock off the back of my trailer, and they opened the

2   door.

3        I heard this, but our instructions from Wal-Mart is to not

4   engage them in any way other than turn our lights on so they

5   can see in the back, and then that -- they got in their

6   vehicles and ran off.  And then I just called the -- the police

7   and then they came out and they made a report, and that was

8   basically it.

9        The most important thing, what happens in this is they

10  have to do an audit of that trailer, so that trailer has to go

11  to that facility and then they have to take every piece of

12  freight out of that trailer and they have to count it and make

13  sure what is present and what has been taken.  And that takes a

14  lot of time.

15  **Q.**   Has anyone from Wal-Mart ever told you that on one of

16  these layovers, you could lock the truck up and leave it for

17  ten hours?

18  **A.**   Never.  Never.

19  **Q.**   Has anyone from Wal-Mart ever told you that you are

20  allowed to take a layover at your home without Wal-Mart's

21  permission?

22  **A.**   No.  You have to have permission.  You have to call ahead

23  of time and you have to get a -- permission from either a

24  manager or an ops manager, and they are going to question as to

25  what commodity you have in your trailer and where you're going

1    to park it, how long you're going to be gone.

2         You have to call and let them know when you're leaving

3    your truck and you have to also call and notify them when

4    you're back in the truck.

5    Q.   How many nights a week are you away from your family when

6    you're driving for Wal-Mart?

7    A.   Four to five.

8    Q.   And can you describe for the jury what that means in terms

9    of your relationship with your family?

10              MS. CONWAY:  Objection, Your Honor.  Relevance.

11              THE COURT:  Well, I think we had actually quite a lot

12   of family-oriented testimony already, so I will allow it.

13   BY MR. MYRICK:

14   Q.   You can answer the question, Mr. Easterling.

15   A.   Well, having been here for going on 20 years in March,

16   I've missed a lot out of my children, a lot.

17        If you want, for example, to be there for graduation, you

18   have to plan a week or two ahead to make sure you can get that

19   time off.  As far as baseball games, swimming events, things

20   like that, just little things, like being a chaperon or

21   something at some event, we don't get to do that.

22        It's very difficult coming home to a place where you're

23   only there for maybe a day and a half or two days.  You're like

24   a stranger in your own house.  I have to call to see what's

25   going on in my home so when I come home, I don't make plans for

**EASTERLING - DIRECT / MYRICK**

1    myself that offsets the plans that my wife has made for our

2    children and her.

3         And it's very difficult.  I have a very strong wife.

4    We've been married for -- we're going on 45 years and she

5    supports me.

6    **Q.**   We've heard from a couple drivers that came in and

7    testified on behalf of Wal-Mart, and these were set run

8    drivers.

9         Can you describe for the jury what a set run driver is.

10   **A.**   Uh-huh.  Set run drivers, that term we changed now and

11   it's basically called set work.  And what that means is -- is

12   that you will come to work on a Monday morning or whenever your

13   workweek starts -- it could be Monday through Sunday, for that

14   matter -- and you will leave, you'll go to a set route, to a

15   set destination, come around, and come right back to Wal-Mart

16   again, and then you're home that night.

17        And we have a few set work positions now where you're out

18   on the road, but there's not very many of those and most of

19   these are taken by seniority drivers, drivers who have been

20   there for a while.

21   **Q.**   Can you describe for the jury what your hours of work are

22   like when you're driving for Wal-Mart.

23   **A.**   Oh, basically, we're working 5 days a week, 14 hours a

24   day.  Now, that's almost like working two jobs.  Normal job is

25   going to be basically 8 hours a day.  Well, I'm working like

1    two 7-hour jobs five days a week, and it's very tough.

2         I'm living in an area about the size of a king-size

3    mattress, to be honest.  The whole -- where I sleep, where I

4    live, and where I drive, just picture a king-size mattress and

5    that's about the size of it.

6         Our diets are not very good.  We have a lot of health

7    issues as truck drivers and we have some very long hours.  If

8    my morning starts -- or my day starts at 8:00 in the morning,

9    my day won't end until 10:00 at night, and that's five days a

10   week.  That's the way it goes.

11   **Q.**   What's your income level at Wal-Mart?

12   **A.**   My income level is around about $90,000 a year, but it's

13   very misleading.  You can take a third of that --

14            **MS. CONWAY:**  Objection.  Nonresponsive, Your Honor.

15            **MR. MYRICK:**  I will ask a follow-up question.

16   **BY MR. MYRICK:**

17   **Q.**   What do you mean by "misleading"?

18   **A.**   What I mean is that 90,000 sounds like a lot of money to

19   most folks, but a third of that goes right off the top for

20   living expenses out on the road.

21        I know you guys probably don't eat out as much as I do,

22   but to get a decent meal, you are going to pay 15 to $20 to get

23   anything that is decent to eat.  We try to eat something like

24   cereal or something in the morning that we can prepare ourself

25   and then we try to make a cold-cut sandwich or heat up a cup of

1    soup or something like that for lunch, but Wal-Mart has no

2    subsistence for us at all.  They don't pay us any per diem at

3    all.

4        My clothes that I wear, except for my shirts, they supply

5    shirts for us, but my clothes, my gloves, everything, my

6    glasses, everything that I use out on the road I have to pay

7    for by myself.

8    Q.   Have you ever complained about your pay to Wal-Mart?

9    A.   Yes.

10   Q.   And what were the complaints that you made to Wal-Mart

11   about your pay?

12   A.   In grassroot meeting, several times I have stood up and I

13   have said, "Hey, you know what?  We're spending a lot of time

14   washing your trucks," because these trucks are like billboards

15   going down the roads, and so we've been instructed to keep them

16   clean.  So I'm spending time washing them, I'm spending time

17   doing all of these little things like post inspection, pre-trip

18   inspection, DOT time, vendor time, weighing the truck.

19       Weighing the truck is a whole new adventure.  You would

20   think you just drive across the scale and it's that simple, but

21   it's not.  We have ways of adjusting weight by moving the

22   tandems back and forth.  Those are the rear wheels of the

23   trailer.  That all takes time to do, and we are not paid

24   anything for doing that.  And in my opinion, that's just not

25   fair.  That's just not the way things should be.

EASTERLING - DIRECT / MYRICK

1    **Q.**   What's Wal-Mart's response been to your complaints?

2    **A.**   Pretty much the same as they have always been in my going

3    on 20 years.  "You know, we're really looking into that and

4    we'll try to get back to you on that, Michael, and see if we

5    can -- and do something about it."

6         But it's never been that way.  And trust me when I tell

7    you, I am not the only one that complains.  We have a large

8    group that are saying, "Hey, this is just not right."

9              **MS. CONWAY:**  Objection, Your Honor.  Move to strike as

10   nonresponsive.

11             **THE COURT:**  Sustained.

12   **BY MR. MYRICK:**

13   **Q.**   How do you feel about Wal-Mart?

14   **A.**   Well, Wal-Mart, when I first started working here, was a

15   pretty decent job.  Things have changed over the years that I

16   have been here, and it comes down to right now is that I'm just

17   not really happy with the way and the direction that they have

18   taken.

19        I believe they could do more for their drivers.  We give

20   them a lot and a lot is asked of us, and I just think that we

21   need to be compensated for what we do.  It's only fair to us as

22   drivers and fair to our families, too.  Our families go through

23   a lot.

24             **MR. MYRICK:**  No further questions, Your Honor.

25             **THE COURT:**  Thank you.

EASTERLING - CROSS / CONWAY

1        Ms. Conway.

2              **MS. CONWAY:**  Thank you, Your Honor.

3                    **REBUTTAL EXAMINATION**

4   **BY MS. CONWAY:**

5   **Q.**   In fact, this year you're making close to 97,000 a year;

6   is that correct?

7   **A.**   This year?

8   **Q.**   Yes.

9   **A.**   I have no idea.

10  **Q.**   And, in fact, in 2014, you made $96,267.50?

11  **A.**   I'm assuming that's gross.

12  **Q.**   Yes, gross.  We all get paid on a gross amount.

13  **A.**   Yes.

14  **Q.**   Everyone pays taxes; right?

15        So in 2014, you made $96,267.50; is that correct?

16  **A.**   I -- if you're saying so, yes, ma'am.

17  **Q.**   Okay.  And when you're at a DC, Wal-Mart feeds you; is

18  that correct?  There's frequently barbecues --

19  **A.**   Only on special occasions.

20  **Q.**   They give you free coffee?

21  **A.**   Yes, there is coffee there if you want to drink it, if you

22  would call that coffee.

23  **Q.**   And you have been a truck driver how many years?

24  **A.**   I first started driving a truck in 1965.

25  **Q.**   So it's over 50 years?

EASTERLING - CROSS / CONWAY

1    **A.**    Yes.

2    **Q.**    And you understood when you joined Wal-Mart what a --

3    truck driving entailed; is that correct?

4    **A.**    I'm pretty sure.

5    **Q.**    You would pretty much describe yourself as an experienced

6    driver when you joined Wal-Mart?

7    **A.**    Yes.

8    **Q.**    When you joined Wal-Mart, you told Wal-Mart that you were

9    very happy and you felt that you had come home and that you

10   felt that it was a great job to have at Wal-Mart?

11   **A.**    Yes.  That was in 1997.

12   **Q.**    And you have stayed at Wal-Mart for 45 years; is that

13   correct?

14   **A.**    Yes.

15   **Q.**    And you've been married for 45 years --

16   **A.**    No, I haven't been at Wal-Mart for 45 years.

17   **Q.**    How long have you been at Wal-Mart?

18   **A.**    Since 1996, and that would be 19 years.

19   **Q.**    And you're still at Wal-Mart; is that correct?

20   **A.**    Well, yes.

21   **Q.**    You just talked about being -- having your trailer broken

22   into; is that correct?

23   **A.**    Yes.

24   **Q.**    And you were specifically instructed by Wal-Mart not to

25   engage with anyone that broke into your trailer; is that

**EASTERLING - CROSS / CONWAY**

1   correct?

2   **A.**    Yes.

3   **Q.**    And you followed Wal-Mart's instruction not to engage; is

4   that correct?

5   **A.**    Yes.

6   **Q.**    You talked about inspections -- I mean, excuse me, DOT

7   inspection taking 30 minutes; is that correct?

8   **A.**    Yes.

9   **Q.**    And it's your experience it takes 30 minutes?

10  **A.**    It can be 20 minutes.  What the DOT rule is is they need

11  to have you out of there by 30 minutes.  They by law cannot

12  take any more than 30 minutes of your time.

13  **Q.**    So by law, the maximum is 30 minutes, but, in fact, you

14  have had DOT inspections less than 30 minutes; is that correct,

15  Mr. Easterling?

16  **A.**    I would probably imagine so over the years, yes.

17  **Q.**    In fact, as recently as 2015, you had a DOT inspection

18  that was only 19 minutes; is that correct?

19  **A.**    Yes.  But you have to understand there is different

20  variations of DOT inspections.

21  **Q.**    Is that correct?

22  **A.**    If you're telling me that.  I don't have the paper that

23  you have.

24  **Q.**    Okay.  So as far as you know, in 2015, you had a DOT

25  inspection that only lasted 19 minutes; is that correct?

1    **A.**    I'm going to ask you what class of DOT inspection was it?

2    **Q.**    How about a Level 1 inspection?

3    **A.**    Level 1 inspections are different than Level 2s or 3s.

4    **Q.**    Well --

5    **A.**    Level 1 inspection is a very walk-around inspection.

6    They're basically wanting to look at your logbook, your medical

7    card, and they run information on your driver's license, as far

8    as I'm concerned.

9    **Q.**    And, Mr. Easterling, you understand that oftentimes it's

10   just a Level 1 inspection that the DOT does?

11   **A.**    No, that's not true at all.  Actually, what happens is --

12   is that if it's raining outside, they're not going to want to

13   get underneath that trailer and check everything they need to

14   check because of water, mud, and road debris falling off the

15   trailer.  So that's when they do the minimum inspection.

16        On a bright, sunny day, if your sticker is gone, they are

17   going to do the whole thing.  Some guys are more thorough than

18   others.  It could take 20 minutes; it could take 30 minutes.

19   **Q.**    And it could take less, depending on how thorough the DOT

20   inspector is; is that correct?

21   **A.**    Not if they're doing brake checks and everything.  Because

22   they have to get on a little --

23   **Q.**    I'm talking about a Level 1 inspection.

24   **A.**    Oh, it could take them 15 minutes.

25   **Q.**    It could take them 15 minutes; is that correct?

1    **A.**   Uh-huh, for Level 1.  It doesn't take much to just take

2    your driver's license and go over and look on the computer,

3    make sure you have your medical card and your logbook's up to

4    date.

5    **Q.**   That doesn't take much time at all; is that correct?

6    **A.**   I just said it takes about 15 minutes.

7    **Q.**   I want to show you --

8               **THE COURT:**  Tracy.

9               **MS. CONWAY:**  May I approach the witness, Your Honor?

10              **THE COURT:**  You may.

11   **BY MS. CONWAY:**

12   **Q.**   Have you had a chance to look at Defendant's Exhibit 639?

13   **A.**   Yes.

14   **Q.**   Is that your handwriting on this exhibit?

15   **A.**   All except for this at the bottom.  I don't know who this

16   is.

17   **Q.**   You don't recognize this trip sheet?

18   **A.**   I recognize the trip sheet, but I don't recognize -- I

19   don't know who signed this down here.  That's not my

20   handwriting.

21   **Q.**   I'm talking about the body of this exhibit.  Is that your

22   writing on the body of this exhibit?

23   **A.**   Yes.

24   **Q.**   Do you recognize this trip sheet as a trip sheet that you

25   filled out?

1    **A.**    Yeah.

2    **Q.**    And did you fill it out in October?

3    **A.**    Yes.

4    **Q.**    And did you fill it out accurately?

5    **A.**    As far as I'm concerned, yes.

6    **Q.**    When you filled out trip sheets, you intended to fill out

7    accurately the time you placed on those trip sheets; is that

8    correct?

9    **A.**    Uh-huh.

10   **Q.**    That means yes?

11   **A.**    Yes.  What happens is when you're doing this, these

12   numbers that are on here as far as the beginning time,

13   departing time, and whatnot, those numbers have to coincide

14   with what's on your computer.

15   **Q.**    Have you ever falsified a number that you've put on a trip

16   sheet?

17   **A.**    No.

18   **Q.**    Okay.

19           **MS. CONWAY:**  I would move to publish and move into

20   evidence --

21           **THE COURT:**  Any objection?

22           **MR. MYRICK:**  No objection.

23           **THE COURT:**  Thank you.  It will be received.

24       (Trial Exhibit 639 received in evidence)

25

1    BY MS. CONWAY:

2    Q.   On this particular trip sheet, can you tell me how many

3    activity codes you received on this trip?

4    A.   How many activity codes?

5    Q.   Yes.

6    A.   One, two, three -- four.

7    Q.   So this trip shows a date that you left at 10:59; is that

8    correct?

9    A.   Yes.

10   Q.   And you returned to Red Bluff the same day; is that

11   correct?

12   A.   It appears that we did, yes.

13   Q.   And how many hours did you spend on this trip?

14   A.   Total?

15   Q.   Total.

16   A.   Oh, gosh.  From 11:00 -- call it 11:00 in the morning

17   until 8:30 at night.

18   Q.   Okay.  And do you know how much money you received on this

19   day?

20   A.   I have no idea, no.

21   Q.   But you do know you had two hooks, two arrives, and you

22   also received mileage; is that correct?

23   A.   Yes.

24   Q.   You were allowed to choose your schedule when you were a

25   driver at Wal-Mart; is that correct?

EASTERLING - REDIRECT / MYRICK

1   **A.**   No.

2   **Q.**   Did you ever bid on a schedule?

3   **A.**   No.

4           **MS. CONWAY:**  No further questions, Your Honor.

5           **THE COURT:**  Thank you.

6       Anything further, Mr. Myrick?

7           **MR. MYRICK:**  Very briefly, Your Honor.

8                       <u>**REBUTTAL EXAMINATION**</u>

9   **BY MR. MYRICK:**

10  **Q.**   Mr. Easterling, you mentioned your hours have changed over

11  time.

12      Do you recall that?

13  **A.**   Uh-huh.

14  **Q.**   Can you explain to the jury what you mean by that?

15  **A.**   Well, when I first came to work here, we were allowed to

16  drive ten hours a day and then we would have a rest break of

17  eight hours.  That changed.

18      What happened is -- and let me back up a little bit.  I

19  know this is confusing for you, but our days would start at

20  midnight and they would go to the following midnight.  Okay?

21  So anything we wanted to do, as long as we had an eight-hour

22  break, we could do in that period of time.

23      That changed.  How that changed is -- is that now we have

24  14 hours in a day that we have to do everything.  For example,

25  if I start at 8:00 in the morning, by 10:00 that night, I have

1    to have everything done in that day.  I'm allowed to drive 11

2    hours a day, and that gives 3 hours left to do all the side

3    work that we need to do.

4         And I know -- I may be losing you folks here because this

5    is complicated.

6         One hour of that is taken away by mandatory rest breaks

7    that we need to take by federal rule, so now we're down to two

8    hours.

9         And you have to remember now, this 11 hours, this is how I

10   make my most money.  I'm a professional driver.  I'm paid the

11   most by the mile.  And so if I'm doing time like what we just

12   added up over here on this board, that time comes right off of

13   my 14 hours.  There may be times of a day when I'm not allowed

14   to drive no more than maybe 9 hours a day because of all of

15   these little things that I've had to do that I'm not being paid

16   for.

17        And so when they tell me that I make $90,000 or 90 --

18   whatever she just said a while ago, it could be a lot more if I

19   was allowed to drive -- or if I'm being paid for the things

20   there that I feel that we should be paid for, because that is

21   work.  It is a lot of work to do those things.

22   Q.   Has the length of a layover changed?

23   A.   Yes.

24   Q.   How?

25   A.   Well, it was eight hours.  Now it is ten hours.

EASTERLING - RECROSS / CONWAY

1    **Q.**    Are you only paid activity pay at the beginning and the

2    end of your trip?

3    **A.**    Unless you're doing -- like going to a vendor, where we're

4    going to pick up Wal-Mart product, then we'll be paid something

5    to do a live load or a -- maybe a live unload at a store.

6    That's an activity code that they have there.

7         But then if it takes a longer time for us to accomplish,

8    we have to give them 45 minutes before we're paid again.

9    **Q.**    Are you paid activity pay for all the activity you perform

10   when you stop for layovers?

11   **A.**    No.  We're not paid anything for that.

12   **Q.**    You gave an estimate of 30 to 45 minutes for fueling.

13        Do you recall that?

14   **A.**    Yes.

15   **Q.**    Are you counting in that estimate the time that you have

16   to spend waiting for a fuel spot to open up?

17   **A.**    Yes, sir, I am.

18        **MR. MYRICK:**  No further questions, Your Honor.

19        **MS. CONWAY:**  Just one brief question, Your Honor.

20                        **REBUTTAL EXAMINATION**

21   BY MS. CONWAY:

22   **Q.**    You never gave a deposition in this case; is that correct?

23   **A.**    No, I never did.

24   **Q.**    And you never talked to any of the experts in this case;

25   is that correct?

PROCEEDINGS

1   **A.**   No, I have not.

2           **MS. CONWAY:**  No further questions.

3           **THE COURT:**  May the witness be excused?

4           **MS. CONWAY:**  Yes, Your Honor.

5           **MR. MYRICK:**  Yes, Your Honor.

6           **THE COURT:**  Thank you very much, sir.  You are

7   excused.

8           **THE WITNESS:**  May I say one thing?

9           **THE COURT:**  No, you may not.  You can go talk to your

10  lawyer.

11          **THE WITNESS:**  Well, I just wanted to tell them thank

12  you.

13          **THE COURT:**  All right.  It's -- I think we'll take our

14  lunch recess at this time, so, ladies and gentleman, if you'd

15  be ready to come back, please, at quarter till 1:00.

16      In the meantime, don't speak with each other or anyone

17  else about this case.  Don't make up your minds.  You have not

18  heard all the evidence yet.

19      (Proceedings were heard out of presence of the jury:)

20          **THE COURT:**  So what is the issue with the witness?

21          **MR. WAGNER:**  Mr. Parrish, who was present during every

22  second of this trial when we notified --

23          **THE COURT:**  What is the name?

24          **MR. WAGNER:**  Ed Parrish.  He's the human resource

25  director for Wal-Mart and the representative for Wal-Mart who's

PROCEEDINGS

1    been sitting here through the whole case.

2         And he was on defendant's witness list, and as soon as we

3    notified them that we also wanted to talk to him today, he's

4    disappeared.  I don't know where he is.

5              **MS. CONWAY:**  Your Honor --

6              **MR. WAGNER:**  Hold -- he's gone.

7         And I -- at 11:05, I notified defendant we are going -- we

8    wanted to call him.  I mean, he was already on the witness

9    list, and all of a sudden he's disappeared inexplicably.

10             **MR. EDELMAN:**  He's here, Your Honor.  He hasn't

11   disappeared.  He is absolutely available.

12        Two issues.  We didn't call him because we've run out of

13   time, and now that they're calling six rebuttal witnesses,

14   we've had to make adjustments.

15        But he's not in any way an appropriate rebuttal witness to

16   their case, which is the first point I would like to make.  And

17   it ties into the concern I have about what we're doing at this

18   point -- what they're doing.

19        We just saw through Mr. Easterling.  He got up and he gave

20   testimony -- you might -- I understand your point of view that

21   you think that part of our case they should be able to rebut

22   relating to what's included within the activity code.  That was

23   about five minutes of his testimony.  The rest of his testimony

24   could not, under any theory, be considered rebuttal.

25        He was on their witness list.  They actually notified us

**PROCEEDINGS**

1    last week that they were going to call him in their case in

2    chief and then they changed their mind and decided to put him

3    over for rebuttal, and now they are putting him on on

4    basically -- it has to be -- this is obviously just my

5    observation, but they're putting him on every topic that they

6    put all their witnesses on during their case in chief.

7         And I would like to ask the Court to consider the

8    following proposition.  That if you're going to allow these

9    people to come in as rebuttal witnesses, that the Court please

10   consider which aspects of their testimony are actually

11   rebuttal.  Because the case law is clear that they're not

12   allowed to call witnesses now to bolster their case in chief.

13        They can't just time it so that they call these witnesses

14   later on at the end of the case right before the case goes to

15   the jury.  It has to be in rebuttal of something that the

16   defense has done that's new or different or unanticipated, but

17   it can't just be, "We're going to put part of our case on at

18   the very end."  And I would say that -- that that was 90

19   percent of what Mr. Easterling testified to.

20        So that's my first -- I have a real concern with the abuse

21   of the rebuttal process by the plaintiffs at this point and

22   would ask the Court to consider adopting some kind of

23   guidelines as to what is appropriate rebuttal testimony and

24   what isn't.

25             **THE COURT:**  Do you want to say something?

1       **MR. WAGNER:**  Only if the Court needs me to.

2       **MR. ARTENIAN:**  I'll say something --

3       **THE COURT:**  Okay.

4       **MR. ARTENIAN:**  -- if I may.

5       **THE COURT:**  Just make your record, because I disagree

6   with what he just said, but I think you need a record.

7       **MR. ARTENIAN:**  Okay.  So our position is we've heard

8   numerous drivers or several drivers called by the defense who

9   are current employees come in and say, "I don't need permission

10  to leave my truck during a layover."  And so that's one of the

11  key pieces of testimony on rebuttal, is people coming in and

12  saying, "Well, there is qualifications to that."

13      This point about leaving the truck somewhere and just

14  having to notify them has a second piece to it, and that is,

15  "And then they will say yes or no depending on what the load is

16  in the truck."  And so that is in direct response to them

17  having brought people and saying to the contrary.  So that is

18  one of the things.

19      And then the other thing is this subsumed or built-in or

20  included within, whatever you call it, pay code argument that

21  they're making, is that we just had a driver come in and give

22  an example of where he's out in Timbuktu somewhere and he's got

23  to get up and he's got to do his pre-trip inspection, and there

24  is no conceivable way that that activity is connected by

25  hundreds of miles to where there's a drop or a hook where he

**PROCEEDINGS**

1  conceivably could be connecting those two activities together.

2      And that's in direct rebuttal to what the defendant's

3  primary case has been about, and that's why we're doing this.

4          **THE COURT:**  All right.  So that was number one.

5      You said there was a number two?

6          **MR. EDELMAN:**  Well, the number two has to do with Ed

7  Parrish.

8          **THE COURT:**  What about Ed Parrish?

9          **MR. EDELMAN:**  He's here.  He wasn't designated as a

10  rebuttal witness by them.  We've --

11          **THE COURT:**  They evidently thought you were going to

12  call him today.

13          **MR. EDELMAN:**  Well, they may have thought that as of

14  Monday, but we've run out of time to call additional witnesses.

15  But that doesn't make him an appropriate rebuttal witness,

16  Your Honor.

17          **MS. CONWAY:**  Additionally, Your Honor, I had the

18  conversation with Mr. Wagner and he did not tell me he was

19  going to call Ed.  He simply inquired, "Where is Ed?"  He just

20  asked where he was, he didn't tell me he was going to call him.

21  And when we got the list last night, Ed Parrish was not on the

22  list.

23          **THE COURT:**  Was he on your list still by last night?

24          **MS. CONWAY:**  By last night, he wasn't.  Last night --

25          **MR. EDELMAN:**  No.

PROCEEDINGS

1    **MS. CONWAY:**  -- we were talking about Dr. Walker, Gary

2  Martin.  I don't believe he was on the list last night.

3    **THE COURT:**  Well, in any event, if you're going to

4  call him, what do you want to call him for that would be proper

5  rebuttal?

6    **MR. ARTENIAN:**  It would be the same topics.  Since

7  he's the director of human resources, he's got knowledge of how

8  the system -- how the pay code system was devised and whether

9  or not those activities that we're disputing in this lawsuit

10  are included in the pay codes and whether amendments were

11  published and distributed or anything along those lines.

12    **MR. EDELMAN:**  And our position, Your Honor, is -- I

13  know you disagree with it, but that has been the subject matter

14  of the entire trial from day one, and certainly in their case,

15  they have questioned witness after witness on that topic.  We

16  have done it in our case.

17    And rebuttal isn't supposed to simply be Round 3, where

18  you start all over.  So I just do not think this is proper

19  rebuttal.  I think it is -- they are misusing the rebuttal

20  process.

21    **THE COURT:**  I think your record on that is clear.

22    If Mr. Parrish is -- he hasn't left the building?

23    **MR. EDELMAN:**  No, Your Honor.

24    **THE COURT:**  Well, if you want to call him, then I

25  would direct you to make him available to be called.

**PROCEEDINGS**

1    **MR. EDELMAN:**  Thank you, Your Honor.

2    **MR. WAGNER:**  What time are we to be back, Judge?

3    **THE COURT:**  Quarter till.

4    (Proceedings were heard out of presence of the jury:)

5    **THE CLERK:**  Come to order.

6    **THE COURT:**  Are we ready?

7    **MS. MARTINEZ:**  Yes, Your Honor.

8    **MR. WAGNER:**  Yes, Your Honor.  Thank you.

9    (Proceedings were heard in the presence of the jury:)

10   **THE COURT:**  All right.  The plaintiffs may call their

11   next witness.

12   **MS. MARTINEZ:**  Your Honor.  The plaintiffs call Pamela

13   Allred to the stand.

14   **THE CLERK:**  Raise your right hand.

15                    **PAMELA ALLRED**,

16   called as a witness for the Plaintiffs, having been duly sworn,

17   testified as follows:

18   **THE CLERK:**  Please state your full name for the

19   record.

20   **THE WITNESS:**  Pardon me?

21   **THE CLERK:**  Please state your full name for the

22   record.

23   **THE WITNESS:**  Pamela Rae Allred.

24   **THE CLERK:**  Spell your last name.

25   **THE WITNESS:**  A-L-L-R-E-D.

1      THE COURT:  Ms. Martinez.

2                 **REBUTTAL EXAMINATION**

3  BY MS. MARTINEZ:

4  Q.   Good afternoon, Ms. Allred.  Today I'm going to ask you

5  about your years of employment with Wal-Mart.  When did you

6  first start working for Wal-Mart?

7  A.   In August of 1994.

8  Q.   When did your employment with Wal-Mart end?

9  A.   I retired in October of 2012.

10 Q.   And when you were hired by Wal-Mart, were you hired as a

11 private fleet driver?

12 A.   Yes.

13 Q.   And did you remain a private fleet driver throughout the

14 entire length of your employment with Wal-Mart?

15 A.   Yes.

16 Q.   Because the class period in this case is October 2004 to

17 October 2015, I'm going to ask you to limit your testimony to

18 that time period.  Can you do that?

19 A.   Yes.

20 Q.   What was your home DC, Ms. Allred?

21 A.   I was in Red Bluff.

22 Q.   Was that always your home DC?

23 A.   Yes, it was.

24 Q.   And what was your schedule?

25 A.   I was -- worked week on, week off.

ALLRED - DIRECT / MARTINEZ

```
 1    Q.   So is that the 7 days on, 7 days off?

 2    A.   Yes.

 3    Q.   And how often were you paid?

 4    A.   Twice a month.

 5    Q.   And how were you paid?

 6    A.   How was I paid?  I'm not sure I know.

 7    Q.   For example, per activity --

 8    A.   Oh, yes.  I was paid by the mile.  I was paid per activity

 9    and sometimes hourly.

10    Q.   Okay.  And how did you know what activities you would be

11    paid for?

12    A.   It was in the pay manual.

13    Q.   In your usual work duties, did you ever meet with the

14    driver coordinator when starting a new trip?

15    A.   Yes.

16    Q.   How many times per week did you meet with the driver

17    coordinator?

18    A.   Four, six times a week.  Four to six times a week.

19    Q.   And how long would those minutes -- how long would those

20    meetings usually last in minutes?

21    A.   Oh, five minutes.

22    Q.   Were you paid separately for your meetings with the driver

23    coordinator?

24    A.   No.

25    Q.   Did anyone at Wal-Mart ever tell you that the meetings
```

ALLRED - DIRECT / MARTINEZ

1    with the driver coordinator were part of an arrive or a drop?

2    A.    No.

3    Q.    Were you ever told that they were part of a hook or a

4    depart?

5    A.    No.

6    Q.    Were you ever told that the driver coordinator meetings

7    were a part of any of the activities listed in your pay manual?

8    A.    No.

9    Q.    In your usual work duties, do you usually perform a first

10   pre-trip inspection at the beginning of your day?

11   A.    Yes.

12   Q.    How often would you perform a first daily pre-trip?

13   A.    About six times a week.

14   Q.    And during your pre-trip inspection, what would you

15   usually do?  What would pre-trip consist of?

16   A.    I would walk around the trailer and the truck and make

17   sure everything -- the tires all had air and there was no flats

18   and make sure there was no leaks from the -- coming from the

19   trailer or make sure the whole thing was safe and roadworthy.

20   Q.    How long was the trailer?

21   A.    The trailer was 53 feet.  Attached to the truck, it was 75

22   feet.

23   Q.    So a 50-foot trailer --

24   A.    53 feet --

25   Q.    53.  Attached to --

**ALLRED - DIRECT / MARTINEZ**

1   **A.**    Attached to the tractor, it would have made it a total of

2   75 feet from the front of the truck to the back of the trailer.

3   **Q.**    75 feet.  I know there are supposed to be 18 wheels, but

4   that's as close as I can get to --

5   **A.**    We can -- we can imagine.

6   **Q.**    Okay.  And how long did it usually take you to perform

7   that first daily pre-trip?

8   **A.**    Fifteen minutes.

9   **Q.**    And how often would you do that first pre-trip inspection

10   of the day?

11   **A.**    How many times during my week that I work -- it was once

12   a -- once a day, every morning for six days that I worked.

13   **Q.**    And this pre-trip inspection here of the 75-foot tractor

14   and trailer, did that ever take you approximately two to three

15   minutes?

16   **A.**    No.  No.  You couldn't possibly do -- no.  It would

17   take -- maybe if you jogged around the truck, you could do

18   that, but then you wouldn't be really inspecting it.

19   **Q.**    You said if you jogged around the trailer, maybe you could

20   make it around in three minutes, but then you wouldn't be

21   inspecting it.  Why do you say that?

22   **A.**    Well, the job was to inspect it and make sure that it was

23   safe to take out on the highway before you started driving, and

24   if you weren't looking at everything, it would take you a lot

25   longer to do that than a minute or two.

ALLRED - DIRECT / MARTINEZ

1    **Q.**   Were you ever told that you were -- that that first

2    pre-trip inspection of the day was a part of any of the

3    activities listed in your pay manual?

4    **A.**   No.

5    **Q.**   Were you ever told that that first pre-trip inspection was

6    part of a depart?

7    **A.**   No.

8    **Q.**   When you said 15 minutes to conduct a pre-trip inspection,

9    do you think that perhaps your memory has faded and that maybe

10   it wasn't 15 minutes?

11   **A.**   No.  I don't -- not at all.

12   **Q.**   In your usual work duties, did you usually perform a daily

13   post-trip inspection of your trailer at the end of the day?

14   **A.**   Every day.

15   **Q.**   And how long would a post-trip usually take?

16   **A.**   The same, 15 minutes, to make certain that it was all

17   roadworthy and safe.

18   **Q.**   And can you tell me where your truck was usually located

19   when you performed that last post-trip of the day?

20   **A.**   At a truck stop or safe haven.  Somewhere off the road.

21   Wherever I was going to spend the night.

22   **Q.**   Were you paid separately for your last post-trip

23   inspection of the day?

24   **A.**   No.

25   **Q.**   Were you ever told that that last post-trip inspection was

**ALLRED - DIRECT / MARTINEZ**

1    a part of any of the activities listed in your pay manual?

2    **A.**   No.

3    **Q.**   Did Wal-Mart require you to wash your truck?

4    **A.**   Yes.

5    **Q.**   How did you learn of this requirement?

6    **A.**   When they took out the -- well, when they got rid of the

7    washers, they had people hired to wash your trucks, and they

8    got rid of those, and they put in a truck wash in the

9    distribution center.  And then they said it was up to us to

10   wash the trucks and the trailers.

11   **Q.**   And how often were you required to wash it?

12   **A.**   Once a week.

13   **Q.**   When you would wash your truck, how long in minutes would

14   it usually take?

15   **A.**   Fifteen minutes to a half hour.

16   **Q.**   Did you ever complain to management about having to wash

17   the truck?

18   **A.**   I did.  I did.  One time I had an occasion to go in to see

19   our GTM and the safety manager.  Rick Norton was the safety

20   manager and Mike Baker was our GTM.  And while I was there at

21   this meeting, he -- the topic of my truck not being clean was

22   brought up.  And he said to me, "Well, it says right up here in

23   the pay manual, in the policy book, that you are to wash your

24   truck once a week."  And I said to him -- I said, "I think

25   state law trumps Wal-Mart policy because," I said, "you don't

**ALLRED - DIRECT / MARTINEZ**

1    even have the right to ask me to do anything without

2    compensating me for it," and I said, "You don't pay us to wash

3    these trucks."

4         And I said, "I've got a very good idea on how to save

5    Wal-Mart money."  I said, "Why don't we get rid of the janitors

6    that clean the bathrooms and the office and the drivers' room

7    out there," and I said, "We will just eliminate those jobs,"

8    and I says, "When the driver coordinators leave to go home,

9    they can go punch the time card, but before they go home, they

10   must come back in and clean these rooms in the bathroom," and I

11   said, "Then they can go home and we can save that money."  I

12   said, "That's exactly what you're asking us drivers to do, is

13   to wash these trucks on our own time before we can go home."

14   **Q.**   You said you said this to Rick Norton and Mike Baker?

15   **A.**   Baker.  GTM, uh-huh.

16   **Q.**   You said Mike Baker was your GTM?

17   **A.**   Yes.

18   **Q.**   Who was Rick Norton?

19   **A.**   He was our safety manager at that time.

20   **Q.**   And when you -- when you communicated all of this to Rick

21   Norton and Mike Baker, what did they say in response?

22   **A.**   They said nothing.  They just kind of gave me that

23   deer-in-the-headlight look like maybe she's right.

24   **Q.**   Did Mr. Baker tell you that you were actually being

25   compensated for --

ALLRED - DIRECT / MARTINEZ

1    **A.**   No.

2    **Q.**   -- washing your truck?

3    **A.**   He never said a word.  I thought if we were going to be

4    paid that -- if we were being paid for that, that would have

5    been a perfect opportunity to say, "Why, we are paying you."

6    But he did not.  He just sat there very quiet and never said

7    another word.

8    **Q.**   Did either of these two gentlemen tell you that washing

9    your truck was part of a hook or a drop?

10   **A.**   No.  They didn't, no.

11   **Q.**   Throughout your employment -- well, actually let me ask a

12   different question.

13        Having had that meeting with them and communicating your

14   stance on washing the truck, did you continue to wash your

15   truck after that?

16   **A.**   I did.

17   **Q.**   Why?

18   **A.**   Well, because I was kind of humiliated into it because one

19   day one of the ops managers -- her name is Janell Walton --

20   came out into the office, out into the driver's room where I

21   was sitting and said, "Don't you have any pride in your ride?"

22   You know, like, *aren't you ashamed that you're driving such a*

23   *dirty truck?*

24   **Q.**   And so you felt that you had to wash it --

25   **A.**   I felt like I probably should, yeah.

ALLRED - DIRECT / MARTINEZ

1   Q.   So you continued to wash it after your meeting with --

2   A.   I did.

3   Q.   -- with these two gentleman?

4   A.   I did.

5   Q.   Throughout your employment with Wal-Mart, were you ever

6   told that the policy had changed and you were actually not

7   required to wash your truck?

8   A.   No.

9   Q.   In your usual work duties, did you ever have to take a

10  layover?

11  A.   Yes.

12  Q.   How often during a workweek would you take a layover?

13  A.   I -- every night -- six nights a week.

14  Q.   And were you required to take your layovers inside your

15  tractor?

16  A.   Yes.

17  Q.   How did you learn of that requirement?

18  A.   That was communicated to us in orientation.  They gave us

19  the tractors with the big sleepers.  That's where we had to

20  sleep and take our layover.

21  Q.   Were you required to get permission in order to take your

22  layover somewhere other than the tractor?

23  A.   Yes.

24  Q.   Did you ever request permission?

25  A.   No.

1   **Q.**   Why not?

2   **A.**   Well, because that was just part of my job, stay with the

3   truck and stay with the load.

4   **Q.**   Throughout your employment with Wal-Mart, did anyone ever

5   tell you that you no longer needed to stay with your tractor

6   during the layover?

7   **A.**   No.

8   **Q.**   How long were your layovers?

9   **A.**   Ten hours.

10   **Q.**   And did you receive pay for layovers taken inside your

11   truck?

12   **A.**   Yes.

13   **Q.**   How much?

14   **A.**   Forty-two dollars.

15           **MS. MARTINEZ:**  I have no further questions,

16   Your Honor.

17           **THE COURT:**  Thank you.  Ms. Conway.

18           **MS. CONWAY:**  Thank you.

19                          <u>**REBUTTAL EXAMINATION**</u>

20   BY MS. CONWAY:

21   **Q.**   You never gave a deposition in this case, did you?

22   **A.**   No.

23   **Q.**   You have never been interviewed by any of the plaintiffs'

24   experts in this case; is that right?

25   **A.**   Any who?

**ALLRED - CROSS / CONWAY**

1    **Q.**   You never talked to any of the experts in this case; is

2    that correct?

3    **A.**   Experts?

4    **Q.**   Yes.

5    **A.**   No.

6    **Q.**   Have you ever talked to a Dr. Phillips?

7    **A.**   Dr. Phillips?

8    **Q.**   Yes.

9    **A.**   No.

10   **Q.**   You worked for Wal-Mart for 18 years; is that correct?

11   **A.**   Yes.

12   **Q.**   You retired from Wal-Mart; is that correct?

13   **A.**   Yes.

14          **MS. CONWAY:**  Thank you.  No further questions.

15          **THE COURT:**  Thank you.  Anything else?

16          **MS. MARTINEZ:**  Nothing else.

17          **THE COURT:**  May the witness be excused?

18          **MS. MARTINEZ:**  Yes, Your Honor.

19          **THE COURT:**  Thank you very much, ma'am.  You are

20   excused.

21       The plaintiffs may call their next witness.

22          **MR. WAGNER:**  Your Honor, the plaintiffs would call

23   Mr. Ed Parrish.

24          **THE COURT:**  All right.

25          **THE CLERK:**  Raise your right hand.

1                          **EDMOND PARRISH**,

2      called as a witness for the Plaintiff, having been duly sworn,

3      testified as follows:

4                  **THE CLERK:**  Please state your full name for the

5      record.

6                  **THE WITNESS:**  Ed Parrish Jr., P-A-R-R-I-S-H.

7                  **THE COURT:**  Mr. Wagner.

8                          **REBUTTAL EXAMINATION**

9      BY MR. WAGNER:

10     **Q.**    Good afternoon, Mr. Parrish.

11     **A.**    Good afternoon.

12     **Q.**    You know who I am.  You have been sitting in court during

13     the entire trial?

14     **A.**    That's correct.

15     **Q.**    What is your job title with Wal-Mart?

16     **A.**    I'm the Human Resources Director for Transportation

17     Division.

18     **Q.**    Is that for the entire country?

19     **A.**    Yes, that is.

20     **Q.**    And your office is in Arkansas?

21     **A.**    In Bentonville, Arkansas, yes.

22     **Q.**    How long have you been employed by Wal-Mart?

23     **A.**    About for 17 years.

24     **Q.**    How long have you been the Human Resource Director for

25     Transportation?

**PARRISH - DIRECT / WAGNER**

1   **A.**   For about 15 years.

2   **Q.**   Fifteen?

3   **A.**   Yes.

4   **Q.**   Okay.  Thank you.

5       So what are some of the things you do as a -- what are

6   you -- what are your responsibilities as the Human Resource

7   Director?

8   **A.**   I'm responsible for recruiting and hiring our Wal-Mart

9   truck drivers, as well as helping with some of the

10  administration of our pay guidelines.

11  **Q.**   Okay.  And as far as your pay guidelines go, do you --

12  does Wal-Mart keep any records as to how often the trucks are

13  washed by the truck drivers?

14  **A.**   Not that I'm aware of.

15  **Q.**   Okay.  Do you know why they don't do that, why they don't

16  keep records of that?

17  **A.**   I can't tell you that.

18  **Q.**   Does Wal-Mart keep any records as to how often and how

19  long the truck drivers do their pre-trip inspections?

20  **A.**   Not that I'm aware of.

21  **Q.**   Do you know why they don't keep records of that?

22  **A.**   I can't tell you that.

23  **Q.**   What about the same question for post-trip inspections?

24  Does Wal-Mart keep any records of how long or how often the

25  truck drivers do their post-trip inspections?

**PARRISH - CROSS / EDELMAN**

1   **A.**   Not that I know of.

2   **Q.**   Do you know why they don't keep records of such?

3   **A.**   No, I don't.

4   **Q.**   What about fueling the vehicles, the tractors?  Does

5   Wal-Mart keep a record of how often the vehicles are fueled and

6   how -- or how long it takes?

7   **A.**   I'm not aware of that.  I don't work in that area so I

8   wouldn't know about the records they would keep for fueling.

9   **Q.**   Okay.  Now, are you aware of any pay bulletins or

10  newsletters that truck drivers have received at any time since

11  2001 advising them of any changes in the pay manuals?

12  **A.**   Anything specific that -- that you have in mind?

13  **Q.**   Anything advising the drivers of any changes regarding the

14  layover rules?

15  **A.**   Not that I'm aware of.

16          **MR. WAGNER:**  I don't have anything further.  Thank

17  you, sir.

18          **THE COURT:**  Thank you.

19          Mr. Edelman.

20                          <u>**REBUTTAL EXAMINATION**</u>

21  **BY MR. EDELMAN:**

22  **Q.**   Good afternoon, Mr. Parrish.

23  **A.**   Hello, sir.

24  **Q.**   Would you -- I want to ask you a few questions.  I will

25  confess that after three weeks in trial, my outline is a lot

**PARRISH - CROSS / EDELMAN**

1    shorter than it might otherwise have been had you testified

2    earlier.

3        But would you give the jury a little bit of background on

4    you.  For example, where you grew up, your family, etc.

5    **A.**   I'm from the State of Tennessee, a little place -- if you

6    know the geography of Tennessee around Memphis, Tennessee, 75

7    miles north of Memphis, and I grew up with a family of eight --

8    six children, five boys, one girl -- and my dad was a

9    construction worker while I was -- up through my teenage years,

10   and my mom also was a worker in one of the local factories in

11   that town.

12       My dad was -- I say construction worker.  He built bridges

13   and worked with heavy equipment and also he drove trucks with

14   that equipment.

15       He oftentimes would come by or take me to work with him on

16   a weekend or what have you, and I would have opportunity to

17   ride with him in the truck, and I thought that was something

18   grand and great as a small kid, a small boy, following along

19   behind his dad.

20   **Q.**   And how about your family?  Do you have kids?

21   **A.**   I have kids, yes.

22   **Q.**   How many kids do you have?

23   **A.**   I have three children.

24   **Q.**   Any grandchildren?

25   **A.**   I have one.  One daughter -- granddaughter that is four

PARRISH - CROSS / EDELMAN

1   years old.

2   **Q.**   Okay.  And in terms of your employment background, can you

3   spend a couple minutes -- not a couple minutes.  But just a few

4   moments to tell us about your employment background before you

5   got to Wal-Mart.

6   **A.**   Yes.  I worked with the retail company called Service

7   Merchandise Company.  It was based out of Nashville, Tennessee.

8   I started with that company about two weeks after I graduated

9   college which I attended in Nashville, Tennessee called

10  Vanderbilt University.  I started at the very bottom, coming

11  out of college in sporting goods and toys, just learning that

12  business.  And after about a year, I moved into the human

13  resources area, and eventually -- eventually received a

14  regional level job working in human resources where I had a

15  number of stores that I covered over the region of the

16  United States.

17      And then eventually was promoted to the system

18  vice-president of human resources in that division, working

19  with stores all across -- with distribution centers and stores

20  across the country.

21      After spending about 20 years with that company, it fell

22  on some economic hard times, and I talked with Wal-Mart and

23  became a part of the Wal-Mart family.

24  **Q.**   All right.  There are a few things I want to ask you

25  about, just a couple of things that were said early in the case

**PARRISH - CROSS / EDELMAN**

1    that I want to follow up on with you.

2         You have been in the courtroom for the whole trial; right?

3    **A.**   That is correct.

4    **Q.**   Do you remember one of the first, if not the first,

5    witnesses in this case, a gentleman by the name of

6    Mr. Franklin?

7    **A.**   Yes.  I remember.

8    **Q.**   All right.  And do you remember that Mr. Franklin was

9    testifying -- testified about a driver who was stabbed in a

10   rest area in a place called Delano?

11   **A.**   Yes, I remember that.

12         **MR. WAGNER:**  Objection, Your Honor.  It's outside the

13   scope.

14         **THE COURT:**  Overruled.

15        You may answer.

16   **BY MR. EDELMAN:**

17   **Q.**   When he said that in court, was that the first you had

18   ever heard of that?

19   **A.**   Yes, it was.

20   **Q.**   After he said that, did you research the issue to find out

21   if that event had actually taken place?

22   **A.**   Yes, I did.

23   **Q.**   What did you determine?

24         **MR. WAGNER:**  Objection.  Hearsay.  Lack of foundation.

25         **THE COURT:**  Well, I don't know about the foundation.

1   It does call for hearsay, so you will have to lay a foundation.

2   BY MR. EDELMAN:

3   Q.   Did you review Wal-Mart's business records, incident

4   reports, and the like to determine whether Wal-Mart had any

5   kind of record of that event having taken place?

6   A.   Yes.  We made contact with the department that would have

7   those types of records.

8   Q.   All right.  What did you learn from that inquiry?

9   A.   We learned that --

10          MR. WAGNER:  Objection.  Hearsay.

11          THE COURT:  Sustained.

12  BY MR. EDELMAN:

13  Q.   Let me ask it a different way.

14      From your -- from the records that you reviewed and the

15  research that you did, putting aside conversations with people,

16  did you find any evidence to support the idea that there was

17  the stabbing that Mr. Franklin testified to?

18          MR. WAGNER:  Objection.  Hearsay and leading.

19          THE COURT:  Overruled.

20      That's just a yes or a no.

21          THE WITNESS:  No.  I found no evidence.

22  BY MR. EDELMAN:

23  Q.   You found no evidence?

24  A.   No evidence.

25  Q.   All right.  Under Wal-Mart procedure, if something like

**PARRISH - CROSS / EDELMAN**

1   that had happened to a driver, would Wal-Mart, in the normal

2   course, document an event like that?

3   **A.**   Yes, they would.

4   **Q.**   Was there any documentation of that?

5   **A.**   There was no evidence -- no documentation found.

6   **Q.**   All right.  And also I want to ask you about -- do you

7   remember a gentleman by the name of Mr. Morzini who testified

8   in the trial?

9   **A.**   Yes, I do.

10  **Q.**   Do you remember that he said there was a driver who had

11  been terminated for staying at home on a layover without

12  permission?

13  **A.**   Yes, I do.

14  **Q.**   And he identified that person as somebody by the name of

15  Dick Poston?

16  **A.**   That's correct.

17  **Q.**   And was Mr. Poston in fact terminated for staying at home

18  on a layover without permission?

19  **A.**   No, he was not.

20  **Q.**   And what was he terminated for?

21  **A.**   He was terminated for using profanity.

22  **Q.**   All right.  And, by the way, when did this happen?

23  **A.**   It happened in May of 1999.

24  **Q.**   Outside of the class period, in any event.

25  **A.**   That's correct.

PARRISH - CROSS / EDELMAN

1   **Q.**   All right.

2         May I approach the witness, Your Honor?

3            **THE COURT:**  Sure.

4   **BY MR. EDELMAN:**

5   **Q.**   Can you identify for us, please, the document that you are

6   looking at.

7   **A.**   Yes.  This is an exit interview form --

8            **MR. WAGNER:**  Your Honor, he is reading from a document

9   that is not in evidence, and I don't even know what he was

10  given.

11           **MR. EDELMAN:**  I'm sorry, counsel.  My apologies.

12           **MR. WAGNER:**  Thank you.

13           **THE COURT:**  Don't read from it.  You can identify it

14  for us.

15           **THE WITNESS:**  Yes.

16  **BY MR. EDELMAN:**

17  **Q.**   Just tell us what this document is.

18  **A.**   This is an exit interview form.

19  **Q.**   And this is -- does Wal-Mart have a standard form that is

20  filled out when an employee exits the company?

21  **A.**   Yes.  That's correct.

22  **Q.**   Or when a driver does?

23  **A.**   Right.

24  **Q.**   And is this such a form?

25  **A.**   Yes, it is.

**PARRISH - CROSS / EDELMAN**

1   **Q.**   And is this maintained by Wal-Mart in the ordinary course

2   of business?

3   **A.**   That's correct.

4   **Q.**   Were you able to retrieve this form by going to Wal-Mart's

5   files to look up the circumstance under which Mr. Poston left

6   Wal-Mart?

7   **A.**   That's correct.

8        **MR. EDELMAN:**  Move the admission of Exhibit -- I'm

9   sorry.  I think I gave you, Your Honor, the one that has the

10  tab.

11       **THE COURT:**  663.

12       **MR. EDELMAN:**  663.

13       **THE COURT:**  Any objection?

14       **MR. WAGNER:**  Yes, Your Honor.  Several.  May we have a

15  sidebar quickly.

16       **THE COURT:**  Okay.

17     (The following proceedings were heard at the sidebar:)

18       **MR. WAGNER:**  First of all, Mr.-- the witness didn't do

19  anything with this record, for one.  Okay.  So it's hearsay.

20  And there is also a relevance issue, and there is this -- this

21  is a third party who is not present here.  There has been no

22  inquiry from Mr. Poston for authority for Wal-Mart to publish

23  this, make it a public record --

24       **THE COURT:**  Was his name testified to?

25       **MR. EDELMAN:**  Yes, Your Honor.

1          MR. WAGNER:  He may have been, but this is a record

2    regarding his privileged employment matters, and he should be

3    allowed to at least be given notice of this as to whether or

4    not it can be published in this case.  It's a matter of whether

5    or not -- I guess the reasons for his termination.  And it is

6    hearsay.

7          THE COURT:  It's a business record.

8          MR. WAGNER:  It -- okay.  It might be a business

9    record, but he can't identify this as being a business record.

10         THE COURT:  He just did.

11         MR. WAGNER:  Well, he wasn't employed at that time.

12   What year was this?  '99.  He wasn't even employed by Wal-Mart

13   at that time.

14         THE COURT:  He is head of HR.

15         MR. EDELMAN:  Indeed.

16         THE COURT:  Well, if those are the objections, they

17   are overruled.

18         MR. WAGNER:  Okay.

19         MR. SALTZMAN:  Also, Your Honor, are we just -- this

20   is a completely opening of the case.  This has nothing to do

21   with anything that was testified to.

22         THE COURT:  That is overruled, too.

23               (Sidebar conference ended.)

24         MR. WAGNER:  We will withdraw our objection.

25         THE COURT:  All right.  Thank you.  It's received.

PARRISH - CROSS / EDELMAN

1              (Trial Exhibit 663 received in evidence).

2              **MR. EDELMAN:**  Thank you, Your Honor.  May we publish

3    it?

4              **THE CLERK:**  On the computer?  So it's up.

5              **MR. EDELMAN:**  We're good.  I'm just going to spend a

6    second on this.

7    **Q.**  Tell us what this is, please, Mr. Parrish.

8    **A.**  This is an exit interview form.  It's a form that is used

9    when an associate is terminated from the company or leaves the

10   company.

11   **Q.**  This is for Richard Poston?

12   **A.**  Richard Poston.

13   **Q.**  The person Mr. Franklin testified about?

14   **A.**  Yes.  That's the one.

15   **Q.**  If we scroll down to the bottom, it shows the reason for

16   the termination.

17   **A.**  Yes.  That's the explanation for the termination for

18   Mr. Poston.

19   **Q.**  It doesn't say anything about being terminated for taking

20   a layover at home without getting authorization?

21   **A.**  No, it does not.

22   **Q.**  Under Wal-Mart's procedure, is the explanation of the

23   termination expected to correspond to the reason why somebody

24   is terminated?

25   **A.**  That is correct.

**PARRISH - CROSS / EDELMAN**

1    **Q.**   All right.  Beyond this explanation, do you know anything

2    about the circumstances of the profanity, how bad it was, what

3    the circumstances were, anything like that?

4    **A.**   No, I do not.  This was done in 1999, and this is the exit

5    interview form, and that's all that I know.

6    **Q.**   Okay.  Are you familiar with the turnover rate for

7    Wal-Mart drivers?

8    **A.**   Yes, I am.

9    **Q.**   And what is it?

10   **A.**   If you look at the last ten years, our turnover rate has

11   averaged 5.5 percent.

12   **Q.**   And in your capacity as Human Resources Director for

13   Transportation, are you familiar with the turnover rate for

14   drivers in the trucking industry?

15   **A.**   Yes, I am.

16          **MR. WAGNER:**  Objection.  Relevance.

17          **THE COURT:**  Sustained.

18   **BY MR. EDELMAN:**

19   **Q.**   What does Wal-Mart do to keep its turnover rate so low?

20          **MR. WAGNER:**  Objection.  Calls for speculation.

21          **THE COURT:**  Sustained.

22          **MR. EDELMAN:**  On that ground?

23          **THE COURT:**  Yes.

24          **MR. EDELMAN:**  All right.

25   **Q.**   Well, you're director of Human Resources?

**PARRISH - CROSS / EDELMAN**

1    **A.**    That's correct.

2    **Q.**    For all drivers in the United States?

3    **A.**    That's correct.

4    **Q.**    Do you have firsthand experience with what Wal-Mart does

5    to retain its drivers at a turnover rate of 5.5 percent over

6    the last ten years?

7    **A.**    Yes, I do.

8    **Q.**    How do you have that experience?

9         **MR. WAGNER:**  Objection.  Relevance -- it's speculation

10    as why people stay or leave.

11         **THE COURT:**  Overruled.

12    You can answer that question.

13         **THE WITNESS:**  Well, I know that drivers, new drivers

14    that we hire, tell us they come to our company because --

15         **MR. WAGNER:**  Objection.  Now it's hearsay.  The

16    response --

17         **THE COURT:**  Well, it's not for the truth.  We don't

18    really know if what the drivers tell him is true or not true.

19    It's to demonstrate what they told and perhaps to reflect their

20    state of mind.

21    With that limited understanding, you can answer the

22    question.

23         **THE WITNESS:**  Yes.  We provide our drivers with a form

24    after about three months of coming aboard with our company, and

25    the drivers tell us that they come to -- they've come to our

1    company because of the pay.  They come to our company because

2    of how we treat them.  We treat them well.  And one of the --

3    found out one of the surprises to our drivers as to why they

4    come is that they don't have to handle the freight.  No

5    unloading, no loading of freight.  The only thing that we ask

6    our drivers to do is simply drive the truck.  And that was

7    seemingly one of the major surprises to drivers coming to our

8    company.

9        The other thing that happens, we offer a fantastic benefit

10   package for our drivers and their families from healthcare

11   through major medical to dental insurance, vision insurance.

12   Offer a 401K plan that helps drivers in planning their future

13   for themselves and their families.  Our 401K program pays --

14   pays our drivers a dollar per dollar for the contributions that

15   they make to the plan.

16       We have vacation and other paid time off programs that

17   entice our drivers, and it becomes competitive in the market,

18   and they tell us that these programs are good.

19       I've talked directly to new hires out there in the market

20   with our new hire drivers.  I work with our recruiting team, so

21   I have direct knowledge of what new drivers are telling us as

22   to why they come and they are attracted to Wal-Mart.

23   BY MR. EDELMAN:

24   Q.   Is it important to Wal-Mart to retain its drivers?

25   A.   Yes, it is important to retain our drivers.

**PARRISH - CROSS / EDELMAN**

1  **Q.**   Is it important to Wal-Mart to treat its drivers fairly?

2  **A.**   Yes, it is.

3  **Q.**   Are Wal-Mart's drivers important to the company?

4  **A.**   Yes, they are.

5  **Q.**   Why?

6  **A.**   Because we're in the business -- in the transportation

7  business for moving freight for the purposes of serving our

8  customers, and our drivers are the ones that are on the front

9  lines who is helping us do that.  So we treat them with great

10 respect and we treat them as a very important asset and very

11 important reason why our customers are served.

12 **Q.**   You were here at the beginning of this case when

13 Mr. Wagner gave his opening statement?

14 **A.**   That's correct.

15 **Q.**   In your view, sir, does Wal-Mart cheat its drivers?

16 **A.**   No, sir.  In my view, Wal-Mart does not cheat its drivers.

17 As a matter of fact, we do just the opposite.  We try to do

18 everything that we can to support our drivers in treating them

19 fairly, treating them with respect and dignity.  As a matter of

20 fact, if I thought that Wal-Mart was cheating its drivers, I

21 would not be sitting here in this seat today.

22      Our -- our drivers are assets to our company, and we treat

23 them that way.  If I thought that -- if -- if we treated them

24 any other way, we would be like the other companies where our

25 turnover rates would be in the 80s, 90s and 100 percent.  We

1   don't have that problem.  Our drivers stay with us.  The only

2   reason that -- 50 percent of what that 5.5 percent that I

3   talked to you about earlier --

4   Q.   The turnover rate?

5   A.   The turnover rate.  50 percent of that is -- are the

6   turnovers because our drivers retire or our drivers are ill or

7   it's death, and so our turnover is very, very low.  And if we

8   treated them badly, I don't think they would stay around.

9   Q.   So you're saying that even of the 5.5 percent turnover

10  rate, half of that is attributable to retirements in the

11  ordinary course?

12  A.   That's correct.

13        MR. EDELMAN:   Thank you, Mr. Parrish.

14        THE COURT:   Anything else, Mr. Wagner.

15        MR. WAGNER:   Briefly, Your Honor.

16                    <u>**REBUTTAL EXAMINATION**</u>

17  BY MR. WAGNER:

18  Q.   Mr. Parrish, Mr. Edelman just showed you, it looked like,

19  some kind of exit interview form or termination form for a

20  driver from 1999, Mr. Poston?

21  A.   Yes.  That's correct.

22  Q.   Do you have Mr. Willie Franklin's exit interview or

23  termination form?

24  A.   No, I do not.

25  Q.   You were in court when he testified; right?

PARRISH - REDIRECT / WAGNER

1    **A.**   Yes, I was.

2    **Q.**   He testified that he was terminated for being found

3    spending part of his layover inside the truck stop as opposed

4    to be inside his cab; correct?

5          **MR. EDELMAN:**  Objection.  Misstates prior testimony,

6    Your Honor.

7          **THE COURT:**  Well, you can ask him the question and

8    if --

9    **BY MR. WAGNER:**

10   **Q.**   Do you remember that testimony?

11   **A.**   I remember him saying that he was terminated for some

12   reason, yes.

13   **Q.**   Okay.  Do you remember that reason being outside of the

14   cab when one of the Wal-Mart spotters saw him?

15   **A.**   I -- I assume that's what he testified for -- on.

16   **Q.**   And you were the Human Resource Director at the time he

17   was fired?

18   **A.**   I'm not sure exactly when he was fired.  I don't know

19   Mr. Franklin.

20   **Q.**   Okay.  And you don't have his termination form?

21   **A.**   No, I do not have his termination form.

22   **Q.**   Mr. Franklin testified that he was terminated for not

23   being in the sleeper berth and he was inside the truck stop

24   getting groceries.  Do you remember that testimony?  This was

25   during his layover?

PARRISH - RECROSS / EDELMAN

1   **A.**   Yes.  I remember him -- his testimony that he was

2   terminated, but I'm not sure exactly the wording that is used,

3   but if that's what it says there and you are explaining it to

4   me, I hear you.

5   **Q.**   Do you have any reason to believe that isn't true, that

6   that was why he was terminated?

7   **A.**   I have no idea why he was terminated, so therefore I can't

8   come comment on that.  I have no background.

9           **MR. WAGNER:**  Thank you.  I don't have anything

10  further.

11          **THE COURT:**  Mr. Edelman?

12          **MR. EDELMAN:**  One moment, Your Honor.  Please.

13      (Defense counsel confer off the record.)

14                  **REBUTTAL EXAMINATION**

15  BY MR. EDELMAN:

16  **Q.**   So, Mr. Parrish, do you remember Mr. Franklin?

17  **A.**   Yes, I do.

18  **Q.**   He said a lot of things; right?

19  **A.**   Yes, he did.

20  **Q.**   Okay.  Do you remember on -- do you remember anything

21  about the cross-examination of Mr. Franklin?

22  **A.**   Yes, I do.

23  **Q.**   Do you remember that Mr. Franklin acknowledged that he was

24  terminated for falsifying his log and saying that he had spent

25  the night in his sleepover berth when, in fact, he had not?

1          **MR. WAGNER:**  Objection.  Leading and misstates the

2     testimony.  But it's also leading.

3          **THE COURT:**  Well, I'll overrule the leading objection,

4     and you'll have to -- if you're going to tell me it misstates

5     it, you've got it there, and you're going to have to

6     demonstrate that.  So I'll let the witness answer.  I don't

7     know what he remembers, but I'm going to deny your objection

8     unless you demonstrate to the contrary.

9          If you remember the question, sir, and you know the

10    answer, you can provide it.

11         **THE WITNESS:**  Would you restate the question?

12    **BY MR. EDELMAN:**

13    **Q.**   All right.  If you don't remember it, it's all right

14    because the record will speak for itself.  But do you remember

15    Mr. Franklin's testimony about how he stated in his log that he

16    had slept in the sleeper berth when in fact he had slept at a

17    DC?

18    **A.**   I remember him stating that he was out of his sleeper

19    berth and had fallen asleep in some other location, but I don't

20    remember exactly why he was terminated.

21    **Q.**   All right.  We're just trying to locate his termination

22    notice.  I don't know if we have it right now, but give me just

23    one second, please.

24         I don't have copies of the document I would like the

25    witness to authenticate.  Can I show it just to him?

1        THE COURT:  Sure.  You can have it --

2        THE CLERK:  It's different.

3        MR. EDELMAN:  May I approach the witness, Your Honor?

4        THE COURT:  You may.

5        THE CLERK:  What document is it?

6        MR. EDELMAN:  I'm sorry.  Here are two copies of

7   Defendant's Exhibit 591.  It's in evidence already.

8        THE CLERK:  Hold on.  591 is -- 10/31 it was admitted.

9        MR. EDELMAN:  Great.  Let's pull it up on the screen,

10  please.

11  Q.   Is this another one of the exit interviews like the one we

12  saw for Mr. Poston?

13  A.   Yes.  This is the same form, similar form.

14  Q.   And then this relates to Mr. Franklin?

15  A.   Yes.  It has his name on it, Willie Franklin.

16  Q.   And then it gives the reasons for the termination?

17  A.   Yes, it does.

18  Q.   Can you read out loud what that says?

19  A.   It says "gross misconduct on 8/28/08."

20  Q.   "Willie -- Willie keyed" --

21  A.   "Willie keyed for pay for layover in the cab of the truck

22  but was found that he did not stay in the truck."

23  Q.   All right.  So --

24  A.   I think that's what it says.

25  Q.   All right.  So he keyed in to get layover pay for staying

PARRISH - RECROSS / EDELMAN

1   in the truck when he didn't in fact stay in the truck?

2   **A.**   That's what it says.

3   **Q.**   I want to show you a page from the 2001 -- and is that a

4   basis for terminating an employee when they falsify an entry in

5   their log?

6   **A.**   Yes.  It would be an integrity issue.

7   **Q.**   And I'm going to try to switch the ELMO.

8        Tracy, if I could, please.

9        **THE COURT:**  Tracy, the ELMO.

10       **THE CLERK:**  Okay.  Here we go.

11  BY MR. EDELMAN:

12  **Q.**   All right.  Now, this is from the Driver Pay Manual for

13  January of 2001.

14  **A.**   Yes, sir.

15  **Q.**   And I want to read your -- I would ask you to read the

16  sentence in the second paragraph that -- I'm going to highlight

17  it for you and then ask you to read it out loud.

18       This is from, I believe, Exhibit 1.  Can you read that

19  sentence aloud, please?

20  **A.**   "Deliberate falsification of pay records or falsely

21  reporting pay activity to gain additional pay can result in

22  termination."

23  **Q.**   And is falsifying your pay log to key in that you were in

24  the sleeper berth when you, in fact, were not a basis for

25  termination under this policy that you just read out loud?

PARRISH - FURTHER REDIRECT / WAGNER

1    **A.**    Yes, sir.

2    **Q.**    Thank you.

3         Is there a relationship between any requirements of pay

4    logs or driver's logs being accurate in Department of

5    Transportation regulations?

6    **A.**    Yes.  You have to log exactly the way that you work for

7    that day or week, and those logs are checked, audited to make

8    sure that you are actually running according to DOT

9    regulations, driving according to DOT regulations.

10   **Q.**    And DOT regulations require that drivers accurately

11   record -- accurately and truthfully record sleeper berth time?

12              **MR. WAGNER:**  Objection.  Leading.

13              **THE COURT:**  Overruled.  You may answer.

14              **THE WITNESS:**  Yes.  You have to record on-duty time,

15   off-duty time, or sleeper berth time or any combination of

16   those times so that it's a matter of record for DOT on the DOT

17   regulations --

18              **MR. EDELMAN:**  Thank you.

19         Nothing further, Your Honor.

20              **THE COURT:**  Thank you.

21              **MR. WAGNER:**  Yes, Your Honor.

22              **THE COURT:**  Mr. Wagner.

23              **MR. WAGNER:**  Yes.

24                        **REBUTTAL EXAMINATION**

25

PARRISH - FURTHER REDIRECT / WAGNER

BY MR. WAGNER:

**Q.**   So Willie Franklin was taking a layover, supposedly, in the tractor cab; right?  Is that your understanding of the circumstances on the night he was terminated?

**A.**   He was taking a layover.  I don't know exactly where.

**Q.**   And did he get authority that night by his management to take his layover somewhere other than the truck?

**A.**   Sir, I do not know Willie Franklin.  I do not know of that circumstance so I can't answer that question.

**Q.**   Weren't you the Human Resource Manager in 2008 when he was fired?

**A.**   Sir, I have responsibilities for 92 facilities, 71 where drivers are located, and these types of issues wouldn't raise up to my level.

**Q.**   But you certainly have -- those are records that certainly you have access to; correct?

**A.**   These are records from each of those locations, and I would have no reason to go and search for those records unless there was an issue laid on my desk.

**Q.**   So Willie Franklin had said he was going to take his layover in the cab, and he was caught outside of the cab, and that's why he was fired; right?

**A.**   I don't know.  Here's the record here.  I can read it to you.

**Q.**   Well, I have it here, I believe.

PARRISH - FURTHER REDIRECT / WAGNER

1        Do you have an extra copy?

2        It says -- you didn't write this, did you?  It says -- did

3   you write this, Mr.--

4   A.   Sir, I don't know Willie Franklin.

5   Q.   I mean, did you write this?  Did you write this document?

6   Is that your handwriting?

7   A.   No, that's not my handwriting.

8   Q.   Well, it says, "Gross misconduct on," it says the date,

9   "8/28/08.  Willie" -- what does that say, that word?  Do you

10  know?

11            MR. EDELMAN:  Keyed.

12            THE WITNESS:  Keyed.

13  BY MR. WAGNER:

14  Q.   "Keyed for pay for layover in the cab of truck but was

15  found that he did not stay in" -- what's that?  "Truck" what?

16  "Truck all day"?

17  A.   That day.  It looks like "that day."

18  Q.   "That day."  Okay.

19       So the layover policy requires the driver to take the

20  layover in the cab unless they get authority to take it outside

21  of the truck; correct?

22  A.   No.  Well, then, he was -- why he was fired for taking his

23  layover outside the truck if he didn't need permission to take

24  it outside of the truck?

25            MR. EDELMAN:  Objection.  Misstates the evidence.

PARRISH - FURTHER REDIRECT / WAGNER

1           **MR. WAGNER:**  No, it doesn't.

2           **THE COURT:**  That's overruled.

3       You may answer the question.

4           **THE WITNESS:**  He was terminated because he did not log

5   it correctly.  He falsified his record.

6   **BY MR. WAGNER:**

7   **Q.**   Did you bring that -- do you have that log?

8   **A.**   No, I don't have a log.  I'm looking at the exit interview

9   form.

10  **Q.**   You didn't bring the log?

11  **A.**   No.

12  **Q.**   Do you know why?

13  **A.**   Do you know why what?

14  **Q.**   Why didn't you bring the log to show what he actually

15  stated that evening?

16  **A.**   Sir, I don't --

17          **MR. EDELMAN:**  Excuse me.  Excuse me.

18          **THE COURT:**  Objection sustained.

19  **BY MR. WAGNER:**

20  **Q.**   Okay.  Have you seen the log that says he --

21  **A.**   No, I have not.

22  **Q.**   Okay.  So what we know from this document is that he

23  didn't ask for permission to take the layover outside of the

24  truck, and he was found taking the layover outside of the truck

25  and he was terminated; correct?

PARRISH - FURTHER RECROSS / EDELMAN

1    **A.**   He was terminated for whatever the violation was at that

2    time.  They would have talked with him and would have

3    understood the details.  I don't understand the details.

4              **MR. WAGNER:**  Okay.  Thank you.

5              **MR. EDELMAN:**  Very briefly, Your Honor.

6                        <u>**REBUTTAL EXAMINATION**</u>

7    BY MR. EDELMAN:

8    **Q.**   Mr. Parrish, you were asked why you didn't bring the log?

9    **A.**   Yes.

10   **Q.**   Did you have any inkling before you got on the stand that

11   counsel was going to ask you about Mr. Willie Franklin?

12   **A.**   I had no idea.

13   **Q.**   Did anybody ask you to bring any documents about

14   Mr. Franklin when you came to court today in?

15   **A.**   No, they did not.

16   **Q.**   So just really quickly, where it says "involuntary

17   termination" on his form, which box is checked?

18   **A.**   It says "gross misconduct, integrity issue, theft, violent

19   act, dishonesty, misappropriation of company assets."

20   **Q.**   All right.  And I'm going to put a portion, with the

21   Court's permission, of Mr. Franklin's testimony from court and

22   see if it refreshes your recollection as to some of the

23   questions that were asked by counsel.

24             **THE COURT:**  You may show that to him, not to the jury.

25             **MR. EDELMAN:**  Okay.

PARRISH - FURTHER RECROSS / EDELMAN

1      THE COURT:  And I fear we are getting really redundant

2  here, but you may show it to him.

3      MR. EDELMAN:  All right.  I think you're right, and I

4  apologize.  I will do this really quickly.

5      Would you read the passage that I've highlighted, please.

6      THE WITNESS:  (Witness reads document.)  Question --

7      THE COURT:  No.  Read it to yourself.

8  BY MR. EDELMAN:

9  Q.  Just read it to yourself just to refresh your recollection

10  as to what he said.

11  A.  Yes.

12  Q.  Does that refresh your recollection --

13      THE COURT:  You may ask him a direct question.

14  BY MR. EDELMAN:

15  Q.  Okay.  Did Mr. Franklin state in court during

16  cross-examination why he was terminated?

17      MR. WAGNER:  Objection.  The record speaks for itself,

18  and it's calling for just a reading of the record, so it's

19  improper.

20      THE COURT:  Yes.  That is the redundancy part we were

21  thinking about earlier.

22      Sustained.  You can do this another way.

23      MR. EDELMAN:  All right.  We are getting good guidance

24  to let this issue go.  I'm going to take this away and call it

25  a day.  Thank you for your testimony.

PARRISH - FURTHER RECROSS / EDELMAN

1          THE COURT:  Mr. Wagner?

2          MR. WAGNER:  We're done.

3          THE COURT:  Okay.  You're excused, sir.

4      It's probably a good time for our afternoon break.  So,

5  ladies and gentleman --

6          MR. WAGNER:  Your Honor, we could go one step further

7  than that.

8          THE COURT:  Oh, yeah?  Oh, yeah?

9          MR. WAGNER:  When I said "we're done," I meant done,

10  done.

11          THE COURT:  You mean as -- does the plaintiff rest?

12          MR. WAGNER:  Right.

13                      (Plaintiffs' rest.)

14          THE COURT:  Oh, well, in that case, ladies and

15  gentleman, what that means is that we've now had all the

16  evidence presented that's going to be presented in the case.

17  So what happens now is we will excuse you from here and bid you

18  a really good weekend.

19      Please, be back, I would say, at 10:00 -- 9:00 on Monday

20  morning.  What will happen then is first I will read you a set

21  of instructions, which will be the rules that you are to apply

22  when you decide the case.  You will also get a written copy of

23  those to take with you in the jury room so you'll have that.

24  So I read that.

25      Then it will be the opportunity of counsel to give the

**PROCEEDINGS.**

1    closing arguments, and they will do that, and when they're

2    finished with that, then you will get the case to deliberate.

3        Once that happens, just by the way, you can set your own

4    schedule.  So you have had to come in at 8:30 every day because

5    I tell you to and we left at 3:30.  When juries are

6    deliberating, they can set their own schedule.  You can come at

7    the time you feel you should come, you can leave when you feel

8    like you should leave.  You can take breaks when you want to

9    and you can take lunch when you want to.  That will be entirely

10   up to you once you get the case, but you'll get it, I would

11   guess, early afternoon on Monday.

12       In the meantime, this is kind of a tricky time because you

13   have heard all the evidence, but it's really important that you

14   not make up your minds because you haven't deliberated with one

15   another about it.  You haven't heard the arguments of counsel.

16   You haven't heard the instructions.  So don't make up your

17   minds.  Don't let anybody talk to you about it, don't do any

18   research, don't go to any websites.  But be back, please, at

19   9:00 on Monday, and we will complete the case then.  Thank you.

20       (Proceedings were heard out of presence of the jury:)

21           **THE COURT:**  10:30 tomorrow to discuss instructions.

22           **MR. WAGNER:**  Yes.

23           **MR. EDELMAN:**  Your Honor, I have one question or one

24   set of exhibits I would like to offer into evidence, if I can

25   find them.

PROCEEDINGS.

1        **THE COURT:**  Exhibits?

2        **MR. EDELMAN:**  Well, these relate to slides that were

3    used yesterday during Dr. Franklin's -- during Dr. Walker's

4    testimony.

5        **THE COURT:**  Which were not admitted.

6        **MR. EDELMAN:**  Were not admitted.  No.  I didn't offer

7    them for admission.  I would like to offer them, not all of

8    them, some of them --

9        **THE COURT:**  Have you talked to counsel about this?

10       **MR. EDELMAN:**  No, I have not.

11       **THE COURT:**  Okay.  Because none of their expert slides

12   are in evidence and none of yours are in evidence.

13       **MR. EDELMAN:**  Okay.

14       **THE COURT:**  If you feel that it would be helpful to

15   the jury in its deliberations to have one or two of those

16   things and you can agree with each other about it, I will be

17   happy to consider that.

18       **MR. EDELMAN:**  Okay.

19       **THE COURT:**  But right now they're not in.

20       **MR. EDELMAN:**  Okay.  We will have that discussion.

21       **THE COURT:**  But you should have that discussion.

22       **MR. EDELMAN:**  Right.  Thank you.

23       **THE COURT:**  Because, of course, only the things that

24   are in evidence are going to go back to the jury room.

25       **MR. SALTZMAN:**  One additional housekeeping timing

**PROCEEDINGS.**

1    issue.  I believe sometime this morning while we were here,

2    there was an upload by defendant of motions -- maybe a 50(a)

3    motion?

4              MR. EDELMAN:  Yes.  I believe so.

5              THE COURT:  A motion for directed verdict?

6              MR. EDELMAN:  Yes.

7              MR. WAGNER:  Your Honor, we will be filing a motion

8    for directed verdict tomorrow, I believe.

9              MR. SALTZMAN:  I guess we want to talk about timing of

10   that since it was uploaded this morning while we were all here,

11   and I think they have it set for tomorrow morning.  It will be

12   a little difficult to be doing written responses tonight --

13             THE COURT:  You need not file a written response by

14   tomorrow morning.  I will consider carefully everything you

15   have written, but I would be very surprised if we didn't at

16   least let the jury decide the case, and then if need be, he

17   will make decisions at that point.  I think it's unlikely I

18   would grant anything, and it is more likely that I would deny

19   things without prejudice to rethinking afterwards.  But you

20   can --

21             MR. SALTZMAN:  Tonight's homework?

22             THE COURT:  I would say focus on the instructions

23   rather than motions, is what I would say.

24             MR. SALTZMAN:  We will take that direction.  Thank

25   you, Your Honor.

PROCEEDINGS.

1          (Proceedings adjourned at 1:59 p.m.)

**PROCEEDINGS.**

1

2

3                       CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, November 17, 2016

8

9     *Pamela A. Batalo*

10    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
      U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25