**Volume 11**

**Pages 2122 - 2347**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

DONALD C. BRYAN, ET AL.,          )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )      **NO. CV 08-05221-SI**
                                  )
WAL-MART STORES, INC.,            )
                                  )
          Defendant   .           )
_____  )

                         San Francisco, California
                         Tuesday, November 15, 2016

                **TRANSCRIPT OF TRIAL PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiffs:
                    LAW OFFICES OF WAGNER, JONES, KOPFMAN &
                    ARTENIAN, LLP
                    1111 East Herndon - Suite 317
                    Fresno, CA  93720
              BY:   **LAWRENCE M. ARTENIAN, ESQUIRE**
                    **NICHOLAS WAGNER, ESQUIRE**
                    **DANIEL KOPFMAN, ESQUIRE**
                    **ANDREW B. JONES, ESQUIRE**
                    **ANGELA MARTINEZ, ESQUIRE**

                    MARLIN & SALTZMAN, LLP
                    29229 Canwood Street - Suite 208
                    Agoura Hills, CA  91301
              BY:   **STANLEY D. SALTZMAN, ESQUIRE**


          (Appearances continued on the next page)

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

APPEARANCES CONTINUED:


For Plaintiffs:
                          THE RDM LEGAL BROUP
                          7979 Ivanhoe Avenue - Suite 400
                          a Jolla, CA  92037
             **BY:  RUSSEL MYRICK, ESQUIRE**


For Defendant:
                          GIBSON, DUNN & CRUTCHER LLP
                          555 Mission Street
                          San Francisco, CA  94105
             **BY:  MICHAEL LI-MING WONG, ESQUIRE**
                 **RACHAEL S. BRASS, ESQUIRE**
                 **JOSEPH A. GORMAN, ESQUIRE**


                          GIBSON, DUNN & CRUTCHER LLP
                          2029 Century Park East
                          Los Angeles, CA  90067
             **BY:  SCOTT A. EDELMAN, ESQUIRE**


                          GIBSON, DUNN & CRUTCHER LLP
                          333 South Grand Avenue
                          Los Angeles, CA  90071
             **BY:  CATHERINE A. CONWAY, ESQUIRE**
                 **JESSE CRIPPS, ESQUIRE**


                          GARVIN, LIGHT, HANSON & FEARY
                          10 West Market Street - Suite 1500
                          Indianapolis, IN  462j04
             **BY:  ADAM SMEDSTAD, ESQUIRE**


                          WAL-MART LEGAL
                          702 Southwest 8th Street, M.S. # 0215
                          Bentonville, AR  72716
             **BY:  JENNIFER B. BECHET, ESQUIRE**

# I N D E X

Tuesday, November 15, 2016 - Volume 11

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **FANTASIA, ANTHONY** | | |
| (SWORN) | 2128 | 11 |
| Direct Examination by Mr. Cripps | 2128 | 11 |
| Cross-Examination by Mr. Wagner | 2136 | 11 |
| | | |
| **MILLER, MARK** | | |
| (SWORN) | 2145 | 11 |
| Direct Examination by Mr. Wong | 2145 | 11 |
| Cross-Examination by Mr. Wagner | 2166 | 11 |
| Redirect Examination by Mr. Wong | 2170 | 11 |
| | | |
| **WALKER, JONATHAN** | | |
| (SWORN) | 2179 | 11 |
| Direct Examination by Mr. Edelman | 2179 | 11 |
| Cross-Examination by Mr. Saltzman | 2298 | 11 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 671 | | 2164 | 11 |
| 686 | | 2157 | 11 |

| | |
|---|---|
| 1 | <u>**Tuesday - November 15, 2016**</u>                    <u>**8:34 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Good morning.  You may all be seated. |
| 6 | Are we ready? |
| 7 | **MR. EDELMAN:**  We are ready.  A couple things to report |
| 8 | to Your Honor.  Mr. Wagner and I have spoken, and he has |
| 9 | decided he does not want to recall the Wal-Mart witnesses.  So |
| 10 | I think we're set on that. |
| 11 | We just wanted to ask you from a scheduling point of view |
| 12 | in terms of the rest of this week, it seems likely, based on |
| 13 | discussions that we've had, that we will both be done at some |
| 14 | point tomorrow.  And I believe that we had spoken about doing |
| 15 | closings on Monday.  So we wanted to ask you if that's your |
| 16 | current thinking and then -- |
| 17 | **THE COURT:**  Well, I'll take your lead on this.  That |
| 18 | was -- that's what my plan had been.  I've been stewing, of |
| 19 | course, about jury instructions, so unless you wanted to do it |
| 20 | differently, I'd suggest we finalize jury instructions on |
| 21 | Thursday. |
| 22 | **MR. WAGNER:**  Okay.  And dismiss the jury then after |
| 23 | Wednesday? |
| 24 | **THE COURT:**  Yes. |
| 25 | **MR. WAGNER:**  Okay. |

**PROCEEDINGS**

1        **THE COURT:**  And ask them to come back on Monday.  And

2   if we do that, then they will have a real good shot at

3   finishing before Thanksgiving.

4        **MR. WAGNER:**  Right.  I think, Your Honor -- I believe

5   your pretrial order limited us to an hour and a half in closing

6   so we will be done Monday by noon.

7        **THE COURT:**  I think there is a real good prospect that

8   they will be back.

9        **MR. WAGNER:**  Okay.

10        **THE COURT:**  We could forge ahead on Thursday, but I

11   don't know exactly when we would finalize the instructions.

12        **MR. EDELMAN:**  Right.

13        **MR. WAGNER:**  Right.  That doesn't seem -- okay.

14        **THE COURT:**  Is that okay with everybody?

15        **MR. ARTENIAN:**  I just wanted to check in on one

16   detail, the hour and a half on each side, can we divide our

17   hour and a half in closing and rebuttal?

18        **THE COURT:**  Oh, absolutely.

19     Are we ready -- what are we doing?  Are we doing more

20   depos?

21        **MR. EDELMAN:**  No.  We're going to start with -- we're

22   going to start with Tony Fantasia, who is a witness at

23   Wal-Mart, and probably do three witnesses before we do more

24   depos.

25        **THE COURT:**  Okay.

1          (Proceedings were heard in the presence of the jury:)

2          **THE COURT:**  So, counsel, I didn't ask you this before.

3     I will ask you now.  The discussion we just had about timing, I

4     would like to share that with the jury.  Is that okay with you

5     guys?

6          **MR. EDELMAN:**  Certainly, Your Honor.

7          **MR. WAGNER:**  Yes.

8          **THE COURT:**  In terms of our timing expectations, we

9     expect that the evidence will end tomorrow.  That is not our

10    promise, but that is our expectation.

11         If it does, then we won't have court on Thursday or Friday

12    and we'll come back on Monday, and that's when the lawyers will

13    do their closing arguments and that's when you'll get the case

14    for deliberation.  If we don't finish tomorrow, then it will

15    slop over on to Thursday morning, but right now our plan is

16    that you wouldn't need to be here Thursday or Friday, but you

17    would need to be here Monday morning next week to hear the

18    closing arguments and to start deciding the case.  So that's

19    the current plan, just so you know.

20         Okay.  So defendants may call their next witness.

21         **MR. CRIPPS:**  Thank you, Your Honor.  We would like to

22    call Mr. Tony Fantasia.

23         **THE COURT:**  All right.

24         **THE CLERK:**  Go ahead and be seated.  I'm going to take

25    your picture.

1       Raise your right hand.

2                           **ANTHONY FANTASIA**,

3       called as a witness for the Defendant, having been duly sworn,

4       testified as follows:

5               **THE CLERK:**  So we want you to speak into this

6       microphone.  And state your full name for the record.

7               **THE WITNESS:**  Anthony Michael Fantasia.

8               **THE CLERK:**  Anthony.  Spell your last name.

9               **THE WITNESS:**  F-A-N-T-A-S-I-A.

10              **THE CLERK:**  Thank you.

11              **THE COURT:**  Mr. Cripps.

12                           **DIRECT EXAMINATION**

13      BY MR. CRIPPS:

14      **Q.**   Good morning, Mr. Fantasia.

15           Ladies and gentleman, good morning.

16           Mr. Fantasia, where do you currently work?

17      **A.**   I currently work for Wal-Mart Transportation.

18      **Q.**   And can you describe for us what your role is at Wal-Mart.

19      **A.**   Currently I am the regional safety manager for Region 1,

20      which is California and Arizona.

21      **Q.**   All right.  And in that role, can you describe for us what

22      your general duties and responsibilities are when it comes to

23      safety at the company.

24      **A.**   Me and my department handle the compliance and OSHA, the

25      DOT and the OSHA part of the fleet.  We maintain all the DQ

**FANTASIA - DIRECT / CRIPPS**

1   files, all of the training files, all of the QHOS -- the hours

2   of service, and we also maintain the OSHA portion.

3   **Q.**   How long have you been involved in safety at the company?

4   **A.**   I was a driver from 1991 to 2010 for Wal-Mart

5   transportation.

6        In 2010 I switched over and was promoted up to safety

7   manager in Porterville, and in 2015 I was promoted to regional.

8   **Q.**   As a safety manager in Porterville, you reported to

9   Mr. Nate Lewis?

10  **A.**   Yes, sir, I did.

11  **Q.**   We heard from Mr. Nate Lewis earlier in this trial.

12       **THE COURT:**  Can you tell me what a DQ file is?

13       **THE WITNESS:**  Driver qualification file, ma'am.

14  **BY MR. CRIPPS:**

15  **Q.**   Do you have any certifications in safety?

16  **A.**   I do.  I have a Certified Director of Safety from NATMI,

17  North American Transportation Institute.

18  **Q.**   Do you have any responsibilities when it comes to training

19  drivers in safety matters in California?

20  **A.**   I do not at this level as a regional, but as a safety

21  manager I did, yes.

22  **Q.**   Can you describe for us briefly what your role was in

23  terms of training drivers at Wal-Mart in safety back when you

24  were responsible for the Porterville area.

25  **A.**   As a new hire, we would bring them in and they would spend

**FANTASIA - DIRECT / CRIPPS**

1    a week in classroom training and that would consist of going

2    through the different divisions of HR, safety and operations.

3         As the safety portion of it, we would teach defensive

4    driving.  We would teach HAZMAT because we do haul HAZMAT also.

5    And we would teach hours of service.

6    **Q.**   When you say "hours of service," are you referring to the

7    rules that exist in terms of how drivers should log their time?

8    **A.**   Yes, sir.

9    **Q.**   And are there DOT or Department of Transportation

10   regulations that govern how drivers should log their time?

11   **A.**   Yes, sir, there is.  It's 395.1.

12   **Q.**   I'm sorry?

13   **A.**   It is.  Department 395.1 is the DOT regulations.

14   **Q.**   That's a code section of the Department of Transportation

15   regulations?

16   **A.**   Yes, it is.

17   **Q.**   Are there rules about how drivers should log their time on

18   ten-hour mandatory DOT breaks?

19   **A.**   Yes, sir, there is.

20   **Q.**   Okay.  Is that also part of Section 395.1?

21   **A.**   Yes, it is.

22   **Q.**   All right.

23        **MR. CRIPPS:**  Your Honor, permission to approach.

24        **THE COURT:**  You may.

25

1   **BY MR. CRIPPS:**

2   **Q.**   Sir, I have marked as Defendant's Exhibit 672 -- I'm going

3   to give you a copy of that here.

4       Do you recognize this as the code section you just

5   described?

6   **A.**   Yes, sir, it is.

7   **Q.**   Where is the portion of the regulation that actually

8   speaks to how drivers should log their time during the DOT

9   mandatory 10-hour breaks?

10  **A.**   It is actually Section G.

11  **Q.**   Okay.

12      Your Honor, move admission of 672 and permission to

13  publish.

14          **MR. WAGNER:**  Objection.

15          **THE COURT:**  This is just a regulation?

16          **MR. CRIPPS:**  Well, let me lay a little more

17  foundation.

18  **Q.**   Mr. Fantasia, are these the rules that Wal-Mart follows in

19  practice in terms of training its drivers as to how to log

20  their time on 10-hour DOT layovers?

21  **A.**   Yes, sir, it is.

22  **Q.**   Okay.

23      Your Honor.

24          **THE COURT:**  Can't he just tell us what they train them

25  to do?  I don't think we need to start getting the law in as

1   exhibits here.

2          MR. CRIPPS:  Your Honor, one moment.

3          THE COURT:  Sure.

4      (Defense counsel confer off the record.)

5          MR. CRIPPS:  Your Honor, could we have a brief

6   sidebar?

7          THE COURT:  Sure.

8      (The following proceedings were heard at the sidebar:)

9          MR. CRIPPS:  Your Honor, the portions that we're

10  discussing are the portions that they train their drivers on,

11  and it's three sections that read very simply in terms of how

12  they need to log their time.  So this is not going to be a

13  convoluted discussion of the law.  It's going to be a

14  discussion about how they train their drivers in accordance

15  with these three sections and what they teach their drivers

16  along those lines.

17         THE COURT:  So why can't he just say that?

18         MR. EDELMAN:  Your Honor, if I could interject.  There

19  has been mixed testimony in this case about whether drivers are

20  required to spend eight hours in a berth.  Some of the drivers

21  have said they are.

22      Wal-Mart's testimony has been that's not what the

23  regulations require, and so part of showing the regulation is

24  to explain that there is not a rule that says that drivers have

25  to spend eight hours in the berth or ten hours in the berth.

**FANTASIA - DIRECT / CRIPPS**

1    They can do a mixture any way that they want, and since all the

2    training at Wal-Mart is done based on these regulations, it

3    seems important for the jury to understand how Wal-Mart trains

4    its drivers and why.

5         **MR. ARTENIAN:**  Your Honor, I object to that because I

6    think there is a regulation that you're not going to show and

7    now we're arguing what the law is or is not in front of the

8    jury.  There is -- there is a regulation which we could pull

9    out and put in front of them and say, "Do you enforce this

10   regulation," and it is detailed and convoluted, but it says

11   what it says.

12        If Wal-Mart doesn't train in accordance with that, that's

13   fine, but I don't think putting actual regs in front of the

14   jury -- those are essentially jury instructions.

15        **THE COURT:**  I agree.  This is simple.  He can have it

16   in front of him, if you want, so he can tell you what he does

17   and he can tell you that it's his belief it's in accordance

18   with all the rules and regulations, but I don't think we need

19   to get those in at this time as an exhibit through a witness.

20        **MR. CRIPPS:**  Thank you, Your Honor.

21            (Sidebar conference ended)

22   BY MR. CRIPPS:

23   **Q.**   Mr. Fantasia, what are the rules that you teach and train

24   drivers on at Wal-Mart in terms of how they should log their

25   time when they're on a DOT-mandated break?

**FANTASIA - DIRECT / CRIPPS**

1    **A.**    We teach our drivers the same policy as the DOT.   There's

2    three ways that you can log your ten-hour break.   You can log

3    your break ten hours of straight off-duty time and be away from

4    the truck.   You can be in a motel; you can go watch a movie;

5    you can sleep at home.   That's straight ten hours of off-duty

6    time.

7        The second option that the DOT lets us do and we follow is

8    you can log straight ten hours of off-duty sleeper berth.

9        Sleeper berth is when you're inside the sleeper berth area

10   of the tractor.   Does not mean you are sleeping the whole time.

11   You could be watching TV.   Most of our trucks do have TV's in

12   them.   There is refrigerators; there is microwaves.   So you are

13   just in that sleeper berth area of that truck.

14       The third is a combination of the two.   You can log some

15   off -- off-duty time, you can log some off-duty sleeper berth

16   time in conjunction together, as long as that total between the

17   two totals up to a minimum of ten hours.

18   **Q.**    All right.   Now, as part of that training, is that

19   training all consistent, to your understanding, with what the

20   DOT regulations themselves set out?

21   **A.**    Yes, it is.

22   **Q.**    Now, when it comes to logging some time out of the sleeper

23   berth, some time in the sleeper berth, is there a minimum

24   amount of time for Wal-Mart drivers that they have to spend in

25   the sleeper berth?

FANTASIA - DIRECT / CRIPPS

1  **A.**   No, there is not.   We follow the DOT requirements, and

2  there is no set time.

3  **Q.**   So, for example, if they want to spend one hour in the

4  sleeper berth and nine hours outside of the sleeper berth,

5  would that be consistent with how Wal-Mart trains its

6  drivers --

7        **MR. WAGNER:**   Objection, leading.

8        **THE COURT:**   Overruled.

9     You can answer.

10        **THE WITNESS:**   Yes, it would be.   Yes.

11  **BY MR. CRIPPS:**

12  **Q.**   Is that consistent also with your understanding of what

13  the DOT regulations also allow?

14        **MR. WAGNER:**   Objection.   Calls for a conclusion of

15  law.

16        **THE COURT:**   Overruled.

17     You can answer.

18        **THE WITNESS:**   Yes, sir, it is.

19  **BY MR. CRIPPS:**

20  **Q.**   For Wal-Mart drivers in California, has there ever been a

21  rule that drivers spend at least eight hours in the sleeper

22  berth?

23  **A.**   No, sir, there has not.

24  **Q.**   Now, very early in this case, we heard testimony about a

25  potential murder in Santa Clarita.

1    Is that anything that you're familiar with?

2    **A.**   Murder, no.  We did have a driver in Santa Clarita a few

3    years back that was on his ten-hour break, and I responded to

4    it, and he had had a few too many to drink and fell getting out

5    of the -- getting into the truck and later passed away.

6    **Q.**   Is -- are you aware of any situation other than that where

7    somebody has passed away as a result of or during a layover?

8    **A.**   No, sir, I'm not.

9         **MR. CRIPPS:**  No further questions, Your Honor.

10         **THE COURT:**  Thank you.

11    Who's up?

12         **MR. WAGNER:**  Yes, Your Honor.

13         **THE COURT:**  Mr. Wagner.

14         **MR. WAGNER:**  Good morning.  Good morning, ladies and

15    gentleman.

16                    **CROSS-EXAMINATION**

17    **BY MR. WAGNER:**

18    **Q.**   Good morning, Mr. Fantasia.

19    **A.**   Good morning.

20    **Q.**   You are the regional safety manager for Wal-Mart and I

21    assume safety for truck drivers; right?

22    **A.**   Correct, yes.

23    **Q.**   In California; right?

24    **A.**   California and Arizona, yes.

25    **Q.**   Now, as part of the safety measure, one of the things you

**FANTASIA - CROSS / WAGNER**

1  do as a safety measure for truck drivers -- the truck drivers

2  have to do is before they start moving their vehicle at all in

3  the morning, they have to do a pre-trip inspection; right?

4  **A.**   Correct.

5          **MR. CRIPPS:**  Objection.  Scope.

6          **THE COURT:**  Overruled.

7       You can proceed.

8  **BY MR. WAGNER:**

9  **Q.**   And you understand what has -- what -- as part of a

10  pre-trip inspection; correct?

11  **A.**   Yes, sir, I do.

12  **Q.**   And what are some of the things you have to do for a

13  pre-trip inspection?

14  **A.**   Pre-trip inspections can vary, depending on the equipment

15  that you're getting into, whether you've been in the equipment

16  for -- for the whole week or whether you're just getting

17  assigned to the equipment that day.  It also varies heavily on

18  the age of the equipment.  You know, when you're assigned a

19  brand new truck, you don't usually check near as much as you do

20  when you're assigned an older truck.

21       So it does vary quite a bit.  The trailers have been

22  already pre-tripped by our shop department and so they've done

23  an extensive pre-trip to the trailer already.

24       So a lot of the pre-trip, when you're hooking to our

25  equipment, is usually a light check, a damage check, and just

**FANTASIA - CROSS / WAGNER**

1    minor pre-trips.  And it's multitasking, you are doing a bunch

2    of different things at one time.

3    **Q.**   Right.  I'm not asking you about -- I know there are

4    certain inspections that have to be done of the vehicle

5    throughout the day.  I'm talking about the very first one

6    before you go to the yard and hook or before you do anything

7    else, the inspection that has to be done on the truck.

8    **A.**   The very first pre-trip done on the truck is when you hook

9    to your very first trailer.

10   **Q.**   Well, that's not true, though, is it?

11   **A.**   Yes, sir, that is true.

12   **Q.**   Well, if you're out on the road and you do a layover in a

13   truck stop somewhere out on the highway, you're already hooked

14   to a trailer; correct?

15   **A.**   Correct.

16   **Q.**   So you have to do a pre-trip inspection in the morning,

17   and you're nowhere near a Wal-Mart distribution center or

18   store.  You still have to do the pre-trip inspection; right?

19   **A.**   Correct, yes.

20   **Q.**   So there is no hook involved at all; right?

21   **A.**   The majority of the time, no.  Yes.

22   **Q.**   So then you do your pre-trip inspection, and how long does

23   it take to do that pre-trip inspection?

24   **A.**   There again, that can vary.  It varies on, once again,

25   the -- if you've had the equipment all week -- if you've

1    checked the oil on Monday and you've had the same truck all

2    week long, your pre-trips seem to be a little more quicker

3    because you're more familiar with the vehicle.

4        If you've had the same truck assigned to you for the last

5    year and a half, you seem to be a little quicker with the

6    pre-trips than somebody that just gets assigned a truck for the

7    first time.  So the times can vary dramatically depending on

8    the truck, the trailer, and the driver.

9    Q.   Isn't there a checklist that the driver has to go down for

10   every pre-trip inspection?

11   A.   There is not a checklist.  The DOT law clearly states the

12   driver has to be satisfied with the tractor.

13   Q.   Doesn't that include checking the lug nuts on all the

14   tires to make sure that they're tight?

15   A.   There's various different ways of doing that.  Some

16   drivers might reach down and grab the lug nuts.  Some drivers

17   may just look at the lug nuts.  There again, it varies,

18   depending on the driver.

19   Q.   How could you tell if a lug nut is tight just by looking

20   at it?

21   A.   There's a couple of different ways.  One is if you've got

22   a half inch of thread on one lug nut sticking out past the lug

23   and all of the others match that, then you're pretty safe that

24   they're all pretty tight.

25       Another way we use to verify that is if a lug nut is lose

**FANTASIA - CROSS / WAGNER**

1  on a wheel and it has been lose for a couple of days, it will

2  show a rust ring, a little line that comes down off of the lug,

3  so you look heavily for those lines to see if there is any rust

4  lines on that.

5  **Q.**  And how many lug nuts are there on each tire?

6  **A.**  There is, I believe, 10.

7  **Q.**  How many tires on each truck?

8  **A.**  There is 18 tires, but there is not 18 sets of lug nuts.

9  **Q.**  How many sets of lug nuts?

10  **A.**  Ten.

11  **Q.**  Okay.  So there's 100 lug nuts to check?

12  **A.**  Correct.

13  **Q.**  Okay.  And what about checking tire pressure?

14  **A.**  The majority of the driver groups do not, and I did not

15  also as a driver.  We did not check with a gauge.  We have

16  what's called a tire thumper and you would thump the tire, and

17  it makes a different sound when it's -- there again, once you

18  have thumped tires for so many years, you have learned what the

19  sound is, and when one is low and when one is not, so you

20  basically thump the tires as you are walking by.

21  **Q.**  Isn't it safer to use a gauge to check the air pressure in

22  a tire?

23  **A.**  Safer?  I would say no.  It would be more precise.

24  **Q.**  Okay.  And so what else has to be done to -- on the

25  pre-trip -- the first pre-trip inspection of the day?

**FANTASIA - CROSS / WAGNER**

1    **A.**    There again, that depends on the driver.  All he has --

2    the driver -- according to the DOT regulations and Wal-Mart

3    regulations is the driver has to be satisfied with the

4    equipment.  What he checks on that to make himself satisfied is

5    up to that driver.

6    **Q.**    So in order to comply with the safety regulations of the

7    various laws, the only rule is that the driver has to be

8    satisfied?

9    **A.**    Correct, yes.

10   **Q.**    So if there is a problem with the equipment and there is

11   an accident, all the driver has to do is say, "I'm satisfied,"

12   and then that will comply with the law?

13   **A.**    I'm not a lawyer.  I don't know.

14   **Q.**    How long does it take to do the pre-trip inspection on an

15   average, on an average time?

16   **A.**    I really couldn't give you an average because, like I

17   said, it varies heavily on the driver.  I've known some that

18   are very quick at it.  I know some that are very slow at it.

19   So it really varies on the driver.  It depends on the

20   equipment.  To just throw out a number to me would be

21   unrealistic.

22   **Q.**    Does Wal-Mart keep any records as to how long it takes to

23   do a pre-trip inspection?

24   **A.**    No, sir, we do not.

25   **Q.**    Let's go to the post-trip inspection, the last inspection

**FANTASIA - CROSS / WAGNER**

1   of the day.  How long does it take to do that?

2   **A.**   There again, that depends on the driver.  We're right back

3   to -- that one is usually a little quicker because it's usually

4   just a walk around and check.

5   **Q.**   Does Wal-Mart keep any records as to how long it takes to

6   do the end-of-the-day post-trip inspection?

7   **A.**   How long it takes?  No, we do not.

8   **Q.**   What about are you familiar with how long it takes to fuel

9   the vehicle?

10  **A.**   Pre-2002 or 2010 when I was a driver, yes.

11  **Q.**   Okay.  And how long did it take between the years of 2004

12  and 2010?

13  **A.**   I fueled roughly twice a week, and between four to six

14  minutes.  It was fairly quick.  The -- the -- I don't know if

15  you've ever seen fuel hoses for trucks, but they're quite

16  large.  They're not like a car hose.  They're quite large so

17  they fill both tanks at the same time very quickly.

18  **Q.**   And I'm not talking about just the time it -- the fuel is

19  running from the fuel tank into the diesel tank on the truck.

20  I'm talking about the time from the time the driver pulls into

21  the aisle -- the island, shuts down the vehicle, gets out of

22  the vehicle, goes over and does all the tasks it takes to

23  safely and adequately fill both of those hundred-gallon tanks

24  of diesel, and then hooking the fuel line back up to the fuel

25  island and then pulling the truck out.  That whole process, how

**FANTASIA - CROSS / WAGNER**

1  long does that take on an average before 2010?

2  **A.**   On our yard, we don't fuel our trucks.  We have people

3  fuel them for us so the driver doesn't get out.

4       If you're fueling at a truck stop, that is about what it

5  takes, about four to six minutes to get out, put the two lines

6  in.  Everything is just like a -- just like fueling your car.

7  You put your credit card in, you punch your numbers, you fuel

8  your truck.  So it's about four to six minutes.

9  **Q.**   For both tanks?

10  **A.**   They're fueled at the same time, yes.

11  **Q.**   And does Wal-Mart keep any records as to how long it takes

12  to fuel these trucks?

13  **A.**   No, sir, we do not.

14  **Q.**   Are you familiar with how long it takes to wash the truck,

15  the tractors?

16  **A.**   No, sir, I am not.

17  **Q.**   Do you know if Wal-Mart keeps any records as to how long

18  it takes to wash the tractors?

19  **A.**   Not that I know of, no, sir.

20       **MR. WAGNER:**  One second, please, sir.

21       (Plaintiffs' counsel confer off the record.)

22  **BY MR. WAGNER:**

23  **Q.**   What about do you know how long the average driver has to

24  wait in line, either at a Wal-Mart fueling station or at a

25  fueling station out on the highway before they can fuel?

**FANTASIA - CROSS / WAGNER**

1    **A.**    I would not know.

2    **Q.**    What about the time -- does Wal-Mart keep any records on

3    that?

4    **A.**    No, sir.

5    **Q.**    What about the time it takes for the driver to do the

6    paperwork involved in paying for the fuel when they're on the

7    road?  Do you know how long that takes in?

8    **A.**    I do not.  I'm the safety department.  I don't deal with

9    pay.

10   **Q.**    And Wal-Mart doesn't keep records on that, do they?

11   **A.**    Not that I know of, no.

12        **MR. WAGNER:**  I think that's all the questions I have.

13   Thank you, Mr. Fantasia.

14        **THE WITNESS:**  Thank you.

15        **MR. CRIPPS:**  Nothing further.  The witness may be

16   excused, Your Honor.

17        **THE COURT:**  All right.  Thank you very much, sir.  You

18   may be excused.

19      The defendants may call their next witness.

20        **MR. WONG:**  Thank you, Your Honor.  The defendants call

21   Mark Miller.

22        **THE CLERK:**  What was the last name?

23        **MR. WONG:**  Miller.

24        **THE CLERK:**  You could be seated.  I'll take your

25   picture.

1      Raise your right hand.

2                          **MARK MILLER**,

3    called as a witness for the Defendant, having been duly sworn,

4    testified as follows:

5           **THE CLERK:**  Okay.  Go ahead and state your full name

6    for the record.

7           **THE WITNESS:**  Mark David Miller.

8           **THE CLERK:**  Did you say Mark?

9           **THE WITNESS:**  Mark, yes.

10          **THE CLERK:**  M-A-R-K.

11          **THE COURT:**  With a K?

12          **THE WITNESS:**  Yes, ma'am.

13          **THE COURT:**  Mr. Wong.

14          **MR. WONG:**  Thank you, Your Honor.

15                          **DIRECT EXAMINATION**

16   BY MR. WONG:

17   **Q.**   Good morning, sir.

18        Good morning.

19        Please introduce yourself to the jury and tell them your

20   employment.

21   **A.**   My name is Mark Miller.  I've been a truck driver for

22   Wal-Mart for the last 22 years, since 1994.

23   **Q.**   And what kind of driver are you?  Private fleet driver?

24   **A.**   Private fleet, yes.

25   **Q.**   Out of which distribution center do you work?

**MILLER - DIRECT / WONG**

1   **A.**   Red Bluff, California.

2   **Q.**   And where is your residence, sir?

3   **A.**   I live in Cottonwood, the next town north of Red Bluff.

4   **Q.**   You said Cottonwood?

5   **A.**   Cottonwood, yes.

6   **Q.**   How far is Cottonwood from Red Bluff?

7   **A.**   About 26 miles.

8   **Q.**   Okay.  And, sir, are you a member of the class of drivers

9   bringing this lawsuit against Wal-Mart?

10   **A.**   No, I'm not a member.  I opted out.

11   **Q.**   And can you just tell us why you opted out of the lawsuit?

12   **A.**   I disagreed with the premise of the lawsuit.

13   **Q.**   Before joining Wal-Mart, did you drive trucks for other

14   companies?

15   **A.**   Yes, I did.  I've been driving for about 36 years.

16   **Q.**   Always driving trucks?

17   **A.**   Yes.  Driving and -- for a time, I owned my own trucks as

18   well.

19   **Q.**   And when you owned your own trucks, that was before

20   joining Wal-Mart?

21   **A.**   Yeah.  I owned my own -- I owned six trucks right prior to

22   joining Wal-Mart.

23   **Q.**   And why did you apply to work at Wal-Mart as a driver?

24   **A.**   Because I wanted a good stable career opportunity that had

25   benefits and, you know, vacation time and retirement.  When you

**MILLER - DIRECT / WONG**

1    own your own business, you don't have any retirement.  And my

2    wife was kind of telling me I needed to head in that direction.

3    **Q.**   And please tell the jury why have you stayed with Wal-Mart

4    for 22 years?

5    **A.**   I've stayed with Wal-Mart for 22 years because it's the

6    best truck driving job I've ever had by far.  It's not even

7    close.

8    **Q.**   And you have a family, sir?

9    **A.**   Yes.  I have a wife and three grown sons.

10   **Q.**   And have you been able to support your family?

11   **A.**   Yes.  I raised my children, put all three of them through

12   college.

13   **Q.**   And my questions will pertain to the class period, which

14   goes from approximately 2004 until October 2015.

15       Do you have that time frame in mind, sir?

16   **A.**   Yes.

17   **Q.**   Prior to October 2015, approximately, how much did you

18   earn per year as a driver for Wal-Mart?

19   **A.**   Probably in the $85,000 a year range.

20   **Q.**   And besides driving, did you have any other role at

21   Wal-Mart?

22   **A.**   I'm a driver mentor.  I help train the new drivers when

23   they come on board.

24   **Q.**   How long have you served as a driver mentor, sir?

25   **A.**   Probably 15 years.

**MILLER - DIRECT / WONG**

1  **Q.**   And in any given year, approximately how many drivers

2  would you mentor?

3  **A.**   It depends on if Wal-Mart was hiring or not.  I've

4  mentored seven or eight drivers in the last year.

5  **Q.**   Okay.  And, Mr. Miller, what does it mean to you to be a

6  driver mentor?

7  **A.**   I believe in Wal-Mart and the Wal-Mart culture, and so the

8  reason that I mentor is that I want to preserve the culture and

9  train the new drivers on, you know, how Wal-Mart does business.

10 **Q.**   Okay.  So let's talk briefly about a day that starts out

11 at a distribution center.  We'll say Red Bluff.

12     Do you have that in mind?

13 **A.**   Yes.

14 **Q.**   And tell us about the beginning of the day, starting with

15 paperwork and a hook.

16 **A.**   Yes.  When I come to work, I go in the office and I see

17 the driver coordinator and I get my paperwork with my load

18 assignments.  I do a set run so I do the same run every day.  I

19 go to the same stores.

20     And I get my paperwork from the coordinators and then I go

21 out to my truck and I go and I hook on to my trailer that

22 matches my paperwork and I do a pre-trip inspection of the

23 trailer to make sure that it's safe to take out on the road.

24 **Q.**   And is getting the paperwork necessary for the hook?

25 **A.**   Yes.  It's part of the job.  You can't do your job if you

1  don't have the paperwork, so I consider that to be part of your

2  daily duties.

3  **Q.**   And specifically, is the paperwork necessary to know which

4  trailer to which to hook?

5  **A.**   Yes.  It would tell you the trailer number and, you know,

6  the destination of where the trailer is going to.

7  **Q.**   And approximately how long does the paperwork process of

8  picking the paper up -- how long does that take?

9  **A.**   Probably about 15 minutes.

10 **Q.**   And you mentioned a pre-trip inspection.  Tell us what

11 that entails and when that happens with respect to the hook.

12 **A.**   Yeah.  You would drive your tractor out.  The paperwork

13 will tell you the trailer number and what zone in the yard the

14 trailer is in so you would drive to that zone and you would

15 hook on to the trailer and then you would hook up your air

16 lines and your lights and crank the landing gear up and then

17 you would make sure that everything was safe to go out on the

18 road.

19 **Q.**   And in your experience at Wal-Mart, is the pre-trip

20 inspection an important part of the hook?

21 **A.**   Yes.  It's part of the job.

22 **Q.**   And is it your understanding that with respect to the

23 pre-trip inspection, you're paid for that?

24      **MR. WAGNER:**  Objection.  Calls for a legal conclusion,

25 leading.

1           **THE COURT:**  Sustained.

2    **BY MR. WONG:**

3    **Q.**   Let me ask you a different question.

4           Is it your understanding that the pre-trip inspection is

5    part of the hook and depart?

6    **A.**   Yes.

7           **MR. WAGNER:**  Objection.  Leading.  Lacks foundation.

8    Vague.

9           **THE COURT:**  Overruled.

10          You can answer.

11          **THE WITNESS:**  Yes.  I believe it is part of the hook

12   process.

13   **BY MR. WONG:**

14   **Q.**   Okay.  And same question with respect to the paperwork.

15   In your experience at Wal-Mart and in trucking, is the

16   paperwork part of the hook and depart?

17   **A.**   Absolutely.  You can't go out without paperwork.  You're

18   not allowed to haul any freight without any paperwork.

19   **Q.**   And you told us, sir, that you mentor other drivers?

20   **A.**   Yes.

21   **Q.**   And is the pre-trip inspection and the paperwork being

22   part of the hook, is that part of what you speak to and teach

23   other drivers?

24   **A.**   Yes, it is.

25   **Q.**   Okay.  Let's -- so you hook and depart, you get out on the

**MILLER - DIRECT / WONG**

1  road, you start your run.

2      You said you're doing a set run right now?

3  **A.**   Yes.

4  **Q.**   Okay.  And how about before October 2015, did you do

5  different types of runs?

6  **A.**   Yes.  In the class period, I did all different kinds of

7  runs.

8  **Q.**   Okay.  So you arrive -- you arrive at a vendor.  You've --

9  you've done loading and unloading at vendors many times, I take

10  it?

11  **A.**   Yes.

12  **Q.**   Okay.  Do you give your time to -- do you give your time

13  to vendors?

14  **A.**   No.  There's no such thing as giving time.  Your arrive

15  codes and your live loads is what pays you for the first 45

16  minutes at a vendor.  After 45 minutes, then you go on the

17  clock.

18  **Q.**   Okay.  Well, let's take that one at a time.

19      I think you mentioned live load?

20  **A.**   Yes.

21  **Q.**   So very briefly, what happens with respect to a live load?

22  You're paid for that?

23  **A.**   Yes.

24  **Q.**   And as of October 2015, approximately how much were you

25  paid?

1    **A.**    I think it was 17.75.  I'm not sure of the exact number.

2    **Q.**    Okay.

3    **A.**    It's gone up since then.

4    **Q.**    So what happens with a live load?

5    **A.**    You arrive at the vendor.  You park your truck.  You go in

6    the office and you give them your load number.  Wal-Mart gives

7    us a load number.  You give the people at the vendor the load

8    number and then they give you paperwork and then you give it to

9    the loader in the warehouse and then they assign you a door,

10   they tell you what door to back into, and you back -- you back

11   the trailer up to the door, and then the people in the

12   warehouse load the load on a live load.  We don't physically

13   load the loads.

14   **Q.**    Okay.  And I'm being reminded by my partner, Mr. Edelman,

15   who has become very adept at putting this chart up there, you

16   will see in front of you, sir, Defense Exhibit 619.  And I

17   believe that's been received into evidence.

18        So feel free -- and this, sir -- can you see it from where

19   you are?

20   **A.**    Yes.

21   **Q.**    If you can't, I can move -- Mr. Edelman can move it closer

22   because this is not a vision test.  But you can see it, sir?

23   **A.**    Yes.

24            **THE COURT:**  It's also on the little screen.

25            **THE WITNESS:**  Oh, right here.

1              **MR. WONG:**  Thank you, Your Honor.

2              **THE WITNESS:**  I can see it just fine.

3     BY MR. WONG:

4     **Q.**   So it's in front of all of us in many different ways.

5          So we were talking about live load and unload, but -- so

6     you're paid for a live load, but are you actually -- are you as

7     the driver -- are you actually doing the loading?

8     **A.**   No, we're not.  We're just waiting while they load or

9     unload.

10    **Q.**   When you say "they load" --

11    **A.**   The warehouse, the vendor would load the freight.  Or if

12    you were live unloading at a store, the store associates would

13    unload the freight.

14    **Q.**   Okay.  Is there a policy or practice at Wal-Mart as to

15    whether drivers touch freight?

16    **A.**   Yes.  They do not want us touching freight.

17    **Q.**   Okay.  So during the live -- during the live load, what

18    kinds of things -- what kinds of things can you be doing as the

19    driver?

20    **A.**   You can talk to your friends on the phone; you can hang

21    out and talk with other drivers that are there at the vendor;

22    you can eat something in your truck; you could take -- you

23    know, we have a sleeper so you could take a nap if you wanted

24    to.  Use the restroom.

25    **Q.**   You could take a nap during a live load?

1    A.    Sure.

2    Q.    Would that potentially be a time for a ten-minute break?

3          MR. WAGNER:  Objection, leading.

4          THE COURT:  Sustained.

5    BY MR. WONG:

6    Q.    Can you take a break?

7    A.    Yes.

8    Q.    And then live unload, same thing?  Are you -- is the

9    driver touching freight?

10   A.    No.  We don't touch the freight.  The store associates

11   unload.

12   Q.    Can you do other things during a live load -- I mean, a

13   live unload?

14   A.    You could probably go use the restroom.  Probably want to

15   be there when they're unloading.

16   Q.    And there's another pay code for arrive and drop.  When

17   you arrive at a vendor, is that pay code relevant?

18   A.    At a live load, it would just be an arrive, AR.  Arrive

19   and drop would be when you arrive and drop a trailer.  You had

20   a drop and hook, vendor --

21   Q.    How about a stop?  Would there be occasions where you

22   would be paid both a live load or unload and a stop or an

23   arrive?

24   A.    No.  You would be paid an arrive and a live unload or an

25   arrive and stop.

**MILLER - DIRECT / WONG**

1   **Q.**   So you could be paid for more than one activity?

2   **A.**   Yeah.  Two.  You're usually paid for two activities,

3   everything you do.  An arrive and a hook or an arrive and a

4   live load or a live unload.

5   **Q.**   Okay.  And in your experience, does that typically cover

6   approximately the first 45 minutes spent at a vendor?

7   **A.**   Yes.

8              **MR. WAGNER:**  Objection.  Leading.  Move to strike.

9              **THE COURT:**  Sustained.

10   Start again without leading the witness.

11              **MR. WONG:**  Okay.

12   **Q.**   Do you feel like you're giving up the first 45 minutes of

13   time at a vendor?

14              **MR. WAGNER:**  Objection.  Leading.  Vague.

15              **THE COURT:**  Sustained.

16              **MR. WONG:**  Okay.

17   **Q.**   Sir, what happens -- how do you get paid after 45 minutes

18   at a vendor?

19   **A.**   You go on the clock.

20   **Q.**   And tell us how that works.

21   **A.**   On your trip sheet -- and also in the computers on our

22   trucks, they keep track of how long we're at a vendor or at a

23   store.  And once you're at a vendor or a store more than 45

24   minutes, it automatically puts you on the clock, and the total

25   time at the vendor or the store is calculated, and minus the 45

1    minutes, they pay you the difference in hourly pay.

2    **Q.**    Okay.  And referring you, sir, to Exhibit -- Defense

3    Exhibit 619, which is on the screen for Court, counsel, and

4    members of the jury, do you see that reflected here?

5    **A.**    It would be unscheduled time, $14 an hour.

6    **Q.**    Okay.  And if the wait time is exceptionally long, like

7    more than two hours, in your experience, how is that handled?

8    **A.**    If you were at a vendor an extremely long amount of time

9    and it impacted your day's total earnings, the company would do

10   something that they call making you whole.  They would make up

11   the difference to your average day's pay.  I mean, if you were

12   at a vendor for, say, eight hours and, you know, we have the

13   14-hour clock and it caused you to lose drive time, there is an

14   instance where the company could make you whole.

15   **Q.**    And how do they make you whole?  How is that done?

16   **A.**    They calculate how much you made for that entire day, and

17   if it's significantly less than your average day's pay, they'll

18   generate a T-pay, and they'll pay you the difference up to your

19   average day's pay.

20   **Q.**    You mentioned T-pay.  What's a T-pay?

21   **A.**    That's generated by the driver coordinators.  It's just a

22   form that they pay you extra money with.

23   **Q.**    All right.

24        Your Honor, may I approach the witness?

25            **THE COURT:**  You may.

**MILLER - DIRECT / WONG**

1    BY MR. WONG:

2    **Q.**    Sir, I'm handing you a photo marked Defense Exhibit 686,

3    which has been marked for identification, not yet received into

4    evidence.

5        Can you please tell us what this is, what this depicts?

6    **A.**    The device on the left is called a pre-pass.  It's a

7    device that allows us to bypass the truck scales.

8    **Q.**    Sir, let me stop you there.

9        Your Honor, move admission of Defense Exhibit 686.

10           **THE COURT:**  Any objection?

11           **MR. WAGNER:**  No.

12           **THE COURT:**  All right.  It will be received.

13        (Trial Exhibit 686 received in evidence).

14           **MR. WONG:**  Your Honor, may I publish?

15           **THE COURT:**  You may.

16    BY MR. WONG:

17    **Q.**    So you were telling us about the pre-pass, and so please

18    tell the jury, what's a pre-pass?

19    **A.**    It's a device that there is some transponders when you

20    come near a truck inspection facility, and this will read the

21    information off of your truck and it will give you either a

22    green light or a red light.  If you get a green light, you can

23    bypass the truck scales without going in.

24    **Q.**    Okay.  And I would note that on this picture, which has

25    been received into evidence as Exhibit 686, the pre-pass is

**MILLER - DIRECT / WONG**

1    next to a FasTrak, with which some people here might be more

2    familiar.  Is a pre-pass somewhat similar to a FasTrak and how

3    it works?

4    **A.**   Yes, it is.

5    **Q.**   Okay.  And do Wal-Mart drivers -- do Wal-Mart drivers all

6    get issued pre-passes?

7    **A.**   Yes.  I believe all the Wal-Mart trucks have pre-passes.

8    **Q.**   Okay.  In your experience, does that save -- does that

9    save time on DOT inspections?

10   **A.**   Yes, it does.

11   **Q.**   And weighing?

12   **A.**   Yes.  Because you don't have to go through the scales if

13   you get a green light.

14   **Q.**   All right.  I'd like now to turn to Department of

15   Transportation or DOT mandatory ten-hour breaks.

16        Do you have that topic in mind?

17   **A.**   Yes.

18   **Q.**   So you said now you're doing set runs, and with a set run,

19   do you take DOT breaks?

20   **A.**   If I was to run out of hours on the road.  The run is

21   calculated for me to get back to the distribution center and go

22   home every night, but if you had a breakdown or, you know, bad

23   weather conditions or whatever and you were to run out of

24   hours, then you would have a layover on the road, yes.

25   **Q.**   Okay.  But in your time at Wal-Mart between 2004 and 2015,

**MILLER - DIRECT / WONG**

1    were there years where you didn't do set runs, where you were

2    so-called running wild?

3    A.    Yes.

4    Q.    Please remind the jury, what does it mean to be running

5    wild?

6    A.    That's just when you're in general dispatch and you just

7    kind of go wherever, you know, wherever the hours you have

8    dictate where you go to.

9    Q.    Okay.  And so you've taken -- you've taken your share of

10   DOT mandatory breaks?

11   A.    Yes.

12   Q.    And tell us about where you typically took your -- where

13   you typically took your DOT breaks?

14   A.    Generally at a Wal-Mart store or a truck stop or maybe a

15   rest area.  Usually you try to stay somewhere safe.

16   Q.    Did you ever take a DOT break at home?

17   A.    Yes.

18   Q.    When you took a DOT break at home, did you have to ask for

19   permission beforehand?

20   A.    No.  I would just notify the company that I was laying

21   over at home and where the truck was.

22   Q.    And when you notified the company, did you -- did you

23   notify a GTM?

24   A.    Generally not because it was in the evenings when the GTM

25   had already gone home, so it was usually just an operations

MILLER - DIRECT / WONG

```
1    manager.

2    Q.    In your time at Wal-Mart between 2004 and 2015, was it

3    ever your understanding that you had to ask for permission to

4    take a DOT break at home?

5              MR. WAGNER:  Objection.  Leading.

6              THE COURT:  Overruled.

7         You may answer, sir.

8              THE WITNESS:  No.  I was not aware that you had to ask

9    for permission.

10   BY MR. WONG:

11   Q.    During your DOT breaks, did you have to stay with your

12   truck the entire time?

13   A.    No.  I did various different things on my DOT breaks.

14   Q.    And I understand that you're a mountain biker.

15   A.    Yes.  I like to mountain bike.

16   Q.    Did you ride a bike during your DOT break?

17   A.    Yes, I did.  I brought my mountain bike with me when I

18   used to run wild and I would mountain bike on my DOT layovers.

19   Q.    Where did you store your mountain bike?

20   A.    When we first had the cabovers, the Wal-Mart shop built us

21   racks on the back of the trucks to hang our bikes.  So I would

22   hang my mountain bike on the back of the cab.

23        When they got the bigger trucks that have the stand-up

24   sleeper, then we would bring the bikes inside the sleeper with

25   us.
```

**MILLER - DIRECT / WONG**

1  **Q.**  So Wal-Mart actually helped install a bike rack in your

2  cab or behind your cab?

3  **A.**  Yes, they did.

4  **Q.**  Are there bike trails in the places where you would go?

5  **A.**  Absolutely.  I knew where all the good bike trails were on

6  the places on my routes.

7  **Q.**  And when you -- when you were running wild, did you

8  sometimes go to places where you had to family?

9  **A.**  Yes.  I have family in Sacramento, so when I laid over in

10  Sacramento, I would stay with family.

11  **Q.**  Can you tell us who you knew in the Sacramento area?

12  **A.**  I have a son and I have my mother-in-law, a couple of

13  nephews that live in Sacramento.  I would visit them.

14  **Q.**  Okay.  So when you -- so you would actually take -- take a

15  layover in Sacramento away from your truck at a family member's

16  home?

17  **A.**  Yes.  I would park -- near their home, there was a Sam's

18  Club and a Wal-Mart, and I would park the trucks at the

19  Wal-Mart store or the Sam's Club and then they would come pick

20  me up.

21  **Q.**  And did you have to ask anyone for prior permission to

22  spend a layover with a family member?

23  **A.**  No.  I didn't ask for permission.  I just told them that I

24  was leaving the truck at the Sam's Club and I was going to stay

25  with my mother-in-law that night.

**MILLER - DIRECT / WONG**

1    **Q.**   Have you ever heard the term "baby-sitting freight"?

2    **A.**   I have never heard that until now.

3    **Q.**   Did you ever have any understanding that you were supposed

4    to stay with the truck and be a security guard during the --

5    during your DOT mandatory breaks?

6    **A.**   No.  I did not.

7    **Q.**   You've been in the trucking industry for how long?

8    **A.**   Thirty-six years.

9    **Q.**   Have you ever heard of any other company who paid drivers

10   anything for a DOT layover?

11           **MR. WAGNER:**  Objection.  Relevance.

12           **THE COURT:**  Sustained.

13   **BY MR. WONG:**

14   **Q.**   Have you ever spent your layover in a hotel?

15   **A.**   Yes.

16   **Q.**   To take a layover in a hotel, let me ask -- let me just

17   ask it different ways.

18       To get reimbursed for the hotel and get layover pay, do

19   you have to ask for permission?

20   **A.**   Yes.  There had to be a circumstance where you would get

21   paid for the hotel and the layover.  You know, I was sick on

22   the road with the flu one time, and I needed to be near a

23   restroom, so I called the company and told them that I was

24   sick, and they had me get a hotel room and they paid for the

25   hotel room and they paid the layover pay.

1    **Q.**    Okay.  But if you wanted to stay in a hotel and just pay

2    for it yourself and get layover pay, did you have to get

3    permission for that?

4    **A.**    No.

5    **Q.**    Have you ever heard of a truck check?

6    **A.**    No.  I've never heard of that.

7    **Q.**    Have you ever heard of safety managers knocking on your

8    door during a layover and making sure that drivers were in the

9    cab during a layover?

10   **A.**    No.  I've never heard that.  And also that would be a

11   violation of DOT regulations to interrupt a driver on their

12   layover, so I don't think Wal-Mart would do that.

13           **MR. WAGNER:**  Objection.  Calls for a legal conclusion.

14   Move to strike.

15           **THE COURT:**  I'll grant the motion to strike.  It

16   wasn't calling for it, but it got a legal conclusion, so I'll

17   strike that.

18   **BY MR. WONG:**

19   **Q.**    Sir, why are you testifying on behalf of Wal-Mart today?

20   **A.**    Because I disagree with the premise of this lawsuit.  I

21   think that Wal-Mart's a good company to work for.  It's a good

22   job, and they've treated me very well over the last 22 years.

23           **MR. WONG:**  Thank you.

24       One minute, Your Honor.

25       (Defense counsel confer off the record.)

1    BY MR. WONG:

2    Q.   Sir, I'm just going to lay the foundation for one document

3    and then we'll be finished.

4         Your Honor, may I approach the witness?

5         I'm handing you a chart I think we have seen before.  It's

6    been marked for identification as Defense Exhibit 671.  And I'm

7    handing you a glass of water as well.

8    A.   Thank you.

9    Q.   So with respect to this exhibit, 671, sir, does this set

10   forth the different ways in which Wal-Mart pays its drivers?

11   A.   Yes.

12            MR. WONG:  Your Honor, move admission of Exhibit 671.

13            THE COURT:  Is there any objection?

14            MR. WAGNER:  No objection.

15            THE COURT:  Thank you.  It will be received.

16         (Trial Exhibit 671 received in evidence)

17            MR. WONG:  Your Honor, may I publish?

18            THE COURT:  Yes.

19   BY MR. WONG:

20   Q.   So, Mr. Miller, just now that the Court, counsel and

21   members of the jury can see this, I just want to reask the

22   question.

23         Does this set forth the different categories or buckets by

24   which Wal-Mart pays its drivers?

25   A.   Yes.

MILLER - DIRECT / WONG

1    Q.    And I think you previously talked about unscheduled time,

2    and that -- and I think you referred to that as being on the

3    clock.  Do you remember that testimony?

4    A.    Yes.

5    Q.    And please tell the jury the difference between

6    unscheduled time and scheduled time.

7    A.    Scheduled time is when you have training or some kind of a

8    meeting that Wal-Mart schedules.  And unscheduled time are for

9    things that happen out on the road like a flat tire or a

10   breakdown or being more than 45 minutes at a store or a vendor.

11   Q.    And do you know what a grassroots meeting is?

12   A.    Yes.

13   Q.    What's a grassroots meeting?

14   A.    A grassroots meeting is where management meets with the

15   drivers and we just kind of talk about the issues going on,

16   kind of air things out, and you could bring up any issues that

17   you might have with the management.

18   Q.    Does Wal-Mart pay drivers for time spent at grassroots

19   meetings?

20   A.    Yes, they do.

21   Q.    What kind of -- what bucket does that fall in?

22   A.    Unscheduled time -- or scheduled time?  I'm sorry.

23   Q.    Scheduled time.

24   A.    Yes.

25   Q.    Okay.

1      All right.  Thank you, Mr. Miller.

2      Nothing further, Your Honor.

3          **THE COURT:**  Mr. Wagner?

4          **MR. WAGNER:**  Yes, thank you.

5                    **CROSS-EXAMINATION**

6  **BY MR. WAGNER:**

7  **Q.**  Hi, Mr. Miller.  My name is Butch Wagner.  I'm one of the

8  attorneys for the class of truck drivers.

9      And it's obvious -- is it fair to say that you have a

10 different opinion or feeling than the other 839 truck drivers

11 that are part of this case about --

12         **MR. WONG:**  Objection.  Vague.

13 **BY MR. WAGNER:**

14 **Q.**  -- about the issues in this case; correct?

15         **MR. WONG:**  Objection.  Vague.  Calls for speculation.

16         **THE COURT:**  Sustained.

17         **MR. WONG:**  Lacks foundation.

18         **THE COURT:**  Sustained.

19 **BY MR. WAGNER:**

20 **Q.**  Sir, you said you didn't agree with the premise of the

21 case; right?

22 **A.**  Yes.

23 **Q.**  Okay.  Have you read the lawsuit itself, what it's about?

24 **A.**  No.  I have a basic understanding.

25 **Q.**  Who told you about what the lawsuit is about then that

**MILLER - CROSS / WAGNER**

1  created your understanding?

2  **A.**   Other drivers.  Probably guys that are in the lawsuit.

3  **Q.**   Okay.  So you haven't read the documents yourself, have

4  you?

5  **A.**   No, I have not.

6  **Q.**   Have you read any of the orders from the Court in this

7  case?

8         **MR. WONG:**  Objection.  Objection to references to

9  those documents, to the orders of the court.

10        **THE COURT:**  Overruled.

11     You can answer that question.

12        **THE WITNESS:**  No, I have not.

13  BY MR. WAGNER:

14  **Q.**   So you don't know the rulings that have been made?

15  **A.**   No, I don't.

16  **Q.**   Okay.  But you feel a loyalty to Wal-Mart; right?  Is that

17  fair to say?

18  **A.**   Yes.

19  **Q.**   All right.  Now, the opinions you've expressed in your

20  testimony, are those your -- those are your personal opinions;

21  right?

22  **A.**   Yes, they are.

23  **Q.**   They're not the opinions of the other drivers as far as

24  you know, are they?

25  **A.**   Some of the drivers have a similar opinion to me, yes.

**MILLER - CROSS / WAGNER**

1   Q.   Okay.  And do you know who some of those drivers are?

2   A.   Sure.

3   Q.   All right.  Do you -- so is it -- have you talked to any

4   of the 839 drivers that are a part of the case about their

5   opinions?

6   A.   Yes, I have.

7   Q.   Okay.  And their opinions are different than yours; right?

8   A.   They're varying, yes.  I mean, there's three different

9   opinions from what I can tell from talking to dozens and dozens

10  of drivers in this case.

11  Q.   Okay.  Now, when you get paid, there's a record of what

12  you get paid for at Wal-Mart; right?

13  A.   Yes.

14  Q.   And your pay records set forth what it is you're actually

15  getting paid for; right?

16  A.   Yes.

17  Q.   Now, you mentioned that you're a -- you have a set route,

18  and a set route brings your -- you back to close to your home

19  at the end of every day; right?

20  A.   Yes.

21  Q.   So there's no -- so you are excused from the layover --

22  taking layovers in the cab because it's known that you take

23  your layovers at home.  In fact, your route is set up to

24  accommodate that; right?

25  A.   Yes.  But in the time of the class, I've also -- in that

1    time, I've run wild as well.  I just currently happen to be on

2    a set run.

3    Q.    Okay.  So you said you ran wild and you said that at times

4    when you ran wild, you didn't get permission sometimes to take

5    your layover outside of the cab; correct?

6    A.    Yes.  I was not aware that you had to ask for permission.

7    I would just notify the company that I was laying over outside

8    of the truck.

9    Q.    So you weren't aware of the policies that required you to

10   do so; huh?

11   A.    No.  I'm not aware of that policy.

12        MR. WONG:  Objection.  Objection.  States facts not --

13   misstates facts.

14        THE COURT:  If you put the word "any" in there, I will

15   let you ask him.

16        MR. WAGNER:  Okay.

17   Q.    Were you aware of any of the policies that required you to

18   get permission to take your layover somewhere other than the

19   tractor?

20   A.    No.  I was not aware that you needed permission and I've

21   never had anyone tell me that I needed permission.  I do it --

22   I took layovers outside of the truck regularly and no one ever

23   told me that wasn't okay.

24   Q.    Well, did you read the driver manuals on the issue?

25   A.    No, I did not.

**MILLER - REDIRECT / WONG**

1    **Q.**   Okay.  Were those given to you at some point or made

2    available to you at some point during your employment?

3    **A.**   Yes.  I have one.

4         (Plaintiffs' counsel confer off the record.)

5    **BY MR. WAGNER:**

6    **Q.**   Did you ever take your layover outside of the tractor --

7    and this is when you were running wild.  Did you ever take your

8    layover outside of the tractor without notifying one of your

9    superiors that you were doing so?

10   **A.**   No.

11   **Q.**   Okay.

12        I don't have anything further.  Thank you, Mr. Miller.

13             **THE COURT:**  Mr. Wong, anything further?

14             **MR. WONG:**  Just a few.

15                    **REDIRECT EXAMINATION**

16   **BY MR. WONG:**

17   **Q.**   Just a couple more questions.

18        Sir, are you aware of a sizeable number of drivers who are

19   opposed to this case?

20   **A.**   Yes.  I know several drivers that are opposed to the case.

21   **Q.**   And did any Wal-Mart lawyer ever try to talk to you before

22   you decided to opt out on your own?

23   **A.**   No.  I got -- I received something in the mail from the

24   plaintiffs' lawyers, and it said if I wanted to opt out, you

25   fill out the bottom of it, you cut it off, and you mail it in.

**PROCEEDINGS**

 1   And I did that a long time ago.  Didn't have anything to do

 2   with lawyers.

 3   **Q.**   All right.

 4        Thank you, sir.

 5             **THE COURT:**  May the witness be excused?

 6             **MR. WONG:**  Yes, Your Honor.

 7             **MR. WAGNER:**  Yes, Your Honor.

 8             **THE COURT:**  Thank you very much, sir.  You're excused.

 9        All right.  The defendants may call their next witness.

10             **MR. EDELMAN:**  Your Honor, would now be an appropriate

11   time to take the morning break?

12             **MR. SALTZMAN:**  Before the next witness, before the

13   expert, we have some issues to discuss.

14             **THE COURT:**  Okay.  Ladies and gentleman, we will take

15   our morning break.  If you would be ready to come back, please,

16   at 10 minutes until 10:00.  In the meantime, please don't

17   discuss this matter with each other or anyone else.  Don't make

18   up your minds.  You've not heard all the evidence yet.

19        (Proceedings were heard out of presence of the jury:)

20             **THE COURT:**  To discuss with each other or with me?

21             **MR. SALTZMAN:**  I think together, the two of us first

22   and then with me.

23             **THE COURT:**  All right.  Well, let me know then.

24                  (Recess taken at 9:39 a.m.)

25                  (Proceedings resumed at 10:01 a.m.)

**PROCEEDINGS.**

1        (Proceedings were heard out of presence of the jury:)

2              THE COURT:  Are we ready?

3              MR. SALTZMAN:  Ready to talk, yes, sir.  Thank you.

4              MR. EDELMAN:  Thank you, Your Honor.  So, Your Honor,

5     I gave Mr. Saltzman earlier this morning a set of the slides

6     that I plan to cover with Dr. Walker.  And he asked me to

7     revise one of the slides, which I did, and we have been through

8     his other objections and I think resolved them, except he still

9     has two --

10             MR. SALTZMAN:  3,  17, 18, and 19.

11             MR. EDELMAN:  So can I give you a set, Your Honor.

12             THE COURT:  Yes.

13             THE CLERK:  Are these going to be marked in evidence?

14             MR. EDELMAN:  They will be marked for identification.

15             THE COURT:  So what's the problem?

16             MR. SALTZMAN:  On No. 17, Your Honor, if the witness

17    testifies to all of this, if he testifies, then I think if he

18    actually testifies to this, then that would be appropriate to

19    then show to the jury, but until he testifies to it, it's just

20    like asking a long, leading question, "Are these all of your

21    conclusions," and he tells him what his conclusions are as he

22    puts them up.

23        At the end of the day, if the expert testifies to these,

24    then I'm sure it will be fine as a summary of his conclusions,

25    but he hasn't testified to that yet.

PROCEEDINGS.

1          THE COURT:  These are all demonstratives, I take it.

2          MR. EDELMAN:  Yes.  Your Honor, what these are, we are

3    talking two very thick reports.  These are all lifted directly

4    from the report, and it's obviously he could look at his report

5    and look at all his subtitles and read them to the jury.  I'm

6    just trying -- this summary, which he will testify to, is just

7    demonstrative to try to get through it more quickly.

8          THE COURT:  The objection to that is overruled.

9        What's the next one?

10         MR. SALTZMAN:  No. 18, Your Honor, the next one in

11   order, what the driver said at the depositions.

12       This is literally the expert coming in and doing a

13   deposition summary of testimony that has all kinds of problems

14   with the underlying testimony itself.  As we have been

15   discussing throughout the trial, there is assumptions on legal

16   conclusions; there is assumptions on factual conclusions.  And

17   the expert is now testifying or trying to testify as an expert

18   about what people -- how they interpreted questions that he

19   can't testify to their interpretation of these issues.  These

20   are actual legal issues that the jury needs to decide.  So

21   having him come in and just testify, especially on the third of

22   those categories -- even the second, the second category,

23   "Spent an entire layover away from the truck," we have no

24   foundation there --

25         THE COURT:  In the report, did you attach -- I mean, I

**PROCEEDINGS.**

1    don't know how he is going to make these calls, but did he

2    attach to his report the deposition transcripts that he added

3    up to come to these numbers?

4         MR. EDELMAN:  This is sourced -- and we did this on

5    purpose.  This is sourced in the bottom right corner to

6    Appendix 4 of his report, and this really -- it's a surprising

7    objection --

8         THE COURT:  I want to know, did you attach the depo

9    transcripts so that you could go back and say, "Well, do I

10   agree that this person said I spent a portion of" -- and this

11   is where he said that for 85 percent of the time.

12        MR. EDELMAN:  I don't remember if the deposition

13   transcripts are attached, but he will say that he read all the

14   transcripts in the same way that Dr. Phillips -- that was the

15   essence of what Dr. Phillips did, is he said his team surveyed

16   the deposition testimony, and then he gave, you'll recall, what

17   he thought were averages or he did his Monte Carlo thing based

18   on a combination of the surveys and the deposition testimony.

19   That was the essence of what Dr. Phillips did.

20        This is also what our witness did.  And so this analysis

21   is very similar to what they heard already from Dr. Phillips.

22   And I think if he wants to cross-examine the witness on whether

23   he thinks this is appropriate or whether he thinks it is

24   founded or not -- but it's directly from his report.  All the

25   data is there.  And it's exactly what their witness did.

**PROCEEDINGS.**

1        **MR. SALTZMAN:**  Your Honor, it's very different,

2    completely different from Dr. Phillips, who coded time.  He

3    looked at depositions and looked at time spent on tasks --

4        **THE COURT:**  He can testify to whatever he can testify

5    to and they can object to whatever they can object to, but this

6    I don't think he should display.

7        **MR. SALTZMAN:**  We would have the same concern about

8    No. 19, Your Honor, which is even more embedded with legal

9    conclusions as to what a paid break is versus an unpaid break.

10   This witness is about to testify in his report and in his

11   deposition, he said unambiguously, "I'm not a legal expert; I'm

12   not a lawyer; I'm not here to offer legal opinions."  And this

13   chart is embedded with a legal opinion as to what is paid rest

14   break versus an unpaid rest break, which is an ultimate issue

15   in the case.

16       **MR. EDELMAN:**  It's not, Your Honor.  It goes directly

17   to the conflicting testimony in the case.  It rebuts

18   Dr. Phillips about whether drivers were paid for time.  It's

19   not legal.  It's a question of were they taking rest breaks

20   during a time when they were being paid.  There has been all

21   sorts of testimony about that, and this is what an expert

22   classically does, is looks at the evidence and tabulates it.

23   It is just what Dr. Phillips did and this is the other had side

24   of the coin.

25       We put Dr. Phillips' assumption on the left of this chart.

**PROCEEDINGS.**

1    He testified that drivers never took rest breaks on paid time,

2    that was his assumption.  And so we're challenging -- we are

3    rebutting the assumption that Dr. Phillips made through this

4    evidence, which is directly sourced to Dr. Walker's report.

5         **MR. SALTZMAN:**  That is completely contrary to what has

6    been done here.  Dr. Phillips did not testify to what would be

7    a paid rest break or unpaid rest break.

8         **THE COURT:**  I'm not going to allow this one either for

9    the same reason.  He can testify, but I'll listen for

10   objections.

11        **MR. SALTZMAN:**  Your Honor, if I could go back to No.

12   17.  If you will recall, when Dr. Phillips testified, we did

13   not and we were not permitted to put up on the board anything

14   until he actually testified.

15        For example, all the numbers, we went through the numbers,

16   put it up -- put them up, had him testify to them, and

17   Mr. Artenian wrote that down as it came out.  And now this

18   witness is being allowed to basically --

19        **THE COURT:**  Well, I'm going to allow this.

20        **MR. SALTZMAN:**  Okay.  So you're done with it.

21        Now, as a global issue, now that we have your guidance on

22   these last two exhibits, as a global issue -- and this is a

23   concern I raised with Mr. Edelman -- Dr. Walker, his report is

24   replete with legal conclusions and legal arguments.  I just --

25   counsel has said he doesn't plan to go there.  He recognizes

**PROCEEDINGS.**

1    that's not his role, but I'm just letting you know that I'm

2    going to have to do a lot of objecting if he goes to legal

3    arguments and legal conclusions.  I want you to know that that

4    at least may be coming so we know what we are dealing with

5    here.  But I think we have your guidance.

6        By the way, an example of that --

7            **THE COURT:**  I don't need an example.

8            **MR. SALTZMAN:**  Well, it's a specific issue I asked

9    Mr. Edelman about, and he thinks he may go there, which is two

10   paragraphs in his report, on again the rest break issues.

11   These -- the witness said these unpaid rest break analyses

12   discussed have nothing to do with paid rest breaks.

13       So, again, we're getting an expert witness, who is not an

14   expert on the law or meal breaks, and he said that, he said he

15   has no idea, testifying as to what the difference is between an

16   unpaid rest break and a paid rest break, an ultimate issue in

17   this case, perhaps, and I need -- I don't think Mr. Edelman

18   should be entitled to go there.

19           **MR. EDELMAN:**  Can we -- we just need to take -- if he

20   has an objection at the time.  I have no intent of soliciting

21   legal opinions from this expert.

22           **MR. SALTZMAN:**  Then we will see how --

23           **THE COURT:**  What occurs to me from looking at one of

24   those charts that we're not going to use, to a lay observer,

25   it's very confusing to talk about paid rest breaks, unpaid rest

1    breaks or rest breaks on paid time.

2        I suspect that you folks mean very different things when

3    you talk about that because when you say rest break on paid

4    time, what you mean is well, we are including it all in the

5    this and the that and they would have had to hang out anyway so

6    they will take a rest break then.  I expect what he is talking

7    about is something very different.

8        I think the witness is going to have to be very precise

9    when he says whatever he says so that you don't just start

10   assuming things about which there is vast disagreement.

11       **MR. EDELMAN:**  Sure.  I'm going to just spend a moment

12   with the witness to tell him which slides we're not covering.

13   If you would just give me two minutes, Your Honor.

14                      (Off the Record)

15       **THE COURT:**  Are we ready?

16       **MR. EDELMAN:**  Yes, Your Honor.

17   (Proceedings were heard in the presence of the jury:)

18       **THE COURT:**  All right.  The defendants may call their

19   next witness.

20       **MR. EDELMAN:**  Thank you, Your Honor.

21   Wal-Mart will call to the stand Dr. Jonathan Walker.

22       **THE CLERK:**  You may be seated.

23       **THE WITNESS:**  Thank you.

24       **THE CLERK:**  You're welcome.  I'll take your picture.

25       Raise your right hand.

WALKER - DIRECT / EDELMAN

1                          **JONATHAN WALKER**,

2    called as a witness for the Defendant, having been duly sworn,

3    testified as follows:

4            **THE CLERK:**  State your name for the record.

5            **THE WITNESS:**  Jonathan Walker.

6            **THE CLERK:**  And that's Jonathan with an A?

7            **THE WITNESS:**  J-O-N-A-T-H-A-N.

8            **THE CLERK:**  Thank you.

9            **THE COURT:**  Mr. Edelman.

10           **MR. EDELMAN:**  Thank you, Your Honor.

11                          **DIRECT EXAMINATION**

12   BY MR. EDELMAN:

13   **Q.**   Dr. Walker, good morning.

14   **A.**   Good morning.

15   **Q.**   Good morning, ladies and gentleman of the jury.

16        Dr. Walker, can you tell us a little bit about your

17   educational and professional background?

18   **A.**   Yep.  I have a Bachelor's in economics from Berkeley.  I

19   have a Ph.D. in economics from MIT.

20        During the last year of my time when I was working on my

21   dissertation, I worked at the Federal Reserve Bank of Boston,

22   which is part of the regulatory structure for banks.

23        After that, I went to work for Monitor Company, which is a

24   strategy consulting firm.  Our clients were Fortune 500

25   companies and their equivalent, privately held and

1    international counterparts.

2        In 1990, I joined Economists Incorporated, which is an

3    economic consulting firm.  At that time, it had one office in

4    Washington, DC, and over the years, I've gone through different

5    jobs there.

6        When I was hired, I was senior economist.  I was promoted

7    to vice-president and then to senior vice-president and then to

8    principal and now I'm the president and chief executive officer

9    of Economists Incorporated.

10   Q.   And is one of your areas of expertise as an economist the

11   economics involved in labor?

12   A.   Yes.  As a graduate student, I took courses in labor

13   economics.  That was one of my areas of emphasis.  I also

14   studied statistics and econometrics and the application of

15   statistics to economic data.

16   Q.   Can you tell us or tell the jury a little bit more about

17   what Economists Incorporated does.

18   A.   Sure.  Economists Incorporated has approximately 35 Ph.D.

19   economists, roughly 70 to 80 staff in total.  We have a lot of

20   different service offerings, many of them are sort of unrelated

21   to the tasks here, but one of the things that is related is

22   work that Economists Incorporated does that relates to labor.

23       So we work with companies that want to know whether their

24   pay policies are having a disparate impact on minorities or on

25   women, you know, make sure that the pay policies are not

1   discriminating against different demographic groups.  We help

2   them to understand whether their planned promotions are

3   favoring one group or another, whether their planned reductions

4   in force are going to have a negative impact on one group or

5   another.

6       We work with companies during litigation or individuals

7   who are in litigation, such as here where there may be lawsuits

8   about discriminatory practices or failure to adhere to wage

9   hour laws.  That's one of the practice areas that is most

10  relevant to what is going on here today.  Because, as I said,

11  we also are involved in a host of other service areas that are

12  not related to litigation.

13  **Q.**  Just briefly, give the jury a sense of what those other

14  areas of economics are that your firm gets involved in.

15  **A.**  Sure.  Antitrust analysis.  So when companies merge,

16  competitors or the companies themselves or their customers may

17  want to know what the impact of the merge is going to be on

18  competition so how is it going to affect the prices that they

19  have to pay.

20      We do a lot of work with auctions around the world.

21  Governments now sell off the rights to use radio spectrum and

22  radio frequencies for cellular telecom, for television or for

23  radio.  And so we work with telecommunications companies

24  helping them to devise strategies for how to participate in

25  auctions for these things.

**WALKER - DIRECT / EDELMAN**

1          We do a lot of work in regulation in general, helping

2     companies to understand how proposed business regulations are

3     going to affect the way they do business and also helping them

4     to understand what regulations -- well, basically how they're

5     going to affect the way they do business.

6          We do some tax-related work.

7          So there are a wide range of things that we do in addition

8     to sort of litigation-related stuff.

9     **Q.**   So it sounds like a lot of what your companies does is not

10    necessarily litigation related?

11    **A.**   That's correct.

12    **Q.**   All right.  And how many offices does Economists

13    Incorporated have?

14    **A.**   We have three offices.  One here in San Francisco.  Our

15    headquarters is in Washington, D.C. and an office in Florida.

16    **Q.**   You're from the San Francisco office?

17    **A.**   I -- I live here in San Francisco, but I travel back to

18    Washington every month.  And I go to the Florida office

19    occasionally as well.

20    **Q.**   Okay.  And how many -- how many Ph.D. economists do you

21    have on your staff?

22    **A.**   It's approximately 35.  It's sort of -- there are a couple

23    of people that it sort of depends on how you count them,

24    whether you count them as employees or not, but it's

25    approximately 35.

**WALKER - DIRECT / EDELMAN**

1   **Q.**   All right.   And as president, do you spend part of your

2   time managing this company?

3   **A.**   Yes.   About half of my time is spent managing the company.

4   About half of my time is spent providing consulting services

5   myself.

6   **Q.**   Okay.

7       Tell us -- you mentioned it, but tell us -- or you

8   mentioned it a little bit in passing, but give us, if you

9   would, particular examples of your consulting work, you, in the

10   labor area since you've been at Economists Incorporated.

11   **A.**   Sure.   Right now, I'm involved in two cases on behalf of

12   the Chicago Teachers Union.   So they are challenging some of

13   the employment-related practices by the Chicago School Board,

14   and they're suing them for them, claiming that they had had a

15   disparate impact on African American teachers.   And I'm working

16   with them on those.

17       I recently testified in a wage hour case, I mean, another

18   lawsuit that's involving California wage hour laws.

19       I've worked on behalf of the Department of Labor, trying

20   to make sure that trustee's for pensions were investing pension

21   plan assets in a way that benefited the beneficiaries and that

22   was true to their fiduciary duties.

23       I have worked on behalf of individuals in cases where

24   they've alleged discriminatory practices by their employees,

25   sex discrimination and race discrimination.   Those --

**WALKER - DIRECT / EDELMAN**

1    Q.   Were you representing the plaintiffs in cases like that?

2    A.   Yes.  Well, the Chicago Teachers Union case is the

3    plaintiff's side, and I have worked on behalf of plaintiffs in

4    discrimination cases as well.

5         The Department of Labor cases were not litigation

6    matters -- actually, one of them did turn into a litigation

7    matter, and the Department of Labor was the plaintiff in that

8    action as well.

9    Q.   So you do some of your work on the plaintiff's side and

10   some of it on the defense side?

11   A.   Yes.  That's right.

12   Q.   Did I understand from your last answer, that you are also

13   retained by the Government as an expert?

14   A.   I have been, yes.

15   Q.   And what would be examples of that?

16   A.   Well, the Department of Labor was an example of that.

17   There were other examples that are outside of the labor field,

18   so I'm currently working for the United States in a lawsuit

19   against Lance Armstrong related to his contract with the postal

20   service when he was the rider for the Tailwind team in the Tour

21   de France.

22        The United States government is suing Lance Armstrong for

23   alleged fraud related to that, and I'm the Government's damages

24   witness in that litigation.  So I was hired by the U.S.

25   Attorney for the District of Columbia and also the Department

**WALKER - DIRECT / EDELMAN**

1    of Justice.

2        There have been other cases where I've worked on behalf of

3    the United States government as well where the United States

4    government has been sued, and I've helped them to measure what

5    damages actually were under the assumption that the Government

6    was wrong, and I have been retained to give opinions about

7    damages on behalf of the Government.

8    **Q.**   Okay.

9        And are you a member of any professional associations?

10   **A.**   Yes, I am.

11   **Q.**   Could you please tell the jury which ones.

12   **A.**   I'm a member of American Economics Association, the

13   Western Economics Association, the American Law and Economics

14   Association, the Industrial Organization Society, the Society

15   of Labor Economists.

16       And also the American Bar Association antitrust section

17   allows affiliate members who are not lawyers because antitrust

18   has a very strong and deep economics part to it, and so I'm an

19   affiliate of that.

20   **Q.**   By the way, that notebook you have in front of you --

21   **A.**   Yes.

22   **Q.**   -- can you just tell the jury what that is.

23   **A.**   Sure.  This is a copy of the two expert reports that I

24   prepared in this case, the two expert reports that Dr. Phillips

25   prepared in this case, the expert reports that Mr. Garcia

**WALKER - DIRECT / EDELMAN**

1  prepared in this case, and also two slides that contain some

2  calculations that I did.

3  **Q.**   Okay.  So we'll get to that later.

4       Have you ever given expert testimony in court?

5  **A.**   I have.

6  **Q.**   How many times?

7  **A.**   Fourteen times.

8  **Q.**   All right.  Have you been recognized in court as an expert

9  before?

10  **A.**   Yes, I have.

11  **Q.**   How many times?

12  **A.**   Fourteen times.

13  **Q.**   Okay.  Okay.  And in what fields have you been qualified

14  as an expert in your previous testimony?

15  **A.**   In economics and in statistics.

16  **Q.**   All right.  So I want to -- I know there is a lot of

17  detail in your reports and a lot of time that went into your

18  work.  I want to start, not by getting into the detail, but by

19  giving the jury the big picture --

20  **A.**   Yes.

21  **Q.**   -- on what you've done.

22  **A.**   Yes.

23  **Q.**   Okay.  And then we're going to get into the underlying

24  detail.

25  **A.**   Yes.

1    **Q.**   So what were you retained to do in this case?

2    **A.**   Well, initially I was asked to review data sets that

3    Wal-Mart had, so computer records that Wal-Mart had, to try to

4    test the plaintiffs' theory of this case to investigate whether

5    there was such a thing as a typical day for a truck driver to

6    try to ascertain whether using the data that Wal-Mart had, one

7    could determine reasonably accurately for people that you

8    didn't have real information about how frequently they engaged

9    in the tasks that, you know, are at issue here.  And when they

10   did do those sorts of things, how often did it tend to take.

11        So my initial task was just to help Wal-Mart and its

12   counsel understand whether the data that Wal-Mart had in

13   computer format was consistent with the idea of there being a

14   typical day, a typical set of experiences, and that was sort of

15   the first thing that I was asked to do.

16   **Q.**   Now, there has been a lot of testimony in this case and a

17   lot of questions asked of drivers, is there such a thing as a

18   typical trip or a typical day.

19        Are you going to be testifying as to the importance of

20   that answer?

21   **A.**   I certainly will be talking about how that relates to a

22   separate issue of loss and how it measures loss and, yes,

23   that's the case.

24   **Q.**   Okay.  And when you were analyzing -- asked by Wal-Mart to

25   analyze the data, were you looking at it in terms of whether

**WALKER - DIRECT / EDELMAN**

1   issues in this case could be resolved through application of

2   any kind of a formula?

3   **A.**   Yes.   I mean, the reason to look at this was to determine

4   whether one could use a formula or averages for some smaller

5   group of people to draw reasonable conclusions about how often

6   the 800 or so drivers about whom we know nothing -- about how

7   often they engaged in tasks and about how frequently or how

8   long it tended to take them when they did.

9        So, yeah, the point was to determine, you know, whether or

10  not one could reasonably and accurately draw conclusions about

11  all 800 people that aren't here based upon the few people about

12  which you knew something.

13  **Q.**   I wish Ms. Martinez were here today so she could see me

14  stealing a page from her book.   But let me just summarize very

15  broadly your first task you told us about.   You looked at the

16  data in the case and you tried to determine whether it could be

17  analyzed on a class-wide basis; is that correct?

18  **A.**   Yes, it is.

19  **Q.**   Okay.   Was there a second thing that you were asked to do?

20  **A.**   Yes.

21  **Q.**   What was the second thing?

22  **A.**   Over time, the project expanded and I was ultimately

23  asked to review the analyses by Dr. Phillips and Mr. Garcia and

24  to review the data that they relied upon, review the methods

25  that they used and to develop an opinion of my own about

**WALKER - DIRECT / EDELMAN**

1    whether their ultimate estimates and results were reliable and

2    reasonable and reasonably accurate.

3    **Q.**    Okay.  So the second thing that you were asked to do was

4    to look at the work that Dr. Phillips, Mr. Garcia, and

5    determine whether their work was reasonably accurate; is that

6    correct?

7    **A.**    That's correct.

8    **Q.**    Let me step back for a second.

9         In terms of the first point that you told us you were

10   asked to do, which was to analyze the data in the case or the

11   data set, I think you might have said, is that, as you

12   understand it, the same data that was given to Dr. Phillips?

13   **A.**    Yes.  In fact, the data I had had Bates numbers on it,

14   which means it was part of the discovery record.

15   **Q.**    And what kind of data was that?

16   **A.**    There were several different data sets that we looked at.

17   The biggest one and the one we did most of the work with was

18   what I think has been called here at trial the payroll data.

19   Sometimes I call it dispatch data, but they are the same thing.

20        These are computerized records that Wal-Mart kept related

21   to each of the trips by all of the class members throughout the

22   class period.  And so each record in the payroll data would

23   have information about the length of the trip in miles, the

24   driver that did the trip, the number of different activities

25   that occurred.  By activities I mean drop, hook, arrive,

1    whether there were layovers, and how much the driver was paid

2    for that particular trip.

3         So that was the dispatch/payroll data.  There were also --

4    Q.   Let me stop you there.

5    A.   Sure.

6    Q.   So that dispatch or payroll data that you were provided,

7    how far back did that go?

8    A.   That covered the entire class period.  So the data that I

9    had went back to October 2004.  It's possible we might have had

10   some earlier, I don't recall, but it started at least in

11   October 2004 through after the end of the class period.

12   Q.   All right.  And I think I interrupted you.  You were going

13   to explain about other data that you analyzed.

14   A.   Sure.  Yes.  There were ESI data.  Those are the data from

15   the onboard computers.  We had that.  We did some work with

16   that.

17        There were T-pay data, so there were several data sets

18   that showed instances of T-pays, which I think there has been

19   some discussion about here.

20        There were -- later there were the Gasboy data that

21   Dr. Phillips has talked about.  These related to instances

22   where trucks were fueled at Wal-Mart distribution centers.

23   There were the DOT/CHP data that Dr. Phillips also talked

24   about, which were records of instances where people had

25   roadside inspections.  They're called DOT/CHP because they are

1    inspections by the California Highway Patrol.  They actually

2    did it, but it's to ensure that the drivers were complying with

3    Department of Transportation regulations, so we had those data.

4         There may have been other data sets that I'm not

5    remembering right now, but those were the main ones that we

6    worked with.

7    Q.   And you just made a reference to some of the things that

8    have been discussed here.  You are referring to the trial?

9    A.   Yes.

10   Q.   Tell the jury how you know what has been discussed in the

11   trial.

12   A.   I've been -- well, there have been transcripts of the

13   testimony and the questions on a daily basis.  And so I've read

14   all of the transcripts which were available -- I don't have

15   yesterday's, but I read all of the transcripts that were

16   available through last Thursday of the trial.

17   Q.   So you've read the testimony from the various drivers on

18   both sides of the case or at least -- if you didn't have

19   yesterday yet you haven't heard from the drivers that Wal-Mart

20   called.  But you read all of the drivers that the plaintiffs

21   called?

22   A.   Yes.

23   Q.   All right.  And you read Dr. Phillips' testimony?

24   A.   Yes, I did.

25   Q.   And Mr. Garcia's testimony?

**WALKER - DIRECT / EDELMAN**

1    **A.**    Yes, I did.

2    **Q.**    Okay.  And, again, I want to step back and ask you as an

3    economist, without reference in particular to the work that

4    Dr. Phillips did in this case, but as a general matter, do you

5    have any problems with economists using data to calculate

6    estimates about information or data that you don't have?

7    **A.**    No.

8    **Q.**    In other words, using information to draw conclusions or

9    extrapolate to a larger set of data?

10   **A.**    No.  I mean, that's the standard thing that economists do,

11   is try to use data that you have to draw conclusions or to

12   understand information that you don't have.  And it can include

13   extrapolating, which is, you know, looking at a small group of

14   information, a sample, and drawing conclusions about a larger

15   population that the sample is drawn from.

16           So, you know, looking at one group of people, a small

17   group of drivers, and trying to draw conclusions about drivers

18   that aren't there, that's one type of instance where that

19   happens.

20           But also trying to determine information about the same

21   group of people, but things you can't observe about those same

22   group of people.

23           So it's a common practice.  It's one of the things that we

24   are trained to do.  We spend a lot of time developing tools to

25   try to do that.

**WALKER - DIRECT / EDELMAN**

1    So that general idea, I have no qualms about, but one of

2    the things that economists need to do is to make sure that when

3    they're doing that sort of thing, that the data that they are

4    relying on, the data that they do have is reliable, and so part

5    of doing that properly is making sure of that, and also making

6    sure that the tools that you're using to draw conclusions are

7    reliable, that you are using them correctly, that you're not

8    being -- they're not using those tools invalidly.

9    **Q.**   And without getting into it quite yet, is that one of the

10   things you are going to testify about today, whether the work

11   of Dr. Phillips relied on data that you consider to be

12   reliable?

13   **A.**   Yes.

14   **Q.**   Now, you mentioned the trial testimony that you have read

15   in this case through last Thursday.  Have you reviewed

16   deposition testimony in this case?

17   **A.**   Yes, I have.

18   **Q.**   All right.  And tell the jury what you have reviewed.

19   **A.**   Sure.  I've read -- reviewed tens -- I don't know exactly

20   how many deposition transcripts of drivers.  I would -- I would

21   estimate it's around 50 or 60 or so.

22       There were 40 drivers that we're going to talk about in a

23   little more detail, actually 39 plus one who wasn't there for

24   very long.  We're going to talk about that group in some

25   detail, and I read theirs.

**WALKER - DIRECT / EDELMAN**

1      There were transcripts from the named plaintiffs.  I think

2  there are nine of those.  So that's 49.  Forty-eight if you

3  count that 39 minus 1.

4      I have also reviewed transcripts of Wal-Mart

5  representatives.

6      And I think those are the major groups of deposition

7  transcripts that I've reviewed in connection with my work in

8  this case.

9  **Q.**  All right.  And I know we'll get to it later.

10 Dr. Phillips testified about 40 depositions and the process

11 that was employed with respect to that.  You just said 39.

12 Tell us what you meant by that.

13 **A.**  Sure.  I mean, we're going to probably get into this in

14 more detail, but 40 people were selected by this process that

15 was supposed to be random, and of those 40, they were then

16 going to be given a questionnaire to fill out.  And it had to

17 do with their experiences at Wal-Mart.  And one of the 40

18 basically just wrote his name at the top of the questionnaire,

19 and then later when he was asked, he said, "Well, I only worked

20 for Wal-Mart for a day or so.  I don't remember how long it

21 actually was."  So he never actually ended up driving trucks.

22      So there is only information about how frequently people

23 engage in tasks and such for 39 people.  It's not a full 40.

24 His transcript, I don't really remember it in great detail, but

25 there wouldn't be much in it other than "yes, this is my name,

**WALKER - DIRECT / EDELMAN**

1  yes, I got the subpoena.  No, I have nothing to add."

2  **Q.**   All right.  And were you also asked in addition to

3  assessing the work of Dr. Phillips to assess the work of

4  Mr. Garcia?

5  **A.**   Yes, I was.

6  **Q.**   And -- all right.  So let's now -- now let's get the

7  bite-size conclusions.

8  **A.**   Sure.

9  **Q.**   And then we're going to go into the detail.

10  **A.**   Sure.

11  **Q.**   Okay?

12      But again on a macro level, can you tell us what your

13  conclusions were regarding your first task, which was to look

14  at the data in the case and to determine whether it was similar

15  enough that it could be analyzed on a class-wide basis for all

16  the drivers, or whether it was -- and therefore under a

17  formula, or whether it was too different from driver to driver

18  and did not lend itself to that.

19           **MR. SALTZMAN:**  Objection.  Leading, Your Honor.

20           **THE COURT:**  It's preliminary.

21      Don't lead him.  But overruled.

22           **THE WITNESS:**  The -- the data -- the analysis, the

23  computer analysis that we did showed to me that the drivers'

24  experiences were way too different from person to person.  They

25  were way too dissimilar to be able to determine through

1   formulas or through sort of representative individuals and

2   extrapolation on a reliable basis what individualized losses

3   were in this case.

4        There were -- people's experiences as represented in the

5   data were just way too different from person to person and day

6   to day for you to be able to determine for the class as a whole

7   how frequently people did these various things and how long it

8   tended to take without going down to a very granular level and

9   getting additional information from each individual person one

10  by one.

11  BY MR. EDELMAN:

12  Q.   And what did the data that you analyzed -- I assume there

13  were others in your office working with you as a team?

14  A.   Yes.  I had a team of people that were working with me.

15  Q.   What did the data say about whether there is such a thing

16  as a usual trip for a Wal-Mart fleet driver?

17  A.   The data said that there were not.  There was no such

18  thing as a usual trip or a typical trip, so the trips would

19  vary from day to day, from person to person.  And as the trips

20  varied, the Wal-Mart data, plus additional data that was

21  developed later, put together, suggested that on a day-to-day

22  basis, people would spend different amounts of time on these

23  different tasks, the numbers of times on a given day they would

24  have to engage in them would vary, and when you looked at

25  different people.  One person on average would not be the same

**WALKER - DIRECT / EDELMAN**

1    as anybody on average.  It was really disparate.

2        And so it's really important for trying to estimate loss

3    for the people that we don't know, the people that have said

4    nothing, the 800 people about whom we know nothing at all, that

5    based on the people that we do know, there is just a wide

6    variety and people just aren't average.

7    **Q.**   So is that important in this case?  And if so, why?

8    **A.**   It's important because the -- the plaintiffs and

9    Dr. Phillips are trying to assess, you know, how frequently did

10   people do these things, wash their trucks, or how frequently

11   did they take rest breaks or, you know, the other activities

12   based on either just an assumption that everybody does it a

13   certain amount of time or based on some sorts of averages from

14   some group of people who have answered questions about those

15   sorts of things.

16       And if it turns out, as it did, that, yes, there is an

17   average amount of time that people do these sorts of things,

18   but it's all over the map from person to person, so nobody

19   actually does it the average amount of time.  Then when you

20   extrapolate, when you try to use this average to say well,

21   everybody else is average, on an individual basis, you are

22   going to be way off from person to person to person.

23       Even for the 40 people who were asked these sorts of

24   questions, they weren't average.  So you could calculate their

25   average, you could take all 40 responses, add them all up and

**WALKER - DIRECT / EDELMAN**

1    divide by 40, but the number that you got was never

2    representative of what any of those 40 people actually did.  It

3    would either grossly overstate the amount they did or grossly

4    understate the amount they did.  So it really wasn't

5    representative or illuminating about -- even the averages

6    weren't illuminating even about the 40 people about whom you

7    knew something.

8         And what you're trying to do or what Dr. Phillips has done

9    is he has taken these averages and he has tried to apply them

10   to 800 people about whom he knows nothing at all.

11   **Q.**   Okay.  So just so we have it all in mind, and you

12   mentioned it a little bit ago when you talked about the 39

13   people who were deposed and who filled out a survey -- but just

14   so we all have it in mind, can you remind us and describe

15   briefly what it was Dr. Phillips did in this case.

16   **A.**   Yes.  At the highest level, what Dr. Phillips did is

17   develop estimates of loss, so how much pay was lost supposedly

18   because people did these tasks and weren't paid for them.

19        And to do that, you know, he didn't know how frequently he

20   did them.  Right?  He didn't know how long it took.

21        So for some tasks, he just assumed, well, let's just

22   assume it takes 15 minutes all the time.  But for others, he

23   developed this sample, and he -- he, as he said, he took all

24   840 class members --

25        **MR. SALTZMAN:**  Objection.  Misstates Dr. Phillips'

1    testimony.

2              THE COURT:  I'm sorry.  What?

3              MR. SALTZMAN:  Misstates Dr. Phillips' testimony.

4              THE COURT:  Well, then that's good ground for

5    cross-examination.

6         You may proceed.

7              THE WITNESS:  He took all 840 of the class members and

8    put them in a random order, and then he started at the top in

9    terms of the first one in this random order.  He had

10   plaintiffs' counsel issue subpoenas to the first person, and

11   the subpoena called for them to show up for a deposition.

12        When they showed up, they were given a questionnaire to

13   fill out that asked questions, like how often did you do this

14   and how often did you do that and how long did this take and

15   how long did that take.  They'd fill out the questionnaire.

16   And then they would meet with counsel.

17        After meeting with counsel, they would --

18   BY MR. EDELMAN:

19   Q.   Excuse me.  They would meet with counsel for whom?

20   A.   Well, for plaintiffs' counsel.

21        So they would meet with plaintiffs' counsel after filling

22   out the questionnaire and then they would be deposed.  And a

23   deposition is an occurrence where you are in a room and there

24   is a court reporter and somebody asks you questions, very much

25   like here except it's in a room.  And the person answers the

1    questions.  And each side gets to ask their questions as here.

2    You know, you will go first and then plaintiffs will go and

3    then sometimes there is some more after that.  And that's all

4    written down and transcribed.

5        Dr. Phillips then got the transcript, the written record

6    of what was said, and his staff looked at each of the

7    transcripts and looked at each of the questionnaires, and they

8    came to some conclusions about what they thought each of the

9    people meant in terms of what they said about their usual

10   amounts of time.

11       So each of the people, they would -- Dr. Phillips' staff

12   came to some conclusions that well, this person usually spent

13   this amount of time when they washed their truck and this

14   person usually washed their truck this many times out of ten

15   usual trips.  And so he came up with these averages for each of

16   these people.

17       And, as I said, he had ordered all the class members in

18   this randomized list and so he was shooting for 40 people to

19   ask questions about.  So they sent out subpoenas to the first

20   and then they would send out subpoenas to the second and so on.

21       And not everybody answered the subpoenas.  Some people had

22   died.  They were on the class list that he had at the time, but

23   they had died.  Some people got the subpoena and never showed

24   up.  A lot of people --

25       **MR. SALTZMAN:**  Narrative, Your Honor.

1              **THE COURT:**  Overruled.

2              **THE WITNESS:**  A lot of people just they weren't able

3    to serve process, he said.  So he had to go through about 105

4    people to get to these -- to get to these 40.

5         And so what Dr. Phillips did, as I said, is he had to come

6    up for his loss numbers with the amount of time that people

7    spent doing these activities, and so for some people, for some

8    tasks, he just assumed a number, 15 minutes for the pre-trip

9    inspection, for example.

10        For other tasks, he took the averages.  It wasn't exactly

11   taking an average.  He did what he called a Monte Carlo

12   process, which effectively at the end of the day is equivalent

13   to taking the average for the 40 in terms of getting the point

14   estimate.  He took the average amount of time and the average

15   frequency from these 40, and for the 800 people who never

16   showed up, he took that average and said well, that's what they

17   did.  That while they were working, this is how often they did

18   these activities, and when they were working at Wal-Mart, this

19   is how long it tended to take.

20        So that was the basic idea of what Dr. Phillips did.

21   BY MR. EDELMAN:

22   **Q.**  All right.  Again, we are still at the macro level before

23   we get into all the detail.

24        Did you draw an opinion, did you form an opinion after

25   analyzing Dr. Phillips' work and the data in the case as to

1    whether his opinions were reliable or appropriate?

2    **A.**    Yes, I did.

3    **Q.**    Okay.  Can you -- let me put up a chart, which I don't

4    intend to cover in detail at this point.

5        All right.  I've put up a chart which we've marked for

6    identification as Defendant's Exhibit 687.

7        Can we also put that on the screen, please.

8        Okay.  Again, we're going to cover this in more detail

9    later.  So I just want to ask you to tell us what this chart

10   reflects.

11   **A.**    Sure.  This is just a summary of the categories of

12   concerns that I have and -- about what Dr. Phillips did.  This

13   is a summary of sort of the categories of problems with his

14   data and his methods.

15   **Q.**    So the first one, the class members' experiences are too

16   varied for damages to be measured reliably on a class-wide

17   basis.  You've already talked a little bit about that in your

18   high-level conclusions; correct?

19   **A.**    Yes.

20   **Q.**    All right.  And then in terms of arbitrary assumptions

21   that he made, the questionnaires he used being confusing, his

22   selectively choosing and then subjectively interpreting

23   responses, people's memory about frequency and duration being

24   unreliable, people being affected by unconscious influences,

25   and the group of drivers not being statistically

**WALKER - DIRECT / EDELMAN**

1    representative, those are things we are going to talk about in

2    more detail later.  Okay?

3    **A.**   Yes.

4    **Q.**   I want to, if we can, go to the next slide, please.

5         I want to start with your first point you made.  And now

6    we're back to the first point on my chart about the data.  And

7    we're going to talk about the data again in the same order

8    before we get to Dr. Phillips.

9         So with respect to your conclusion after reviewing the

10   data that because of the experiences of class -- of drivers are

11   not similar, you cannot draw conclusions on a class-wide basis.

12        First, please describe, Dr. Walker, the work you did to

13   come to this conclusion.

14   **A.**   Sure.  We -- we got computerized information from -- from

15   Wal-Mart, and we, you know, use our computers at our offices to

16   analyze those data, and we looked at things like how long are

17   trips.  So for different trips, are they generally the same

18   length?  Do they vary in length from person to person?  How

19   about numbers of trips?  Does everybody take the same number of

20   trips per week?  Does the same -- do people tend to -- even if

21   it's different from person to person, do people's numbers of

22   trips change over time?  Does the length of their trips change

23   over time?

24        Layovers.  You know, do people tend to have the same

25   number of layovers over the course of a week or a year?  You

**WALKER - DIRECT / EDELMAN**

1  know, over the course of the class period, on average was it

2  the same, you know, the experiences of drivers on average in

3  2014 as it was in 2004.

4  So we got the computer data and we analyzed it to try to

5  look for things like that to try to drill down on the idea of

6  whether things were basically the same or whether, you know,

7  they were not.  They were dissimilar over time and across

8  people.

9  **Q.**  And how long did this work of analyzing this data take you

10  and your team?

11  **A.**  I -- I don't have an absolute number, but there were

12  hundreds of person hours that we put into analyzing the various

13  data sets in this case, the dispatch data, the driver data, the

14  CHP data, the Gasboy data and other data that Dr. Phillips

15  generated.

16  **Q.**  What did you find from this data about how drivers'

17  experiences differed?

18  **A.**  That they were all over the map.  That there is no such

19  thing as a typical experience.  That any individual driver's

20  experiences from day-to-day were highly dissimilar, and then

21  when you looked even on average for a driver from one driver to

22  another, you got different answers.  You know, the data showed

23  different things about different people.

24  So one person's average wouldn't be representative of that

25  person's every day and one person's average wouldn't be

**WALKER - DIRECT / EDELMAN**

1    representative of another person's average either.

2    **Q.**   Let's look at a slide from your report.  And we'll go to

3    slide No. 4.

4        This is the type of slide that when I look at, I get

5    confused.  So tell us what this is.

6    **A.**   Okay.  This is a graphical illustration of all of the

7    trips that a man named Mr. Allan took.  So Mr. Allan was one of

8    the class members that took that subpoena and filled out that

9    questionnaire.

10   **Q.**   So he's one of the 39?

11   **A.**   He's one of the 39.

12       And alphabetically Mr. Allan is the first one of the 40,

13   of the 39.  If you put them in alphabetical order, the first

14   person you see is Mr. Allan.

15       So what this chart has done is for each one of Mr. Allan's

16   trips, I have created a little diamond or the computer created

17   a little blue diamond.  And so on this chart you have got dates

18   on the bottom and then we've got trip lengths on the top, and

19   so for each trip, I determine how long was the trip in terms of

20   the miles --

21   **Q.**   Let me slow you down.

22   **A.**   Sure.

23   **Q.**   So the bottom is you're starting in January of '04 and

24   it's actually going through May of '16, so it's going a little

25   bit past the class period.

1    **A.**    Yes.

2    **Q.**    So we'll just, you know, focus our inquiry on up to

3    October of 2014.

4         But the bottom is showing the dates, right --

5    **A.**    Correct.

6    **Q.**    -- of the trip?

7         And then the vertical axis is showing how long the trips

8    were?

9    **A.**    That's right.

10   **Q.**    Okay.  So something that's on the bottom is going to be a

11   shorter trip and something that is on the top is going to be a

12   longer trip?

13   **A.**    If a diamond -- so each diamond, the place that it -- the

14   place it's placed on the chart is determined by when it

15   happened and how long it was.  And so the longer the trip was,

16   the higher up on the chart it's going to be.  So a trip that

17   was really short would be really close to this very bottom of

18   the chart.  But a trip that was really long would be up higher.

19   **Q.**    All right.  So Mr. Allan -- in May of 2005 at the very

20   beginning there, we see two dots, three dots.  Those are three

21   really short trips he took --

22   **A.**    Yes.

23   **Q.**    -- during that period?

24   **A.**    Exactly.

25   **Q.**    Keep going, please.

**A.**   So what this shows, this is all of his trips, and then there is a red line there that says 431.  So if you were to take the length of all of those trips and find the average length, it's 431 miles for Mr. Allan over the period that is covered by this chart.

And if it were the case that all the trips were the same in terms of length, instead of seeing a chart like this, you'd have sort of one thick blue that right along that red line because it would mean that all of them were 431 miles.

But you don't see anything like that.  You see basically diamonds all over the place.  These trips were just significantly different, and they were different from day to day.

You could see that sometimes it would be trips that are really close to the bottom.  Almost, you know, zero miles.  I don't know exactly how long those are.  And then maybe the next day he has got a trip that is 2500 miles.

So there is this huge variation just from Mr. Allan from day to day to day, and even though you can calculate this average of 431 miles, you know, it's not at all obvious, you know.  You'd actually have to use a computer to determine it.  It's not like everything is clustered around the same length of time.  There is a huge variation for Mr. Allan in the length of the trips that he takes from day to day to day.

And you can also see that there's a -- even within the

1    chart, there is sort of a randomness, but there is a different

2    sort of randomness.

3         So if you look at June 2009 and then look to the left, it

4    looks a lot different from this little period from June of 2009

5    to March of 2012.  So there you see this clustering much more

6    condensed than before, so this little period is different than

7    the period before.  Then there is a gap in his employment, and

8    then there is another group of dots that, again, they're not

9    uniform at all.  But they're non-uniform in a different way

10   from the ones that we saw before.

11        So experiences are varying from day to day to day.  The

12   averages are almost certainly varying from one of these groups

13   to the next group.  This is not a graph showing someone that

14   has a typical and common and uniform day from day to day to day

15   to day.

16   **Q.**   So can you take an average -- I mean, as an economist, you

17   can average any set of data; right?

18   **A.**   Yeah.  You can take any group of numbers and calculate

19   what the average is, but it doesn't necessarily mean that the

20   average is representative.

21        So here the average is 431, but that doesn't mean that

22   usually Mr. Allan went on trips that were 431 miles.  He went

23   on trips that were really, really long; he went on trips that

24   were really, really short.  The vast majority clearly of these

25   trips were nowhere near 431.  Just 431 happens to be the

**WALKER - DIRECT / EDELMAN**

1    average.

2    **Q.**   Okay.  Let's go to the next slide.

3         Please tell us what this is.

4    **A.**   So this is similar as Mr. Allan.  This is a graphical

5    picture of all of the trips that Mr. Lacas took starting when

6    he started, which looks like sometime in 2005, and then we have

7    data that continued a little bit beyond the class period.

8         And it's the same general idea as for Mr. Allan in terms

9    of how the chart is put together.  It shows Mr. Lacas, because

10   I did this for all 40 -- all 39 of the people who took those

11   depositions, and if you line them all up alphabetically,

12   Mr. Allan was the first and Mr. Lacas was right in the middle

13   of the people that took the depositions.  And so for Mr. Lacas,

14   we see the same basic idea that nothing is typical.  There is

15   no usual.  It's highly variable from day to day, the length of

16   his trips.

17        We also see little clusters that look -- although there is

18   still a wide degree of variation, they are different from other

19   clusters.  So this period from roughly May of 2005 to October

20   of 2006, that looks a lot different from this period later

21   from, say, that is right underneath November of 2010.

22        So even though there is a wide variation from day to day

23   to day -- and there are also different periods where the

24   average trip length is, you know -- is much dissimilar from

25   some other period in time.

**WALKER - DIRECT / EDELMAN**

1    We also saw -- I don't remember what the number was for

2  Mr. Allan.  I think it was roughly 400 or so when you took the

3  average overall of his trips, but you can see Mr. Lacas, it's

4  significantly different.  His is 210.

5    So even just the average, which is not representative of

6  day to day to day, but just the average itself over the entire

7  period is significantly different from Mr. Allan to Mr. Lacas.

8  **Q.**   Let's do one more.  Tell us what Figure 5 is.

9  **A.**   It's the same general story, but now for Mr. Vasquez.

10    And, again, if you line up those 39, 40 people that were

11  supposedly representative, they were chosen because they were

12  supposedly statistically representative of the class,

13  Mr. Vasquez is the last alphabetically.  So I chose the first

14  in the alphabet, the middle of the alphabet, and the third in

15  the alphabet, and we get the same idea.

16    Trips just vary day to day in terms of length.  They are

17  nowhere near the average.  They are very far from the average,

18  most of them are.  The average is different than what the

19  average was for the other people.  So Mr. Allan's average is

20  around 400.  Mr. Vasquez was -- I think it was 288 or maybe it

21  was 210.  I mean, you all saw it.  Your memories are probably

22  better than mine.  But it was different than 388.

23    We see the same basic story is that experiences are highly

24  dissimilar from day to day or from person to person to person

25  in terms of average trip length.

**WALKER - DIRECT / EDELMAN**

1  Q.   So back to my poor penmanship, but you were analyzing this

2  data to determine whether it can be assessed, damages or loss

3  can be assessed by the class-wide basis using a formula.

4  A.   Right.

5  Q.   Tell us why what you just explained to us about these

6  three drivers that you picked -- the beginning, the middle and

7  the end of the alphabet, although I think you said you have

8  charts for all of them.

9  A.   I do.

10  Q.   Tell us -- we're not going to go through all of them

11  today.  Okay?

12  A.   Okay.

13  Q.   Tell us why the findings that you've reached or what these

14  charts represent -- tell us why that matters for this case.

15  A.   Because many of these tasks you would expect to vary based

16  upon how long people's trips are.  So if people tend to be on

17  much shorter trips, you would expect that to be related to how

18  often they end up meeting with driver coordinators, and the

19  frequency of meeting with driver coordinators will affect how

20  long you stick around and chat with them.  It may affect how

21  frequently you are at a distribution center and have the

22  opportunity to refuel.  It may affect how dirty your truck

23  gets, how often you have to wash it, how much time you take

24  washing it.

25       A lot of the tasks that we are concerned about are likely

1    to be related to how long your trips tend to be.  And if your

2    trip lengths are varying from day to day to day, there is

3    reason to expect and to be concerned that the amount of time

4    you spend on these tasks is also likely to vary from day to day

5    to day.  And if your trip lengths vary from person to person,

6    there is reason to expect that these other tasks are going to

7    vary from person to person to person.

8         And if these other tasks vary from person to person, then

9    it's not going to be accurate when you take this average, and

10   you just assume that everybody is at an average, that everybody

11   is the same, that everybody is typical, everybody is usual.

12   Q.   So the length of the trips you have been showing on these

13   charts is going to impact the types of tasks we've been talking

14   about in this case, both how often they're done and for what

15   length of time?

16   A.   There is reason to believe and to be concerned about that,

17   yes.

18   Q.   Okay.  All right.  Now, let me -- let's go to the next

19   slide that we are going to display.

20        Is this another slide from your chart?

21   A.   From my report, yes.

22   Q.   From your report.  I'm sorry.

23        And would you tell us what Figure 6 represents.  I know it

24   says -- let's start -- it says, "Average annual trips per class

25   member by domicile."

**WALKER - DIRECT / EDELMAN**

1          Now, what is "domicile"?

2     **A.**   Those were the distribution centers.

3     **Q.**   Okay.

4     **A.**   So Apple Valley, Red Bluff, Porterville.

5     **Q.**   Explain to us what this slide shows, please.

6     **A.**   Sure.  This shows, by year, what was the average number of

7     trips by drivers at the different distribution centers.  So

8     let's skip 2004 because the class started in October.  There's

9     not many -- there's not a full year, which is why those bars

10    are shorter.

11         If you look at 2005, what the chart shows is the blue bar

12    is Porterville.  And it shows that roughly about 225 was the

13    average number of trips that drivers who were headquartered in

14    Porterville took in 2005.

15         Then somewhat fewer trips were taken that year by drivers

16    in Red Bluff.  Maybe 210.  But there are a lot more trips by

17    drivers on average by -- by drivers operating out of Apple

18    Valley, closer to 300.

19         And so that's just explaining, you know, what the chart is

20    showing, and for each year we've calculated a different

21    average.

22         And the point of the chart is if we just take a look at

23    those green bars which have to do with Apple Valley, they make

24    the chart -- I think they make the easiest picture to see,

25    there are two issues that you want to take from this chart.

**WALKER - DIRECT / EDELMAN**

1    One is that it doesn't -- it's not constant.  So it's not

2    the case that what's going on in 2006, for example, is

3    representative of what's going on in 2008.  You know, things

4    are changing over time.  And so if you're going to take

5    someone's -- well, let me get back to the fact that it's

6    changing over time.

7    The other thing to notice about this is that they are

8    different by domicile.  So it's not the case that drivers in

9    Porterville tend to run the same number of trips in a year as

10   drivers in Apple Valley or that drivers in Red Bluff tend to

11   run the same number of trips as drivers in the other two

12   domiciles.

13   I mean, in particular, if you look at 2008, the drivers in

14   Apple Valley had, on average, over twice as many trips as the

15   drivers in Red Bluff.

16   So there are these big differences across domiciles which

17   calls into question whether it's going to be reliable to lump

18   all the domiciles together and try to estimate the typical day

19   in terms of how much time you spend on various activities for

20   everybody in each of the three domiciles, rather than looking

21   at all the domiciles separately.

22   **Q.**   Thank you.

23   All right.  I'm going to take you to another chart in your

24   report.

25   **A.**   Yes.

**WALKER - DIRECT / EDELMAN**

1   **Q.**   Let's go to Slide 8.

2   **A.**   Yes.

3   **Q.**   This one looks totally overwhelming.  So it's entitled,

4   "Statistical Tests of Survey Responses Drivers in the Top

5   Quartile" -- that is 25 percent?

6   **A.**   Yes.

7   **Q.**   Versus the bottom quartile, the bottom 25 percent?

8   **A.**   Yes.

9   **Q.**   Of average miles per trip?

10  **A.**   Yes.

11  **Q.**   Okay.  That's about as much as I'm going to explain.

12  **A.**   Okay.

13  **Q.**   Now you need to tell us what this means.

14  **A.**   This one -- so so far, we looked at this information that

15  tended to suggest that there is a lot of differences across

16  drivers in average miles per trip.  And we saw that, look, the

17  amount of time you are driving is varying from person to person

18  to person.

19       And, as I said, there is reason to expect that is going to

20  impact the tasks we care about, but it's just an expectation.

21  It's not actually demonstrating that.

22       So what this analysis is intended to do --

23  **Q.**   Let me stop you for a second, because I'm suspecting that

24  it's difficult to read.

25       **A JUROR:**  Very.

**WALKER - DIRECT / EDELMAN**

1         **MR. EDELMAN:**  Yes.  So are you able to do call-outs on

2     the fly?  I know we have some for particular things, but not

3     otherwise?

4         **UNIDENTIFIED SPEAKER:**  No.

5     **BY MR. EDELMAN:**

6     **Q.**   Okay.  Let's go back to the other slide, please.

7         I think that it would be helpful, since it's hard to read,

8     if you can read it, just tell us what these -- the columns on

9     the left represent, and then I think we can wait to understand

10    the numbers when you give specific examples.  But when it says

11    "Question" and it's got 3A through 15-B.

12    **A.**   Yes.

13    **Q.**   -- what is that?

14    **A.**   So these were the questions that were on the

15    questionnaire.  So there was a questionnaire that was

16    administered to those 40 -- 40 folks who were selected from

17    that randomized list.

18        And so what this chart shows is for each of the questions,

19    there is a row.  The first row says, "Usual pre-trip length."

20    So there was a question on the questionnaire -- that's

21    paraphrasing, but there is a question on the questionnaire

22    asking about each person's usual pre-trip length and they had

23    an answer.

24        Then the next question was usual post-trip length, and so

25    each of these rows represents one of the questions that was

**WALKER - DIRECT / EDELMAN**

1    asked.

2         The next column --

3    **Q.**   Let me -- two things.

4    **A.**   Sure.

5    **Q.**   6A says, "Number of washings in 10 usual trips."

6    **A.**   Yes.

7    **Q.**   And did the questionnaire have that "usual trips" in

8    quotes?

9    **A.**   No.  We put that in quotes to make clear that we're taking

10   that from the questionnaire.  That, you know, I wouldn't use

11   the term "usual trips," because I think that that is confusing

12   because there is no such thing as a usual trip.

13   **Q.**   All right.  And so -- okay.  So these are all the

14   questions on the questionnaire.

15        And then you've done A mathematical analysis which is

16   reflected in the next few columns.

17   **A.**   Yes.

18   **Q.**   And we can get into that, I think, through an example.

19        So 15A, why don't we focus on that, "Usual rest break

20   length."

21        Can we go to the next slide please.

22        Okay.  All right.  I read it wrong.  So 15A is the number

23   of rest breaks in 10, quote, usual trips.

24        Can you explain to us the work that you did there?

25   **A.**   Yes.  So what's been pulled out is an example of the

1    information regarding a particular question.  And so this one

2    was on the questionnaire, "Number of rest breaks in 10 usual

3    trips."

4         Overall for this chart, what I did is I took the 39 people

5    whom Dr. Phillips was relying on and who had filled out his

6    questionnaire, and then I went back to the dispatch data, which

7    has their average number of miles driven, average number of

8    miles per trip.

9         So for each of those 40 people, I calculated well, what

10   was their average trip length over the course of the class

11   period.  And I put those 40 people in order based upon how long

12   they tended to drive.  So the people at the top were the people

13   that had the longest average trip length; the person at the

14   bottom of the 39 was the person that had the shortest annual

15   trip length.

16        So now I have got this group of 39.  I cut it up into

17   quarters.  So this is the top one -- 25 percent of the people

18   in terms of trip length.  Here is the next 25, here is the next

19   25, here is the next 25.

20        What this chart does is among those 40 people, it compares

21   the people who had the shortest trips on average to the people

22   who had the longest trips on average, and it says well, how do

23   they differ in terms of what they said about how frequently

24   they engaged in these tasks and how long they said that they

25   took.

1    And the reason for this was to see whether it's the case

2  that people that drive longer trips tend to say different

3  things than people that drive shorter trips.  So what this does

4  is it tests that idea that trip length matters.  We know that

5  trip length is all over the board.

6    If it's also the case that trip length determines how

7  frequently you say you do this stuff, how often you wash your

8  truck, how many rest breaks you take in 10 usual trips, if it

9  affects that, then it suggests that it makes a big deal -- it's

10  a big deal that everybody drives different numbers of --

11  different lengths of trips from day to day because it suggests

12  well, your number of rest breaks is likely to vary from day to

13  day.  And it's a big deal that some people drive on average

14  longer than others because it means that the people that drive

15  longer are likely to be different than the people who drive

16  shorter.

17    And so what we have pulled out here are the answers from

18  Dr. Phillips' questionnaire.  This is what -- a summary of what

19  they wrote on their questionnaires, and it compares the bottom

20  quartile in terms of trip length, so among the people that

21  filled out questionnaires, the 25 percent who drove the

22  shortest trips on average -- it compares their answers to the

23  answers that the people who drove the longest trips on average

24  said.

25    And so what we see -- and you don't -- you can't really

**WALKER - DIRECT / EDELMAN**

1    tell from the way that it's pulled out, but that 3.61, that's

2    the answer on average that the people who drove the shortest

3    trips said in terms of the number of rest breaks in 10 usual

4    trips.  So on average, those 9 people said 3.61 rest breaks per

5    10 usual trips.

6        That number 7 there --

7    **Q.**   Let me understand that.  3.61 rest breaks in 10 usual

8    trips?

9    **A.**   That's what they estimated their average number of rest

10   breaks was per 10 usual trips when they were asked.

11   **Q.**   So that's the way it's asked, is for ten usual trips.

12       What does that mean on a one-trip basis?

13   **A.**   It would mean .3 -- you know, .4.  Maybe once every other

14   trip.  It's a little less than that.

15   **Q.**   A little less than that.  So they are taking fewer than

16   one rest break per trip?

17   **A.**   According to their estimates, based on what per usual trip

18   means, yes, that's the idea.  That's how they answered the

19   question.

20   **Q.**   Because it's confusing when it says per ten trips.  I just

21   want to make sure we have that.  So go on.

22   **A.**   So actually, if you look at the 17.21, it's not lined up,

23   but that's the number that -- the 25 percent who drove the

24   longest.  So the drivers who drove the long trips, what did

25   they say on average in terms of the number of rest breaks they

WALKER - DIRECT / EDELMAN

took per 10 usual trips.

And they said in 10 usual trips, they would take 17.21.

So one group says 3.61, less than 4.  The other group says 17.  So there is a huge difference.  And as you see, that 376 percent, that's the difference.

There is a 376 percent difference in what the -- excuse me -- the drivers who drove the shortest trips said in terms of how frequently they take rest breaks versus the drivers who took the longest trips on average, what they said in terms of the frequency that they took rest breaks.

Those three little stars -- so that 13.6, that's the difference.  There was a 13.6, roughly a 14-trip difference -- I'm sorry -- rest-break difference in the number of rest breaks the two different groups said that they took on average.  And those three stars there, that means that this is statistically significant at the 99 percent level.  That you can rule out to a 99 percent degree of confidence that this is just random chance that is causing this disparity.

That's particularly important because it's very difficult, it's very unusual to get statistically significant differences in averages when you're dealing with small numbers.  Here we're dealing with one group had nine in it, one group had seven in it, yet this difference is so large that you can rule out to a 99 percent degree of confidence that it's due just to chance.

And it -- and it really tends to indicate, pretty

**WALKER - DIRECT / EDELMAN**

1    strongly, that if you take drivers who drive long halls and you

2    take drivers who drive the shorter halls, that you are going to

3    get a difference in what they say about how frequently they

4    take rest breaks.

5    **Q.**   All right.  Do we have a better way of displaying it

6    before we go on to the next example?  Okay.

7        We might have an easier way to read this because I want to

8    go through one more example and figure it out.  If I could just

9    ask everybody's indulgence for one second, we are going to try

10   to get PDF on the screen.  That's it?  Okay.  Must be my eyes.

11       All right.  Let's go to another example to illustrate your

12   point.

13               **THE COURT:**  If you put it on the ELMO, it might be

14   easier.

15               **MR. EDELMAN:**  You think?

16               **THE COURT:**  You can make it bigger on the ELMO.

17               **THE CLERK:**  Hold on.

18   **BY MR. EDELMAN:**

19   **Q.**   Is that a little easier to read?  Thank you, Your Honor.

20       Here we can see the questions a little more legibly, and

21   the next column representing your arithmetic calculations.

22       And then talk for a second about this top quartile and the

23   bottom quartile, so the top 25 and the bottom 25 percent of the

24   39 people, you have a certain number of responses.

25   **A.**   Yes.

**WALKER - DIRECT / EDELMAN**

1   **Q.**   Are those the number of people who responded to that

2   question?

3   **A.**   Yes.  The people who filled out the questionnaire didn't

4   always answer every question.  Sometimes they put question

5   marks; sometimes they said "varies."  Sometimes they said "I

6   can't tell."  So this is the number of people within that group

7   of the -- of 25 percent who actually answered the question.

8            **THE COURT:**  This is substantially worse.

9            **MR. EDELMAN:**  I can't even see it.  It's not on the

10  screen anymore.  Which button did you hit?

11           **MR. WONG:**  I was trying to get that lamp on to get rid

12  of the shadow.

13           **MR. EDELMAN:**  I tell you what.  I'm going to go back

14  to the other system anyway because I want to do a call-out.

15           **THE CLERK:**  Hold on.

16           **MR. EDELMAN:**  So, Kim, can we go to the next slide?

17           **THE CLERK:**  Can you turn off the --

18           **MR. EDELMAN:**  The ELMO?

19           **THE CLERK:**  Yes.

20           **MR. EDELMAN:**  Sure.

21  **Q.**   All right.  So now we're looking at something else, which

22  is the usual length of, quote, meeting at the end of the trip.

23           Why did you put "meeting" in quotes?

24  **A.**   Because after reading the transcripts, deposition

25  transcripts and trial testimony, some of these interactions

1    weren't what I would call a meeting.  I mean, when I hear a

2    meeting, I think of sitting down and conversing for a while.

3         These were sometimes just sort of, you know, "here's the

4    papers.  Bye."  So I put those in quotes because "meeting" is

5    the word that is used on the questionnaire, but I didn't want

6    to suggest that is really happening as to the meeting that I

7    had in mind.

8    **Q.**   So what we are talking about here is what the plaintiffs

9    are calling a meeting, but it's when the drivers are getting

10   their dispatch instructions at the window?

11   **A.**   This is actually the end of the trip, so, yes.

12   **Q.**   Or turning in --

13   **A.**   I mean, this is -- turning in paperwork, yes.

14   **Q.**   Turning in paperwork.

15        So if we could -- yeah.  Go back to that call-out.

16        Is there -- there is not a way to make that particular

17   thing more easier to read, is there?

18        Is that easier?  No.  Let's just stay with what we got.

19        Tell us what you're depicting here through your analysis

20   in terms of the usual length of the meeting at the end of the

21   trip.

22   **A.**   Well, this was again -- this is -- the question on the

23   questionnaire had to do with how long does that meeting tend to

24   last.  And I looked at the answers for the top 25 percent in

25   terms of the length of their trips and the bottom 25 percent in

**WALKER - DIRECT / EDELMAN**

1   terms of the length of their trips, and --

2   Q.   Hold on a second.  I'm getting a little dizzy here.  Let's

3   just do the big one that has all the information.  We'll just

4   stay with that.

5   A.   Sure.

6   Q.   All right.  Go ahead, please.

7   A.   So you could see -- actually this version I can't see.

8   The original I could tell, the one that was up before.  This I

9   can see.

10  Q.   Okay.

11  A.   So the only numbers that are really important and what I

12  was going to say right now is the 9.67, and that was the

13  average for the people that drove the shorter trips, and they

14  said the usual length of that meeting on average was 9.67

15  minutes.  So a little under 10 minutes.

16       And then the next number that is really important for this

17  is the 4.63.  That was the average length that the people that

18  drove the longer trips tended to say.  So they said their

19  meetings lasted a little under five minutes.

20       And the third number that is pretty important here is the

21  far left, the 5.04.  That's the difference.

22       So there is a 5-minute difference.  So the people that

23  drove the long trips said the meeting only lasted 4 minutes, 5

24  minutes.  The people that drove the shorter trips said it was

25  twice as long.  109 percent is the difference.  Five minutes

1    may not seem like a lot, but the difference between 5 and 10 is

2    double, and that means that when you get your loss estimates,

3    that the loss is twice as high for one group as for another.

4         And once again, those two stars means that this is

5    statistically significant at the 5 percent level.  So it's not

6    1 percent level, but it's 95 percent confident, which is the

7    standard, a standard that is commonly used in scientific

8    literature that this is not due to chance.

9         And again, it's even though we're dealing with small

10   numbers.  Nine people -- that's what that "9" is -- among the

11   bottom 25 percent answered this, and eight people among the top

12   25 percent answered this.

13        So even though you have got these really small numbers,

14   the disparity is so large that they are statistically

15   significant.

16        And you don't need to be able to read all of this

17   thoroughly, but I can see that some of these percentages -- and

18   maybe you can, too -- percentages differences for some of these

19   other questions are quite large.  One of them is 399 percent.

20   Several of them are in the 20 percent.  There is another one

21   that is 100 percent.  There is one that is 67.9 percent.  It's

22   not just one or two of these questions or categories for which

23   trip length seems to be related to the amount of time or the

24   frequency at which people engage in these activities.

25        It looks like that's normally the case.  That for lots of

1   these different categories, a lot of these different

2   frequencies, meaning how often they occur, and a lot of these

3   durations, meaning how long they last, that trip length is

4   relevant, and we know that trip length varies a lot from driver

5   to driver and from day to day.

6   **Q.**   All right.  So you've described how the drivers' responses

7   to these questionnaires varied from one to another.

8        Did Dr. Phillips' questionnaires responses indicate that

9   the drivers experiences with the tasks were different as well?

10  **A.**   Yes, it did.

11  **Q.**   And let's take a look at Figure 15.  Okay.  So this is a

12  chart from your report; correct?

13  **A.**   Yes, it is.

14  **Q.**   And it's entitled "Frequency and Duration of Truck

15  Washing"?

16  **A.**   Yes, it is.

17  **Q.**   So this is showing how often people said they washed their

18  truck?

19  **A.**   Yes.

20  **Q.**   The frequency?  And how much time it took, the duration?

21  **A.**   How long they said, yes.

22  **Q.**   How long they said.  And these are their responses to

23  Dr. Phillips' survey?

24  **A.**   Yes.

25  **Q.**   What's the significance of the work you did in Figure 15?

**WALKER - DIRECT / EDELMAN**

1  **A.**  Well, so far, we've gone through various analyses that

2  tend to suggest hey, people differ a lot in terms of length of

3  their trips.  Here is some information that says hey, it looks

4  like these things that we care about are related to the length

5  of the trip.

6      This seems to suggest that people are going to be

7  different, that when you absolutely look at how long they spend

8  on these activities, it's going to be really, really different

9  from person to person.

10      This is testing that directly.  So what this does is this

11  took all of the people from Dr. Phillips -- who took

12  Dr. Phillips' questionnaire, and each one of these triangles

13  represents somebody that answered both the question about how

14  frequently they washed their truck and also the question about

15  how long it took.

16      I don't remember offhand whether this is going to add up

17  to 39 because not everybody answered all the questions.  So

18  some people might have said how frequently, but they didn't say

19  how long.  Some people may have said how long, but they didn't

20  say how frequently.  Some people may not have said either one.

21  They said, "It just" -- "it varied so much, I can't answer."

22  But for the people --

23  **Q.**  Can I stop you for one second?

24  **A.**  Yes.

25  **Q.**  Horizontally you have the frequency per 10 usual trips?

**WALKER - DIRECT / EDELMAN**

1    **A.**    Yes.

2    **Q.**    If you go to 10, that would be somebody who said they

3    washed their truck every trip?

4    **A.**    That's right.

5    **Q.**    All right.  So that's how often they do it.

6         And then on the vertical axis, they are saying how long it

7    took.

8    **A.**    That's right.

9    **Q.**    Go ahead.

10   **A.**    Sure.  So what this shows is for each person who answered

11   both questions, each of these diamonds represents such a

12   person.  And so as -- as Mr. Edelman said, there is one in the

13   far right.  This person said that he washed his truck 10 times

14   per 10 usual trips.  So usually he said he washed his truck

15   every time he did a trip.

16        And then he said that when he washed his truck, it usually

17   took 20 minutes.  So that it's 20 minutes is how high up we go,

18   and 10 out of 10 is how far to the right we go on the chart.

19        So we have plotted everybody who answered both questions

20   on this chart.  And we also have this little red square, which

21   is the average, and just basically what Dr. Phillips is relying

22   upon when he tries to estimate what is it that the people who

23   weren't here do.

24        And what this shows is that people are all over the map.

25   If it were true that everybody was roughly the same, that

1   everything was right around average, you wouldn't see all these

2   diamonds all over the map.  You would see a whole bunch of

3   diamonds right around that square, and you don't see that at

4   all.

5       You see that a lot of people washed their trucks much less

6   frequently than average.  You saw a lot of people wash their

7   trucks more frequently than average.  You see that a lot of

8   people took much less than the average response or said they

9   did in terms of the truck washing.  A lot of people said they

10  took more than the average.

11      But the average itself wasn't representative of anybody.

12  There was no sort of typical for the class.  They're just all

13  over the map.  And, yes, you can calculate an average, but it

14  is not reliably telling you anything about any individual

15  person.

16      And why this matters is because if you then try to

17  extrapolate from this average and say hey, you know --

18  **Q.**    You mean from the red dot?

19  **A.**    From the red dot.  And you say well, let's treat everybody

20  as though they are like this average.

21      Even if you're right that these people are like everybody

22  else -- and we're going to get to the board about why there are

23  problems with that -- but even if you think the rest of the

24  class, the 800 people that aren't here, the 800 people who

25  never took depositions or never took questionnaires or

1    whatever, even if you think they're just like these people, you

2    are likely to be way off for a whole bunch of them.

3        So nobody's estimates of their loss are going to be

4    accurate.  Everybody is going to be way over or way under, on

5    an individualized basis, the amount of money that they would be

6    due.  Even if you assumed they're just like these people, even

7    if you assumed that every time everybody washed their truck, it

8    was unpaid, even if you assumed that all these people's

9    estimates about how often they did these things were accurate,

10   you still would be tremendously off on an individual basis for

11   any person's actual loss.

12   Q.   So this particular chart is just for truck washing?

13   A.   Yes.

14   Q.   Which is one of the nine or so tasks that the plaintiffs

15   have raised issues about in this case.

16   A.   Yes.

17   Q.   Did you do a chart like this in your report for each of

18   the tasks at issue?

19   A.   I did.

20   Q.   All right.  And let's take a look at -- let me ask the

21   next question.  Did the chart that you did for each of the

22   tasks -- we can't go through all of them today, but did they

23   show the same type of variation among the responses?

24   A.   Yes, they did.

25   Q.   All right.  And so let's go to the next chart, which is

WALKER - DIRECT / EDELMAN

1  Figure 19 from your report.

2      So this is entitled, "Frequency and Duration," so how

3  often and how long it supposedly lasted of re-fuelings at

4  Wal-Mart?

5  **A.**   Yes.

6  **Q.**   Is this another -- is this like the last chart you did but

7  another example?

8  **A.**   Yeah.  This is just a different task, but it's the same

9  general setup.

10 **Q.**  So walk us through this, please.

11 **A.**   Sure.  So, once again, on the bottom, going from left to

12 right, that's how often did they say it happened in 10 usual

13 trips.  Going from bottom to top, that's how often did people

14 say it tended to last usually.

15     The little red square is the average.  When you average

16 everybody's answers, that's where you end up.  And then each of

17 the little diamonds represents somebody that answered both

18 questions.  And, once again, rather than seeing everybody

19 clustered around that red square, which would be the case if

20 everybody was pretty much around average, you see this

21 dispersion.  They are just all over the chart.  That there are

22 people that wash their trucks much more frequently and took

23 much longer.  There are people that wash their trucks much less

24 frequently and took less time.  And so it's not the case that

25 there is typical, that all of the diamonds seem to be around

1   the same place.

2        To the contrary, there is just a large variation among

3   drivers -- among respondents, among these 39 people.  There is

4   a large variation in how long they say it took to refuel at

5   Wal-Mart and how frequently they say that it actually occurred.

6   **Q.**   And "mean" and "average" mean the same thing?

7   **A.**   Yes.

8   **Q.**   So you have explained that what Dr. Phillips did was he

9   would use that average or that mean for purposes of the work

10  that he did; correct?

11  **A.**   Yes.  He did something slightly different technically, but

12  it had the exact same result arithmetically.  So he did this

13  Monte Carlo, and at the end of the day, this Monte Carlo is

14  just using the average, but it involves some steps in between.

15  **Q.**   So when you have a scattered chart like this where you

16  don't actually have anybody who -- you don't even have a dot

17  that represents the average, what is the impact of applying an

18  average like that to assess the data across a group?

19  **A.**   You are going to end up with individualized damages that

20  are subject to a wide degree of error.

21       So when people make estimates, as in polling, there is an

22  estimate of 53 percent of the people surveyed said this, and

23  that's an estimate of what the whole population is like.

24       Well, you know it's not exactly 53 percent in the

25  population, so you report what is called a margin of error, and

**WALKER - DIRECT / EDELMAN**

1    you can say with some confidence, some specific level of

2    confidence, well, the answer is within this margin.

3        And so -- and so for an estimate to be reliable, that

4    margin should be kind of narrow.  It shouldn't be 50 percent

5    plus or minus 49 percent.  That doesn't tell you anything.

6    Somewhere between 100 percent.  So a reliable estimate has to

7    have a somewhat narrow margin of error.

8        What this means, this dispersion, it means that when you

9    try to extrapolate, when you just say everybody is the average,

10   on an individualized basis, the margins of error are going to

11   be huge.

12       So leaving aside all of the problems that are on that

13   board that we're going to talk about in a few minutes, even

14   assuming that people are accurate and their recollections of

15   how long things took and the 800 people that we don't know

16   anything about really are similar to these 40, leaving that

17   aside, assuming that is true, when you try to extrapolate from

18   data like this to the entire class, on an individual basis, you

19   can't be very confident that your estimates of loss are

20   anywhere near the estimates of loss -- the loss that people

21   actually incurred.

22       That's even assuming, as I said, that all those problems

23   on the board are wrong, assuming a way that people actually got

24   paid for any of these activities, leave all of that aside.  You

25   still will end up with hugely unreliable estimates due

**WALKER - DIRECT / EDELMAN**

1    exclusively to this dispersion of people's experiences.

2    Q.   In your report, you gave a simple example of what happens

3    when you take data that are completely different and you

4    average it to try to get the average.

5    A.   Yes.

6    Q.   Can you give the jury that example?

7    A.   Yeah.  That example was a father and his son.  So a father

8    might be 6'3".  His son is, his newborn baby, might be 20

9    inches long.  So you can average their average heights.  So

10   6'3" is 75 inches.  Twenty inches for the baby.  That's 95

11   inches.  Half of that is the average.  That's 47 and a half

12   inches.  That is about 4' tall.

13       So you have a father who is 6'3", newborn baby, 20 inches.

14   The average of their heights is 4' tall.

15       That doesn't represent either one of them.  The baby is

16   not 4' tall; the father is not 4' tall.  Yes, you can calculate

17   an average, but it's not representative of either one of them.

18       So you can calculate averages here.  You can calculate

19   averages, as I have done, on this chart, but it's not

20   representative of anybody.  It's not representative of that guy

21   up in the upper right-hand corner.  It's not representative of

22   that guy down there in the lower left-hand corner.  It's not

23   representative of anybody at all.  Yes, you can calculate it,

24   but it doesn't tell you anything about any individual.

25   Q.   So take that baby and dad and apply that to what

**WALKER - DIRECT / EDELMAN**

1    Dr. Phillips did here where he worked with a subset of 39

2    people and then presented an analysis that is supposed to apply

3    to 840 truck drivers across a class.

4    **A.**    Yes.  It's the same issue, that the 840 -- assuming all

5    those other assumptions are correct, the 840 are spread out,

6    and they're much different than the average, and so if you use

7    that average for them, each one of their estimates is likely to

8    be off by a lot, and you won't be able to say to any degree of

9    certainty exactly how much that person's damages ought to be.

10   **Q.**    Let's go to your next slide.

11       Do we have a better way of first displaying this just so

12   that folks can read the slide?  And then we will drill down.

13   Just like you were doing a PDF -- you know what?  Better yet.

14   That is slide No. 13.  Let me just use the ELMO for a second.

15       I'm not going to ask Mr. Wong to help me on this one.

16           **THE COURT:**  Would you put the ELMO on, Tracy?

17           **THE CLERK:**  Is that what they wanted?

18           **MR. EDELMAN:**  Maybe that is a little better.

19   **Q.**    All right.  Let's take it one step at a time.  This says,

20   "Range of confidence intervals among re-sampled estimates."

21   And then you've got damage categories on the left.  And I

22   realize part of it is highlighted so we don't see everything.

23       What are the damage categories?  Are these from

24   Dr. Phillips' work?

25   **A.**    Yes.  So these were -- in his reports, Dr. Phillips

1   estimated individualized losses for each of the 840 people

2   using the method that I talked about, and these are each the

3   different categories of loss that he estimated.

4        So he added a category of loss for pre-trip inspections,

5   for post-trip inspections.  He had one based on rest breaks,

6   based on the -- the respondents' answers when they were asked

7   about how many rest breaks per 10 trips.

8        He had one based on refueling at Wal-Mart where the

9   question was based on how many times per week.  One based on

10  Gasboy.  Another based on Gasboy.  Both of those were the

11  frequencies were based on a number of re-fuelings per 10 trips

12  and so on.  So he had a whole list of categories for which he

13  estimated loss.

14  **Q.**   All right.

15  **A.**   And he did this for every person.

16  **Q.**   For every person --

17  **A.**   In the class.

18  **Q.**   For 840 --

19  **A.**   840 people.

20  **Q.**   840 people.  All right.

21       So now let me walk you through or ask you to please walk

22  us through what work you did -- what work is depicted on this

23  slide.

24  **A.**   Well, as I said, he didn't exactly just take averages.  He

25  used this Monte Carlo method.  And the difference between the

1    Monte Carlo method and just taking the average is in terms of

2    the estimate itself, you end up in the same place.

3         But as Dr. Phillips said on the stand, the advantage of

4    Monte Carlo is it allows you then to look at and see what the

5    margin of error actually is.  So it generates a margin of error

6    so you can see how reliable are your estimates.  And

7    Dr. Phillips published in his report well, what were the

8    margins of error for each individual person's damages estimates

9    for each one of his different categories of loss.

10        And so what I've done -- and they were huge.  As I had

11   said, when you have those disparities like you saw in that

12   other graph, where, you know, the people's experiences are way

13   dissimilar from each other, I said -- and it's the case that

14   the damages are going to be extraordinarily imprecise.  You are

15   not going to be able to say to a reasonable degree of certainty

16   that damages are close to whatever your damages estimate is.

17        And so what this chart does -- and there are numbers -- we

18   don't really -- if you want, you can see more closely.  But

19   what it does is that for each of these damages categories, I've

20   identified the person that had the widest damages range, and

21   I've actually -- and I've also identified the person that had

22   the sort of the usual or typical damages range.  And the

23   purpose was to illustrate that for each of these damages

24   categories, Dr. Phillips' damages estimates are incredibly

25   imprecise.  That all he can say with a reasonable degree of

**WALKER - DIRECT / EDELMAN**

1    certainty or the degree of certainty that is typically used in

2    science, a 95 percent confidence level, all he can say is the

3    damages are within these bounds that are just outrageously

4    large.

5        And so this particular graph shows or the part that is

6    highlighted shows the damages range, the biggest range of

7    damages for any of those 840 people for the damages category

8    called end-of-day meeting per 10 trips or loss category.

9        So Dr. Phillips' estimates of the loss for Driver No. 12,

10   it looks like 12866.  I can't quite make it out, but his driver

11   number is there.  Dr. Phillips estimated a range of -- that it

12   started at $810 and ended at $118,518.97.

13       So to a 95 percent degree of confidence, Dr. Phillips was

14   able to say that that driver's loss for end-of-day meetings,

15   which were based upon the answers on the questionnaire that

16   related to 10 trips -- but that driver's loss was somewhere

17   between roughly $800 and $118,000.  That's what he could say to

18   a 95 percent degree of certainty.

19       And that's not precise at all.  That is, by definition, an

20   unreliable estimate.  You can't say for certain that it's not

21   somewhere between -- not to a 95 percent degree of certainty

22   that it's not -- all you can say to a 95 percent degree of

23   certainty is that damages are somewhere between $810 and

24   $118,518.97.

25   **Q.**  So sometimes one gets a little lost in the charts --

WALKER - DIRECT / EDELMAN

1   A.   Yes.

2   Q.   -- and you kind of got to get back to the big picture.

3       This wide -- this is just one particular driver where he

4   is showing the range?

5   A.   Yes.

6   Q.   One of the 840?

7   A.   Yes.

8   Q.   So just big picture, but short answer --

9   A.   Yes.

10  Q.   -- tell -- remind us again how this kind of range -- why

11  it matters in terms of the ultimate question of trying to

12  accurately figure out any alleged loss in this case.

13  A.   Well, as -- going back to the charts that show the

14  disparities, what that showed is that people's experiences are

15  really widely varied, and what this says is that yeah, if you

16  just apply the average, you will get an estimate, but you know

17  from the data that are generating the estimate that the true

18  number could be, I don't know, $118,000 more, or the true

19  number could be thousands of dollars less.  You don't really

20  have confidence that that estimate is anywhere near the loss

21  that the person actually suffered, even if all of your other

22  assumptions are true.

23  Q.   Okay.  And have you done -- this one was for the

24  end-of-the-day so-called meetings.

25      Have you done another slide that reflects the median

**WALKER - DIRECT / EDELMAN**

1   range?

2   **A.**   Yes.

3   **Q.**   And I'm putting that up now.  That's a supplemental figure

4   from your second report.

5   **A.**   Yes.

6   **Q.**   Can you explain to us what this is.

7   **A.**   Yeah.  This is -- so that $118,000 number, that was the

8   biggest -- that was the largest range.  And I wanted to

9   illustrate that that was not just there's this one example of

10  somebody that had an individual damage estimate that was not

11  precise.

12      So for each of these different categories, I've also shown

13  the median.  Median means the one that's right in the middle.

14  So out of all the 840 persons for whom Dr. Phillips calculated

15  a damage estimate, for each -- and for each of them for whom he

16  calculated a damage estimate for end-of-trip meetings, I just

17  lined them up in terms of how big your damages range was, and

18  this one here that is up on the screen now is the one that was

19  in the middle.

20      So this is more typical.  It's about the sizes of the

21  damages ranges that Dr. Phillips calculated related to

22  end-of-day meetings per 10 trips.

23      And this one, it's not, you know, $800 to $118,000, but

24  it's still an incredibly wide range.  It's $200, $265 to

25  $11,000.  So it's an incredibly wide range, even for the

**WALKER - DIRECT / EDELMAN**

1    median.

2        And I think you can see in the background here in this

3    column that's the third from the right, there is some zeros

4    there.  So for some of these damages categories, Dr. Phillips

5    couldn't even rule out, based on assuming all of his other

6    assumptions were true, that damages weren't zero for lots of

7    different people for lots of different categories.

8    **Q.**  Next slide that I would like to ask you about from your

9    report, this also deals with -- well, this is now beginning of

10   the day, driver coordinator, what they call, meetings.

11   **A.**  Yes.

12   **Q.**  Can you walk us through this slide, please.  This is

13   Supplemental Figure 12 from your report.

14   **A.**  Yeah.  This is just an example to show, look, the

15   end-of-day meetings isn't the only ones.  We wanted to bring

16   out some other examples to look at.

17       This is the beginning-of-the-day meeting, and this is,

18   again, the person with the biggest range for his damages

19   estimate.  This is -- looks like Driver 2382.  I may have

20   gotten that number wrong.  But this -- this damages range is a

21   low of $291.66 and a high of $98,211.58.

22       So to a 95 percent degree of confidence, Dr. Phillips

23   could conclude that this person's damages were somewhere

24   between roughly $300 and $98,000.

25       And this -- again, this is directly from Dr. Phillips'

1    report, Appendix A of his report.  I did calculate these

2    numbers.  I just sorted them and then picked the ones that were

3    in the middle and the ones that were the highest.

4    **Q.**   So this is the highest?  This is an example of the

5    highest?

6    **A.**   Yes.

7    **Q.**   Now we are going to look at like what you just did

8    previously, an example of something in the middle?

9    **A.**   Yes.

10   **Q.**   All right.  So walk us through your slide Supplemental

11   Figure 12 from your second report, please.

12   **A.**   Sure.  The driver who had the median-sized damages range

13   in this category, his range was between $291 and $49,075.62.

14        So, again, just an incredible range, and what

15   Dr. Phillips' analysis shows to a 95 percent degree of

16   confidence is merely that if all of his other assumptions are

17   correct, that this person's loss was somewhere between about

18   $300 and $50,000.

19   **Q.**   So if you look at all these ranges and how much they

20   varied and you've spoken about the -- what you view as the

21   unacceptability of the averaging approach that Dr. Phillips did

22   across the entire class, if you can't use a formula like

23   Dr. Phillips did in a case like this where you have 9

24   plaintiffs that are supposedly representative of a larger group

25   of 840, how do you go about figuring out damages for each

**WALKER - DIRECT / EDELMAN**

1    member of the class, if there are any?

2    **A.**   Well, each person needs to go through and be analyzed on

3    an individualized basis.  You look at each individual

4    circumstances, you look for information related to each

5    individual, you talk to each individual about their background.

6    You get whatever data the individuals have about, you know,

7    what they did and where they worked and how long they took

8    for -- to do these tasks and how often it happened and where

9    they were.  You look to see whether they have other data that

10   are specific to them.  And you do this on an individual basis.

11   But you can't do it accurately using these sort of averages or

12   formulaic approaches.

13   **Q.**   So you are essentially saying you can't do it

14   formulaically on a class-wide basis?

15   **A.**   That's correct.  You cannot.

16   **Q.**   Now, have you read -- you did, but did you focus on

17   Dr. Williams' -- Dr. Phillips' trial testimony where he gave

18   estimates for each of the individual plaintiffs in this case?

19   **A.**   Yes, I did.

20   **Q.**   I'm going to put on the ELMO for you and for members of

21   the jury and the Court the chart that we were provided that he

22   prepared, and -- just a little bigger.  And then we can go

23   across each category as we need to.

24        So you understand that these 9 individuals are the 9 named

25   plaintiffs in this case?

**WALKER - DIRECT / EDELMAN**

1    **A.**   Yes.

2    **Q.**   Now, did Dr. Phillips -- let me just ask you:  What do

3    these numbers that he has put by each of their names represent?

4    **A.**   These represent his estimates of their losses by category,

5    and the total is on the far right.

6    **Q.**   His estimates of loss?

7    **A.**   Right.

8    **Q.**   What do you mean by that?

9    **A.**   Well, these are the numbers that he arrived at for each of

10   these individuals using his method of extrapolating from the

11   40, or, in some cases, taking a fixed number for everyone and

12   then applying it to the named plaintiffs.  Using that

13   methodology, this is what he estimated each of these people's

14   losses would be.

15   **Q.**   So let me make sure I understand that.  So you've walked

16   us through a series of slides illustrating what you saw as the

17   problems in averaging when you have data that's all across the

18   map.

19   **A.**   Right.

20   **Q.**   Right?

21   **A.**   Right.

22   **Q.**   Are you saying that he used that same process to arrive at

23   averages and then he just applied them to the 9 plaintiffs

24   here?

25   **A.**   For -- for most of these damages categories or loss

1   categories, yes.  For some, he just applied a fixed number.  So

2   pre-trip inspections, he said, "Well, everybody's pre-trip

3   inspections are always 15 minutes," so that did not come from

4   the averaging.

5       The post-trips --

6   **Q.**   That was just an assumption he made?

7   **A.**   That was just an assumption.

8   **Q.**   It's not something that is specific to any deposition

9   testimony or trial testimony that the 9 plaintiffs gave?

10  **A.**   That's right.

11  **Q.**   Go on, please.

12  **A.**   The same with the post-trips.  That is totally unconnected

13  to anything that any particular plaintiff, let alone these

14  plaintiffs, said.

15      The unpaid rest breaks, that was based on an assumption

16  that everybody has 20 minutes' worth of unpaid rest breaks

17  every day.  It wasn't related to anything that Mr. Ridgeway or

18  any of the other named plaintiffs said about their particular

19  experiences.

20      The waiting time was an assumption that everybody has got

21  45 minutes of wait time per week that was not compensated.

22  It's not tied to anyone's particular testimony about what they

23  did, what their experiences were, whether their wait time was

24  compensated, or whether they had wait time at all.

25      The DOT inspections, that's not tethered at all to

**WALKER - DIRECT / EDELMAN**

1  anything particular to any of the named plaintiffs.  The

2  weighing -- the washing the truck, the weighing outside

3  Wal-Mart, all of that is based on his extrapolations from --

4  from those 40.

5      None of that is related to anything in particular that

6  Mr. Ridgeway said, either at deposition or in any interviews

7  that Mr. Phillips had.  I don't think he had any.  It's all

8  related -- it's all based either on fixed assumptions or these

9  extrapolations.  It's not related to their specific

10  circumstances.

11  **Q.**  And those assumptions are the same ones where he made

12  assumptions, like a 15-minute rest break -- those are the same

13  assumptions that he made for the 840?

14  **A.**  Yes.

15  **Q.**  So he did the same thing with respect to the 9 plaintiffs

16  that he did with respect to the whole class?

17  **A.**  Yes.

18  **Q.**  It's your view that this analysis for the 9 plaintiffs

19  suffers from the same flaws as his analysis with respect to the

20  entire class?

21  **A.**  Yes.

22          **THE COURT:**  Do you know how much longer you have?

23          **MR. EDELMAN:**  Now would probably be a good time,

24  Your Honor.

25          **THE COURT:**  All right.  Ladies and gentleman, we will

**PROCEEDINGS**

1    take our lunch break.  If you would be ready to come back,

2    please, at quarter till 1:00.

3        In the meantime, please do not discuss this case with each

4    other or with anyone else.  Do not make up your minds.  You

5    have not heard all the evidence yet.

6            (Luncheon recess was taken at 11:57.m.)

7    **AFTERNOON SESSION**                                    **12:50 a.m.**

8        (Proceedings were heard out of presence of the jury:)

9            **THE CLERK:**  Remain seated.  Please come to order.

10           **THE COURT:**  Are you ready?

11           **MR. EDELMAN:**  We're ready, Your Honor.

12       (Proceedings were heard in the presence of the jury:)

13           **THE COURT:**  Ladies and gentleman, as you may have

14   noticed, Tracy is not here.  She has gone home.  She is not

15   feeling great.  Corin is going to help us this afternoon.

16   Thank you very much.

17       And, Mr. Edelman, you may proceed.

18       And you are still under oath, sir, from this morning.

19           **THE WITNESS:**  Yes, Your Honor.

20   **BY MR. EDELMAN:**

21   **Q.**  Good afternoon, Dr. Walker, ladies and gentleman,

22   Your Honor.

23       Dr. Walker, we left off before lunch talking about the

24   damage summary that was provided or the loss summary, whatever

25   you call it, that was provided with respect to the nine

**PROCEEDINGS**

1  plaintiffs in this case.

2      I now want to switch gears and talk specifically about

3  your analysis of Dr. Phillips' work.

4      What did you conclude about whether Dr. Phillips was able

5  to reliably show how much the class was supposedly underpaid?

6  **A.**   Ultimately, that he was not able to determine, to a

7  reasonable degree of accuracy and reliability, the losses

8  suffered by the class as a whole or by any individual class

9  member.

10 **Q.**   And why is that?

11 **A.**   Well, there are -- it's the various reasons that are

12 listed on the board, but in sum, it's because his -- the data

13 that he relied upon were not reliable, and there are a lot of

14 reasons for that that we can talk about later.  And then the

15 methods that he used to extrapolate from those data were also

16 unreliable.  And consequently, the ultimate estimates were

17 neither reasonable nor reliable either.

18 **Q.**   And earlier you had mentioned that Dr. Phillips had used a

19 questionnaire?

20 **A.**   Yes.

21 **Q.**   And we saw in some of your charts a list of the questions

22 that he had asked.  What is the difference between a

23 questionnaire and a survey?

24 **A.**   There is no real difference.

25      Technically speaking, a survey is any collection of

**PROCEEDINGS**

1    information about a sample that you're going to use to then

2    draw conclusions about a wider population from which the sample

3    is drawn.  There are lots of different ways to collect survey

4    information.

5         If you do it using a written form, a questionnaire, that

6    questionnaire is often called a survey instrument where people

7    will say that's the survey, but whether you call it a survey or

8    you call it a questionnaire, it's the exact same thing.  It's a

9    written instrument that is used to collect information from a

10   sample of people from which you intend to draw inferences about

11   a broader population.

12   **Q.**   You heard or read, rather, Dr. Phillips' testimony where

13   he said that he didn't give a survey.  He gave a questionnaire

14   instead.

15   **A.**   Yes.

16   **Q.**   Is there any significance to the distinction he was

17   attempting to draw in your mind?

18   **A.**   No.  There is no distinction in my mind.  In both cases

19   you are trying to draw information from a smaller group of

20   people or a sample using a written instrument, a questionnaire,

21   to then use the information to draw conclusions about a broader

22   population.

23        The ultimate issue is the information that you're getting

24   from the questionnaire or survey or whatever you want to call

25   it, is that reliable, and is it reliable to draw inferences

PROCEEDINGS

1    about the broader population based upon that information.

2        And there are principles contained within the survey

3    literature that talk about the circumstances under which you

4    can reliably infer things about a broader population from

5    information that you get from a sample of people.  And whether

6    you call the original group of information survey information

7    or questionnaire information has no import whatsoever on the

8    reliability of the inferences.

9    Q.   It has come out in this case that there were actually two

10   questionnaires or surveys that were presented to the

11   plaintiffs, the one that Dr. Phillips did and then we've seen a

12   two-sheet piece of paper -- I mean, a two-piece-of-paper

13   questionnaire that class members and plaintiffs were sent at

14   the beginning of the case.

15       Does the fact that -- by the plaintiffs' lawyers.

16       Does the fact that the class was sent two different

17   questionnaires or surveys make any difference in your mind?

18   A.   Yes, it does.

19   Q.   Why?

20   A.   Well, later we will talk in a little more detail about

21   sources of error in surveys.  I mean, what are some of the

22   things that cause error in surveys.

23       One of the things that causes error in surveys is when the

24   people that are filling out the survey know about the reasons

25   for the survey and the sponsors for the survey, and by sending

**PROCEEDINGS**

1    out sort of a pre-survey to all of the class, that led some of

2    the people that were then chosen randomly by Dr. Phillips to

3    potentially have had information beforehand about, you know,

4    what people might be asking for, what might be the purpose of

5    the survey, and it undermines confidence in the answers that

6    they give on that second survey.

7    **Q.**   And when you say they might have had some understanding

8    about what the purpose of the survey was, you mean that it was

9    connected to damage claims in the lawsuit?

10   **A.**   I mean that it's connected to the loss claims in this

11   case, how much they might recover personally, how much their

12   colleagues might recover, yes.  It's related to those things.

13   **Q.**   All right.  So now I would like to go to the chart which

14   we have marked for identification as Defendant's 687.

15        Is this -- does this chart have your language?

16   **A.**   Yes, it does.

17   **Q.**   Is this something that you prepared?

18   **A.**   Yes.  That's right.

19   **Q.**   So did you find fundamental flaws in Dr. Phillips'

20   approach?

21   **A.**   I did.

22   **Q.**   And why don't you -- I think you've covered the first one

23   already.

24   **A.**   Yes.

25   **Q.**   So why don't we go to the second point, that Dr. Phillips

**PROCEEDINGS**

1    made arbitrary assumptions.

2          What assumptions did Dr. Phillips make regarding

3    pre-trips?

4    **A.**   Dr. Phillips assumed that every class member conducted a

5    15-minute pre-trip inspection on every shift that he was able

6    to identify and that that pre-trip inspection was

7    uncompensated.

8    **Q.**   And what assumption did Dr. Phillips make regarding

9    post-trips?

10   **A.**   Again, he assumed that every shift that he was able to

11   identify included a 15-minute post-trip that was also

12   uncompensated.

13   **Q.**   And what assumption did Dr. Phillips make regarding wait

14   times?

15   **A.**   For purposes of his loss calculation, he assumed that

16   every driver suffered 45 minutes of uncompensated wait time for

17   every week that he worked.

18   **Q.**   And did you do any analysis of testimony that the drivers

19   did at their depositions concerning layovers?

20   **A.**   I did.

21   **Q.**   All right.  And these are the -- is this the 39

22   depositions or is this the 50 or 60 depositions that you read?

23   **A.**   The -- the calculations that related to layovers were

24   based on the 39 depositions.  The 39 people who were -- who

25   Dr. Phillips selected that were, in his estimation,

**PROCEEDINGS**

1  statistically representative of the class.

2  **Q.**   Okay.  And what conclusions did you or what analysis did

3  you do of the testimony of the 39 depositions in terms of what

4  those drivers said about layovers?

5       **MR. SALTZMAN:**  Objection, Your Honor.  Legal

6  conclusion.  Argumentive.  Calling for interpretation of the

7  testimony.

8            **THE COURT:**  Overruled.

9       You may answer.

10           **THE WITNESS:**  I basically went through their

11  deposition transcripts and I identified instances where they

12  were asked, "Have you ever spent a portion of a layover away

13  from your truck."  And I found that in 85 percent of the --

14           **MR. SALTZMAN:**  Objection, Your Honor.  The objection

15  now, he has gone beyond that.  The objection now would be

16  irrelevant and beyond the scope.

17           **THE COURT:**  Well, I don't know what he found 85

18  percent of yet, so it's a little hard to gauge the relevance.

19  But it's overruled.

20           **THE WITNESS:**  So out of the 39 drivers, 85 percent

21  said that they'd spent a portion, at least a portion of one

22  layover away from their truck.  82 percent of the 39 drivers

23  said that they had spent at least one entire layover away from

24  their truck.  And 63 percent said that they felt that they had

25  the discretion to spend their layovers away from their trucks

PROCEEDINGS

1   without Wal-Mart's approval.

2         And these are the percentages of people that actually said

3   it.  Not all of the deponents were asked all of the questions.

4   So the -- in the case of the 63 percent, the 37 percent that

5   are remaining, it's not the case that they all said they needed

6   to get permission, but some of them just weren't asked the

7   question.

8   **BY MR. EDELMAN:**

9   **Q.**  And okay.  So that's layovers.  Can you remind us what

10  Dr. Phillips' assumption was -- I think you said it a moment

11  ago -- regarding whether drivers took unpaid rest breaks?

12        **MR. SALTZMAN:**  Your Honor, that calls for a legal

13  conclusion as to paid versus unpaid and therefore lack of

14  foundation and beyond his expertise.

15        **THE COURT:**  I'm going to sustain the objection.

16  Can you reframe that question?

17        **MR. EDELMAN:**  Sure.

18        **THE COURT:**  Paid versus unpaid is what the case is all

19  about.  So you are making assumptions in the question that I

20  don't think we have an agreement on.

21  **BY MR. EDELMAN:**

22  **Q.**  What conclusions did -- again, I'm asking about the work

23  that Dr. Phillips did, to set it up.

24        What conclusions did Dr. Phillips reach about rest breaks

25  and any assumptions that he relied on in reaching those

**PROCEEDINGS**

1   conclusions?

2           **MR. SALTZMAN:**  Objection, Your Honor, vague and --

3           **THE COURT:**  Overruled.  You can answer.

4           **THE WITNESS:**  Dr. Phillips assumed that each driver

5   had 20 minutes of unpaid rest during each of his shifts and

6   that no driver had any paid rest breaks during any of their

7   shifts.

8   **BY MR. EDELMAN:**

9   **Q.**  So that's every day?

10  **A.**  Every shift that a driver worked, they did -- they did not

11  take any paid breaks, they did not take breaks during any

12  period of time for which they were being paid, and they had 20

13  minutes of breaks that they took that was unpaid.  That was his

14  assumption about every driver for every shift that he was able

15  to identify in the dispatch/payroll data.

16  **Q.**  Okay.  So that's just an assumption, that's not based on

17  the evidence, in other words?

18  **A.**  Correct.  That would be one of the arbitrary assumptions

19  that I'm talking about there on that second bullet point on the

20  board.

21  **Q.**  All right.  And did you -- why do you think that

22  assumption was arbitrary?

23          **MR. SALTZMAN:**  Objection, Your Honor.  Again, he's

24  going to the same issue, calling for legal conclusions.

25  Ultimate issue of the case.

1          **THE COURT:**  Overruled.

2      You may answer.

3          **THE WITNESS:**  Well, one is regarding the issue about

4   whether everybody took 20 minutes of unpaid rest every day,

5   Dr. Phillips' own survey responses, and also what he called his

6   survey -- his hybrid data, which is -- it's based on the

7   surveys and the deposition transcripts.

8      Those data showed that not every one of the 40, 39 people

9   whom he said were statistically representative took breaks,

10  rest breaks at that frequency.  Some people said they never

11  took rest breaks; some people said they took shorter rest

12  breaks; some people said they took rest breaks maybe three

13  times out of 10 trips.  But it was not the case that everyone

14  said well we take 20 minutes of rest breaks for every shift.

15  I'm not aware of anyone that said that.

16     Secondly, the deposition testimony from these persons was

17  that they took rest breaks, in their words, while they were

18  being paid for wait time during a drop --

19         **MR. SALTZMAN:**  Your Honor, again, move to strike.

20  Objection.

21         **THE COURT:**  These are quotations from the --

22         **MR. SALTZMAN:**  Legal conclusions --

23         **THE COURT:**  -- from the deposition?

24         **MR. EDELMAN:**  This is his review of the deposition

25  testimony, the same deposition testimony on which Dr. Phillips

1  based his conclusions, which he is rebutting.

2       THE COURT:  But did the drivers testify that they took

3  rest breaks while they were being paid wait time?

4       THE WITNESS:  Some of them --

5       THE COURT:  Is that what you -- I'm sorry.

6       MR. EDELMAN:  I'm happy -- yes.  That's what I

7  think -- that's what he is getting at, Your Honor.

8       THE COURT:  Well, if it's inaccurate, you can --

9       MR. SALTZMAN:  It's not a point of being inaccurate.

10  Can we have a sidebar really briefly on this?

11       THE COURT:  Sure.

12     (The following proceedings were heard at the sidebar:)

13       THE COURT:  So did his report include a citation to

14  the places in the depositions that he's referring to when he

15  comes up with these numbers?

16       MR. EDELMAN:  I don't remember that.

17       THE COURT:  Can you find out?

18       MR. EDELMAN:  Can I find out?

19       THE COURT:  Yes.

20       MR. EDELMAN:  Your Honor, this is my colleague, Laura

21  Sucheski, who is the brains behind this operation.

22       THE COURT:  She didn't hear you.  You will have to say

23  that again.

24       MR. SALTZMAN:  Make sure she hears it.

25       MR. EDELMAN:  Your Honor, this is Laura Sucheski --

PROCEEDINGS

1      THE COURT:  He just said you are the brains of the

2    outfit.

3      MR. EDELMAN:  The answer is yes, this is an appendix

4    to -- go ahead.

5      MS. SUCHESKI:  So this is what he is talking about.

6    This is where he identified --

7      THE COURT:  These are the depo transcripts.

8      MS. SUCHESKI:  Where a rest break was taken

9    simultaneously during an activity pay.

10      MR. SALTZMAN:  That goes to the ultimate legal issue

11    that we have been debating for three weeks.  The drivers --

12    either deposition or here, but certainly at deposition under

13    the *Cardena* standard from Judge Carter's decision and others

14    that follow it, they don't understand there is no showing,

15    there is no foundation.  They understand the difference between

16    a paid rest break and an unpaid rest break, so if you are

17    asking the driver that, they have no foundation to answer that.

18    And that's what the objections were at both here and earlier,

19    but now we have an expert hopscotching that entire issue and

20    potentially being allowed to testify about misunderstood legal

21    principles by class members, and that simply should not be

22    allowed.

23      THE COURT:  So the three categories of things he wants

24    to talk about are what?

25      MR. EDELMAN:  Well, at this point we are just on rest

**PROCEEDINGS**

1  breaks.

2        **THE COURT:**  I know.  There are three things he wants

3  to say about rest breaks.

4        **MR. EDELMAN:**  The last thing he wants to say that I

5  think he was about to get into is that there is testimony from

6  drivers that they would take their ten-minute rest breaks at

7  times when they were -- because a lot of drivers don't want to

8  stop to take -- like on the side of the road or whatever.  They

9  would take their ten-minute rest breaks at times when they were

10  being compensated either through unscheduled time or while they

11  were waiting, but in any instance while they were being paid.

12        **THE COURT:**  So he would say they would say they took

13  it on other time when they were being paid for something else.

14  And you would say "so what"; right?

15        **MR. SALTZMAN:**  Well, I will say "so what" if I have

16  to, but I don't --

17        **THE COURT:**  I think you do have to say "so what."  And

18  what you are going to say is -- not to this witness, maybe, but

19  to the jury, well, these are the laws.  Because they don't know

20  what the laws are so they are taking their rest breaks whenever

21  they can, but this is what has to happen.

22      So I think the fact that if they said that in their

23  depositions and there's all these citations which would suggest

24  to me you guys had an opportunity to figure out whether they

25  really said this in their depositions, he can repeat it.

PROCEEDINGS

1          MR. SALTZMAN:  The problem is, as you recall, we filed

2    the motion in limine to prevent this because I think it's --

3          THE COURT:  Was it successful?

4          MR. SALTZMAN:  Apparently not, Your Honor.

5          THE COURT:  I guess not.

6          MR. SALTZMAN:  But it's doubly problematic where now

7    we have an expert basically saying "I just looked at all this

8    stuff."  They had a chance to bring on the witnesses.  The

9    witnesses, over our objections, have made those statements.  I

10   would have to literally go through every one of those to see

11   whether I objected to each one of those which obviously we

12   can't do.  It's too prejudicial to have an expert come on and

13   say exactly what they shouldn't be saying, which is the

14   ultimate issues that drivers are said.  They don't understand

15   what a paid rest break is under California law.  There is no

16   foundation for that.  Now we have --

17         THE COURT:  He is saying what they took.  He is not

18   saying they took a paid rest or unpaid.  He is saying this is

19   what they testified to.

20       I'm going to overrule the objection.

21         MR. SALTZMAN:  We've got to be really careful that

22   it's only what they said and he is not to be offering any

23   testimony that makes -- that they have paid rest breaks.

24         MR. EDELMAN:  Look, I'm doing my best here, but you

25   lost your motion in limine.  This has been in his report for

**PROCEEDINGS**

1    six months, and now is not the time when the witness is on the

2    stand, in my view, to be telling me how to do my examination.

3    I mean, if this were an issue, it should have been brought up

4    before.

5              **MR. SALTZMAN:**  I did --

6              **MR. EDELMAN:**  Yeah, and the motion in limine was

7    denied.

8              **MR. SALTZMAN:**  And I bought it up earlier this

9    morning.

10             **MR. EDELMAN:**  This is in plain sight in his report,

11   and I'm trying to cover it in a way that does not elicit legal

12   conclusions.  I'm not asking for the legal conclusions.  I'm

13   doing the best I can.  I think -- you know what I think.

14             **THE COURT:**  You do your best to do what he says.

15             **MR. EDELMAN:**  All right.  Thank you.

16                  (Sidebar conference ended.)

17   **BY MR. EDELMAN:**

18   **Q.**   I think you were beginning to get into an explanation of

19   driver testimony --

20   **A.**   Yes.

21   **Q.**   -- from your report concerning rest breaks.

22   **A.**   Yes.

23   **Q.**   So what did the drivers say in their depositions, the 39

24   that we're talking about -- what did those drivers say about

25   whether they were earning pay while taking rest breaks?

**A.**   Well, 22 of them were asked questions about whether they took rest breaks while they were earning pay and in the midst of activities such as drops and hooks and arrives or unscheduled time.

And of those 22, 16, or 73 percent of those who were asked, said that they had taken breaks during time when they were being paid, either being paid by the minute for unscheduled time or by the minute for downtime or while they were being paid for a live unload while they were waiting or being paid during a live load or being paid in conjunction with a drop or a hook.

Of the 22 who were asked, 16 said that they had gotten -- taken breaks while they were being paid for something else. And the other six includes people whose answers were ambiguous, and I don't know one way or the other.

**Q.**   Did Dr. Phillips account for this testimony of drivers taking rest breaks on paid time?

**A.**   No, he did not.

**Q.**   Did Dr. Phillips account, in his assumptions, for those drivers who chose not to take the 10-minute rest breaks at all?

**A.**   No.  He assumed that everyone took 20 minutes of unpaid rest every shift and that no one ever took any paid rest.

**Q.**   So how does that affect, then, the reliability of Dr. Phillips' conclusions?

**A.**   It tends to suggest that his loss estimates will be

1   overstated.  So leaving aside that first bullet about how any

2   sort of extrapolation from an average in the circumstances such

3   as these will lead to hugely imprecise results, the fact that

4   he assumed that everyone took 20 minutes of unpaid rest on

5   every shift when there's evidence to suggest they did not and

6   his assumption that no one ever took any paid rest which would

7   reduce that 20-minute number, the fact that he assumed that

8   nobody did, those will tend to inflate his loss estimates

9   relative to whatever amount, if any, the class members, the

10  individual class members are entitled to.

11  **Q.**   What about Dr. Phillips' assumptions that a pre-trip would

12  take 15 minutes, a post-trip would take 15 minutes and that

13  there was wait time of 45 minutes for every driver?  Do those

14  fall into the category of arbitrary assumptions that you were

15  referring to?

16  **A.**   Yes.  Those are the arbitrary assumptions that I was

17  talking about.  They are just assumptions out of nowhere that

18  are inconsistent with what the 20 -- I'm sorry -- the 39 class

19  members said.  And they're inconsistent with what some of the

20  people have said here at trial about what they do on a regular

21  basis.

22  **Q.**   Let's turn to the next topic, No. 3, where you said the

23  questionnaire was confusing.

24      Why or how was the questionnaire confusing?  Can you give

25  an example?

**A.** Yes. The most glaring example is sort of almost at at

very beginning when it talks -- it asks people filling out the

questionnaire to count things up in terms of usual trips. So

there were questions about, you know, how many times in 10

usual trips does this happen? Or usually what happens in this

way or that way or the other?

And the deponents, the survey takers were asked, "Well, is

there a usual trip?"

And they said, "No, there is no such thing as a usual

trip. And some of them said, "I was confused because there is

no usual trip."

So that would be one example of the confusion that was

embedded in the questionnaire.

**Q.** And what about the use of the word "trip"? Is that a term

from the depositions that you read after these questionnaires

were given that the drivers found to be confusing?

**A.** Yes. The use of the word "trip" was also confusing

because there are multiple definitions of trip running around

in the case -- or floating around in the case.

We've seen trip sheets, and many of the analyses that I've

put together are based on trips and trip is a term of art in

Wal-Mart. Drivers get instructions about where they're

supposed to drive and where they've supposed to drop things off

and the set of instruction is called a trip.

Dr. Phillips, on his questionnaire, said, "Tell me how

1    many times this happened in 10 usual trips where trip is

2    defined as beginning and ending at a distribution center."

3        Well, trips don't always begin and end at distribution

4    centers, so once you add that definition, you now have got two

5    different types of trips, one of which is one that is specific

6    to this questionnaire that people don't use in their ordinary

7    lives and the other one is the one that is part of Wal-Mart.

8        Then there is a third definition of trip, which I have

9    learned about recently, with regard to Department of

10   Transportation guidelines.  And they often talk about trip as

11   being the first -- as basically a shift.  It's when you start

12   your day, when you end your day, is a pre-trip and a post-trip.

13   So there are different definitions of trip.

14       And many of the questions that Dr. Phillips posed to the

15   survey takers required them to sort of figure out, well, how am

16   I supposed to answer this?  What's 10 usual trips supposed to

17   be.

18       And different people, once they were deposed after filling

19   out the questionnaire, said they interpreted it differently.

20   And then not everyone was asked so you don't know how they were

21   interpreting the instructions.

22   Q.   Did the drivers themselves testify to being confused about

23   the questionnaires in their deposition?

24   A.   Yes, they did.

25   Q.   And how does the fact that the drivers were confused when

1   filling out these questionnaires impact the reliability of the

2   ultimate conclusions that Dr. Phillips drew?

3   **A.**   Well, when you are reviewing data that's collected from a

4   survey instrument, a questionnaire, whatever you want to call

5   it, if it's not clear what the respondents were answering, then

6   it's ambiguous when you try to interpret it, and it undermines

7   and reduces the confidence that you can have that your

8   interpretation of these answers is accurate.

9        You don't know for sure that the drivers were even saying

10  what you think they were saying.  And we'll get into whether or

11  not what they are saying is accurate, but even what is it they

12  think they are saying in terms of -- what is it they meant to

13  convey in terms of how frequently things happen or how long

14  they last?  You can't tell because there is ambiguity in the

15  questions.  And so you have to interpret it if you're the

16  researcher, like Dr. Phillips' staff, and there is a lack of

17  confidence that the interpretation is accurate.

18  **Q.**   Let's go to your third point, the questionnaire -- I'm

19  sorry.  The fourth point, that Dr. Phillips selectively chose

20  and subjectively interpreted responses.

21       How did Dr. Phillips choose which responses upon which to

22  base his estimates?

23  **A.**   Well, rather than relying on the questionnaire, what

24  Dr. Phillips said he did is he relied on a mixture of what

25  people wrote on their questionnaires and what they said at the

1    depositions.

2         At the deposition -- so remember, the people came in,

3    they're given this questionnaire, they conferred with counsel,

4    and then there were questions that were asked by defendant's

5    counsel and by plaintiffs' counsel at a deposition.

6         And so they weren't all asked the same thing at the

7    depositions.  They weren't -- all the questions weren't phrased

8    in the same way.  And some people were asked about some topics

9    and some -- and not asked about others, and so Dr. Phillips had

10   his staff read through the depositions and he had given them

11   some instructions about how to interpret what they were

12   reading.

13        And the instructions that I read, that were an appendix to

14   his report, said well, to the extent anybody has a range, take

15   the two numbers that are in the range and take an average.

16        Sometimes people didn't give ranges.  Sometimes people

17   gave ranges but they also said, "Well, usually it's this amount

18   of time."  So they might be asked, for example, you know, "How

19   long does this, that or the other thing take?"

20        "Well, usually it takes 10 minutes," might be what they

21   write on their form.  But then at the deposition, they might be

22   asked, "Well, what is the longest you have ever heard this

23   thing taking, and what is the shortest time you have ever heard

24   this thing taking?"

25        And so Dr. Phillips staff would then read through and see

1    those two instances and say, "Well, we are going to take the

2    average of those two numbers," notwithstanding that the person

3    already told us how long this thing usually takes on the

4    questionnaire.  There was interpretation that went into this.

5    It wasn't the case that there's a straightforward answer for

6    everyone that is right there in front of you to see.

7        Each one of these depositions, which were -- I don't

8    remember how long they were, but I think they lasted a couple

9    hours apiece -- each one of them, he had people reading through

10   and interpreting what is it that people are really saying about

11   how long these things take.  And so there is a great degree of

12   subjective interpretation by Dr. Phillips' staff that went into

13   creating what he called his hybrid data, which is what he used

14   then to extrapolate, you know, to the rest of the class.

15   **Q.**   So was this what he called coding?

16   **A.**   Yes.  This is what he called coding.

17   **Q.**   And coding sounds scientific.

18       Did you find the approach that he took to be methodical?

19   **A.**   No.  It was not methodical or scientific.  It was highly

20   subjective.  There were some general guidelines that he had

21   given his staff.  But I found once I looked at what they had

22   done and he provided that in his backup material, they didn't

23   always follow the guidelines.

24   **Q.**   Let me show you a slide on representing an example of a

25   choice that Dr. Phillips made that you highlighted in your

1    second report.  And let's pull up slide 20, please.  Okay.

2        So this says Dr. Phillips selectively chose responses

3    which is the topic we're on, an example.

4    **A.**    Yes.

5    **Q.**    It talks about a class member named Charles McLaughlin?

6    **A.**    Yes.

7    **Q.**    Can you tell us what this slide depicts?

8    **A.**    Sure.  Mr. McLaughlin was one of the 39 people who filled

9    out a questionnaire and then was deposed.  On his questionnaire

10   he was asked how long does this driver coordinator meeting

11   last?  And I don't remember the exact language but it was a

12   question about how long does it usually last.  And he answered

13   that the usual amount of time was 25 minutes.

14       So then subsequently there was a deposition, and during

15   the deposition, he was asked basically, you know, "what's the

16   shortest you've heard of it taking," or, you know, "how short

17   could it be and what's the longest you have ever heard of it

18   taking and how long could it be?"

19       And he said, "Well, it could range from 15 to 45 minutes."

20       So Mr. McLaughlin had testified that it usually takes 25

21   minutes.  So for purposes of his hybrid data, Dr. Phillips did

22   not use the 25 minutes that Mr. McLaughlin said it usually

23   took.  Instead he looked at this range of 15 to 45 and he said

24   the average is 30, so for purposes of his hybrid data, he said

25   Mr. McLaughlin's trips or meetings with driver coordinators

1    usually last 30 minutes, when Mr. McLaughlin had actually said

2    explicitly on his questionnaire they usually last 25, even

3    though the range is 15 to 45.

4    **Q.**   So this is an example of what you were just explaining a

5    moment ago?

6    **A.**   Yes.  Yes.  And this example, it results in a 20 percent

7    increase in what's attributed to Mr. McLaughlin relative to

8    what Mr. McLaughlin actually wrote on his questionnaire.

9    **Q.**   Let's go to the next slide, please.

10        Okay.  So this is another example, a second example of

11   responses that Dr. Phillips selectively chose according to you

12   in your report.

13        Can you explain what you are showing here?

14   **A.**   These are actually three examples.  So one example relates

15   to Mr. McKee.  So Mr. McKee said that adjustments could take up

16   to two hours.  And Dr. Phillips interpreted that to mean that

17   adjustments usually take two hours.

18        There is Mr. McCulley.  Mr. McCulley said that he had

19   never been at a DOT roadside inspection that took more than 20

20   minutes.  So Dr. Phillips' staff interpreted that as saying

21   that roadside inspections usually took 20 minutes.

22        Mr. McFall said the driver coordinator meetings last five

23   minutes or less.  Dr. Phillips' staff interpreted that as

24   Mr. McFall saying that driver coordinator meetings usually

25   lasted five minutes.

PROCEEDINGS

**Q.**   Okay.   I'm going to move to the next topic on your chart,
Exhibit 687 for identification.   Memories about frequency and
duration -- memory about frequency and duration is unreliable.
So frequency, how often it happens, duration, how long it
lasts.

**A.**   Yes.

**Q.**   What do you mean by this?

**A.**   There is actually an extensive literature, lots of
articles have been written about whether or not when people are
surveyed after the fact, about how frequently -- so semi
routine things happened, whether that's accurate.

Whether -- when you ask somebody, you know, "How often
were you stuck in traffic a year ago?   How -- how -- how often
per week were you stuck in traffic in 2015," when you give
surveys like that, people do not tend to give accurate
responses.   It's not that they're trying to be inaccurate.
It's just that they are systematically wrong and that they
systematically overstate certain types of activities and how
they have occurred.

And the way that that's measured is that you give surveys
about things where you have external information and you can
measure the survey response and you can compare it to the
external information.

So, for example, people have been asked, you know, "How
many hours did you work a year ago?"   And then you could

PROCEEDINGS

1    compare the survey answers to records that employers may have

2    and they systematically overstate hours worked.

3        People may be asked in the course of healthcare studies,

4    people who are involved in studies of drugs who have serious

5    health issues, so they have a reason to answer correctly.  Some

6    of them are -- some experiments are set up so that they are

7    supposed to write down in daily diaries so how frequently did

8    you have this symptom or that symptom or the other symptom, and

9    then they are asked later on, they are given a survey, two

10   weeks ago, how often did you have this symptom, that symptom,

11   the other symptom, and they routinely overstate the frequency

12   at which the symptoms occurred.

13       There has been some studies based on housework where

14   people took daily diaries of how much time they spent on

15   housework and then after the fact, much later, they are asked

16   how much time did you spend per week on housework.

17       Men tend to overstate the amount of time they spent on

18   housework by over one hundred percent.  Women tend to overstate

19   the amount of time they spent on housework by nearly 100

20   percent.

21       So asking people questions about how frequently things

22   happened in the past is not a reliable way to ascertain how

23   frequently it actually happened.

24       And these studies show that this sort of bias -- and when

25   I say "bias," I mean statistical bias.  Some sorts of errors

1    average out.  So if you ask a hundred people, each one of them

2    is off, but on average, it's right.

3        Bias is a statistical term for error that doesn't average

4    out.  These are not studies of 10 people I'm talking about or

5    20 or 40.  There are sometimes a hundred, sometimes thousands.

6        And one of the things that -- that they have shown is that

7    if you are going to -- I'm sorry.  If the length of period --

8    the period of time over which you are asking people to recall

9    is longer, so you're asking people about things a year ago or

10   two years ago, you're more and more likely to get inaccurate

11   responses.

12       Some of the research has shown that the bias starts to

13   kick in as soon as three or four dates and in this case, we're

14   talking about events that occurred in 2004, 2005, and then

15   averaging over an 11-year period.

16       And so Dr. Phillips was relying on these survey responses

17   about people's recollections about how frequently things

18   occurred on average, and that sort of analysis is inherently

19   inaccurate.  There is no basis in the literature on surveys to

20   assume that people's average answers are likely to be true.

21       And to the contrary, there is evidence from other sorts of

22   validation studies that they will tend to overstate the

23   frequency.  Not because they're trying to.  It's just that's

24   the way people's memories work.  When they have been measured,

25   that is what has been shown to be the case.

**PROCEEDINGS**

1    **Q.**   So when you talk about the literature in the field and you

2    talk about all the studies that are out there --

3    **A.**   Yes.

4    **Q.**   -- is Dr. Phillips method of relying on people to give

5    their memory of events that took place up to -- even more than

6    10 years ago, is that considered reliable in your field?

7    **A.**   No.

8    **Q.**   And were you able to actually test that based on the data

9    in this case?

10   **A.**   I was.

11   **Q.**   All right.  How were you able to do that?

12   **A.**   Well, for two of these activities we care about, we were

13   able to test.  One we were able to actually test well, were

14   people's memories about how frequently they gassed up, was that

15   accurate, because we now have this Gasboy data.  So people were

16   asked in the questionnaire --

17   **Q.**   Let me just stop you.  Remind the jury -- everybody what

18   the Gasboy data is again.

19   **A.**   Sure.  These were data that pertained to every instance at

20   which the trucks that were driven by the class members and many

21   other people refueled at Wal-Mart distribution centers.  So the

22   Gasboy data, they don't say who refueled.  They just have the

23   truck.  And for every time a truck refuels, it shows the truck

24   number and the fact that it refueled.

25          Dr. Phillips and his staff were then able to match up

1   trucks with class members.  And they constructed a data set

2   that showed how frequently the class members refueled at

3   Wal-Mart distribution centers and had every instance over a

4   period of time.

5        So you could see how frequently, at best, because actually

6   the data show how frequently the trucks that class members

7   drove on a given day got refueled.  We don't know for a fact

8   that it was the class member himself who did the refueling, but

9   this Gasboy data shows, at most, how frequently class members

10  refueled at Wal-Mart distribution centers during the period of

11  time that were covered by the data.

12       So we've got the Gasboy data, which actually show

13  objective evidence about the maximum number of times the class

14  members could have refueled at Wal-Mart during -- at Wal-Mart

15  distribution centers during the period of time that the Gasboy

16  data were around.  And I don't remember off the top of my head.

17  I think it's 2013 to 2015 but it's a period of a couple of

18  years for which you have these data.

19       You also have the class member -- the 40 who took the

20  survey and who said, "This is how often I refueled at

21  Wal-Mart."

22       What I did is I took the people that were in both, the

23  Gasboy data and part of the 40, and I said well, did it match

24  up?  Did what they said in terms of the frequency match up with

25  what we can actually see?

**PROCEEDINGS**

1    And it didn't.  It was just like all the other research

2    that we've seen on this sort of thing, that they on average

3    overstated that the frequency at which they gassed up at

4    Wal-Mart centers by close to 60 percent.

5    So that was the only sort of instance of frequency, how

6    often things do that we actually could test it.  We could test

7    and we showed, well, look, the -- the frequency at which it

8    actually happened versus the frequency at which people recalled

9    it happening, it was a 60 percent difference.

10   I can't tell you whether it's due to the memory issues

11   entirely to recall issues, I can't tell you whether it's due to

12   some of the confusion or some of the other issues we are going

13   to talk about.  But the net effect of all of that was that

14   there was a 60 percent overstatement in the frequency at which

15   people gassed up during the period for which we have data.

16   **Q.**   All right.  I want to ask you about some additional work.

17   Did you also compare data with memory in the context of DOT

18   inspections?

19   **A.**   Yes, I did.

20   **Q.**   What did you do in particular?

21   **A.**   Well, that went to how long things last.  There is not

22   only data and research showing that people tend to

23   systematically overstate the frequency at which things occur,

24   how often they happen, there is research to indicate that they

25   overstate how long things lasted, too.

**PROCEEDINGS**

1 **Q.** Hold on one second.

2 **A.** Sure.

3 **Q.** Can we get slide 22, please?

4  All right.  So now we're talking not just about how often

5 you do something, but how long something lasts?

6 **A.** Yes.

7 **Q.** And you were able to draw a comparison in this case

8 between the actual data we had versus what people said in these

9 39 depositions?

10 **A.** Yes.

11 **Q.** And that's what is depicted in this slide No. 22?

12 **A.** This is slightly different.  There were two things I did

13 regarding duration.  One of them had to do with the people who

14 came, the drivers who came and testified.  So we have -- and

15 that's what this is.

16 **Q.** All right.  Why don't you explain this.

17 **A.** So we have DOT data.  So, again, you may have heard of

18 this DOT/CHP data.  The CHP conducts these inspections and they

19 write down how long it takes in realtime when they are doing

20 them.  And so we have a bunch of their reports.  Dr. Phillips

21 got a bunch of their reports and he used that to estimate how

22 long DOT inspections actually last.

23  There are some of the people here who testified at trial

24 who testified on the stand about how long they thought DOT

25 inspections lasted for whom there were also actual DOT/CHP data

1   we could look back to to see, well, was their expectation,

2   their recollection, was that accurate?  Did it track with the

3   amount of time that the inspections that they took actually

4   took?

**Q.**   Okay.  So what you're doing in this slide is you are

6   actually comparing their trial testimony, which we have heard

7   in this Court, versus the data from the DOT and the CHP?

**A.**   Yes.

**Q.**   Go on.

**A.**   So there were two instances where Mr. Green had a CHP

11  inspection that was part of the data set that was made

12  available to us.  One of the first inspections on June 24,

13  2013, took 17 minutes.  The second inspection on February 18,

14  2013, took 10 minutes.  And Mr. Green's estimate was -- at

15  trial was that DOT inspections tend to take 30 to 45 minutes.

     He actually had two inspections that lasted 10 to 17

17  minutes, but his estimate on the stand was well, they tend to

18  take a half hour to 45 minutes.  So it's significantly off.

19  It's significantly overstated relative to the length of time

20  that it actually took, at least, you know, to the extent that

21  we can measure it.

     Mr. Harold, his was pretty accurate.  He assumed -- he

23  testified that they tend to take 20 to 25 minutes and his

24  inspection actually took 25 minutes.  So his was pretty much

25  accurate.

**PROCEEDINGS**

1    Mr. Hill had two inspections.  One took less than 4

2    minutes.  3.75 minutes.  One took a little -- about 7 and a

3    half minutes.  But he testified at trial that they take 20

4    minutes to a half an hour.  So the inspections that are

5    actually in the CHP data are about, you know, 3 to 7 minutes --

6    you know, almost 4, sorry, to a little over 7 minutes, and his

7    actual -- his estimate at trial was they're 20 minutes to a

8    half an hour.  Lots, lots more.

9    Mr. Jennings had an inspection --

10   **Q.**   Let me stop you, just in the interest of time.

11   **A.**   Sure.

12   **Q.**   I think you've conveyed that point clearly.

13   Was there -- was there another test that you did that

14   you -- I think I cut you off when you were starting to explain

15   it?

16   **A.**   Yes.

17   **Q.**   Could you explain that, please?

18   **A.**   Sure.  These were limited to the people who testified at

19   trial.

20   I also did a similar sort of analysis using the DOT data

21   that I did with the Gasboy data.  So among the 39 people who

22   were selected by Dr. Phillips to be statistically

23   representative of the class, I found all of their instances

24   where they were in the CHP data, and you could see how much

25   their actual inspections took, how long they took, and I

**PROCEEDINGS**

1    compared it to their estimates about how long CHP inspections

2    tend to take.

3         And then I calculated, on average, or at least

4    Dr. Phillips', you know, estimation of what they said, and I

5    compared, well, is it the case that the hybrid data for them

6    match up with what the CHP data says in terms of how long DOT

7    inspections actually take.

8         And what I found, it was not the exact same number, but

9    there was another roughly between 55 and 60 percent

10   overstatement in the amount of time that they estimated that

11   they spent on DOT inspections relative to the amount of time

12   that the CHP officers had written down when they actually took

13   the inspections.

14        So there are two different factors that are impacting

15   Dr. Phillips' hybrid data that frequencies are potentially

16   significantly overstated, and we have one example that we can

17   measure where they're overstated by 60 percent.

18        Then the length of time each thing takes separately is

19   potentially overstated and we have one example that we can test

20   and that's also another 60 percent.

21        These two factors are cumulative.  So if you have got a 60

22   percent overstatement in the amount of time something takes and

23   you got an additional 60 percent overstatement in how

24   frequently it occurs, when you put the two things together, you

25   are going to overstate the amount of time spent on the activity

1   on average by about 150 percent.

2       So --

3   **Q.**   Okay.

4   **A.**   Yeah.

5   **Q.**   So when you are talking about this phenomenon of

6   unreliable memory, you're not suggesting that anybody is

7   purposely lying?

8   **A.**   No, I'm not.

9   **Q.**   You are just talking about what happens in the normal

10  course when people are asked to go back and remember things

11  from the past?

12  **A.**   Yes.  Yes.  And the research is instances where there is

13  no incentive to lie.  This is just what happens.  In fact,

14  there is even incentive to tell the truth.  Everyone is trying

15  to give their best estimate.  It's just the best estimate is

16  not accurate.

17  **Q.**   All right.  Let's talk about your next concern, that

18  people are affected by unconscious influences?

19  **A.**   Yes.

20  **Q.**   What do you mean by that?

21  **A.**   There I'm talking about two types of error that are

22  discussed at length in survey literature.

23      One of them is what -- what happens when people that are

24  taking a survey or they are giving the information, when

25  they're aware of the purposes of the survey.

1      And the other -- well, let me finish with that one first.

2   If the people that are giving the survey, the people that are

3   writing things down or the people that are interpreting the

4   information, if they're aware of the purposes of the survey,

5   there is the potential for that to influence either the answers

6   that they give or if it's -- if we're talking about the people

7   that are interpreting the results, the interpretation that they

8   give.  So you may have heard of something called a double-blind

9   survey.

10      What double blind means is that the person who is actually

11   filling out the survey doesn't know.  Why am I filing out the

12   survey?  What's this for?  Who is sponsoring it?

13      And the persons that are either giving the surveys to

14   them, if it's oral, or the people that are interpreting the

15   results, if they are going through the data, they don't know

16   what is the ultimate purpose of this, you know, what is this

17   for.

18      The reason for that is to prevent the knowledge of the

19   survey and the purposes of the survey from influencing the

20   answers that they give.  And the literature is concerned with

21   lots of ways that might happen.

22      I mean, the obvious affect here is that people knew that

23   this survey was about their pay and their colleague's pay.  And

24   it's hard to imagine that wouldn't influence their answers.

25   And I don't mean that that wouldn't cause them to inflate, I'm

1    not saying that.  I'm saying how do you forget, how do you undo

2    and unring the bell when you know this is all about your pay

3    and the pay of your colleagues.

4        So that's one of the things that I meant by unconscious

5    influences.

6        The other is something that is called social desirability

7    bias.  That is when people are surveyed about things that are

8    either thought to be socially good or socially bad, it

9    influences the rate at which they say they did them.

10       So the two examples that are most used in the literature,

11   one for positive is voting.  And if you ask people, if you

12   survey them about whether they voted at some time in the past,

13   your survey responses will overstate the rate at which people

14   voted.  So more people will say, historically in all the people

15   that have done this because it's always been the case, there is

16   a higher instance of people saying, "Yeah, I voted in 2008.

17   Yeah, I voted in 2004," than actually voted when you go back

18   and look at the actual voting rolls.  So people overstate the

19   degree at which they engage in good things, things that are

20   thought of as good.

21       The flip side is they will understate the degree in which

22   the frequency at which they participate in things that are

23   perceived to be bad.  So if you take a survey about people and

24   ask them, "Do you have a DUI," and then you compare that to

25   actual arrest records, that -- you'll find that a smaller

**PROCEEDINGS**

1    percentage of people will answer affirmatively that I have a

2    DUI than what you see when you go back and look at arrest

3    records.

4        The reason this is relevant to this case is because some

5    of these tasks are potentially socially desirable.  So the

6    reason that this is relevant is that, for example, washing your

7    truck.

8        Washing your truck is a courtesy.  It's a courtesy to any

9    other drivers that are driving the truck.  It's a courtesy to

10   Wal-Mart.  It's a courtesy to your other drivers whose

11   reputation and image is affected by whether or not your truck

12   and all the other trucks are clean.  So the social desirability

13   bias may influence -- don't know that it did, but the reason

14   that it's an issue is that it may have and you can't measure

15   it.  Social desirability bias could influence the rate at which

16   people report having washed their trucks and the amount of time

17   they spent on it.

18       Similarly, pre-trip and post-trip inspections, those are

19   clearly socially desirable things.  These are safety

20   inspections.  And the more time that you spend making sure that

21   your truck is safe, the better it is for you, for Wal-Mart, for

22   anybody who happens to be driving on the road with you.

23       So there was no effort to control for those sorts of

24   things and they were potentially going to have an impact on

25   Mr.-- Dr. Phillips' results.

**PROCEEDINGS**

1  **Q.**   What about if people who are filling out surveys know that

2  they are doing so in conjunction with a lawsuit where damage

3  claims are going to be based on the results of those surveys?

4  What impact might that have?

5  **A.**   Well, there are a couple.  One is the obvious, that well,

6  you got a self-interest and that may prompt you to want to put

7  a higher number.

8      But aside from that, you're just aware.  Leaving that

9  aside, you're just aware -- if you're even aware that that's

10  one of the things that this information is being put to over

11  the entire 40 people, there may be an impact on how people

12  respond.  So this undermines your ability to have confidence

13  that the people's recollections of what they are writing down

14  is an accurate representation about what actually happened.

15  **Q.**   And is that why the literature in your field relies on

16  things like blind studies and double-blind studies to eliminate

17  that type of potential bias?

18  **A.**   Yeah.  Whenever a researcher can, you would like to have

19  no such influences available.

20  **Q.**   Was Dr. Phillips study double blind?

21  **A.**   No, it was not.

22  **Q.**   How not?

23  **A.**   Well, the people that were -- that were taking the

24  surveys, they had been subpoenaed, you know.  They knew that it

25  was part of the lawsuit.  Many of them had been sent a survey

1   before talking about the lawsuit.  There was talk among drivers

2   about lawsuits.  So everyone knew what this was about.

3       And then on the interpretation side, Dr. Phillips' staff

4   knew what the reasons were and how their interpretations of the

5   deposition responses impacted things.  So everybody involved

6   was fully aware.  So that's the opposite of double blind.

7   **Q.**  Okay.  Last topic on your board that the -- you're

8   concerned that the group of drivers that were being surveyed

9   and questioned were not -- the group was not statistically

10  significant.  Tell us what you mean by that.

11  **A.**  Well, you know, Dr. Phillips went through this process to

12  get a statistically representative group.  Now, remember, he

13  put everybody in random order, and then so he chose the first

14  person that came up randomly and he tried to reach him and

15  tried to reach the second person and the goal was to get 40

16  people.  But he didn't get the first 40.  The first 40 is

17  random because he put them in random order and so the first 40

18  people is random.  But he had to go through more people.  He

19  ended up going through I think 105 people to get 40 to show up

20  and fill out the questionnaire and take the deposition.

21      And that happens.  That happens in all surveys, that you

22  produce a random list and you can't reach everybody.

23      But the concern here and everywhere where you do these

24  surveys is that the factors that are causing people not to

25  respond could be correlated.  It could be that there is

1    something about them that has got some relationship to the

2    things that you care about.  And that's what is called

3    nonresponse bias.  That it could be that the people that end up

4    showing up are statistically different from the underlying

5    population, even though that first list was put together

6    randomly.  And that happened here.  It seems to have happened

7    here.

8         The -- the people who showed up for the depositions and to

9    take the questionnaire were overrepresenting people who were

10   retired from Wal-Mart or who are on extended leaves of absence.

11   So there was a higher percentage of people among the 39 who

12   were either retirees or on extended leaves of absence.  There

13   was a higher percentage of them who were in that category than

14   for the class as a whole.  So there was a smaller percentage of

15   people in the class that were retired than there were among the

16   people who took the questionnaires.

17        The reason we care -- because that could be random.  It

18   could be random sometimes.  One, I measured it to see, well,

19   how likely is that difference to be random.  And I determined

20   that there is only a 9 percent chance that the difference that

21   we saw in terms of the percentage of people that were retired

22   or on extended leave of absence just happened by chance rather

23   than it being the case, that the retirees were systematically

24   overrepresented.  Okay.  It may not matter.  If the retirees

25   and everybody else are the same in terms of how frequently they

1    engage in these tasks, it's okay.  No harm, no foul.

2        Well, I also looked to see among the 39, did the retirees

3    answer questions differently than the non-retirees, people that

4    were still working, and I found that there were differences in

5    the way the two groups of people answered the questions.

6        The people that were retired among the 39 or on extended

7    leaves of absence tended to say the tasks took longer or that

8    they occurred more frequently.

9        So there is a serious problem with Dr. Phillips' sample.

10   It doesn't appear as though it's representing the class

11   accurately statistically and it appears that it -- it's

12   overrepresented by or the people who are deposed were

13   overrepresented by people who were either retired or on

14   extended leaves of absence.

15       I also conducted other statistical tests based on the

16   driver data and showed statistically significant differences

17   between the class and the survey respondents in terms of things

18   like average trip length, number of miles driven and things

19   like that.

20       So ultimately, even though Dr. Phillips made an effort to

21   get a statistically representative sample, there is reason to

22   doubt that the sample he ended up with actually was

23   representative of the class.

24   Q.   What about the size of the group?  Did that -- was that of

25   any importance to your analysis?

**A.**   Yes.   I mean, that affects again the reliability of the responses.

And for some of these categories, you know, there were 39 people, at most, for any different given set of questions that Dr. Phillips asked, from any of them, many fewer than 39 actually answered the questions.   So these sample sizes were very small, and given the methodology that Dr. Phillips employed, that introduces more error that is sort of hard to quantify.

Without going into great detail about this Monte Carlo process, it's basically sort of resampling.   You take a sample, put it back, and sample again.   I think that there was some deposition testimony about an urn.

If you did a Monte Carlo analysis based upon one person, so you only had one sample, one person in your sample, the Monte Carlo analysis would indicate that you figured out for those 800 people, each one of them, that you knew for a certainty what their damages were, because every time you reached into the urn, you came out with the same number.

But that sort of -- of -- but there clearly is uncertainty in that example, but it just doesn't show up in the Monte Carlo analysis.   And the smaller sample, the more of that missing uncertainty there actually is.

**Q.**   Okay.   A moment of silence for the court reporter who has been working very hard.

**PROCEEDINGS**

1    Ultimately, the impact of the group not being

2  statistically representative on the reliability of

3  Dr. Phillips' analysis is what?

4  **A.**   That that is another reason to be concerned that his

5  estimates of the average amount of time that people spend on

6  tasks and the frequency at which they occur are both

7  overstated.

8  **Q.**   All right.  So in court, Dr. Phillips presented his

9  methodology which you've described today.  And then he prepared

10  or counsel prepared a chart while Dr. Phillips testified.  And

11  they made calculations that supposedly represented the amount

12  of money that the group, the class, was owed.  You've read that

13  testimony?

14  **A.**   I have.

15  **Q.**   Okay.  Were those calculations accurate or reliable?

16  **A.**   No.

17  **Q.**   Why not?

18  **A.**   For the various reasons we've been talking about.  The

19  accuracy is affected by the fact that they're based on

20  arbitrary assumptions.  The fact that many of the answers that

21  people were giving, that they were relying upon, were answers

22  to confusing questions.

23    The fact that Dr. Phillips had to interpret what the

24  answers were.  And at least in three or four instances, we know

25  for a fact he interpreted them in a rather odd way.

**PROCEEDINGS**

1    The fact that there is reason to believe that the

2    estimates about how frequently things occurred and how long

3    they lasted were overstated.  When we could measure it, it was

4    overstated by 60 percent, each one.

5    The fact that the group of people that he's extrapolating

6    from seemed to be overly populated by folks who were retired

7    and tended to recall more frequent and longer instances.

8    All of that indicates that it's not likely to be accurate

9    and as far as reliability goes, there is all that stuff we

10   talked about this morning, that even if it were accurate, it

11   wouldn't be reliable on an individual basis because you can

12   look at Dr. Phillips' own calculations of the reliability of

13   his estimates and they had these ranges from a few hundred

14   dollars to, you know, many tens of thousands of dollars.  So

15   for all of those reasons, the individual calculations are

16   unreliable and also the aggregate is unreliable as well.

17   **Q.**   A smaller question, just on one topic.  Did Dr. Phillips

18   make any errors when he was calculating time owed for weighing

19   or adjusting a trailer?

20   **A.**   Yes.

21   **Q.**   What were those errors?

22   **A.**   Well, the weighing and adjusting in particular -- what

23   this refers to is when drivers depart from a vendor, have to go

24   to an independent weigh station and they find out when they're

25   at the independent weigh station that there is something major

1  wrong about their load, either it's overweight or it's

2  distributed in the truck in such a way that is not easily fixed

3  and the driver then has to go back to the vendor to get the

4  trailer reloaded.  I mean, that's what the adjustments may

5  entail.

6      And the deponents were talking about what I just said,

7  they said they were at the depositions, when they wrote down

8  adjustments, the examples that they were using, what they were

9  basing their answers on included cases where they had to do

10  that.

11      The problem is those are instances where we know we are

12  not talking about uncompensated time.  Wal-Mart's policy

13  when --

14          MR. SALTZMAN:  Object.  Lack of foundation,

15  Your Honor.  Calls for speculation.

16          THE COURT:  Wal-Mart's policy?  What is his foundation

17  for that?

18  BY MR. EDELMAN:

19  Q.  How are you familiar with Wal-Mart's policy?

20  A.  The deponents who were talking about this talked about

21  their being compensated for it and they explained why during

22  their deposition testimony.

23  Q.  So limit your explanation based on the deponent's

24  testimony.

25  A.  Sure.

**PROCEEDINGS**

1   **Q.**   Since you don't work at Wal-Mart.

2   **A.**   Sure.  The people that talked about these adjustments

3   testified that when that happened in the specific instance that

4   they gave, the example they gave in the deposition, they were

5   compensated with mileage pay when they drove back to the -- to

6   the vendor and they were compensated by the hour for all the

7   time that they were waiting at the vendor for the reloading to

8   occur.  So all of the time that was being used and thrown into

9   these averages for those sorts of examples, was time that was

10   compensated either by mileage or by the hour.

11   **Q.**   Okay.  I want to switch gears now and talk about what they

12   called their penalty analysis that was testified to by

13   Mr. Garcia.

14   **A.**   Yes.

15   **Q.**   Do you recall his testimony.

16   **A.**   I do.

17   **Q.**   All right.  Now, again, to set the stage, can you briefly

18   explain what a penalty -- what was the penalty analysis that

19   Mr. Garcia attempted to provide?

20   **A.**   According to Mr. Garcia's testimony, he understood that

21   there was a one-hundred penalty that would be applied for every

22   paycheck per person -- I'm sorry.  The first paycheck per

23   person, which included a period of time for which someone

24   earned less than minimum wage.

25       So if someone had a paycheck covering a pay period and

1    sometime during that pay period there was a period of time

2    during which they earned less than minimum wage, the first time

3    that happened, according to Mr. Garcia, he assumed that there

4    was a one-hundred dollar penalty due, assuming that Wal-Mart

5    was intentional in having not paid that minimum wage for that

6    time.

7    **Q.**   Let me just stop you there.

8        So one of the assumptions in Mr. Garcia's analysis was he

9    just assumed liability on Wal-Mart's part and that the conduct

10   was whatever -- whatever conduct that issue was, was

11   intentional?

12   **A.**   Yes.

13   **Q.**   All right.  So with that assumption, what did he then do?

14   **A.**   And then he assumed that if it happened again, each

15   subsequent paycheck, there is a 250-dollar penalty per paycheck

16   per person.  And so then thirdly, he assumed that every

17   paycheck that class members got over the class period included

18   these violations.

19       So he went through all of the paychecks and he assumed --

20   we did it by calendar.  He didn't actually look at paychecks,

21   but every period where they should have gotten a paycheck, and

22   for the first one per person, he added $100.  For the second

23   one per person, there's 250.  250 for the third and thereafter,

24   and he added up all those penalties.

25   **Q.**   Was that a reliable approach?

**PROCEEDINGS**

1    **A.**   No.

2            **MR. SALTZMAN:**   Objection, Your Honor, calls for a

3    legal conclusion.   Lacks foundation.

4            **THE COURT:**   Are you asking statistically?

5            **MR. EDELMAN:**   Yes.

6            **MR. SALTZMAN:**   He is asking just did he multiply,

7    that's okay.

8            **THE COURT:**   I don't understand that, but I'm

9    overruling your objection and you can answer the question.

10   BY MR. EDELMAN:

11   **Q.**   Why was the statistical or mathematical approach that he

12   utilized unreliable?

13   **A.**   Because it wasn't based on any evidence that any

14   particular paycheck or any number of paychecks or any paychecks

15   at all actually covered a period of time during which the

16   person who was receiving the paycheck wasn't receiving minimum

17   wage.   It was just based on an assumption that each and every

18   such paycheck had that.

19   **Q.**   So are there there any other reasons that the calculation

20   of the unpayment penalty was flawed?

21   **A.**   Yes.

22   **Q.**   What else?

23   **A.**   Ultimately, if -- if it's determined that the first one

24   was not intentional, the calculations are of no more use

25   because that was built in.   So in that way, they are also

**PROCEEDINGS**

1    flawed.

2    **Q.**   Okay.  In conclusion, Dr. Walker, are Dr. Phillips' damage

3    calculations a reasonable and reliable estimate of the value of

4    time that was spent on the tasks?

5           **MR. SALTZMAN:**  Objection, Your Honor.  Asked and

6    answered.

7           **THE COURT:**  Overruled.

8      You may answer.

9           **THE WITNESS:**  No, they are not.

10    **BY MR. EDELMAN:**

11    **Q.**  And in conclusion, Dr. Walker, are Mr. Garcia's penalty

12    calculations a reasonable and reliable estimate of potential

13    penalties in this case?

14    **A.**  No, they are not.

15           **MR. EDELMAN:**  Excuse me one moment, Your Honor.

16      (Defense counsel confer off the record.)

17           **MR. EDELMAN:**  No further questions, thank you, sir.

18           **THE COURT:**  Mr. Saltzman, would you like to start

19    right this minute or would you rather have our afternoon

20    recess.

21           **MR. SALTZMAN:**  We may as well have the afternoon

22    break, Your Honor.

23           **THE COURT:**  The court reporter might agree with you on

24    that.

25      Ladies and gentleman, if you would be ready to come back,

WALKER - CROSS / SALTZMAN

1    please, at 20 minutes after 2:00.  In the meantime, don't speak

2    with each other or anyone else about this case.  Don't make up

3    your minds.  You have not heard all the evidence yet.

4         (Proceedings were heard out of presence of the jury:)

5                   (Recess taken at 2:04 p.m.)

6              (Proceedings resumed at 2:20 p.m.)

7         (Proceedings were heard out of presence of the jury:)

8              **THE CLERK:**  Remain seated.  Please come to order.

9              **THE COURT:**  Are you ready?

10             **MR. SALTZMAN:**  Yes, Your Honor.

11             **THE COURT:**  Okay.

12        (Proceedings were heard in the presence of the jury:)

13             **THE COURT:**  All right.  Mr. Saltzman, you may proceed.

14   You are still under oath from before, sir.

15             **THE WITNESS:**  Yes, thank you.

16                     **CROSS-EXAMINATION**

17   BY MR. SALTZMAN:

18   Q.   Good afternoon, Dr. Walker.

19   A.   Good afternoon.

20   Q.   How do you do?

21   A.   I think you say "how do you do" back.  How do you do?

22   Q.   Okay.  Good.

23        So we met before at your deposition; right?

24   A.   Yes.

25   Q.   Okay.  So I'm going to be asking you some questions for a

1   while now, and we'll go over some of the areas you've covered.

2       Now, to begin with, I want to go back through the history

3   of the data that was involved in this case.

4       You said you reviewed Dr. Phillips' deposition testimony;

5   is that correct?

6   **A.**   Yes, I did.

7   **Q.**   And his trial testimony?

8   **A.**   Yes, I did.

9   **Q.**   So you're aware from all of that, that it took some time

10  until plaintiffs were able to get custody of and the review of

11  the electronic data, payroll dispatch data you referred to;

12  correct?

13  **A.**   It was sometime after he was retained that it was provided

14  to him, yes.

15  **Q.**   And by the time he was able to get that data to analyze,

16  do you understand that he had already prepared and they had

17  already done the survey and were commencing depositions;

18  correct?

19  **A.**   I --

20  **Q.**   The questionnaire?

21  **A.**   -- think so.  But I don't remember the exact timing of

22  everything, but that may be true, yes.

23  **Q.**   So absent -- if there had never been any data produced

24  here, there would have had to be some way to figure out how to

25  get reasonable estimates, correct, without having any data

1   whatsoever?

2   **A.**   If -- if there were no data, then I presume you would have

3   tried to do something else, yes.

4   **Q.**   Okay.  And one of those things might be a questionnaire

5   and some follow-up depositions; correct?

6   **A.**   You may have tried to do that, yes.

7   **Q.**   Okay.  And, in fact, that happened prior to the time that

8   Dr. Phillips was able to obtain the electronic data and payroll

9   information we've talked about; correct?

10  **A.**   As I said, I don't really remember all the timing of

11  everything.  It may -- it may be.  I don't dispute that.

12  **Q.**   Okay.  And it was also before Dr. Phillips was able to

13  obtain the Gasboy data; correct?  Which came in basically

14  really this summer; right?

15  **A.**   The depositions did commence prior to our receiving the

16  Gasboy data, yes.

17  **Q.**   Okay.  And also before Dr. Phillips was able to obtain the

18  DOT inspection reports that you referred to; correct?

19  **A.**   Yes.  The depositions, the 39 depositions commenced prior

20  to our receiving the CHP data.  I don't know exactly when he

21  got his data or what he said, but certainly before we got it.

22  **Q.**   Okay.  And you have testified that the survey, the

23  questionnaire, actually, as you called it -- it's been called a

24  questionnaire -- you've testified that the questionnaire was

25  confusing; correct?

**WALKER - CROSS / SALTZMAN**

1    **A.**    That -- yeah.  That it confused several of the deponents.

2    They said they were confused, yes.

3    **Q.**    And do you agree that one of the ways in which it was

4    confusing to the recipients of the survey or the

5    questionnaire -- one of the ways it was confusing was that it

6    referred to 10 usual trips; right?

7    **A.**    That was one of the ways that they said they were

8    confused, yes.

9    **Q.**    Okay.  What do you understand a usual trip to be?

10   **A.**    I don't understand there is such a thing as a usual trip.

11   **Q.**    Okay.  That might have been one of the problems with the

12   document; right?

13   **A.**    Yes.

14   **Q.**    Okay.  Now, you did talk about one of the documents that

15   you were shown.  It was called figure 9 and it was page No. 8.

16         Counsel, do you have a clean copy?  I have written on

17   mine.

18              **MR. EDELMAN:**  Which slide number is it?

19              **MR. SALTZMAN:**  Slide number Figure 8 -- Figure 9, Page

20   8 of your presentation.

21              **THE COURT:**  I have it if you want it.

22              **MR. SALTZMAN:**  Let's go to the ELMO.  I'm fine with

23   that.  Thank you so much, Your Honor.

24   **Q.**    And you talked about in terms of the -- the top quartile

25   and the bottom quartile of the people that had the

**WALKER - CROSS / SALTZMAN**

1   questionnaire referring to Line 12 B, the usual length of

2   meetings at end of the trip -- and I'll point to that here for

3   the jury, it would be right here, the 4.63, and to the right,

4   9.67.

5       Do you see those two numbers?

6   **A.**   I do.

7   **Q.**   So the 4.63 relates to those drivers who you said had the

8   longest trips; right?

9   **A.**   I think so.  I mean, I don't -- if you showed the top, I

10  could tell you.  But I think the longest was first.

11  **Q.**   And the second quartile was the one to the right was those

12  who had the shorter drives; right?

13  **A.**   Yes.

14  **Q.**   Okay.  So when -- and we're talking here about the usual

15  length of meeting at the end of a trip.

16      Sir, if someone has multiple trips per day or multiple

17  delivers in lieu of, let's say, one longer trip with one

18  delivery, would you agree that that person with multiple trips

19  will have more paperwork to turn in at the end of the day

20  because they had multiple stops and delivers?

21  **A.**   That might be the case.  I don't know.  I thought that

22  they turned -- that they often turned in paperwork at the end

23  of each trip.  But it could be that that is something that

24  happens and that's, you know, another reason why you shouldn't

25  be aggregating everyone altogether as one.  That could be one

**WALKER - CROSS / SALTZMAN**

1   explanation for this difference.

2   **Q.**   So we have people -- so people that have multiple drops

3   will have more time with the coordinator and people with the

4   single drop perhaps or a single triple will have less time with

5   the coordinator; correct?

6   **A.**   I don't know --

7   **Q.**   Make sense?

8   **A.**   -- that.  I said that that is a -- if it's the case, that

9   people collect all of their trip information at the end of

10  their trips and don't actually turn it in at the end of trips

11  but have rather collected all, it's possible that they might

12  have more paperwork to turn in to their coordinator at the end

13  of the day than people on longer trips.  That's a potential

14  explanation for what we see here.

15  **Q.**   Okay.  And then at the end of the day, when we average

16  those together, if we have literally just the two numbers you

17  have here, and you had 4.63 and 9.67, so the average is about 7

18  and a quarter, correct, if we took the midpoint of those two?

19  **A.**   Let's see.  4.63, 9.67 so it's 13, 14, 7 and a quarter,

20  that's about right, yes.

21  **Q.**   If we had 10 drivers in this class, it was a 10-person

22  case instead of 800, and we had five short -- had more short

23  halls and five that had longer halls, they would average seven

24  and a quarter hours -- seven and a quarter minutes for those

25  duties, correct, just averaging them together?

**A.**   Well, no.  It would depend on who these 10 people are.  As I said, this is what people answered in their questionnaires. If those people that you are talking about in this hypothetical are 10 people who answered the same way as the people that answered this questionnaire, there is still the question in terms of are they remembering correctly.

**Q.**   Okay.  Let's deal with that -- let's move on to are they remembering correctly.

You gave examples on memory issues.  You gave one example. There were -- people were asked how many hours they worked a year ago.  Do you recall that?

**A.**   Yes.

**Q.**   And when they compared later to records, people were -- had errors in recalling how many hours they worked a year ago.

In this case, sir, do you agree with me that these drivers on the tasks that are involved here, these are tasks that they do literally every day of their driving work life?

**A.**   Some of them are tasks that occur every day.

**Q.**   Let's go through them.

**A.**   I don't know whether they are all -- in fact, I don't think that they are all tasks that occur every day, no.

**Q.**   Let's go through them.  The pre-trip and post-trip inspections, you understand that those are done -- the pre-trip is before they begin driving for the day, the first inspection before they begin to drive for the day?

**WALKER - CROSS / SALTZMAN**

1   **A.**   Yes.

2   **Q.**   That has to be done every day; correct?

3   **A.**   Yes.

4   **Q.**   And a post-trip is done at every day at the end -- when

5   they finish driving at the end of their shift; correct?

6   **A.**   They are supposed to, yes.

7   **Q.**   By law, do you understand that you have to fill out a form

8   called a DVIR, a Driver Vehicle Inspection Report when they

9   complete a post-trip inspection?

10  **A.**   I don't remember.  I may have read about that, but I don't

11  recall off the top of my head.

12  **Q.**   Are you aware that they have to turn in that DVIR form to

13  their coordinator at the end of each day's shift or at the end

14  of the week when they return, if they have them?  They have to

15  give them for every single day they drive?

16      Do you know that?

17  **A.**   I don't recall that.  It may be that it was mentioned in

18  the transcripts that I read, but I don't recall.  But I don't

19  doubt what you're saying -- I don't doubt that it's true.

20  **Q.**   Okay.  So that's something they do each and every day?

21  Agreed?  The post-trip inspection?

22  **A.**   The post-trip inspection they're supposed to do at the end

23  of each driving day, yes.

24  **Q.**   Okay.  And the layovers we've talked about, when a driver

25  is on the road, a layover is if they are on the road, they do a

WALKER - CROSS / SALTZMAN

1  layover every day; correct?  Every evening?

2  **A.**  Yeah.  If they're on the road and they have to stop, they

3  do a layover, yes.

4  **Q.**  Okay.  And fueling, that would be one of those events

5  that's not every day.  It's two or three times a week; correct?

6  **A.**  I don't know how often fueling occurs for everybody, so

7  I'm not sure.

8  **Q.**  Amongst the transcripts that you read from the trial

9  testimony here this week, did you read the drivers' testimony

10  of those who have testified before the jury here in the last

11  two and three weeks?

12  **A.**  Yes.  I mean that's the issue.  That --

13  **Q.**  No.  The question is:  Did you read them?

14  **A.**  Yes, I did.

15  **Q.**  Okay.  Thank you.

16      And did you see any drivers who testified to not fueling

17  at least every week?

18  **A.**  I don't recall.  I don't recall one way or the other.

19  **Q.**  Did you see any drivers testifying to not fueling twice a

20  week?

21  **A.**  Again, I just don't recall specifically what drivers said

22  at trial about how often those drivers refueled on average.

23  **Q.**  And you criticized Dr. Phillips for using the

24  questionnaire -- the question statements regarding frequency of

25  fueling; correct?

1   **A.**   Could you repeat that?

2   **Q.**   Did you criticize earlier, in response to your examination

3   by Mr. Edelman, Dr. Phillips for having relied upon the

4   questionnaire answers regarding frequency of fueling?

5   **A.**   He didn't rely on the questionnaire answers.

6        Dr. Phillips relied upon what he called his hybrid data,

7   which is a combination of questionnaire responses and his

8   interpretations of depositions.  And I just don't remember

9   specifically about fueling, whether they were deposition

10  responses included in the hybrid data or whether it was all --

11  I'm sorry, questionnaire responses included in the hybrid data

12  or whether it was all deposition.

13  **Q.**   In your review of the transcript of Dr. Phillips'

14  testimony last week, did you notice where he testified that he

15  utilized the Gasboy data for determining the frequency of

16  fueling?

17  **A.**   Yes.

18  **Q.**   And that was the only data he utilized for the frequency

19  of fueling?  Did you notice that?

20  **A.**   In the numbers that he gave to the trial, yes, I did.

21  **Q.**   Okay.  So let's go down the list here while we are going

22  through this of what issues or what claims the plaintiffs are

23  making that Dr. Phillips in fact utilized that survey that you

24  found confusing, some of the drivers found confusing and I

25  think we can all agree, it was somewhat confusing.  Let's see

**WALKER - CROSS / SALTZMAN**

1   where he used it.

2        Do you believe that Dr. Phillips utilized the survey --

3   the questionnaires that were given out to the drivers before

4   their depositions in determining any data regarding -- any

5   claims regarding layovers?

6   **A.**   No.

7   **Q.**   For the layovers, he utilized only the hard data, the

8   electronic data, produced by Wal-Mart in electronic form for

9   its payroll and dispatch records; correct?

10  **A.**   Well, no.  He also used assumptions about, you know, how

11  many much time was spent in the trucks.

12  **Q.**   Let me be more specific.  In terms of the number of

13  layovers for which claims -- data and loss estimates were

14  provided, did you utilize only the hard data, the electronic

15  data?

16  **A.**   Yes.

17  **Q.**   Okay.  So the questionnaire had no influence on the

18  layover loss estimate regarding frequency of it occurring;

19  correct?

20  **A.**   That's correct.

21  **Q.**   And with regard to the rest break claims that the

22  plaintiffs are making for not being paid for their rest breaks,

23  did the frequency of rest breaks occurring come solely from the

24  hard data, the electronic data, that Dr. Phillips was provided

25  by Wal-Mart?

**WALKER - CROSS / SALTZMAN**

1   A.   Yes, it did.

2   Q.   And with regard to the pre-and post-trip inspections, do

3   you agree that the frequency of pre- and post-trip inspections

4   occurring was determined by Dr. Phillips based solely upon the

5   hard data from the electronic payroll information provided to

6   him?

7   A.   And some, what I think, are reasonable assumptions, yes.

8   Q.   And we talked briefly already about the fueling and the

9   use of the Gasboy.  I can't -- I know I asked you this, I'm not

10  sure whether you agreed.

11       But you did see that Dr. Phillips testified that he relied

12  upon the Gasboy data only for determining the frequency of

13  fueling at Wal-Mart DCs for all of the drivers; correct?

14  A.   Hum --

15  Q.   With extrapolation back for the years that didn't exist?

16  A.   Yes.  Once you throw in the extrapolations, the numbers

17  that he presented at trial were exclusively based upon Gasboy

18  in terms of frequency, yes, for fuelings at Wal-Mart

19  distribution centers.

20  Q.   And with regard to washing of the trucks, in your review

21  of the various pay manuals -- and I take you did review

22  Wal-Mart's pay manuals; correct?

23  A.   I did, yes.

24  Q.   In your review of those pay manuals, did you notice that

25  the driver pay manuals instruct the drivers to wash their

**WALKER - CROSS / SALTZMAN**

1  tractor at least once per week?

2  **A.**   I saw that.  I don't remember whether that was in all of

3  the pay manuals.  I did see it in at least one pay manual, yes.

4  **Q.**   With regard to the time spent weighing the tractors, first

5  of all, going back over the ones we've just talked about, for

6  any of the ones we've just talked about, did you see

7  Dr. Phillips in his testimony relying upon any of the

8  questionnaire answers that were given by the drivers prior to

9  their depositions being taken?  That would be the pre-trip, the

10  post-trip, the washing, the fueling, and the rest breaks.

11  **A.**   Your question is did he rely on the questionnaire

12  responses for anything?

13  **Q.**   Yes.  For any of those in terms of frequency occurring.

14  **A.**   In terms of frequency only or in terms of his loss?  I

15  thought the first question was loss.  Is it frequency only or

16  what's the question?

17  **Q.**   Okay.  Start with frequency.

18  **A.**   I think not.  I think that the -- those were just

19  assumptions about what everybody does.

20  **Q.**   Okay.  And the loss estimates attributed to those claims,

21  did he rely upon the surveys in any manner in making his

22  determination that were testified to last week?

23  **A.**   Yeah.  My recollection -- I don't -- I mean, sir, there

24  are a number of estimates and they're all confused in my mind

25  of things that he did and the ones he actually testified to.

**WALKER - CROSS / SALTZMAN**

1        I think that the Gasboy -- the duration, the length of

2    time that each refueling took was based upon the extrapolations

3    from the hybrid data which would have included both -- might

4    have included both survey responses and deposition testimony.

5    But I don't remember the specifics of what he ultimately

6    testified to at trial as opposed to other analyses that he did,

7    but I think that that's the case.

8    **Q.**   When you refer to hybrid data, is that in your mind what

9    you are saying is essentially the depositions and then the --

10   beginning with the questionnaire and then estimates given for

11   duration that came about and were talked about in the

12   depositions as well?

13   **A.**   Yes.

14   **Q.**   And do you recall Dr. Phillips testifying that where they

15   had a number in the depositions, which were -- you understand

16   those were cross-examination depositions with counsel from both

17   sides present?

18   **A.**   Yes.  Both sides were present.

19   **Q.**   And both sides got a chance to question all of the

20   witnesses under oath in front of a court reporter, as you said,

21   just like here except in a conference room.

22   **A.**   Yes.

23   **Q.**   So each side had a chance to question the witnesses.

24   Those were the depositions you're talking about; right?

25   **A.**   Yes.

WALKER - CROSS / SALTZMAN

Q.   And in those depositions, many of the people, not all of them, I agree, but many of the people were asked for duration on many of these tasks; correct?

A.   Yes.

Q.   And did you notice in the testimony given by Dr. Phillips, that whenever there was a number given in the depositions, which were the cross-examinations, he relied upon or his -- his instruction was to rely upon the deposition as the most credible number given that there was cross-examination by both sides?

A.   If you leave out the "given" part, yeah, I remember.  I don't know whether he said "given."  But I know that he said -- I saw the instructions, that they were to rely on the deposition testimony to the extent there was a conflict between the deposition testimony and the questionnaires.

Q.   Okay.  Now, what about for the driver coordinator meetings, beginning of the day and the end of the day, did you see in the testimony given by Dr. Phillips that he relied upon the deposition estimates for the frequency and duration of those occurring?

A.   Well, the hybrid data.  My recollection was that he relied upon the hybrid data that we're talking about, the averages, to extrapolate from the 39 to the 800.

Q.   And, again, to the extent there were numbers in both the deposition and in the questionnaire, he relied upon the

1    deposition which was the subject of cross-examination by

2    counsel for both sides; correct?

3    **A.**   Well, those were the instructions.   The instructions were

4    not followed in every case.   I don't know that I would say that

5    that's the case.

6    **Q.**   You gave us a few examples where perhaps the instructions

7    were not followed.   Is it your testimony that there are others

8    that you just haven't brought to our attention?

9    **A.**   My recollection is that there were others, yes, but I

10   didn't create a comprehensive list.

11   **Q.**   Okay.   So the ones you know of are the ones you testified

12   to?

13   **A.**   The ones I specifically cited and included in my report to

14   illustrate the phenomenon are the ones that I can testify

15   about, yes.

16   **Q.**   And the CHP, Department of Transportation inspections, for

17   that, Dr. Phillips also relied upon the hard data which are the

18   reports that were produced by Wal-Mart after the original

19   reports were all generated if this case; correct?

20   **A.**   He relied upon the CHP data, yes.

21   **Q.**   That was data that was provided by Wal-Mart through

22   pretrial discovery, but provided after the original reports

23   were created; correct?

24   **A.**   I don't know when everything was turned over to you.   I

25   know I got it after I -- I got it after the reports were done.

**WALKER - CROSS / SALTZMAN**

1    **Q.**   I think you can assume we didn't get it any sooner.

2        Do you have any reason to believe that plaintiffs got that

3    before you did?

4    **A.**   I don't know.

5    **Q.**   Okay.

6        Now, you had some criticism or some comments on the

7    accuracy of the testimony that was given earlier before the

8    data was provided and relied upon from the CHP.  I want to talk

9    about that briefly.

10       This is page 22 of the defendant's presentation.  And I

11   don't -- let's see.  Hopefully everybody can see it a little

12   bit.

13       On the left-hand side is what you testified was

14   information generated by the DOT/CHP reports; correct?

15   **A.**   Yes.

16   **Q.**   On the right-hand side was trial testimony given by the

17   same people literally in the last two weeks here in court;

18   correct?

19   **A.**   Yes.

20   **Q.**   Now, in the CHP reports, which you have shorter durations

21   on for most of the instances, do you know whether the CHP is

22   measuring time spent by a driver waiting to eventually get to

23   the CHP officer who is going to do the inspection?

24   **A.**   No.  I don't -- I don't know that there's not some wait

25   time to add to this.

**WALKER - CROSS / SALTZMAN**

1    **Q.**   And, in fact, you would agree with me that the officer --

2    we've all dealt with officers in one way or another at some

3    point in our lives -- they would not have been measuring the

4    time that someone was waiting to talk to them correct?

5    **A.**   I don't know.  I mean, you'd have to ask the officers.

6         I know that these are the data that Dr. Phillips relied

7    upon.  These measurements from DOT/CHP, that this is

8    purportedly measuring what he said is relevant and so I used

9    that.  That's what Dr. Phillips used and so I looked to see

10   whether Dr. Phillips data matched up with what people said.

11        But I wasn't there.  I don't know, you know, what the CHP

12   officers said or did.

13   **Q.**   You would agree that there is not much reason to assume

14   that an officer would have been counting the time when someone

15   was waiting, parked in their truck, to move up to eventually

16   become inspected; correct?  That wouldn't be logical?

17             **MR. EDELMAN:**  Objection.  Calls for speculation.

18             **THE COURT:**  Overruled.

19        You can answer.

20             **THE WITNESS:**  I don't know.  I don't know that there

21   was any wait time.  I don't know that a CHP officer who is

22   writing down the time is basing it upon the moment where he

23   waved someone over or whether it starts sometime later.  I

24   don't know.

25        All I know is that these are the data Dr. Phillips relied

**WALKER - CROSS / SALTZMAN**

1    upon and we can compare what the data say to what the deponents

2    actually said when they were at trial.

3    **BY MR. SALTZMAN:**

4    **Q.**   So, in fact, Dr. Phillips relied upon not the larger

5    estimates that were given at trial, but the more conservative

6    smaller estimates, statements of time written down by officers

7    on an inspection report; correct?

8    **A.**   I don't know that I could say they are more conservative.

9    They are the objective data that we have and those are the ones

10   that Dr. Phillips relied upon for this purpose.

11   **Q.**   So he didn't rely upon memory in any manner for this.   He

12   went by hard data that was produced by Wal-Mart that Wal-Mart

13   got from the CHP?

14   **A.**   For purposes of this calculation, yes, he did.

15   **Q.**   Okay.   Now, with regard to wait time, you mentioned that

16   Dr. Phillips calculated a 45 minute per week wait time for each

17   driver for their potential loss in this case; correct?   That's

18   what you understood him to do?

19   **A.**   I do not understand that he calculated a wait time.   He

20   assumed that every driver had 45 minutes of wait time per week

21   and he conducted calculations that were based on that

22   assumption, yes.

23   **Q.**   Okay.   And, again, you reviewed his transcript from last

24   week?

25   **A.**   I did.

1    **Q.**   You didn't see him actually testifying that he didn't have

2    an estimate, but gave a 45 minute value for that -- if it was

3    45 minutes, this is what it would be worth?

4    **A.**   I don't know that I would have paid any attention to a

5    distinction like that.  He might have said something like that.

6    But he presented numbers that were based upon the assumption

7    that there was 45 minutes of wait per week.

8    **Q.**   In fact, he presented a number that was a little over two

9    millions dollars for that based upon 45 minutes being the

10   number, but in fact testified he was not offering a number.

11   You don't recall that?

12   **A.**   I -- to me, it's -- he gave a number that is two million,

13   but he wasn't testifying it was two million.  He gave the

14   number and that number was based upon 45 minutes.

15   **Q.**   Okay.  And he did not rely upon the questionnaire for that

16   45 minutes; correct, since he said he was not giving a number.

17   He was giving a value for that?  So, again, the survey did not

18   come into play -- the questionnaire did not come into play in

19   any way; correct?

20   **A.**   Yeah.  That's right.  That was based just upon an

21   assumption that it's 45 minutes, without regard to the

22   questionnaire or the deposition testimony or anything anybody

23   had said about what they really did.

24   **Q.**   So you spent approximately two and a half hours of

25   examination this morning and early this afternoon basically

1   attacking the questionnaire, yet in going through everything we

2   just went through, it essentially wasn't used at the end of the

3   day by Dr. Phillips.  You agree?

4   **A.**   No.  We spent a lot of time this morning talking about the

5   differences in experiences about -- among all the class

6   members.  And there were lots of data that tended to go towards

7   that.

8        And one of the uses for the questionnaire is to show that

9   basically people thought that they had a wide disparity of

10  experiences.  And whether or not Dr. Phillips used it, this was

11  evidence that people's circumstances and what they do varied on

12  a day-to-day.  I think we spent a lot of time this morning

13  talking about that.

14       And that implied that you would end up with grossly

15  inaccurate estimates of people's losses if you took any fixed

16  number, whether it was the average that you got from surveys or

17  from hybrid data or whether it's just an arbitrary number, like

18  45 minutes or 15 minutes or something else.  And you would get

19  wildly unreliable estimates if you were to use that to estimate

20  damages for the class once you looked at these things on an

21  individual basis.

22       We also spent a lot of time talking about how unreliable

23  memory is generally, and whether or not Dr. Phillips relied on

24  it for every one of his damages estimates, he was relying on it

25  for many of them.

1          So we talked about a variety of things this morning.  We

2     talked about how trips aren't typical and usual.  We talked

3     about --

4     **Q.**   Sir.

5     **A.**   -- Dr. Phillips' own estimates about how reliable or

6     unreliable his estimates were.

7          So, no, I did not spend all this morning or two and a half

8     hours talking exclusively about a questionnaire.  I talked

9     about arbitrary assumptions; I talked about the fact that the

10    group of people that he relied upon was not statistically

11    reliable; I talked about, again, typical is not normal.  So

12    there were a lot of things that we talked about.

13    **Q.**   Let me ask you about this:  Memory about frequency of

14    duration is unreliable.

15    **A.**   Yes.

16    **Q.**   So drivers do a pre-trip every single day; right?

17    **A.**   They're supposed to.  I don't know whether they do.  I

18    imagine most do every single day.  Just based on people and

19    large numbers, I imagine that some people don't do it some

20    days.  But generally speaking, they're supposed to and my guess

21    is that they do.

22    **Q.**   And they do a post-trip or they are supposed to do a

23    post-trip every single day and fill out the DVIR form?

24    **A.**   Well, again, I don't recall the DVIR form.  I have no

25    reason to doubt you about that.

**Q.**   So with regards to that task, most of these drivers have

been very experienced.  The jury has heard from 10 or more,

maybe 12 have come in.  They are all pretty experienced

drivers; right?

**A.**   It's my understanding, yes, that the Wal-Mart drivers are

particularly experienced.

**Q.**   They have come into court and they were brought into

depositions and they testified about events that they have done

literally every day, specifically the pre- and post-, for 5,

10, 15, 20 years of their lives, five days a week.

Can you tell me, do you believe, sir, that that type of

event is subject to the recall problem that your example

mentioned earlier about asking people how many hours work they

did a year ago?  Do you see any correlation between asking

someone what -- how many hours they worked a year ago and

asking them how long it takes or how frequently they do

something that they do every single day of their work life?

**A.**   Well, yeah.  I mean, the -- the research that I was

talking about, the -- what about a year ago, that was one

example.  That was one example of lots of different types of

research into this area.

Some of it talks about, you know, how frequently do you

take medications that are really important to you and that

you're taking all the time.

And in this case regarding pre-trips, as you said, the

WALKER - CROSS / SALTZMAN

1   pre-trip was based on an arbitrary assumption.  That was the

2   second type of --

3   Q.   What's the arbitrary assumption?  Remind me, please.

4   A.   Every pre-trip took 15 minutes per person every shift.  So

5   Dr. Phillips' assumption is now regarding pre-trips in

6   particular and post-trips in particular was based on an

7   arbitrary assumption that each pre-trip and each post-trip took

8   15 minutes for each person all the time.  That assumption was

9   inconsistent with what all of these people said was their

10  typical -- not everybody.  Some people said 15, but it was

11  inconsistent with what many people said about how much time

12  they actually spent on pre-trips.

13  Q.   Sir, did you look at the deposition averages of the people

14  with regard to the duration of pre-trip inspections and the

15  conclusion Dr. Phillips offered at least from the depositions

16  that it was 14.5 minutes, so it was a half minute shorter than

17  what he ultimately used which was the 15, did you see that?

18  A.   I saw his testimony on that, yes.

19  Q.   So you did see -- you said it was an arbitrary assumption

20  except the depositions yielded a number of 14.5 minutes.  You

21  saw that, right?

22  A.   I saw that the hybrid data had an average of something

23  like 14 minutes, but he didn't use 14 minutes.  He used the 15

24  minutes.

25  Q.   Did you read the testimony of the various drivers who

**WALKER - CROSS / SALTZMAN**

1    testified here in court over the last two and a half weeks --

2    did you review their testimony for the average duration of a

3    pre-trip inspection?

4    **A.**    Again, I've read lots of trial testimony and transcripts

5    from different deponents about the amount of time that they

6    spent on pre-trips, and I don't have it all segregated in my

7    mind who testified at a deposition and who testified at trial.

8    But people testified to lots of different numbers, which you

9    show which I can see when I actually plot it out on graphs and

10   they were not all consistently 15 minutes.  And that was why

11   the 15 minutes is an arbitrary assumption.

12   **Q.**   You wouldn't expect everybody to testify to the exact same

13   number, would you?  That would be -- that would be pretty much

14   impossible; correct?

15   **A.**   If it's the --

16   **Q.**   For everybody to come in and say exactly the same number?

17   **A.**   If it were the case that it were a rote activity -- I

18   mean, that's the point.  It's not a rote activity.  Different

19   people spend different amounts of time on these different

20   tasks, and I don't know whether -- on average.  At least based

21   on what they say.

22       I don't know that it's even a consistent time on pre-trips

23   of across a given person.  I don't know that it doesn't vary

24   based upon the nature of the trip that they just ended or the

25   nature of the trip that they are going to go on or how much

1    sleep they got last night.  But what I do know is that people

2    didn't say that they were all 15 minutes.

3    **Q.**   I agree with you.  We found agreement.

4    **A.**   Some people said it was much longer; some people said it

5    was much shorter.

6         And the 15-minute number that Dr. Phillips relied upon, it

7    wasn't based on the hybrid data.  As he said, it just so

8    happened that the 15 minutes was close to the average from the

9    hybrid data.

10   **Q.**   So 14 and a half wasn't close enough to 15, plus all the

11   testimony of the drivers that were here, but you don't have

12   their numbers in your mind; correct?  I guess the jury took its

13   notes and we'll hear what they have to say on that.

14        **MR. EDELMAN:**  Objection, Your Honor.  Argumentive.

15   There is no question there.

16        **THE COURT:**  Yes.  We don't need editorials.

17        **MR. SALTZMAN:**  Thank you.

18   **Q.**   Did you also see that Dr. Phillips, just like he had done

19   with the waiting time, for each of the events that we're

20   talking about like pre-trip and post-trip, in addition to the

21   average -- or to the numbers he had for frequency and duration

22   which led to his loss calculations, did you see that he also

23   gave a per-minute calculation for each of those events?

24   **A.**   Yeah.  That was not in his report.  Some of them were,

25   but, yes, there were per-minute calculations that I had never

1    seen that I've not had a chance to review that were presented

2    at trial and that were not part of his report.  I did see that.

3    I took note of that for that reason.

4    **Q.**   Did you see that he testified that if the average duration

5    he had concluded was not accepted, that it was possible just to

6    take that one-minute number and multiply it by whatever the

7    trier of fact felt was the right number to arrive at a damage

8    total for each of these tasks?

9    **A.**   I wouldn't be surprised if he said that.  I don't know

10   exactly what he said, but he may have.

11   **Q.**   You don't recall?

12   **A.**   I don't recall specifically what he said about the one

13   minute, but if you say that's what he said, I don't have any

14   reason to doubt you.

15   **Q.**   Now, for all of the tasks we're talking about -- I can

16   keep listing them until we get comfortable and we have got them

17   all in our minds.

18        For the pre-trip and post-trip, you agree Wal-Mart has no

19   electronic record or even a hand record that it's produced to

20   the plaintiffs that would track how long those events took;

21   correct?

22   **A.**   Not that I know of.  That's right.

23   **Q.**   Right.  And there is no record of the length of the CHP --

24   well, actually it did.  It did produce these records we've

25   talked about from the CHP; correct?  So for that, we have a

**WALKER - CROSS / SALTZMAN**

1   real record.

2   **A.**   Yes.  There is CHP data.

3   **Q.**   That's what Dr. Phillips relied upon, agreed?

4   **A.**   That there is CHP data that he relied upon and also

5   extrapolated other people, yes.

6   **Q.**   The washing of the trucks, would you agree that Wal-Mart

7   has not produced and, to your knowledge, doesn't have any data

8   that shows how long it took -- how frequently they washed and

9   how long it took to do that task?

10  **A.**   To my knowledge, yes, that's right.

11  **Q.**   Wal-Mart has not produced and you have not seen any data

12  that shows how long it took to fuel and how often they

13  fueled -- well, we don't know how long but we know how often,

14  at least, for the Gasboy, three years; correct?

15  **A.**   For the Gasboy, yes, we know and for others we do not.

16  **Q.**   So for the Gasboy, we know how often for three years which

17  has been extrapolated.  But we do not know the duration.

18  Wal-Mart did not track that; correct?

19  **A.**   As far as I know, Wal-Mart did not track that.

20  **Q.**   And Wal-Mart did not track the duration of the driver

21  coordinator meetings; correct?

22  **A.**   That's as far as I know, correct, yes.

23  **Q.**   Now, Wal-Mart does have in every tractor a -- what's

24  called an onboard computer, right, an OBC?

25  **A.**   Yes.

**WALKER - CROSS / SALTZMAN**

1   **Q.**   Can you tell us what an OBC is to your knowledge?

2   **A.**   Onboard computer.

3   **Q.**   That computer has some codes built into it, right, there

4   are activity codes it has built in?

5   **A.**   Yes.

6   **Q.**   Do you know whether Wal-Mart has ever attempted to add

7   additional codes, for example, like a pre-trip inspection code,

8   so that before the driver did that, he could -- he or she could

9   literally press the button, put in a code, go do the pre-trip

10  and then press a button when it's concluded?

11  **A.**   I don't know.

12  **Q.**   Do you have any reason to believe that that system, the

13  Qualcomm onboard computer system built by Qualcomm computer

14  company, has the ability to add that code into it?

15  **A.**   I don't know one way or the other.

16  **Q.**   What about a post-trip inspection?  Is there any code

17  built into the system so that the drivers could track the time

18  they spend doing a post-trip inspection?

19  **A.**   Not to my knowledge.

20  **Q.**   And what about rest breaks?  Is there a rest break code?

21       Have you done other trucking cases?

22  **A.**   Yes, I have.

23  **Q.**   Are you aware that some companies have codes for rest

24  breaks?

25  **A.**   I'm not aware.

**WALKER - CROSS / SALTZMAN**

1    **Q.**    Okay.  Does Wal-Mart have a code for rest breaks in its

2    onboard computer system?

3    **A.**    Not to my knowledge.

4    **Q.**    Does Wal-Mart have a code in its system for CHP,

5    Department of Transportation inspections?

6    **A.**    Not to my knowledge.

7    **Q.**    Does Wal-Mart have a code in its system for the washing of

8    the tractors?

9    **A.**    You mean a code in the Qualcomm computer?

10   **Q.**    Yes.  In the Qualcomm computer created by Qualcomm

11   computer software company in San Diego.

12   **A.**    Not to my knowledge.

13   **Q.**    Okay.  Does it have a code for when the weighing event is

14   taking place off-site?

15   **A.**    Not to my knowledge.

16   **Q.**    Does it have a code for the fueling?  It has the Gasboy

17   for when they go do it.  Does it have a code for how long that

18   takes?

19   **A.**    Not to my knowledge.

20   **Q.**    And for the driver coordinator meetings, does it have a

21   code for that?

22   **A.**    No, not to my knowledge.

23   **Q.**    Now, for the layovers it has a code; right?

24   **A.**    Yes.

25   **Q.**    So the driver can press a button and go into layover mode

WALKER - CROSS / SALTZMAN

1  and the company knows that; right?

2  A.   Yes.

3  Q.   Now, if Wal-Mart had codes for the events I just talked to

4  you about, we wouldn't be having this discussion about how to

5  calculate the time spent; correct?

6  A.   I doubt it, but, yeah, I don't know.   That's a

7  hypothetical -- based on some hypothetical world, but I doubt

8  it.

9  Q.   We would not be having this discussion; right?

10  A.   Not this exact discussion, no.

11  Q.   I want to show you this chart.   It's Figure No. 12 on page

12  13 of the earlier presentation.   This one deals with the

13  end-of-day meeting per 10 trips; correct?

14  A.   Yes.

15  Q.   And the highlighted section shows a low confidence level

16  of $810 in potential loss and a high of $118,000 in loss;

17  right?

18  A.   Yes.

19  Q.   That's not for one individual driver supposedly?

20  A.   Yes.

21  Q.   Tell me and tell the jury as well, if you could, what that

22  means on the low end, what does that mean for that driver?

23  A.   What do you mean what does it mean?

24  Q.   How was that number arrived at?

25  A.   Through this Monte Carlo analysis.

**WALKER - CROSS / SALTZMAN**

1   **Q.**   Which you're familiar with; right?

2   **A.**   I'm familiar with Monte Carlo analysis, yes.

3   **Q.**   Do you use it?

4   **A.**   Not very much, no.

5   **Q.**   So tell me how that number is arrived at for an individual

6   driver.

7   **A.**   How Dr. Phillips arrived at that number?

8   **Q.**   How the Monte Carlo system arrived at that number.

9   **A.**   Well, the way that Dr. Phillips arrived at that number was

10  through resampling.  And so he had a number of -- he had a

11  certain sample from his hybrid data regarding end-of-trip

12  meetings and he had, as I recall, samples both for the number

13  of meetings per 10 trips and then he had people who had

14  answered how long those trips take, and so to determine for

15  this person how long were his end-of-day meetings, he sampled

16  from his 39 people or however many people answered the

17  question.  He reached into the urn, he pulled out a number for

18  how many trips per week there are.  And then he wrote that

19  number down or the computer actually did.  He repeated that

20  process a thousand times to get an estimate and then that gave

21  him a thousand different estimates.

22       He actually simultaneously had reached into the urn to

23  determine for each one of the trips how long does it take?  So

24  he has got a length of time and a number of instances and he

25  repeated this a thousand times to get a thousand different

1    estimates of the amount of time spent on these meetings.  And

2    then he attached a dollar value to them, so he had a thousand

3    different estimates about what damages are.

4         And then he took the -- the 5 in terms of the 5 of the

5    smallest.  That was the lower limit for the confidence range.

6    He took the 5 that were the highest.  That was the upper limit

7    for the confidence interval.  And that's the interval for his

8    damages for this particular category of damage.

9    Q.   That's one individual from the, what, 40 or from the 840?

10   A.   This is from the 800.

11   Q.   Okay.  So from the 800 plus.

12        So if the high-end number is $118,000 and that number had

13   been relied upon in ultimate damage calculations, with 840

14   people at $118,000 -- and I can represent to you I did the math

15   a few minutes ago, that would yield $99 million in damages for

16   that one claim.  Do you agree with -- you can follow that math,

17   right, 840 times 118,000?

18   A.   It would have been close to a billion dollars.

19   Q.   I did it wrong then?  A billion dollars?  I have 99

20   million in my math.

21   A.   Maybe you are right.  Maybe I did it wrong in my head.

22   Q.   Do you know what the actual claim was for loss for the

23   entire class of 840 people for that particular end-of-day

24   coordinator meeting?

25   A.   I have not memorized all of Dr. Phillips' calculations,

1    no.

2    **Q.**   I'm putting up before you -- this is a handwritten chart

3    that my co-counsel, Mr. Artenian, wrote up last week when he

4    was questioning Dr. Phillips.  So if you -- you read

5    Dr. Phillips, you would have seen all these numbers being

6    talked about before they got written on the sheet by

7    Mr. Artenian.  Okay.

8        So the driver coordinator end-of-day meetings towards the

9    bottom, and it says $3,875,116, plus for the last -- the

10   earliest year, $438,009.  Together, those numbers total a loss

11   of $4,313,000 and change, agreed?

12   **A.**   Yes.

13   **Q.**   Okay.  So you have criticized or critiqued the system and

14   the formula that would yield a high of 118,000 and a low of

15   $810, but in fact when that system was concluded with its work

16   on the global class-wide level, it produced a number of 4

17   percent of what you have shown as the extraordinary, as you

18   called it earlier, the highest possible.  I think you referred

19   to that earlier in direct exam.  So it didn't yield 118,000

20   times 840.  It yielded $5,134 per all 840 people, if it was

21   applied equally to everybody, agreed?

22   **A.**   Well, there are a lot of numbers that you threw out there

23   that I have not analyzed or paid any attention to before.  I

24   never --

25   **Q.**   I will break it down for you then.  I will do it more

1    slowly.  I'm sorry.  That wasn't fair.

2              MR. EDELMAN:  I would ask that the witness be allowed

3    to complete his answer.

4              THE COURT:  You can complete your answer short.

5              THE WITNESS:  Just that I had never said that the

6    damages were 800,000 times -- whatever the number was times

7    800.  That's not something that I did nor is it something that

8    I said should be done.

9    BY MR. SALTZMAN:

10   Q.   Okay.  But you did highlight that number of 118,000 and

11   talked about it for quite a while this morning.  It's on --

12   that was as to one individual that eventually got fed into the

13   entire system and yielded a global number for the class for

14   that claim of 4,313,000, which is in front of you on the screen

15   right now, the combination of the two subtotals for that claim;

16   correct?

17   A.   Again, that's a pretty long story.  The 800,000 -- I'm

18   sorry, the 118,000, yes, it's a number that has to do with the

19   reliability of an individual's damages estimate.  Yes.  And

20   when you average everything out, you don't just add up all the

21   highs of the damages intervals or add up all the lows.

22        And also the reliability of the group is going to be more

23   than the reliability for any individual because the

24   overstatements by thousands or tens of thousands will be offset

25   by understatements for other people by thousands or tens of

1     thousands.  So I'm not sure what the question actually was

2     other than are those numbers around and the answer is yes.

3     Q.   You actually mention -- that was going to be my next

4     question.  Do you know what the margin of error was for this

5     claim for the class once the Monte Carlo finished its work as

6     opposed to any one individuals with these extraordinary highs

7     and lows that the computer created -- do you know what the

8     margin of error was for the class on that claim?

9     A.   Well, there are two things.

10         What Dr. Phillips calculated from the margin of error, I

11    don't remember, but he calculated it.

12         The actual margin of error is not something that he

13    calculated or could calculate because the actual margin of

14    error has to incorporate all of the other errors besides the

15    errors that are merely due to the fact that people have grossly

16    dissimilar circumstances.  So the actual margin of error has to

17    somehow account for the potential that people are not

18    remembering correctly.  It has to account for all of the other

19    types of errors.  And I don't even know how you would go about

20    calculating a margin of error under those circumstances.

21    Q.   And you are assuming error when you talk about not

22    remembering, for example, how long things take that people do

23    every day of their working lives.  You're assuming there is an

24    error in that as opposed to that number being a reasonable

25    estimate offered by each of the class members?

1    You don't -- is it your testimony that a class member

2    cannot give a reasonable estimate of how much time they take

3    doing a pre-trip inspection?  Is that your ultimate testimony?

4    **A.**   I'm saying that a class member's estimate of the usual

5    amount of time for a post-trip inspection, which wasn't used by

6    Dr. Phillips in the numbers he presented here in any way, he

7    just said 15 minutes, but I'm saying a class member's estimate

8    of the usual amount of time on post-trip or pre-trip

9    inspections over a 12-year period, or for some class members

10   over maybe a year period that was 10 years ago, may or may not

11   be accurate.  I don't know that these pre-trip inspections and

12   post-trip inspections -- that's not something we really

13   got into.

14   **Q.**   I'm sorry --

15   **A.**   It wasn't something that they got into about whether those

16   tended to be the same all the time.  I know they're not the

17   same from person to person.  I don't know whether they're

18   consistently the same for every pre-trip and every post-trip

19   that everybody engages in.

20        And if they do engage in them every day, but they vary, so

21   that they're not all 5 minutes.  Sometimes they're 5; sometimes

22   they're 10; sometimes they're 7; sometimes they're 20.  I'm

23   saying that someone's estimate about what it usually is is

24   likely to be unreliable because all of the studies I have ever

25   read where it's ever been tested, it's proven to be unreliable

1    and it's tended to be overstated.

2    **Q.**   You had a chance to review all of the Wal-Mart payroll

3    dispatch data that they provided to you; correct?

4    **A.**   Yes, I did.

5    **Q.**   In reviewing that data, the electronic payroll data, am I

6    correct that the records you reviewed did not show any separate

7    payments for any of the tasks we're talking about here in terms

8    of payroll being paid to the employee for the time spent doing

9    a pre-trip inspection?  That does not exist in the payroll

10   data; correct?

11   **A.**   There is no separate payment, separate activity code

12   for --

13   **Q.**   Right.

14   **A.**   -- for pre-trip inspection.

15   **Q.**   Am I correct that there is no separate activity code by

16   which a driver could be paid for a post-trip inspection in the

17   payroll data?

18   **A.**   That's right.

19   **Q.**   And am I correct, same question, as to each of the tasks

20   we're talking about, that there is no payroll -- and you've

21   reviewed all the payroll data.  There is no way they can be

22   paid in the system that Wal-Mart has on a separate payment for

23   the time spent doing fueling; correct?

24   **A.**   Well, there is no code in the activity -- I'm sorry, in

25   the payroll data, but they sometimes are paid separately for

**WALKER - CROSS / SALTZMAN**

1    various of these tasks through the T-pay system.

2    **Q.**    Through the T-pay discretion?

3    **A.**    Through the T-pay system, yes.

4    **Q.**    How many instances did you see in the T-pay discretionary

5    system of any employee -- any driver being paid for fueling,

6    pre-trip or post-trip.

7    **A.**    I don't know.  I mean, the entries do not allow you to go

8    and add up what every payment is for.

9    **Q.**    You didn't see the category of other where it describes

10   what the payment is for?

11   **A.**    If I could finish.  Many payments are either miscellaneous

12   or make whole, so you can't tell what they are all for.  I did

13   see some instances for some specific things that are at issue

14   here, but it's not possible to go through and add up all the

15   instances where there was a payment for something at issue here

16   because there are these miscellaneous categories and you don't

17   know what it's for.

18   **Q.**    When we had your deposition two months ago, you had not

19   reviewed the discretion pay -- T-pay at that point to be able

20   to answer that question I just asked you, had you?

21   **A.**    I probably hadn't.

22   **Q.**    Okay.  And so now you knew this was coming and you still

23   looked at it and you cannot tell anybody, from what you did

24   review, how often you saw payments for pre- or post-trip

25   inspections or fueling or washing or inspections or weighing;

1    is that correct?

2    **A.**   Yeah.  I mean, I still have not looked to try to do those

3    things.  I just said you can't -- you can't get an exhaustive

4    list that way because there are entries in the data set that

5    are just miscellaneous or make whole and you can't tell what

6    they actually are.  But, no, I never tried to do that --

7    **Q.**   Fair enough.

8    **A.**   -- either before or after my deposition.

9    **Q.**   Now, with regard to rest breaks.  Let's talk about that

10   for a few minutes.  You talked about earlier some of the rest

11   breaks perhaps occurring when a driver was on an activity code

12   where he or she was being paid; correct?

13   **A.**   Yes.

14   **Q.**   Are you familiar with California law regarding rest

15   breaks, that they are supposed to be off duty, fully relieved

16   of all responsibilities?

17   **A.**   I'm aware of that language, but I'm not a lawyer.  I can't

18   interpret exactly what it means.

19   **Q.**   Well, when a driver is receiving any one of the activity

20   codes that the jury has seen for the last two and a half weeks,

21   they're on duty receiving payment for whatever task is in that

22   activity code; correct?

23   **A.**   That gets into sort of legal analysis about what on duty

24   actually means for purposes of the California Code.

25       I don't know.  I'm not a lawyer.  I don't know whether --

**WALKER - CROSS / SALTZMAN**

1  and I assume you'll make the legal argument, that if you're

2  waiting, that counts as on duty.  I don't know.

3  **Q.**   You're not a lawyer and you can't give that

4  interpretation, but you gave an interpretation of what the

5  class members said in their depositions; correct?

6  **A.**   That's what they said.  They said that they were engaged

7  in these activities while they were on unscheduled time, which

8  is time when they're just getting paid by the minute.  They

9  said that they engaged in these activities when they were doing

10  live unload, which is basically wait time while the truck is

11  being unloaded.  They said that they were engaged in these

12  activities --

13  **Q.**   Do you know whether --

14  **A.**   -- when they were engaged in live load.  That's what they

15  said and that's what I reported.

16  **Q.**   Do you know if any of the drivers whose depositions you

17  read are attorneys?

18  **A.**   I doubt that they're attorneys.

19  **Q.**   Do you know if they are any better qualified to answer

20  this on-duty versus off-duty question than you are sitting here

21  today?

22  **A.**   I -- I don't know one way or the other.

23  **Q.**   And you've been involved in litigation now for 20, 30

24  years?

25  **A.**   Boy, yeah.

**WALKER - CROSS / SALTZMAN**

1   **Q.**   Twenty years at least.  Sorry --

2   **A.**   No.  No.  It's close.  I've been -- I've been involved

3   in -- with the EI for 26 years, and there has been a case at

4   least per year for that time where I have been involved --

5   **Q.**   You have been involved in employment cases; right?

6   **A.**   Yes.

7   **Q.**   You have been involved in meal or rest break cases;

8   correct?

9   **A.**   Yes.

10  **Q.**   So you have at least a working knowledge, a lay person's

11  working knowledge of all the terminology involved in meal and

12  rest breaks; right?

13  **A.**   On this issue about whether -- if you're waiting and

14  you're being paid for waiting, whether that can count as a rest

15  break time, I would have assumed so.

16      I -- when I think about the average -- you know, work and

17  how it happens, I assume that's the case, but it's not come up.

18  As I said, I'm not a lawyer, but it -- I would imagine, you

19  know, if you're being paid and you take a break, that that

20  counts.  But I'm not a lawyer and I didn't -- you know, I don't

21  purport to be.

22  **Q.**   You understand that truck drivers' time is highly

23  regulated during the day in terms of they are allowed to be

24  driving for 11 hours, they are allowed to be off duty -- I mean

25  on duty but not driving for 3 more hours.  They have 14 hours

1    available to them to work and make money; right?

2    **A.**   That's my understanding, yes.

3    **Q.**   When they go on rest breaks, if they are were getting a

4    legal and proper rest break, they would code off duty; correct?

5    **A.**   That's my understanding, yes.

6    **Q.**   So if they're on duty and receiving activity code pay,

7    they cannot at the same time be off duty and getting an

8    off-duty meal break that does not take away time from their

9    workday; correct?

10             **MR. EDELMAN:**   Objection.  Calls for a legal

11   conclusion.

12             **THE WITNESS:**   You also said something about meal

13   breaks.

14             **THE COURT:**   You said meal break.

15             **MR. SALTZMAN:**   I'm sorry to everybody.  It's a little

16   late for me, too.

17   **Q.**   I'm talking about rest breaks only.  So if a driver

18   goes -- if they are going to get the most time they're entitled

19   to under the law, they obviously don't want to be using 20

20   minutes a day of on duty rest break time; correct?  That

21   wouldn't make sense?

22   **A.**   I don't really fully understand.  I mean, it is true that

23   some of the drivers said that one of the reasons they didn't

24   take breaks was specifically because they wanted to maximize

25   their driving time.  Yes, that's true.

1    **Q.**   Okay.  So I guess my last question on this issue for you

2    is, since you don't feel comfortable answering the legal

3    interpretation questions of on duty versus off duty for rest

4    breaks, do you think it was appropriate for you to be relying

5    upon the drivers' answers in their depositions since they also

6    obviously are not lawyers and they don't have your experience

7    in this field?

8    **A.**   I think it was perfectly appropriate.  I think that

9    it's -- there are a lot of factual determinations that are left

10   to the jury and a lot of legal things that you all are going to

11   argue, and I think that as a factual matter, it is relevant

12   that people took breaks when they were getting paid for these

13   other things.  And it's not for me ultimately to decide whether

14   that counts as on duty or off duty.  I'm not giving that

15   opinion.  But I think it's highly relevant that a majority, a

16   clear majority of the people that were asked said that they

17   took rest breaks while they were getting compensated for

18   something else because the time was just wait time.  When

19   there -- when they actually had no other obligations, nothing

20   they actually had to do, so they took those opportunities to

21   take breaks.

22        I think it's a relevant factual issue.  I think it's

23   perfectly appropriate for me to bring it up and it's perfectly

24   appropriate for me to explain, as I did, that what Dr. Phillips

25   did was he assumed affirmatively that that was not paid rest,

1    and that his analysis was based upon the affirmative assumption

2    that the time that people spent in rest breaks, as they

3    understood them, and when they were getting paid, didn't count.

4    His analysis is based on the affirmative assumption that that's

5    wrong.

6         I don't know for a fact, as a matter of law, that it's

7    not, but I'm thinking that that is a factual issue that it's

8    perfectly appropriate for me --

9    Q.   In reading --

10   A.   -- to bring to people's attention.

11   Q.   In reading over his transcript of his testimony last week,

12   did you see that he said that he was asked by counsel to assume

13   that they were not paid rest breaks, which is an issue in this

14   case, so he was not asked to make any legal arguments in that

15   regard?  Did you see that?

16   A.   I saw that he said that he was asked to assume 20 minutes

17   of unpaid rest for everyone.  I don't --

18   Q.   So you're not criticizing --

19   A.   I don't specifically recall what you just said, no.

20   Q.   You are not criticizing Dr. Phillips.  You are just

21   acknowledging that that was an assumption that he was asked to

22   make?

23   A.   Yes.  And his calculations were based upon the assumption

24   that there were 20 minutes of unpaid rest every day and that

25   there was no paid rest any day.

WALKER - CROSS / SALTZMAN

1    **Q.**    You reviewed the activity codes that Wal-Mart has

2    published during the life of this case; right?

3    **A.**    Yes.

4    **Q.**    In reviewing the written activity codes that you saw in

5    their manuals, did you see any activity code which included in

6    writing the act of doing a pre-trip inspection under another

7    activity code?

8    **A.**    No, I did not see that.

9    **Q.**    Did you see any activity code that included -- I'm going

10   to read now the whole list of them so we can keep moving.

11       Did you see any written activity code that -- published by

12   Wal-Mart and enforced with its workers, that said that it

13   included under any activity code a post-trip inspection for

14   washing, the fueling, the weighing, driver coordinator

15   meetings, roadside inspections, or rest breaks?

16   **A.**    My recollection was that there was some discussion

17   explicitly about weighing.  That a depart was, under certain

18   circumstances, as I recall, supposed to include actually

19   weighing off-site, if necessary, before the depart actually

20   happened.  So weighing I think so, but the others, no.

21   **Q.**    Okay.  I won't debate the weighing with you.  We will have

22   to look at that sometime other.

23       You talked about the subpoena process and bringing drivers

24   into the deposition process; correct?

25   **A.**    Yes.

**WALKER - CROSS / SALTZMAN**

1    **Q.**   Okay.  And I'm going to try and summarize the numbers for

2    you.  I think we went over this at your deposition.  You

3    understand there were about 104 people originally selected of

4    whom the first 40 would have been the random sample if they

5    were all produced; right?

6    **A.**   Yes.

7    **Q.**   And no one would expect the first 40 to actually appear;

8    correct?  That's not reasonable; right?

9    **A.**   I'm not surprised that they weren't.

10   **Q.**   Right.  That's pretty normal?

11   **A.**   I don't know whether it was reasonable, but it's not

12   unreasonable that it wasn't the first 40.

13   **Q.**   In fact, I think we can leave aside the six people who

14   were deceased.  They obviously weren't going to appear;

15   correct?

16   **A.**   It depends on what you are leaving them aside for.  If you

17   are leaving them aside because you are saying that they

18   couldn't have contributed to nonresponse bias, then you're

19   wrong because there are different likelihoods of dying based

20   upon age.  So drivers who left in 2004, 2005, 2006 are more

21   likely to be drivers who had died.  And if there are

22   differences in experiences between drivers early in the class

23   period versus late, then the fact that some drivers died could

24   actually affect the reliability of the number.

25   **Q.**   So the unfortunate passing of six of the drivers, in your

1   mind, has a realistic input, you believe, or impact on how the

2   sample or how the questionnaire and the depositions eventually

3   came out?  Is that what you are telling us?

4   **A.**   I'm saying that it effects potentially whether or not the

5   ultimate sample is statistically reliable, yes.

6   **Q.**   And then about 50 people, there was no ability to serve

7   process on them; correct?  Is that what you understand?

8   **A.**   Well, it's my understanding that there were 50 that the

9   process server went to, yes, and went to three times and didn't

10  reach.

11  **Q.**   Went three times; correct?  They were instructed to go

12  three times; right?

13  **A.**   That's what people testified about, yes.

14  **Q.**   And many of these people are still active drivers;

15  correct?

16  **A.**   Yes.

17  **Q.**   Whether they are working for Wal-Mart or somebody else,

18  they are active drivers; right?

19  **A.**   I assume so, yes.

20  **Q.**   You know from this file, that --

21  **A.**   Wal-Mart drivers.  I don't know about other companies, but

22  yes.

23  **Q.**   You know from this file, that these drivers are off and on

24  the road for several days at a time; right?

25  **A.**   That's my understanding, yes.

1   **Q.**   It would be no surprise that people wouldn't be there to

2   be served with a subpoena to appear at a deposition; correct?

3   **A.**   You're asking me whether I was surprised?

4   **Q.**   I assume you weren't surprised by that?

5   **A.**   I was surprised, because these are not people that are

6   unrelated to the case.  These are your sort of putative

7   clients.  This is not like when you're trying to reach people

8   that are totally unrelated to you.  I was surprised that you

9   couldn't reach 50 people out of a hundred.  Given that there

10   was --

11   **Q.**   You do understand --

12          **MR. EDELMAN:**  Excuse me, Your Honor.  He needs to be

13   allowed to finish.

14          **THE COURT:**  You can finish but keep it short.

15   **BY MR. SALTZMAN:**

16   **Q.**   You are talking more than I am here today.

17   **A.**   As far as I knew, there was no reason why you could not

18   have called these people up.  Under those circumstances, I

19   don't -- I was surprised.  I don't know why you needed to rely

20   upon a subpoena process for people that you are representing as

21   legal counsel.  So, yes, I was surprised.

22   **Q.**   So did you see in any of Dr. Phillips' reports or his

23   testimony, that in fact we clearly avoided contacting people so

24   we wouldn't taint that process and therefore left it to an

25   independent process server to be the first contact?  We made no

**WALKER - CROSS / SALTZMAN**

1   attempt to contact these people and taint the pool.  You didn't

2   see any of that in Dr. Phillips' reports?

3   **A.**   I didn't see it, and it doesn't make any sense given that

4   you had sent them letters already.

5   **Q.**   Okay.  In this case, sir, given the instructions that we

6   were not going to contact these people other than through a

7   process server, assuming that case, assuming that scenario,

8   which is how it went down, do you understand -- does it affect

9   your response as to whether you were surprised that 50 people,

10  who are full-time drivers mostly, could not be found in the

11  short time we had to try and get this process done?  No impact?

12  **A.**   You're asking am I not surprised given that if I assumed

13  that you hadn't ever contacted them, by the fact that you

14  couldn't contact them?  I mean, I don't know how to answer that

15  question.

16  **Q.**   Fair enough.  Okay.

17          **THE COURT:**  Mr. Saltzman, how much longer do you think

18  you have?

19          **MR. SALTZMAN:**  Probably another 15 or 20 minutes.

20          **THE COURT:**  Well, it's 3:30.

21          **MR. SALTZMAN:**  I can finish it first thing in the

22  morning.

23          **THE COURT:**  I think that's what we will do.

24      Ladies and gentleman, we will take our afternoon recess at

25  this time.  If you would be back, please, at 8:30 tomorrow.

WALKER - CROSS / SALTZMAN

1           The last I spoke with the lawyers, which has not been

2    recently but it was this morning, we were expecting we would

3    finish tomorrow so that's still my expectation.

4           Have a good evening.  Don't talk to each other or anyone

5    else about this case.  Don't make up your minds.  You haven't

6    heard all the evidence yet.

7                   (Proceedings adjourned at 3:30 p.m.)

**WALKER - CROSS / SALTZMAN**

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, November 16, 2016

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25